FILED

2011 Aug-01  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | **COMPLAINT** |
| **STATE OF ALABAMA & GOVERNOR** ) | |
| **ROBERT J. BENTLEY,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

Plaintiff, the United States of America, by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.  In this action, the United States seeks to declare invalid and preliminarily and permanently enjoin the enforcement of various provisions of House Bill 56, as amended and enacted by the State of Alabama, because those provisions[1] are preempted by federal law and therefore violate the Supremacy Clause of the United States Constitution.

_____

[1]  For brevity's sake, this Complaint will use the term, "H.B. 56," to refer to the challenged provisions of the law except where the context provides otherwise.

2.   In our constitutional system, the federal government has preeminent authority to regulate immigration matters.  This authority derives from the United States Constitution and numerous acts of Congress.  The nation's immigration laws reflect a careful and considered balance of national law enforcement, foreign relations, and humanitarian interests.  Congress has assigned to the United States Department of Homeland Security, Department of Justice, and Department of State, along with other federal agencies, the task of enforcing and administering these immigration-related laws.  In administering these laws, the federal agencies balance the complex — and often competing — objectives that animate federal immigration law and policy.  Although a state may exercise its police power in a manner that has an incidental or indirect effect on aliens, it may *not* establish its own immigration policy or enforce state laws in a manner that interferes with the federal immigration laws.  The Constitution and federal immigration laws do not permit the development of a patchwork of state and local immigration policies throughout the country.

3.   Despite the preeminent federal authority and responsibility over immigration, the State of Alabama recently enacted H.B. 56, a sweeping set of provisions that are designed to address numerous aspects of immigration regulation and enforcement.  According to Alabama State Representative and bill co-sponsor

Mickey Hammon, the purpose of the law is "to prevent illegal immigrants from coming to Alabama and to prevent those who are here from putting down roots." Julia Preston, *In Alabama, a Harsh Bill for Residents Here Illegally*, New York Times, June 3, 2011.[2]  Representative Hammon stated that he believed that H.B. 56 would make unlawfully present aliens' lives "difficult and they will deport themselves."  *Id.*  H.B. 56's provisions, working in concert and separately, seek to punish unlawful entry and presence by requiring, whenever practicable, the determination of immigration status during any lawful stop by the police where there is "reasonable suspicion" that an individual is unlawfully present, and by establishing new state punitive and criminal sanctions against unlawfully present aliens.  The mandate to enforce H.B. 56 to the fullest extent possible is reinforced by a provision allowing for any legal resident of Alabama to file suit against any state or local authority that "adopt[s] or implement[s] a policy or practice that limits or restricts the enforcement of this act to less than the full extent permitted by this act."  Ala. H.B. 56 § 6(d).  Any such authority held liable would face civil penalties of between $1,000 and $5,000 "for each day that the practice or policy has remained in effect after the filing of an action" for under-enforcement.  Persons working for state or local authorities have an affirmative duty to report violations of H.B. 56 where the person has "reasonable cause to believe" that H.B. 56 is

---

[2] *Available at*: http://www.nytimes.com/2011/06/04/us/04immig.html

being violated.  A failure to report a violation is a criminal offense.  Ala. H.B. 56
§ 6(f).

4.   By emphasizing one goal — maximum enforcement — H.B 56 ignores
the many other objectives that Congress has established for the federal immigration
system.  This failure to abide by the set of interests animating federal immigration
law provides sufficient reason that H.B. 56 is preempted.  But just as importantly,
even where Alabama appears to pursue *one* of the goals of the federal system, it
does so to the detriment of other federal immigration priorities, thereby disrupting
federal immigration enforcement and burdening resources that focus on aliens who
pose a threat to national security or public safety.

5.   If allowed to go into effect, H.B. 56's enforcement scheme will conflict
with and undermine the federal government's careful balance of immigration
enforcement priorities and objectives.  For example, it will impose significant and
counterproductive burdens on the federal agencies charged with enforcing the
national immigration scheme, diverting resources and attention from aliens who
pose a threat to public safety or national security that the federal government
targets as its top enforcement priority.  The scheme will cause the detention and
harassment of authorized visitors, immigrants, and citizens who do not have or
carry identification documents specified by the statute, or who otherwise will be

swept into the ambit of H.B. 56's enforcement-at-all-costs approach. It will conflict with longstanding federal law governing the registration and employment of aliens. It will also conflict with the administration and enforcement of U.S. education laws. And it will undermine federal law and invade federal authority by imposing punitive sanctions for conduct that falls outside of the state's police powers and that Congress affirmatively decided should not be subject to such sanctions.

6. The United States understands the State of Alabama's legitimate concerns about illegal immigration, and has undertaken significant efforts to secure our nation's borders and to address the problems created by unlawfully present aliens within our nation's borders. The federal government, moreover, welcomes cooperative efforts by states and localities to aid in the enforcement of the nation's immigration laws. But the United States Constitution forbids Alabama from supplanting the federal government's immigration regime with its own state-specific immigration policy — a policy that, in purpose and effect, interferes with the numerous interests the federal government must balance when enforcing and administering the immigration laws and disrupts the balance already established by the federal government. Accordingly, the provisions set forth below are invalid

under the Supremacy Clause of the United States Constitution and must be struck down.

## JURISDICTION AND VENUE

7.    This action arises under the Constitution of the United States, Article VI, Clause 2 and Article I, Section 8, and federal immigration laws including, but not limited to, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

8.    Venue lies in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b).  Defendants are the Governor of Alabama and the State of Alabama, both of whom are deemed to reside in the Northern District of Alabama for purposes of venue.  A substantial part of the events or omissions giving rise to this lawsuit occurred or will occur in the Northern District of Alabama.

## PARTIES

9.    The United States of America is the plaintiff in this action, suing on its own behalf, as well as on behalf of the United States Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), the Department of State, and the Department of Education.

10.    DHS is an executive department of the United States.  *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  DHS is responsible for the administration and enforcement of laws relating to immigration, as well as the investigation of immigration crimes and protection of the United States' borders against the illegal entry of aliens.  *See* 8 U.S.C. § 1103.  DHS is also responsible for providing citizenship and immigration services.

11.    DOJ is an executive department of the United States.  *See* Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870).  The Attorney General, as the head of DOJ, shares certain immigration-related responsibilities with the Secretary of Homeland Security, and he may, among his various immigration functions, order aliens removed from the United States and order the cancellation of removal.  *See, e.g.*, 8 U.S.C. §§ 1103, 1158, 1182, 1227, 1229a, 1229b.

12.    The Department of State is an executive department of the United States.  *See* State Department Basic Authorities Act of 1956, Pub. L. No. 84-885, as amended; 22 U.S.C. § 2651 *et seq*.  The Department of State is partially responsible for administering aspects of the federal immigration laws, including but not limited to the administration of visas.

13.    The Department of Education is an executive department of the United States.  *See* Department of Education Organization Act, 20 U.S.C. § 3401 *et seq.* The Department of Education administers elementary and secondary education programs that provide financial assistance to States, school districts and others, including but not limited to programs serving students who may be from immigrant backgrounds and are English learners.

14.    Defendant, the State of Alabama, is a state of the United States that entered the Union as the 22nd State in 1819.

15.    Defendant, Governor Robert J. Bentley, is the Governor of Alabama, and is being sued in his official capacity.

## STATEMENT OF THE CLAIM

### Federal Authority and Law Governing Immigration and Status of Aliens

16.    The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

17.    The Constitution affords the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const., art. I § 8, cl. 3.  Further,

the federal government has broad authority to establish the terms and conditions for entry and continued presence in the United States, and to regulate the status of aliens within the boundaries of the United States.

18.    The Constitution affords the President of the United States the authority to "take Care that the Laws be faithfully executed."  U.S. Const., art. II § 3.  Further, the President has broad authority over foreign affairs.  Immigration law, policy, and enforcement priorities are affected by and have impacts on U.S. foreign policy, and are themselves the subject of diplomatic arrangements.

19.    Congress has exercised its authority to make laws governing immigration and the status of aliens within the United States by enacting the various provisions of the INA and other laws regulating immigration.  Through the INA, Congress set forth the framework by which the federal government determines which aliens may be eligible to enter and reside in the United States, which aliens may be removed from the United States, the consequences for unlawful presence, the penalties on persons who violate the procedures established for entry, conditions of residence, and employment of aliens, as well as the process by which certain aliens may ultimately become naturalized citizens of the United States.  *See* 8 U.S.C. § 1101 *et seq.*  The INA also vests the executive branch with considerable discretion in enforcing the provisions of the federal immigration laws,

generally allowing federal agencies to ultimately decide whether particular immigration remedies are appropriate in individual cases.

20.    In exercising its significant enforcement discretion, the federal government prioritizes for arrest, detention, prosecution, and removal those aliens who pose a danger to national security, a risk to public safety, or threaten border security.  Consistent with these enforcement priorities, the federal government focuses its enforcement resources on aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; aliens subject to outstanding criminal warrants; and aliens who are repeat re-entrants or fugitives from immigration courts, especially those with criminal records.

21.    In crafting federal immigration law and policy, Congress has necessarily taken into account multiple and often competing national interests. Assuring effective enforcement of the provisions against illegal immigration and unlawful presence is a highly important interest, but it is not the only goal of the federal immigration laws.  The laws also take into account other uniquely national interests, including facilitating trade and commerce; welcoming those foreign nationals who visit or immigrate lawfully and ensuring their fair and equitable treatment wherever they may reside; responding to humanitarian concerns at the

global and individual levels; and otherwise ensuring that the treatment of aliens present in our nation does not harm our foreign relations with the countries from which they come or jeopardize the treatment of U.S. citizens abroad.  Because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal citations omitted), Congress vested substantial discretion in the President and the responsible federal agencies to adjust the balance of these multiple interests as appropriate — both globally and in individual cases.

22.     Congress has tasked the Executive Branch with overseeing significant portions of the United States' immigration interests, and has provided each with specific powers to promote the various goals of the federal immigration scheme and to enforce the federal immigration authority under the INA.  *See* 8 U.S.C. § 1103.  The Department of State is also empowered by the INA to administer aspects of the federal immigration laws, including visa programs.  *See, e.g.*, 8 U.S.C. § 1104.  DHS may generally order an alien immediately removed where the alien either fails to present the appropriate documentation or commits fraud at the time of the alien's inspection for admission into the country.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).  DHS may also place an alien into removal proceedings, and

may ultimately remove an alien who entered the United States unlawfully or violated the conditions of his admission.  *See* 8 U.S.C. §§ 1182, 1225, 1227, 1228(b), 1229, 1229a, 1231.  DOJ may order an alien removed for many reasons, including if the alien has stayed in the United States longer than permitted or has engaged in certain unlawful conduct.  *See* 8 U.S.C. §§ 1227, 1229a.  In addition to removal, the statute authorizes DHS and DOJ to employ civil and criminal sanctions against an alien for immigration violations, such as unlawful entry, failing to appropriately register with the federal government, and document fraud. *See, e.g.,* 8 U.S.C. §§ 1325, 1306, 1324c.  However, in the exercise of discretion, the administering agencies may decide not to apply a specific sanction and may, among other steps, permit the alien to depart the country voluntarily at his or her own expense, and may even decide not to pursue removal of the alien if deferred federal enforcement will help pursue some other goal of the immigration system. *See* 8 U.S.C. § 1229c.

23.    Under federal law, both DHS and DOJ may, for humanitarian or other reasons, decline to exercise certain immigration sanctions or grant an otherwise unlawfully present or removable alien an immigration benefit — and potentially adjust that alien's immigration status — if the alien meets certain conditions.  *See, e.g.*, 8 U.S.C. § 1158 (providing asylum eligibility for aliens who have a well-

founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, if removed); 8 U.S.C. § 1254a (providing temporary protected status for otherwise eligible nationals of a foreign state that the Secretary of Homeland Security has specially designated as undergoing ongoing armed conflict, a natural disaster, or another extraordinary circumstance); 8 U.S.C. § 1227(a)(1)(E)(iii) (providing discretion to waive ground of deportability "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest" for aliens who are otherwise deportable for encouraging unlawful entry of an immediate family member); 8 U.S.C. § 1229b (granting the Attorney General discretion to cancel removal for certain aliens). DHS also has the authority to permit aliens, including those who would be inadmissible, to temporarily enter the United States for "urgent humanitarian reasons" or "significant public benefit."  8 U.S.C. § 1182(d)(5).  DHS may also refrain from enforcement actions, in appropriate circumstances, against persons unlawfully present in the United States.  *See* 8 C.F.R. § 274a.12(c)(14) (discussing deferred action).

24.    In light of these statutory provisions, DHS and DOJ exercise discretion with respect to, among other things, whether to allow an unlawfully present alien to voluntarily depart, whether to place an alien into removal

proceedings, whether to exact criminal sanctions on an alien who has committed an immigration violation, whether to allow an unlawfully present alien to remain in the country without physical detention during the removal process and whether to grant an alien humanitarian or some other form of relief.  Decisions to forego removal or criminal penalties result not only from resource constraints, but also from affirmative policy considerations — including humanitarian and foreign policy interests — established by Congress and balanced by the executive branch.

25.    Congress, which holds exclusive authority for establishing alien status categories and the consequences thereof and setting the conditions of aliens' entry and continued presence, has affirmatively decided that unlawful presence — standing alone — should not subject an alien to criminal penalties, incarceration, or other punitive measures, although unlawful presence may subject the alien to the civil remedy of removal.  *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)&(C). However, unlawful presence becomes an element of a criminal offense when an alien is found in the United States after having been previously removed or after voluntarily departing from the United States.  *See* 8 U.S.C. § 1326.  Further, unlawful entry into the United States is a criminal offense.  *See* 8 U.S.C. § 1325. Congress specifically authorized federal immigration officers to patrol the United States border, as well as search vehicles and lands near the border, to prevent

aliens from unlawfully entering the United States, and it empowered these officers to arrest an alien who is seen attempting unlawful entry at the border or whom the officer has reason to believe has unlawfully entered the country and is likely to escape before a warrant can be obtained.  *See* 8 U.S.C. § 1357.

26.    Congress has created a comprehensive alien registration system for monitoring the entry and movement of aliens within the United States.  *See* 8 U.S.C. §§ 1201, 1301-1306; *see also* 8 C.F.R. Part 264 (regulations regarding "Registration and Fingerprinting of Aliens in the United States").   Under this federal alien registration system, aliens seeking to enter the United States, either permanently or temporarily (other than diplomatic and official visitors), must be registered by the Department of State at the time of visa application.  *See* 8 U.S.C. §§ 1201(b), 1301, 1302.   Any alien who is 14 years or older, who has not otherwise been registered and fingerprinted under the INA, and who remains in the United States for 30 days or longer, must apply to be registered and fingerprinted by DHS.  *See* 8 U.S.C. § 1302(a).  The INA provides that any alien who is required to apply for registration and willfully fails to do so may be fined and imprisoned not more than six months.  *See* 8 U.S.C. § 1306(a); 18 U.S.C. § 3571.  Aliens are required to report any change of address to DHS within ten days of such change. *See* 8 U.S.C. § 1305.

27.     As part of this federal alien registration system, Congress further specified the content of the registration forms, *see* 8 U.S.C. § 1304, what special circumstances may require deviation, *see* 8 U.S.C. § 1303, and the confidential nature of registration information, *see* 8 U.S.C. § 1304.  Aliens who are 18 years and older are required to carry in their possession their certificate of alien registration or alien registration receipt card.  *See* 8 U.S.C. § 1304(e).  The INA provides that any alien who fails to comply with this requirement may be fined and imprisoned not more than 30 days.  *See id.*; 18 U.S.C. § 3571.

28.     However, there are several circumstances in which an alien would not be provided with evidence of registration notwithstanding the federal government's knowledge of the alien's presence.  Federal law provides a variety of humanitarian options for aliens — including unlawfully present aliens — who have been victimized or fear persecution or violence, including but not limited to asylum, special visas for victims of trafficking, and special visas for victims of violent crime.  In order to qualify for such programs an alien needs to apply and satisfy the criteria that the program at issue requires.  During the pendency of the application process, an alien may not have evidence of registration even though the federal government is aware of the alien's presence, has decided against removing the alien, and has no interest in prosecuting the alien for a crime.  These humanitarian

programs demonstrate that one aspect of federal immigration policy is to assist and welcome such victims in the United States, notwithstanding possible temporary unlawful presence.  It would therefore violate federal policy to prosecute or detain these types of aliens on the basis of their immigration status — which is often known to the federal government and, for affirmative policy reasons, not used as the basis for a removal proceeding or criminal prosecution.

29.    Congress has further exercised its authority over the entry and movement of aliens by criminalizing the smuggling of unlawful aliens into the country, as well as the facilitation of unlawful immigration within the nation's borders.  *See* 8 U.S.C. § 1324.  Specifically, federal law prohibits the knowing attempt to bring an alien into the United States "at a place other than a designated port of entry or place other than as designated by the [Secretary of Homeland Security]," 8 U.S.C. § 1324(a)(1)(A)(i), and imposes criminal penalties on a person who, "knowing or in reckless disregard" of the fact that an alien has unlawfully entered or remained in the United States, attempts to "transport or move" the alien within the United States "in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii).  These criminal sanctions are directed at the smuggler and are not meant to serve as a criminal sanction for the unlawfully present alien or for incidental transportation.  Congress chose not to penalize an unlawfully present

17

alien's mere movement within the country or across state lines unless other factors are present, nor do the federal immigration laws penalize the provision of transportation services in such situations.

30.   Federal law also imposes criminal penalties on a person who "conceals, harbors, or shields from detection" an alien in "knowing or in reckless disregard" of the fact that the alien has unlawfully entered or remained in the United States.  8 U.S.C. § 1324(a)(1)(A)(iii).  Similarly, it is unlawful to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that" such entry or residence will be in violation of the law.  8 U.S.C. § 1324(a)(1)(A)(iv).  Federal law does not, as a general matter, restrict the movement of aliens — whether lawfully or unlawfully present — between different states.  Federal law additionally exempts from certain of these prohibitions religious organizations which "encourage, invite, call, allow, or enable" an alien to volunteer as a minister or missionary, and which provide the alien with basic living expenses. 8 U.S.C. § 1324(a)(1)(C).    Congress    has further exercised its authority over immigration and the status of aliens by regulating the hiring of aliens not authorized to work in the United States.  8 U.S.C. § 1324a(a)(1).  Specifically, federal law makes it unlawful "to hire, or to recruit or refer for a fee" an alien, knowing that the alien is not authorized to work

in the United States. *Id.* Federal law also makes it "unlawful for a person or other entity, after hiring an alien for employment," to "continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). In addition, Congress established civil penalties for immigration-related document fraud, such as the presentation of fraudulent documents to demonstrate work eligibility. 8 U.S.C. § 1324c. In enacting penalties on employers of unlawful aliens, as well as on unlawful aliens who engage in document fraud, Congress chose not to impose criminal penalties on aliens solely for seeking or obtaining employment in the United States without authorization and in fact decided that criminal sanctions for seeking or obtaining employment would run counter to the purposes of the immigration system. Although unlawfully present aliens may be subject to removal, no criminal penalty attaches simply because an alien has solicited or performed work without proper authorization.

31. DHS is primarily charged with administering and enforcing the INA and other laws relating to immigration, which it accomplishes mainly through its components, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"). *See* 8 U.S.C. § 1103. DHS also receives state and local cooperation in

its enforcement efforts.  *See, e.g.*, 8 U.S.C. § 1357(g).  In addition, Congress prescribed by statute a number of ways in which states may assist the federal government in its enforcement of the immigration laws.  *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1357(g)(1)–(9) (authorizing DHS to enter into agreements to provide appropriately trained and supervised state and local officers with the authority to perform functions related to the investigation, apprehension, and detention of aliens); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony in the United States).

32.    Through a variety of programs, DHS works cooperatively with states and localities to accomplish its mission to enforce the federal immigration laws. ICE administers the Law Enforcement Support Center ("LESC"), operational 24 hours a day, 7 days a week, which serves as a national enforcement operations center and — among other responsibilities — promptly provides immigration status and identity information to local, state, and federal law enforcement agencies regarding aliens suspected of, arrested for, or convicted of criminal activity.

Further, ICE and CBP officers respond to requests from state and local law enforcement officers on a variety of immigration matters, including assisting with translation, determining alienage, and evaluating immigration documentation.

33.   But the opportunity that federal law provides for cooperation by state and local officials does not mean that states can enact their own immigration policies to rival the national immigration policy; the formulation of immigration policy and balancing of immigration enforcement priorities is a matter reserved for the federal government.   Such regulations do not fall within the state's traditional police powers and remain the exclusive province of the federal government.

## Alabama's H.B. 56

34.   On June 9, 2011, Governor Bentley signed into law H.B. 56, which contains several provisions designed to work together to discourage and deter the entry into and presence of unlawful aliens in Alabama through a comprehensive statute designed to address all aspects of these aliens' lives.   H.B. 56 includes various provisions, for example, that transform state and local police into immigration enforcement officers outside of the federal verification scheme:  in the context of any lawful stop where there is "reasonable suspicion" that the individual is unlawfully present in the United States (Section 12); and in every situation where an alien is driving without a license (Section 18).   These verification

provisions are reinforced through the creation of a private right of action, which subjects state and local authorities to civil penalties of up $5,000 per day if a court concludes that "any official or agency . . . [has] adopt[ed] or implement[ed] a policy" that "limits or restricts the enforcement of federal immigration laws . . . to less than the full extent permitted by federal law."  (Section 6).  H.B. 56 also creates or amends several state law criminal provisions, which impose criminal penalties or other punitive sanctions for unlawful status:  thus, H.B. 56 criminalizes an alien's failure to federally register or carry his federal registration documents – effectively an effort to criminalize unlawful presence (Section 10).  The statute also creates a criminal sanction for those who provide housing to unlawfully present aliens or encourage an unlawfully present alien to come to Alabama (Section 13)  H.B. 56 also criminalizes an unlawfully present alien's attempt to seek work  (Section 11(a)); and subjects employers who employ or retain unlawfully present aliens to civil penalties and private lawsuits (Sections 16 & 17).

35.   H.B. 56 second-guesses federal immigration policies and attempts both to re-order federal priorities in the area of immigration enforcement and to directly regulate immigration and the conditions of an alien's entry into and presence in the United States despite the fact that those subjects are federal domains and do not involve any legitimate state interest.  Alabama's adoption of a

policy focused exclusively on punishing unlawful presence disrupts the national enforcement regime set forth in the INA and reflected in federal immigration enforcement policy and practice, including the federal government's prioritization of enforcement against aliens who pose a threat to public safety or national security.  Thus, because H.B. 56 attempts to set state-specific immigration policy, it legislates in an area constitutionally reserved to the federal government, conflicts with the federal immigration laws and federal immigration policy, and impedes the accomplishment and execution of the full purposes and objectives of Congress, and is therefore preempted.

36.    H.B. 56 implements a novel and comprehensive immigration regime that, among other things, creates a series of state sanctions triggered by an alien's unlawful presence.  The sanctions range from criminalizing mere presence (Section 10), employment (Sections 11, 16, and 17), and housing and transportation (Section 13) of aliens, to chilling an alien's ability to enter into and enforce agreements central to daily life (Sections 27 and 30) or even to go to school (Section 28).  H.B. 56 further expands the opportunities for Alabama police to detain aliens under these various crimes by enforcing an immigration status verification system (Sections 12 and 18), backed up by a private right of action. By pursuing criminal enforcement and ignoring other objectives embodied in the

federal immigration system (including the federal government's prioritization of the removal of dangerous aliens), H.B. 56 conflicts with and otherwise stands as an obstacle to Congress's demand for sufficient flexibility in the enforcement of federal immigration law to accommodate the competing interests of immigration control, national security and public safety, humanitarian concerns, and foreign relations — a balance implemented through the supervision and policies of the President and various executive officers with the discretion to enforce the federal immigration laws.  *See* 8 U.S.C. § 1101 *et seq.*  Enforcement of H.B. 56 would also effectively create state crimes and sanctions for unlawful presence despite the exclusive federal control over the consequences for unlawful presence and Congress's considered judgment to establish civil removal — and not criminalization or other punitive sanction — as the exclusive consequence of unlawful status.  Alabama's punitive scheme would further undermine federal foreign policy, in that the federal government has — as a matter of mutual understandings — established that unlawfully present foreign nationals (who have not committed some other violation of law) should be removed without criminal sanction or other punitive measures and that the same treatment should be afforded to American nationals who are unlawfully present in other countries.  H.B. 56 would thus interfere with federal policy and prerogatives in the enforcement of the

U.S. immigration laws, and with the administration and enforcement of U.S. education laws.

37.    Numerous other states have passed or are contemplating passing legislation similar to H.B. 56.  The development and implementation of various conflicting state immigration enforcement policies would result in further and significant damage to (1) U.S. foreign relations, (2) the United States' ability to fairly and consistently enforce the federal immigration laws and provide immigration-related humanitarian relief, and (3) the United States' ability to exercise the discretion vested in the executive branch under the INA, and would result in the non-uniform treatment of aliens across the United States.

### *Section 10 of H.B. 56*

38.    Section 10 of H.B. 56 makes it a state criminal offense  — to be applied "[i]n addition to any violation of federal law" — for "an alien who is unlawfully present in the United States" to violate 8 U.S.C. § 1304(e), which requires every alien to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him," or 8 U.S.C. § 1306(a), which penalizes the willful failure to apply for registration when required.  Section 10 of H.B. 56 provides a state penalty of up to $100 and up to thirty days imprisonment.

39.     Section 10 of H.B. 56 is preempted by the comprehensive federal alien registration scheme — including 8 U.S.C. §§ 1201, 1301-1306, and 8 C.F.R. Part 264 — which provides a "standard for alien registration in a single integrated and all-embracing system." *Hines v. Davidowitz*, 312 U.S. 52, 73 (1941).  The federal scheme provides an extensive array of civil sanctions for aliens unlawfully present in the United States, and reflects the affirmative choice of Congress not to have states criminalize unlawful presence.  Section 10 of H.B. 56 conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in creating a uniform and singular federal alien registration scheme.

40.     Section 10 — the enforcement of which H.B. 56 effectively mandates through operation of Section 6's maximal enforcement provision — demands the arrest and prosecution of all aliens who do not have certain enumerated registration documents.  H.B. 56 thus seeks to criminalize the presence of aliens, including those whose presence has been accepted by the federal government (at least during the pendency of their status review) and thereby conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in providing certain forms of humanitarian relief.

41.     Additionally, Section 10 of H.B. 56 is tantamount to a regulation of immigration, in that it seeks to control the conditions of an alien's entry into and

presence in the United States without serving any traditional state police interest. Accordingly, Section 10 of H.B. 56 is preempted by the federal government's recognized exclusive authority over the regulation of immigration.

### Section 11(a) of H.B. 56

42.    Alabama H.B. 56 § 11(a) criminalizes any attempt by "an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state."

43.    Alabama's prohibition on unauthorized aliens seeking or performing work is preempted by the comprehensive federal scheme of sanctions related to the employment of unauthorized aliens — including 8 U.S.C. §§ 1324a-1324c.  The text, structure, history, and purpose of this scheme reflect an affirmative decision by Congress to regulate the employment of unlawful aliens by imposing sanctions on the employer without imposing criminal sanctions on the unlawful alien employee.   Alabama's criminal sanction on unauthorized aliens stands as an obstacle to the full purposes and objectives of Congress's considered approach to regulating employment practices concerning unauthorized aliens, and it conflicts with Congress's decision not to criminalize such conduct for humanitarian and other reasons.  Enforcement of this new state crime additionally interferes with the comprehensive system of civil consequences for aliens unlawfully present in the

United States by attaching criminal sanctions on the conditions of unlawful presence, despite an affirmative choice by Congress not to criminalize unlawful presence.

### Sections 12(a) & 18 of H.B. 56

44.     Section 12(a) of H.B. 56 mandates that for any lawful "stop, detention or arrest made by a state, county, or municipal law enforcement official" "in the enforcement of any state or local law or ordinance," including civil ordinances, where reasonable suspicion exists that an individual is an alien and is "unlawfully present" in the United States, the officer must make a reasonable attempt to determine the individual's immigration status when practicable, and to verify it with the federal government pursuant to 8 U.S.C. § 1373(c), unless such verification efforts may hinder or obstruct an investigation.

45.     Section 18 amends Alabama's requirement that motor-vehicle drivers carry their licenses with them.  If a person is arrested for driving without a license, and the law-enforcement officer cannot confirm that the person has a valid driver's license, then the officer must first "transport the person to the nearest or most accessible magistrate."  Ala. H.B. 56 § 18(b).  Next, "[a] reasonable effort shall be made to determine the citizenship of the person and if an alien, whether the alien is lawfully present in the United States by verification with the federal government

pursuant to 8 U.S.C. § 1373(c)."  Ala. H.B. 56 § 18(c).  A verification inquiry must

be made within 48 hours, and if the person is unlawfully present, then he "shall be

considered a flight risk and shall be detained until prosecution or until handed over

to federal immigration authorities."  Ala. H.B. 56 § 18(d).  Section 18 places no

limit on how long a person may be detained if federal authorities' response to the

verification request is delayed.

46.    The mandatory nature of Sections 12 and 18, in combination with

Section 6's full enforcement provision, directs officers to seek maximum scrutiny

of a person's immigration status, which will necessarily result in numerous

inspections and detentions of individuals who are lawfully present in the United

States.

47.    Regarding Section 12, verification is mandated for all cases where an

Alabama police officer has a "reasonable suspicion" that a person in a lawful stop

is unlawfully present and it is practicable to do so.  But a "reasonable suspicion"

will often rely on factors which equally could be exhibited by lawfully present

aliens or United States citizens.  Thus, the Alabama verification scheme will often

result in the verification requirement being applied — wholly unnecessarily — to

lawfully present aliens and United States citizens.  Section 12 of H.B. 56 will

therefore impose burdens on lawful immigrants and U.S. citizens alike who are

stopped, questioned, or detained and cannot readily prove their immigration or citizenship status, including those individuals who may not have an accepted form of identification because, for example, they are legal minors without a driver's license. Alabama's alien inspection scheme therefore will subject lawful aliens to the "possibility of inquisitorial practices and police surveillance," *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941) — a form of treatment which Congress has plainly guarded against in crafting a balanced, federally-directed immigration enforcement scheme.

48.    Section 18 poses the same risk of unwarranted harassment. Section 18 requires law enforcement to verify with DHS the immigration status of every alien who is unable to produce a valid driver's license, regardless of whether the alien has documentation of lawful status. And because Section 18 does not limit the amount of time an alien might be detained pending verification, an alien who cannot produce a valid driver's license will be at risk of extended detention even when, in many cases the initial basis for his stop (such as speeding or having a broken tail light), would not have led to detention at all. Thus, on its face, Section 18 appears to place a burden on lawfully present aliens that is distinct from the burden it places on U.S. citizens engaged in the same conduct. Further, Section 18 requires law enforcement to verify with DHS the immigration status of every alien

simply as a result of the alien's inability to produce a valid driver's license, regardless of whether the alien has documentation of lawful status.

49. Alabama's state alien inspection scheme and attendant federal verification requirements will impermissibly impair and burden the federal resources and activities of DHS. The mandate in Sections 12 and 18 for verification of alien status will necessarily result in a dramatic increase in the number of verification requests being issued to DHS — many of which will result from violations of non-criminal ordinances — and will thereby place a tremendous burden on DHS resources, necessitating a reallocation of DHS resources away from its policy priorities. As such, the federal government will be required to divert resources from its own, carefully considered enforcement primary priorities — aliens who pose a threat to national security and public safety — to address the work that Alabama will now create for it — verification of individuals who are caught driving without a license or jaywalking. Such interference with federal priorities, driven by state-imposed burdens on federal resources, constitutes a violation of the Supremacy Clause. Sections 12 and 18 therefore conflict with and otherwise stand as an obstacle to the full purposes and objectives of Congress, and their enforcement would further conflict with the enforcement prerogatives and

priorities of the federal government.  Moreover, Sections 12 and 18 do not promote any legitimate state interest.

### Section 13 of H.B. 56

50.    Section 13(a)(1) of H.B. 56 criminalizes any act, attempt, or conspiracy to "[c]onceal, harbor, or shield . . . an alien from detection in any place in this state . . . if the person knows or recklessly disregards the fact that the alien has come to, has entered, or remains in the United States in violation of federal law."  It is also a crime to "[e]ncourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such coming to, entering, or residing in the United States is or will be in violation of federal law."  Ala. H.B. 56 §§ 13(a)(2).    Section 13(a)(3) criminalizes the transportation, attempted transportation, or conspiracy to transport "an alien in furtherance of the unlawful presence of the alien in the United States," provided that the person knows or recklessly disregards that the alien is unlawfully present.    Section 13(a)(4) of H.B. 56. makes it a crime  to "[h]arbor an alien unlawfully present in the United States by entering into a rental agreement, as defined by Section 35-9A-141[3] of the Code of Alabama 1975, with an alien to provide accommodations, if the person knows or recklessly disregards the fact that the alien is unlawfully

---

[3] Section 35-9A-141 defines "rental agreement" as any agreement "embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises."

present in the United States."   A violation of Section 13 will generally be a Class A misdemeanor.  Ala. H.B. 56 § 13(b).

51.    Alabama's anti-harboring provisions are preempted by federal law, including 8 U.S.C. § 1324.  Congress has explicitly regulated the smuggling, transportation, harboring, and concealment of aliens via § 1324, but that scheme does not impose, or even contemplate, any conditions restricting unlawfully present aliens' access to housing, much less the extensive restrictions imposed by H.B. 56.  If anything, the INA assumes that an unlawfully present alien will generally have a reliable address.  *See* 8 U.S.C. § 1229(a)(1)(F)(i) (explaining that an alien noticed to appear for a removal proceeding must immediately provide the Attorney General "with a written record of an address . . . at which the alien may be contacted respecting [the] proceeding.").   And, more broadly, the INA contemplates that unlawfully present aliens will be subject to an orderly, civil removal process initiated by the federal government.  This removal process would be undermined by a state law making it a criminal offense to rent housing to these aliens because the law would deny unlawfully present aliens the ability to reside in Alabama.

52.    Alabama's anti-harboring prohibitions constitute a preempted regulation of immigration because they attempt to establish the consequences of

unlawful presence and to criminalize the process of alien entry and residence. Additionally, these provisions will result in special, impermissible burdens for lawfully present aliens, who will predictably be impaired from finding housing due to the strictures of Section 13(a)(4). Section 13(a)(4) thus conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress in creating a comprehensive system of penalties for aliens who are unlawfully present in the United States, which has never included a systematic denial of housing.

53.     Because the purpose of this law is to deter and prevent the movement of certain aliens into Alabama, the law also restricts interstate commerce. Enforcement and operation of Section 13 would therefore conflict and interfere with the federal government's management of interstate commerce, and would thereby violate Article I, Section 8 of the United States Constitution.

### Sections 16 & 17 of H.B. 56

54.     Section 16(a) of Ala. H.B. 56 provides:

No wage, compensation, whether in money or in kind or in services, or remuneration of any kind for the performance of services paid to an unauthorized alien shall be allowed as a deductible business expense for any state income or business tax purposes in this state. This subsection shall apply whether or not an Internal Revenue Service Form 1099 is issued in conjunction with the wages or remuneration.

And Section 16(b) provides:

> Any business entity or employee who knowingly fails to comply with the requirements of this section shall be liable for a penalty equal to 10 times the business expense deduction claimed in violation of subsection (a).   The penalty provided in this subsection shall be payable to the Alabama Department of Revenue.

55.   Section 17(a) provides:

> It shall be a discriminatory practice for a business entity or employer to fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) or discharge an employee working in Alabama who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) while retaining or hiring an employee who the business entity or employer knows, or reasonably should have known, is an unauthorized alien.

And Section 17(b) provides that "[a] violation of subsection (a) may be the basis of a civil action in the state courts of this state."   A prevailing party may recover both compensatory relief and reasonable attorney's fees.

56.   In the Immigration Reform and Control Act of 1986 ("IRCA"), Congress has established a statutory scheme that establishes, among other things, employer-directed sanctions for unauthorized employment.   IRCA states in pertinent part that:

> The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

8 U.S.C. § 1324a(h)(2).

35

57.   By Sections 16 and 17, Alabama seeks to impose sanctions on employers or potential employers of unlawfully present aliens. Because these sanctions do not fall within IRCA's licensing savings clause, they are expressly preempted.

### Sections 27 & 30 of H.B. 56

58.   Subject to certain limited exceptions, Section 27(a) states that:

> No court of this state shall enforce the terms of, or otherwise regard as valid, any contract between a party and an alien unlawfully present in the United States, if the party had direct or constructive knowledge that the alien was unlawfully present in the United States at the time the contract was entered into, and the performance of the contract required the alien to remain unlawfully present in the United States for more than 24 hours after the time the contract was entered into or performance could not reasonably be expected to occur without such remaining.

59.   Section 30 makes it a new felony for an unlawfully present alien, or anyone acting on behalf of an unlawfully present alien, to "enter into or attempt to enter into a business transaction with the state or a political subdivision of the state." Ala. H.B. 56 § 30(b). Section 30(a) broadly defines the term "business transaction" to include:

> any transaction between a person and the state or a political subdivision of the state, including, but not limited to, a person applying for or renewing a motor vehicle license plate, applying for or renewing a driver's license or nondriver identification card, or applying for or renewing a business license. "Business transaction" does not include applying for a marriage license.

36

Any person who wants to enter into such a "business transaction" must provide proof of lawful residence.  Ala. H.B. 56 § 30(c).  By its own terms, this provision makes it a felony to engage in any transaction with a state instrumentality.  These provisions impose different and more punitive restrictions on aliens than Congress intended.  Section 27 chills the ability of unlawfully present aliens (as well as lawfully present aliens and some United States citizens) to make and enforce otherwise valid contracts.  By interfering with this right, Section 27 is exposing unlawfully present aliens to widespread commercial abuse — despite Congress's specific effort to regulate immigration so as to protect foreign nationals (whether lawfully or unlawfully present) from such abuse.  *See, e.g.*, 8 U.S.C. § 1324a(g)(1) (prohibiting employers from forcing employees to post bonds indemnifying the employers against IRCA liability).  Section 30 transforms otherwise lawful conduct (engaging or attempting to engage with state or local governments in a wide swath of circumstances) into criminal conduct only by virtue of who is performing it.  Under Section 30, unlawfully present aliens would commit felonies by engaging in transactions essential to Alabama residence, such as paying for county water service or remitting municipal property taxes.  This differential treatment conflicts with Congress's determination that unlawful presence should result in civil rather than criminal sanctions, and United States foreign policy,

which seeks similar treatment for American nationals who travel abroad.  Because

the power to decide the terms and conditions applicable to aliens' stay is within the

exclusive province of the federal government, Sections 27 and 30 are preempted.

### Section 28 of H.B. 56

60.    Section 28 of H.B. 56 requires all public elementary and secondary

schools to determine

> whether the student enrolling in public school was born outside the
> jurisdiction of the United States or is the child of an alien not lawfully
> present in the United States and qualifies for assignment to an English
> as Second Language class or other remedial program.

Ala. H.B. 56 § 28(a)(1).  To make this determination, the school "shall rely

upon presentation of the student's original birth certificate, or a certified

copy thereof."  *Id.*, § 28(a)(2).

61.    Section 28 further provides that:

> [i]f, upon review of the student's birth certificate, it is determined that
> the student was born outside the jurisdiction of the United States or is
> the child of an alien not lawfully present in the United States, or
> where such certificate is not available for any reason, the parent,
> guardian, or legal custodian of the student shall notify the school
> within 30 days of the date of the student's enrollment of the actual
> citizenship or immigration status of the student under federal law.

Ala. H.B. 56 § 28(a)(3).  The Act further specifies that, for purposes of § 28(a)(3),

notification shall consist of both of:

a. The presentation for inspection, to a school official designated for such purpose by the school district in which the child is enrolled, of official documentation establishing the citizenship and, in the case of an alien, the immigration status of the student, or alternatively by submission of a notarized copy of such documentation to such official; and

b. Attestation by the parent, guardian, or legal custodian, under penalty of perjury, that the document states the true identity of the child.

Ala. H.B. 56 § 28(a)(4).  If the student or his or her parent, guardian, or legal representative possesses no such documentation but nevertheless maintains that the student is either a United States citizen or an alien lawfully present in the United States, the parent, guardian, or legal representative of the student may sign a declaration so stating, under penalty of perjury.  *Id.*

62.    "If no such documentation or declaration is presented, the school official shall presume for the purposes of reporting under this section that the student is an alien unlawfully present in the United States." Ala. H.B. 56 § 28(a)(5).  The Act provides that "[v]erification of lawful presence in the United States shall not be required for . . . primary or secondary school education, and state or local public benefits that are listed in 8 U.S.C. Section 1621(b)."  *Id.*, § 7(e)(1).

63.    The Act requires each school district to "collect and compile data as required by this section," and to "submit to the State Board of Education an annual report listing all data obtained pursuant to this section." *Id.*, § 28(a)(5)(b)-(c).  In turn, the Alabama Board of Education must use this information to prepare an annual report detailing the numbers of U.S. citizens, and lawfully present and unlawfully present aliens enrolled in public schools, and analyze the impact on education and the costs to the state imposed by unlawfully present alien-students.[4] Ala. H.B. 56 § 28 (d).  Aside from a general prohibition on public disclosure, *see* Ala. H.B. 56 § 28(e), Section 28 does permit any interference with communications between governmental officials related to immigration enforcement.  *See also* 8 U.S.C. § 1373(b) ("no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from . . . exchanging . . . with any other Federal, State, or local government entity" "information regarding the immigration status, lawful or unlawful, of any individual").

64.    In light of the collection and reporting requirements that Section 28 imposes, many classes of parents may choose to keep their children from attending school.  Most obviously, parents who know their children are unlawfully present

---

[4] This report would not specify the names or otherwise identify those individuals presumed to be unlawful aliens, as the annual report would provide data "aggregated by public school." Ala. H.B. 56 § 28(a)(5)(d)(2).

may choose to keep their children home, rather than have their status reported to school authorities.  Furthermore, some parents or guardians may not be able to provide the documentation Section 28 requires or fear the consequences of sending their children to school under a presumption of unlawful presence.  For example, some parents may not have any official documentation of their child's lawful presence.  And, given the myriad designations and rules governing federal immigration status, some of those parents may not be in a position to declare, under penalty of perjury, their children's immigration status.  Thus, such parents or guardians may choose to withdraw their children from school to avoid having to choose between possibly perjuring themselves, with all the consequences that might entail (or that the parent fears such perjury might entail for themselves or their children, or both). Because Section 28 will lead to the harassment of lawfully present and unlawfully present aliens, it is preempted.

65.    Alabama, by its mandatory data collection, classification, and reporting requirements, has impermissibly established a registration scheme for aliens — one that has no counterpart under federal law and was not contemplated by Congress.  Without any precondition, Section 28 explicitly commands the parents of children who are born outside the United States to produce documentation and submit a declaration (under penalty of perjury) verifying the

citizenship of their children.   This state-addendum to the federal system for tracking and verifying alien status demands precisely the type of "indiscriminate and repeated interception and interrogation by public officials"— here, the officials of the Alabama school system — that the Supreme Court described as outside of the state's police powers, as a danger to federal foreign relations, and as preempted by federal law.  *Hines*, 312 U.S. at 65-66.

66.    Furthermore, Section 28's state-level verification immigration scheme will be error-prone.  Many parents of lawfully present children may not be in a position to provide the attestations and declarations Section 28 contemplates because of language issues, a lack of familiarity with the legal system, or fear of disclosing their own immigration status.  Other parents, unsure of their children's immigration status, may not be able to provide a sworn statement.  Thus, Section 28's reliance on parental reporting means that many lawfully present children will be reported as unlawfully present.

67.    By reason of the foregoing, defendants' actions have caused and will continue to cause substantial and irreparable harm to the United States for which plaintiff has no adequate remedy except by this action.

## FIRST CAUSE OF ACTION – VIOLATION OF THE SUPREMACY CLAUSE

68.     Plaintiff incorporates paragraphs 1 through 67 of the Complaint as if fully stated herein.

69.     Sections 10, 11(a), 12(a), 13, 27, 28, and 30 of H.B. 56, taken in whole and in part, represent an impermissible effort by Alabama to establish its own immigration policy and to directly regulate the immigration status of aliens. In particular, these sections conflict with federal law and foreign policy, disregard federal policies, interfere with federal enforcement priorities in areas committed to the discretion of plaintiff United States, and otherwise impede the accomplishment and execution of the full purposes and objectives of federal law and foreign policy.

70.     Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 of H.B. 56 violate the Supremacy Clause, and are invalid.

## SECOND CAUSE OF ACTION – PREEMPTION UNDER FEDERAL LAW

71.     Plaintiff incorporates paragraphs 1 through 70 of the Complaint as if fully stated herein.

72.     Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 of H.B. 56 are preempted by federal law, including 8 U.S.C. § 1101 *et seq.*

**THIRD CAUSE OF ACTION – VIOLATION OF THE COMMERCE CLAUSE**

73.     Plaintiff incorporates paragraphs 1 through 72 of the Complaint as if fully stated herein.

74.     Section 13 of H.B. 56 restricts the interstate movement of aliens in a manner that is prohibited by Article One, Section Eight of the Constitution.

75.      Section 13 of H.B. 56 violates the Commerce Clause, and is therefore invalid.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

1.     A declaratory judgment stating that Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 of H.B. 56 are invalid, null, and void;

2.     A preliminary and a permanent injunction against the State of Alabama, and its officers, agents, and employees, prohibiting the enforcement of Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 of H.B. 56;

3.     That this Court award the United States its costs in this action; and

4.     That this Court award any other relief it deems just and proper.

DATED:  August 1, 2011

TONY WEST
Assistant Attorney General
JOYCE W. VANCE
United States Attorney
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs
Branch


_____
C. LEE REEVES, II
VARU CHILAKAMARRI
JOSHUA WILKENFELD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs
Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4805
Fax: (202) 616-8470
Email: lee.reeves@usdoj.gov