FILED

2011 Aug-01  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

_____

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **Case No. 11-J-2746-S** |
|  | ) |
| **STATE OF ALABAMA & GOVERNOR** | ) |
| **ROBERT J. BENTLEY,** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

_____

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TONY WEST
Assistant Attorney General
JOYCE WHITE VANCE
United States Attorney
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch
C. LEE REEVES, II
VARU CHILAKAMARRI
JOSHUA WILKENFELD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4805
Fax: (202) 616-8470
Email: lee.reeves@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................4

   I.      FEDERAL STATUTORY & REGULATORY FRAMEWORK
         GOVERNING IMMIGRATION .......................................................4

   II.     SUMMARY OF KEY PROVISIONS OF H.B. 56 ................................7

LEGAL STANDARD .....................................................................................................13

ARGUMENT ..................................................................................................................13

   I.      THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS............13

        A.    Section 10 of H.B. 56 – Alabama's "Complete or Carry an Alien
             Registration Document" Provision – is Preempted by Federal Law .........17

             1.     Operation of Alabama's Alien Registration Scheme....................17

             2.     Section 10 Interferes With the Comprehensive Federal
                  Alien Registration Scheme .............................................................17

             3.     Section 10 is Preempted Because it Essentially Seeks to
                  Criminalize Unlawful Presence and Will Result in the
                  Harassment of Aliens .....................................................................20

        B.    Section 11(a) of H.B. 56 – Alabama's New Criminal Sanction
             Against Unauthorized Aliens Who Solicit or Perform Work in a
             Public or Private Place – is Preempted by the Federal Employer
             Sanctions Scheme ..........................................................................................22

             1.     Congress Has Established the Exclusive Sanctions Regime
                  With Respect to Alien Employment .............................................22

              2.     By Criminalizing Work Performed by Unlawfully Present
                  Aliens, Section 11 Impermissibly Conflicts With IRCA's
                  Objectives .....................................................................................25

        C.    Section 16 & 17 Of H.B. 56 – Alabama's New Penalty System
             Against Employers Who Hire Unauthorized Aliens – is Preempted
             by the Federal Employer Sanctions Scheme...............................................25

1.     Section 16 Violates IRCA's Prohibition on Employer Sanctions ...................................................................26

2.     The Employer Tax Deduction Provision is Not Severable From the Penalty Provision .........................................28

3.     Section 17 Violates IRCA's Prohibition on Employer Sanctions ...................................................................30

D.     Alabama's Prohibitions on the Harboring and Transporting of Aliens, and on Encouraging Their Travel into the State, are Preempted by Federal Law .......................................................31

E.     Alabama's Housing Restriction – Section 13(a)(4) of H.B. 56 – is Preempted by Federal Law .........................................35

F.     Alabama's Restrictions on Private Contracts and Transactions with the Government – Sections 27 and 30 of H.B. 56 – Are Preempted by Federal Law ..........................................................38

1.     Section 30 Conflicts with Federal Policies Regarding the Treatment of Aliens ...........................................38

2.     Section 27 Conflicts with Federal Policies Regarding the Treatment of Aliens ...........................................40

G.     Section 28 of H.B. 56 – Alabama's Education Registration Scheme – is Preempted by Federal Law ...........................41

1.     Alabama's Educational Registration Scheme Conflicts with Federal Policy, and will Impermissibly Burden Lawfully Present Aliens ...................................................41

2.     Alabama's Mandatory Alien Registration Scheme for School Children is Preempted ................................46

H.     Sections 12 and 18 of H.B. 56 – Alabama's Mandatory Immigration Status Verification Scheme – are Preempted by Federal Law .....................................................................47

1.     Alabama's Mandatory Verification Scheme Represents a Non-Cooperative Method of Participating in Federal Immigration Enforcement ..............................................49

a.     A State's Systematic and Mandatory Verification of Immigration Status Must be Conducted in

"Cooperation With" the Secretary ....................................51

b.    Alabama's Mandatory Verification Scheme
Inherently Interferes with Federal Discretion and is
Not Cooperative ..............................................................55

2.    Alabama's Verification Scheme Will Impermissibly
Burden Federal Resources .............................................58

3.    Alabama's Verification Scheme Will Impermissibly Result
in the Harassment and Interrogation of Lawfully Present
Aliens  ............................................................................61

II.    THE UNITED STATES WILL SUFFER IRREPARABLE HARM
ABSENT A PRELIMINARY INJUNCTION .......................................65

III.    A BALANCING OF THE HARDSHIPS FAVORS THE UNITED
STATES AND DEMONSTRATES THAT THE PUBLIC INTEREST
WOULD NOT BE DISSERVED BY GRANTING INJUNCTIVE
RELIEF ..............................................................................................72

CONCLUSION…………………………………………………………………..74

# TABLE OF AUTHORITIES

## CASES

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ............................................................................... 20, 21, 70

*Arres v. IMI Cornelius Remcor, Inc.,*
    333 F.3d 812 (7th Cir. 2003) ............................................................................... 15

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ............................................................................... 25, 37

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ............................................................................... 20, 59

*Cate v. Oldham,*
    707 F.2d 1176 (11th Cir. 1983) ............................................................................... 66

*Chae v. SLM Corp.,*
    593 F.3d 936 (9th Cir. 2010) ............................................................................... 60

*Chamber of Commerce  v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ............................................................................... *passim*

*Chamber of Commerce v. Whiting,*
    131 S. Ct. 1968 (2011) ............................................................................... 26, 33

*Chism v. Jefferson County,*
    954 So.2d 1058 (Ala. 2006) ............................................................................... 29

*Chy Lung v. Freeman,*
    92 U.S. 275 (1875) ............................................................................... 14, 22

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ............................................................................... 14, 19, 22, 25

*Cunningham v. Adams,*
    808 F.2d 815 (11th Cir. 1987) ............................................................................... 66

*De Canas v. Bica,*
    424 U.S. 351 (1976) ............................................................................... *passim*

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) ............................................................................... 66

*Edwards v. California*,
   314 U.S. 160 (1941) ............................................................................................ 35

*Felder v. Casey*,
   487 U.S. 131 (1988) ............................................................................................ 25

*Ferreira v. Ashcroft*,
   382 F.3d 1045 (9th Cir. 2004) ........................................................................... 15

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................................................ 32

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) ............................................................................................ 13

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ............................................................................................ 14

*Gade v. Nat'l Solid Waste Mgmt. Ass'n*,
   505 U.S. 88 (1992) .............................................................................................. 13

*Garrett v. City of Escondido*,
   465 F. Supp. 2d 1043 (S.D. Cal. 2006) ................................................... 33, 36, 59

*Georgia Latino Alliance for Human Rights v. Deal*,
   Case No. 11-1804 (N.D. Ga. 2011) ............................................................. *passim*

*Graham v. Richardson*,
   403 U.S. 365 (1971) ............................................................................................ 61

*Henderson v. Mayor of the City of New York*,
   92 U.S. 259 (1876) .............................................................................................. 61

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ......................................................................................... *passim*

*Hoffman Plastic Compounds v. NLRB*,
   535 U.S. 137 (2002) ............................................................................................ 23

*King v. Campbell*,
   988 So.2d 969 (Ala. 2007) ................................................................................. 28

*League of United Latin Am. Citizens v. Wilson*,
   908 F. Supp. 755 (C.D. Cal 1995) ..................................................................... 15

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996)........................................................................... 28

*Lem Moon Sing v. United States*,
    158 U.S. 538 (1895)........................................................................... 32

*Lozano v. City of Hazleton*,
    620 F.3d 170 (3d Cir. 2010).................................................... 33, 36, 37

*Mathews v. Diaz*,
    426 U.S. 67 (1976)............................................................................. 14

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)........................................................................... 43

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992)........................................................................... 65

*Mureau v. Oppenheim*,
    663 F.2d 1300 (5th Cir. 1981) .......................................................... 41

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985)........................................................................... 62

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989)........................................................................... 66

*New York v. United States*,
    505 U.S. 156 (1992)................................................................ 16, 47, 61

*Nken v. Holder*,
    129 S. Ct. 1749 (2009)...................................................................... 71

*North Dakota v. United States*,
    495 U.S. 423 (1990) [See also Arizona] ........................................... 59

*Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ........................................................ 66

*Osmose, Inc. v. Viance, LLC*,
    612 F.3d 1298 (11th Cir. 2010) ................................................... 13, 64

*Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)........................................................................... 13

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................................ *passim*

*Puerto Rico Dept. of Consumer Affairs*,
    485 U.S. 495 (1988) ................................................................................................. 25

*Quinchia v. U.S. Att'y Gen.*,
    552 F.3d 1255 (11th Cir. 2008) ............................................................................. 21

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) ................................................................................................. 52

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ................................................................................. 66

*Saenz v. Roe*,
    526 U.S. 489 (1999) ................................................................................................. 43

*Safford Unified School Dist. No. 1 v. Redding*,
    129 S.Ct. 2633 (2009) ............................................................................................. 62

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1261 (11th Cir. 2005) ....................................................................... 29, 71

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ................................................................. 13, 71, 72

*Shaughnessy v. United States ex rel. Mezie*,
    345 U.S. 206 (1953) ................................................................................................. 14

*Takahashi v. Fish and Game Comm'n*,
    334 U.S. 410 (1948) ................................................................................................. 15

*Toll v. Moreno*,
    458 U.S. 1 (1982) ............................................................................................. 14, 41

*Toll v. Moreno*,
    458 U.S. 11 (1982) ..................................................................................... 14, 36, 41

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ................................................................................................. 52

*United States v. Zheng*,
    306 F.3d 1080 (11th Cir. 2002) ............................................................................. 23

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011) .................................................................... *passim*

*United States v. Arizona,*
   703 F. Supp. 2d 980 (D. Ariz. 2010) ..................................................... 59

*United States v. Locke,*
   529 U.S. 89 (2000)................................................................................. 38

*United States v. Sanchez-Vargas,*
   878 F.2d 1163 (9th Cir. 1989) ("§ 1324(a)(1) .................................. 33-34

*Villas at Parkside Partners v. City of Farmers Branch, Tex.,*
   701 F. Supp. 2d 835 (N.D. Tex. 2010) .......................................... 36, 37

*Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.,*
   475 U.S. 282 (1986)............................................................................. 19

## STATUTES

8 C.F.R. § 214.1(e)................................................................................. 24

8 C.F.R. Part 264 ............................................................................... 5, 18

8 C.F.R. § 274a.12(c)(14) ................................................................. 7, 51

8 C.F.R. § 274a.10 ................................................................................ 24

H.R. 4437, 109th Cong. § 203 (2005) .................................................. 21

H.R. Rep. No. 99-682(I) at 46 .......................................................... 5, 24

H.R. Rep. 111-157, at 8 (2009)............................................................. 52

S. 2454, 109th Cong. §§ 206, 275 (2006)............................................. 21

Pub. L. No. 110-329, Title II, 122 Stat. 3574, 3659 (2008)................. 52

Pub. L. No. 111-83, Title II, 123 Stat. 2142, 2149 (2009)................... 52

8 U.S.C. § 1101 ...................................................................................... 6

8 U.S.C. § 1103................................................................................ 7, 49, 50

8 U.S.C. § 1158.................................................................................. 6, 51

8 U.S.C. § 1182 ...................................................................................................... 5, 51

8 U.S.C. § 1201 ...................................................................................................... 5, 18

8 U.S.C. § 1225 ...................................................................................................... 5, 51

8 U.S.C. § 1227 ............................................................................................ 5, 6, 24, 51

8 U.S.C. § 1228 ...................................................................................................... 5, 51

8 U.S.C. § 1229 ................................................................................................ 5, 37, 51

8 U.S.C. § 1229b ........................................................................................................ 6, 51

8 U.S.C. § 1229c ...................................................................................................... 5, 51

8 U.S.C. § 1231 ...................................................................................................... 5, 51

8 U.S.C. § 1252c .................................................................................................. 49, 50

8 U.S.C. § 1254a .................................................................................................... 6, 51

8 U.S.C. § 1255 ............................................................................................................ 6

8 U.S.C. § 1301 ............................................................................................................ 18

8 U.S.C. § 1301-1306 ................................................................................................... 5

8 U.S.C. § 1302 ............................................................................................................ 18

8 U.S.C. § 1303 ............................................................................................................ 18

8 U.S.C. §1304 .............................................................................................. 8, 17, 18

8 U.S.C. § 1305 ............................................................................................................ 18

8 U.S.C. § 1306 ................................................................................................... *passim*

8 U.S.C. § 1323 ............................................................................................................ 32

8 U.S.C. § 1324 ................................................................................................... *passim*

8 U.S.C. §1324a .................................................................................................. *passim*

8 U.S.C. § 1324c ............................................................................................ 5, 24, 51

8 U.S.C. § 1325 ................................................................................................. 5, 32, 51

8 U.S.C. § 1327 ........................................................................................................ 32

8 U.S.C. § 1328 ........................................................................................................ 32

8 U.S.C. § 1357(g) ................................................................................................ *passim*

8 U.S.C. § 1373 ..................................................................................................... *passim*

8 U.S.C. § 1621 ........................................................................................................ 12

18 U.S.C. § 3571 ...................................................................................................... 18

18 U.S.C. 1546(b) .................................................................................................... 24

## UNITED STATES CONSTITUTION

U.S. Const., art. I § 8, cl. 4 ...................................................................................... 4

U.S. Const., art. I § 8, cl. 3 ...................................................................................... 4

U.S. Const., art. II § 3 ............................................................................................. 4

U.S. Const., art. VI, cl. 2 ........................................................................................ 13

## STATE BILLS

Ala. H.B. 56 ...................................................................................................... *passim*

## MISCELLANEOUS

Fed. R. Civ. P. 65 ................................................................................................ 1, 13

Pursuant to Federal Rule of Civil Procedure 65, the United States hereby moves this Court to preliminarily enjoin enforcement of various provisions of Alabama's H.B. 56 to preserve the status quo until this matter can be adjudicated. Specifically, the United States respectfully requests that this Court preliminarily enjoin Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30 of H.B. 56.

## **INTRODUCTION**

In our constitutional system, the power to regulate immigration is exclusively vested in the federal government. The immigration framework set forth by Congress and administered by federal agencies reflects a careful and considered balance of national law enforcement, foreign relations, and humanitarian concerns — concerns that belong to the nation as a whole, not a single state. The Constitution and federal law do not permit the development of a patchwork of state and local immigration policies throughout the country. Although a state may adopt regulations in a legitimate area of local concern even though they may have an indirect or incidental effect on aliens, a state may not establish its own immigration policy or enforce state laws in a manner that interferes with federal immigration law.

The State of Alabama has crossed this constitutional line. In acknowledged disagreement with the manner in which the federal government has regulated immigration and in contravention of these constitutional principles, Alabama recently enacted H.B. 56 — a comprehensive set of immigration provisions designed to "attack[] every aspect of an illegal alien's life," explicitly making life in Alabama so intolerable that unlawful aliens living elsewhere will not come to Alabama, and prevent those who do live in the state from "putting down roots."[1] In service of Alabama's nascent immigration policy, H.B. 56 creates a panoply of new state offenses

---

[1] Julia Preston, *In Alabama, a Harsh Bill for Residents Here Illegally*, New York Times, June 3, 2011, a*vailable at*: http://www.nytimes.com/2011/06/04/us/04immig.html

criminalizing, *inter alia*, an alien's failure to comply with registration requirements under federal law, an alien's unauthorized attempt to solicit or perform work, and an alien's attempt to interact with state or local government.  H.B 56 also makes it a crime for any landlord to rent housing to an unlawfully present alien, prevents Alabama courts from enforcing agreements to which unlawfully present aliens are a party, and creates an alien registration system for school-age children.  And to achieve maximum enforcement of its new immigration policy, H.B. 56 establishes a new state-wide mandatory immigration status-verification system to be employed whenever practicable by every law enforcement officer who, during the course of a stop, has reasonable suspicion that a person is "unlawfully present," or whenever the officer cannot verify that the person has a valid driver's license.  State and local authorities have no choice but to enforce H.B. 56 to the hilt: Any lawful resident of Alabama may sue a local law enforcement agency for money damages if that agency fails to enforce immigration laws to the fullest extent possible, and the offending agency would also lose all state funding.

Both separately and in concert, many of H.B. 56's provisions would subvert and interfere with federal immigration laws and objectives; and therefore are preempted.  First, Alabama impermissibly seeks to create a state-specific immigration policy that is expressly designed to supplant the federal government's immigration policy.  As such, H.B 56 does not simply provide for state and local officers to lend legitimate assistance to federal officials responsible for administering the federal immigration laws, but instead exceeds a state's role with respect to aliens, interferes with the federal government's balanced administration of the immigration laws, and critically undermines U.S. foreign policy objectives.  H.B. 56 therefore exceeds constitutional boundaries.  The states are not permitted to set their own independent immigration policies, with varying and potentially conflicting enforcement systems and priorities.  Were a

number of states to act as Alabama has and strike out on their own, federal immigration policy and enforcement efforts would be seriously frustrated and hampered.  Second, individual provisions of H.B. 56 separately conflict with federal law and are therefore preempted.  H.B. 56's criminal and other provisions create a host of conditions on aliens which are preempted because they each conflict with congressional objectives underlying specific federal immigration laws.  Further, H.B. 56's new state-wide mandatory immigration status verification scheme and "reasonable suspicion" provision would disrupt federal control and discretion over immigration enforcement, and it would result in the harassment and incarceration of lawful resident aliens — and even U.S. citizens who would not have readily available documentation to demonstrate their citizenship.  In addition, this scheme would divert and burden federal immigration resources that are needed to target high-priority aliens.  The federal government has made its top enforcement priority aliens who pose a danger to national security or risk to public safety, but Alabama's indiscriminate approach would stand in the way of the federal government's focused efforts to remove the most dangerous aliens from the country.

A preliminary injunction against various provisions of H.B. 56 is necessary to preserve the status quo, because the United States is likely to prevail on the merits of this case, and absent injunctive relief, the United States will suffer irreparable harm.   Enforcement of H.B. 56 will disrupt the constitutional order by undermining the federal government's control over the regulation of immigration and immigration policy and by interfering with its ability to ensure suitable discretion in administration of immigration law, to balance the purposes and objectives of federal law and to pursue its chosen enforcement priorities.  Moreover, administration of H.B. 56 would result in the harassment of lawfully present aliens and even U.S. citizens. Implementation of the law would also damage the United States' ability to speak with a single

and authoritative voice to foreign governments on immigration matters and is already having negative effects on long-standing and vital international relationships.  And implementation of H.B. 56 would impede the federal government's ability to provide measured enforcement of criminal sanctions so as to accommodate the many other objectives that Congress enacted into the immigration laws.  As a matter of law and in the public interest, this Court should enter a preliminary injunction to prevent the provisions of H.B 56 listed above from going into effect.

## **BACKGROUND**

## I.   **FEDERAL STATUTORY & REGULATORY FRAMEWORK GOVERNING IMMIGRATION**

The Constitution vests the political branches with exclusive and plenary authority to establish the nation's immigration policy.  *See* U.S. Const., art. I § 8, cl. 4 (Congress has the authority to "establish an uniform Rule of Naturalization"); U.S. Const., art. I § 8, cl. 3 (Congress has the authority to "regulate Commerce with foreign Nations"); *see also* U.S. Const., art. II § 3 (vesting the President with the authority to "take Care that the Laws be faithfully executed").  Pursuant to this authority, over several decades, Congress has enacted and refined a detailed statutory framework governing immigration — a task that has involved reconciling the complex and often competing interests of national security and public safety, foreign relations, and humanitarian concerns.  *See, e.g.*, Declaration of William J. Burns, Deputy Secretary of State (attached as Exhibit 1), ¶¶ 5-6.  The federal immigration scheme, largely enacted in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, empowers the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State, among other federal agencies, to administer and enforce the immigration laws, and it provides for the considerable exercise of discretion to provide for and direct enforcement in a manner consistent with federal policy objectives.

A.    **Federal Laws and Discretion Regarding the Entry, Removal, and Treatment of Aliens Within the United States**

The INA sets forth the conditions under which a foreign national may enter, be admitted to, and remain in the United States.  As part of these conditions, Congress created a comprehensive alien registration system for monitoring the entry and movement of aliens within the United States.  *See* 8 U.S.C. §§ 1201(b), 1301-1306; *see also* 8 C.F.R. Part 264.  If an alien enters the United States without inspection, presents fraudulent documents at entry, violates the conditions of his admission, or engages in certain proscribed conduct, the federal government (through DHS) may place him in removal proceedings or seek his removal through alternate administrative proceedings.  *See* 8 U.S.C. §§ 1182, 1225, 1227, 1228, 1229, 1229c, 1231.  In addition to removal, DHS and DOJ may employ civil and criminal sanctions against the alien for particular violations of the federal immigration laws.  *See, e.g.*, 8 U.S.C. §§ 1325, 1306, 1324c.

To prevent the unlawful entry of aliens into the United States, Congress further criminalized certain activities of third parties, such as the smuggling of unauthorized aliens into the country, and the facilitation of unlawful immigration within the nation's borders.  *See* 8 U.S.C. § 1324.  Critically, Congress provided for the civil removal of unlawfully present aliens, but did not criminally penalize their mere presence or movement within the country absent other factors.  Nor did Congress impose criminal penalties on aliens solely for seeking or obtaining employment in the country without authorization, *see* H.R. Rep. No. 99-682(I) at 46, electing instead to prohibit employers from hiring unauthorized aliens.  *See* 8 U.S.C. § 1324a(a)(1).  Similarly, Congress has not imposed sanctions, either civil or criminal, that would effectively preclude unlawfully present aliens from obtaining any housing, or engaging in routine interactions with state or local authorities, particularly those interactions that inevitably and unavoidably result from their presence in the country.

5

Under this framework, administering agencies are empowered to exercise their discretion not to apply a specific sanction to an alien who has unlawfully entered or remained in the United States. For example, DHS has authority to permit aliens, including those who would otherwise be inadmissible, to temporarily enter and remain in the United States (*i.e.*, "parole") for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In addition, DHS and DOJ may withhold or cancel the removal of an alien under a variety of special circumstances, including those relating to family unity and domestic abuse. *See* 8 U.S.C. § 1227(a)(1)(E)(iii); 8 U.S.C. §§ 1229b (providing DOJ discretion to cancel the removal of an otherwise inadmissible or removable alien under certain circumstances); *see also* 8 U.S.C. § 1182(a)(6)(A)(ii) (excluding from inadmissibility certain aliens who have been subjected to battery or extreme cruelty). Further, both DHS and DOJ may grant an otherwise unlawfully present or removable alien relief from removal — and potentially adjust that alien's immigration status — if the alien meets certain conditions. If the alien provides "critical reliable information concerning a criminal organization or enterprise" to federal or state authorities, and is deemed by the Attorney General to be "essential to the success of an authorized criminal investigation," the Attorney General may grant the alien an S visa and also may later adjust the alien's status to permanent resident. 8 U.S.C. §§ 1101(a)(15)(S) & 1255(j). If an alien has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, he may be eligible for asylum in the United States, "irrespective of [his] status." *See* 8 U.S.C. § 1158. Similarly, an alien may be afforded temporary protected status and remain in the United States if he is an eligible national of a country that DHS has designated as experiencing ongoing armed conflict, natural disaster, or another extraordinary circumstance. *See* 8 U.S.C. § 1254a. Under certain circumstances, moreover, an alien may be provided

employment authorization while the federal government evaluates his immigration status. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14); Declaration of Lori Scialabba, Deputy Director, USCIS (Attached as Exhibit 9), ¶¶ 6, 12, 14, 15, 18.

Although not an exhaustive description of the complex and detailed federal immigration framework, these provisions reflect that the federal immigration laws do not focus on one, singular interest, but instead seek to further multiple and sometimes competing objectives.

The INA vests DHS — which administers and enforces the INA mainly through its components, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS") — DOJ, the Department of State, and their respective components with broad discretion in enforcing the federal immigration laws, generally allowing federal agencies to decide whether particular immigration remedies are appropriate in individual cases. *See* 8 U.S.C. § 1103; *see generally* Declaration of Daniel H. Ragsdale, Executive Associate Director for Management and Administration, ICE (Attached as Exhibit 2), ¶ 41; Burns Decl., ¶¶ 14-15 .  Because the enforcement of federal immigration law also directly implicates foreign relations, the State Department is actively involved in the administration and enforcement of federal immigration law.  Just as with DHS and DOJ, the State Department is vested with broad discretion in administering the INA, and takes into account the competing interests of the INA, including foreign policy interests.

## II.    SUMMARY OF KEY PROVISIONS OF H.B. 56

H.B. 56 contains various measures requiring state and local law enforcement officials to enforce federal, and in some cases, state measures directed at the presence of unauthorized aliens.  The Act follows Arizona's S.B. 1070 in creating a multi-faceted regulatory structure that

addresses numerous aspects of aliens' lives.  The following is a summary of provisions

principally implicated by the United States' preliminary injunction motion.

### A.  Section 6

Section 6 requires all state and local law enforcement agencies to enforce all provisions

of H.B. 56 to their full extent.  If in the judgment of the Alabama Attorney General any

enforcement authority has not enforced H.B. 56 to the "full extent permitted by law," the

Attorney General must report any such failure to the Governor, and the offending agency will

face, among other possible sanctions, a loss of "any funds, grants, or appropriations from the

State of Alabama" "until such violation has ceased and the Attorney General has so certified."

(§ 6(a)).  Section 6(d) grants a private right of action to any lawful resident of Alabama to sue

any state or local authority that fails to enforce any provision of H.B. 56 fully.  Upon a judicial

finding that an agency has failed to enforce any provision of the Act to its full extent, the agency

shall face a civil penalty between $1,000 and $5,000 for each day that the challenged policy or

practice remained in effect after the filing of the action.

### B.  Section 10

Section 10 makes it a state criminal offense for a person in Alabama to violate 8 U.S.C.

§ 1304(e), which requires aliens to carry their alien registration cards, or § 1306(a), which

requires aliens to register with the federal government.  (§ 10(a)).  A violation of Section 10 is a

Class C misdemeanor punishable by a fine of up to $100 and 30 days in jail.  (§ 10(f)).  Fifty

percent of the assessments collected for Section 10 violations shall be remitted to the

apprehending jurisdiction, while the remaining half will be divided equally between the Alabama

Department of Homeland Security and the Alabama Department of Public Safety.  (§ 10(g)).

### C.  Section 11(a)

Section 11(a) makes it a crime "for a person who is an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state."  A violation of Section 11(a) is a misdemeanor punishable by a fine of up to $500.  (§ 11(h)).

### D.  Section 12

Section 12(a) states that "[u]pon any lawful stop, detention, or arrest made by a state, county, or municipal law enforcement officer of this state in the enforcement of any state law or ordinance of any political subdivision thereof, where reasonable suspicion exists that the person is an alien who is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the citizenship and immigration status of the person, except if the determination may hinder or obstruct an investigation."  Verification requests must be made to the federal government, as state and local authorities are not authorized to make final verification determinations.  (§§ 12(a), (c)).  If, however, "for any reason federal verification . . . is delayed beyond the time that the alien would otherwise be released from custody, the alien shall be released from custody."  (§ 12(b)).

### E.  Section 13

Section 13 criminalizes three separate activities when they are done by a person who knows or recklessly disregards the fact that the activities involve an alien who has unlawfully entered or remained in the United States: (i) concealing, harboring, or shielding (or attempting or conspiring to do so) an alien from detection in any place in this state, including any building or any means of transportation; (ii) encouraging or inducing an alien to come to or reside in the state; (iii) transporting (or attempting or conspiring to do so) an alien in furtherance of his

9

unlawful presence.  Section 13(a)(4) also makes it a state crime: to "[h]arbor an alien unlawfully present in the United States by entering into a rental agreement, as defined by Section 35-9A-141 of the Code of Alabama 1975, with an alien to provide accommodations, if the person knows or recklessly disregards the fact that the alien is unlawfully present in the United States."  "In the enforcement of [Section 13], an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government."  (§ 13(g)).

### F.  Section 16

Section 16 provides penalties for employers who knowingly seek a tax deduction for wages in connection with payments made to unlawfully present alien employees.  Section 16 forbids employers from deducting wages or compensation paid to unlawfully present aliens on state or business tax filings.  (§ 16(a)).  Any employer who knowingly fails to comply with Section 16 faces a penalty of 10 times the business expense deduction claimed.  (§ 16(b)).

### G.  Section 17

Section 17 makes it an unlawful business practice for a business entity or employer to fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States or to discharge an employee working in Alabama who is a United States citizen or an alien who is authorized to work in the United States while retaining or hiring an employee whom the business entity or employer knows, or reasonably should have known, is an unauthorized alien.  (§ 17(a)).  Section 17 authorizes a private right of action for aggrieved employees or applicants, and permits them to obtain compensatory relief and attorney's fees if they prevail.  (§§ 17(b)-(d)).

### H.  Section 18

Section 18 amends Alabama's requirement that motor-vehicle drivers carry their licenses

with them.  If a person is arrested for driving without a license, and the law-enforcement officer cannot confirm that the person has a valid driver's license, then the officer must first "transport the person to the nearest or most accessible magistrate."  (§ 18(b)).  Next, "[a] reasonable effort shall be made to determine the citizenship of the person and if an alien, whether the alien is lawfully present in the United States by verification with the federal government pursuant to 8 U.S.C. § 1373(c)."  (§ 18(c)).  State or local authorities must initiate a verification inquiry within 48 hours, and if that inquiry confirms that the person is unlawfully present, then he "shall be considered a flight risk and shall be detained until prosecution or until handed over to federal immigration authorities."  (§ 18(d)).  Unlike Section 12(a), Section 18 does not provide that a person may avoid the verification process by presenting, for example, a valid passport or other forms of identification.  Also unlike Section 12, Section 18 contains no detention-limiting language while verification remains pending.

### I.  Section 27

Section 27 prevents, with limited exceptions, Alabama state courts from enforcing the terms or conditions of any contract to which an unlawfully present alien is a party if the other party had direct or constructive knowledge that the alien was unlawfully present at the time the parties entered into the contract.  (§§ 27(a)-(b)).  In any court proceedings, the court "may request the federal government to provide further automated or testimonial verification" of the alien's immigration status.  (§ 27(d)).

### J.  Section 28

Section 28 requires every public elementary and secondary school in this state to determine "whether the student enrolling in public school was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States and qualifies for

assignment to an English as Second Language class or other remedial program."  (§ 28(a)(1)).

To make that determination, Section 28(a)(1) requires that the school "rely upon presentation of

the student's original birth certificate, or a certified copy thereof."  (§ 28(a)(2)).  "If, upon review

of the student's birth certificate, it is determined that the student was born outside the jurisdiction

of the United States or is the child of an alien not lawfully present in the United States, or where

such certificate is not available for any reason, the parent, guardian, or legal custodian of the

student shall notify the school within 30 days of the date of the student's enrollment of the actual

citizenship or immigration status of the student under federal law.  (§ 28(a)(3)).  "Notification

shall consist of" both "official documentation establishing the citizenship and, in the case of an

alien, the immigration status of the student," and a statement "by the parent, guardian, or legal

custodian, under penalty of perjury, that the document states the true identity of the child."

(§ 28(a)(4)).  "If no such documentation or declaration is presented, the school official shall

presume for the purposes of reporting under this section that the student is an alien unlawfully

present in the United States."  (§ 28(a)(5)).  Such a determination would not prevent a child from

attending school, however, as the Act states that "[v]erification of lawful presence in the United

States shall not be required for . . . primary or secondary school education, and state or local

public benefits that are listed in 8 U.S.C. Section 1621(b)."  (§ 7(e)(1)).

### K.  Section 30

Section 30 makes it a felony for any unlawfully present alien to enter into or attempt to

enter into a "business transaction" with a state or local government within Alabama.  (§§ 30(a)-

(c)).  The statute does not define "business transaction," but Section 30 does specify that an

application for a marriage license would not constitute a "business transaction" for Section 30

purposes.  (§ 30(a)).

## LEGAL STANDARD

A preliminary injunction is warranted where, as here, the movant has established (1) that the movant is substantially likely to succeed on the merits, (2) that the movant will suffer irreparable harm in the absence of an injunction, (3) that the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) that an injunction would not disserve the public interest.  *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010); *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *see* Fed. R. Civ. P. 65.

## ARGUMENT

## I.     THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS

The Supremacy Clause of the U.S. Constitution provides that federal laws and treaties are "the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.  In some cases, the Constitution — of its own force — can preempt state action in a field exclusively reserved for the federal government.  *See De Canas v. Bica*, 424 U.S. 351, 356 (1976).  Statutes enacted by Congress may also preempt — either expressly or impliedly — state law and other actions.  *See Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).  The Supreme Court has recognized two methods by which state or local laws may be impliedly preempted.  "Field preemption" exists when a "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room to supplement it" because "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."  *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotations marks omitted).

"Conflict preemption" occurs when a party cannot comply with both state and federal law, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). These bases for preemption are not "rigidly distinct," however, and "field preemption may be understood as a species of conflict pre-emption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal citations omitted).

It has long been recognized that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas*, 424 U.S. at 354; *see also Toll v. Moreno*, 458 U.S. 1, 11 (1982) ("determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization" are matters exclusively reserved to the federal government); *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."). Control of immigration is a "fundamental sovereign attribute," *Shaughnessy v. United States ex rel. Mezie*, 345 U.S. 206, 210 (1953), because, among other reasons, the power over immigration, like other powers concerning the Nation's external relations, was given to the national government and withheld from the states so that "a single State" could not, "at her pleasure, embroil us in disastrous quarrels with other nations," *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875). Indeed, this principle of "supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution," and "was pointed out by authors of The Federalist in 1787, and has since been given continuous recognition by [the Supreme] Court."

14

*Hines*, 312 U.S. at 62.

Although this federal power does not preclude "every state enactment which in any way deals with aliens," *De Canas v. Bica*, 424 U.S. at 355, a state exceeds its power to enact regulations touching on aliens generally if the regulation is not passed pursuant to state "police powers" that are "focuse[d] directly upon" and "tailored to combat" what are "essentially local problems." *De Canas*, 424 U.S. at 356–57. Thus, only the federal government may establish the national immigration policy and the comprehensive schemes for administering and enforcing that policy. *See, e.g., Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. . . . Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states."); *Ferreira v. Ashcroft*, 382 F.3d 1045, 1050 (9th Cir. 2004) ("In the immigration context . . . the need for national uniformity is paramount."); *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 815 (7th Cir. 2003) ("Federal immigration power is not just superior to that of the states; it is exclusive of any state power over the subject. Illinois is not entitled to have a policy on the question [of] what precautions should be taken to evaluate the credentials of aliens."); *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 769–70 (C.D. Cal 1995) (noting that under *De Canas*, a state is barred from enacting a "comprehensive scheme" for immigration, *i.e.*, a system of state laws that affects "a direct and substantial impact on immigration").

As with many other areas of the law, although a state has no constitutional authority to

set national immigration policy or a distinct immigration policy for the state – or enact statutory

or regulatory schemes for independently administering and enforcing such an independent policy

– a state may nonetheless cooperatively assist the federal government in the *federal*

*government's* enforcement of the national immigration policy.  *Cf. New York v. United States*,

505 U.S. 144, 167-68 (1992) (recognizing that in areas of exclusive federal concern, Congress

has the power to offer States the choice of "conform[ing] to federal policy choices" and

"regulating [ ] activity according to federal standards," or "having state law pre-empted by

federal regulation. . . . This arrangement, which has been termed 'a program of cooperative

federalism,' [ ] is replicated in numerous federal statutory schemes").[2]  The imperative for

deference to the federal government is even more pronounced in immigration enforcement and

policymaking which is a uniquely federal interest.  *See supra*, page 14-15.

*     *     *

Against this backdrop, H.B. 56 clearly represents an impermissible effort to usurp the

federal government's control over immigration policy in two critical and equally problematic

ways: (1) H.B. 56 creates a host of new *Alabama-specific* conditions for aliens (some with

criminal consequences) – including those relating to alien registration, education, employment,

transportation, housing, and everyday business transactions; and (2) H.B. 56 attempts to displace

the federal government's exclusive authority to create a systematic scheme for the administration

and enforcement of the federal government's *own* immigration laws by codifying an inflexible

*Alabama-specific* approach that is, by any definition, "non-cooperative."  As will be discussed in

---

[2]  *See, e.g.*, *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. . . . The potential for deadlock . . . inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause . . . .").

greater detail below, both types of actions will interfere with, and intrude upon, areas in which the federal government has primacy, and therefore they are preempted.

### A.   Section 10 of H.B. 56 – Alabama's "Complete or Carry an Alien Registration Document" Provision – is Preempted by Federal Law

Perhaps the starkest conflict of H.B. 56 with federal law is evident in Alabama's new alien registration requirement, codified in Section 10 of H.B. 56, which legislates in an area that is fully occupied by Congress and which conflicts with the federal scheme.

#### 1.   Operation of Alabama's Alien Registration Scheme

Section 10 of H.B. 56 attaches Alabama criminal sanctions to the federal registration system.  Section 10(a) provides that:

> In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 U.S.C. § 1304(e) or § 1306(a)[ ], and the person is an alien unlawfully present in the United States.

Violation of Section 10 is a Class C misdemeanor and punishable by a fine of not more than $100 and not more than 30 days in jail.  Ala. H.B. 56 § 10(f).  Alabama's registration crime turns on a determination of lawful status, and Section 10 provides that that determination shall be made by the federal government pursuant to 8 U.S.C. § 1373(c) and not by local law enforcement.   Ala. H.B. 56 § 10(b).  To reaffirm Alabama's intent to criminalize unlawful presence, Section 10 excludes anyone who "maintains authorization from the federal government to be present in the United States."  Ala. H.B. 56 § 10(d).

#### 2.  Section 10 Interferes With the Comprehensive Federal Alien Registration Scheme

Exercising its exclusive authority over immigration, Congress has created, through the alien registration provisions of the INA, a comprehensive system for monitoring the entry and location of aliens within the United States — a system that cannot be supplemented by state

registration provisions.  The federal alien registration scheme includes very specific measures

ranging from which aliens must register, 8 U.S.C. §§ 1201, 1301, when they must register, 8

U.S.C. § 1302, the content of the registration forms, 8 U.S.C. §§ 1303, 1304, the circumstances

under which an already-registered alien must report a change of address, 8 U.S.C. § 1305, and

the penalties for failing to register, 8 U.S.C. § 1306, and for failing to carry registration, 8 U.S.C.

§ 1304(e), 18 U.S.C. § 3571, 8 C.F.R. Part 264.

The federal alien registration scheme has been held by the Supreme Court to represent the

quintessential example of a pervasive and comprehensive scheme of federal regulation that

leaves no room for state legislation in this area.  In *Hines v. Davidowitz*, 312 U.S. 52 (1941), the

Court recognized that the federal alien registration laws manifest congressional intent to monitor

aliens through a system that would be "uniform," "single," "integrated," and "all-embracing."

*Id.* at 74.  The Court considered the precursor to the current federal alien registration system, and

held that it precluded Pennsylvania from enforcing its own alien registration requirements,

because:

> the federal government, in the exercise of its superior authority in this field, has
> enacted a complete scheme of regulation and has therein provided a standard for
> the registration of aliens, [and] states cannot, inconsistently with the purpose of
> Congress, conflict or interfere with, curtail or complement, the federal law, or
> enforce additional or auxiliary regulations.

*Hines*, 312 U.S. at 66-67.  Put simply, *Hines* squarely held that Congress intended the federal

government to exercise exclusive control over all issues related to alien registration, and that

states lack the authority to "complement" that law.  *See id.*  As the Ninth Circuit recently held in

invalidating the Arizona law provision on which Section 10 was modeled, "[n]othing in the text

of the INA's registration provisions indicates that Congress intended for states to participate in

the enforcement or punishment of federal immigration registration rules."  *United States v.*

*Arizona*, 641 F.3d 339, 355 (9th Cir. 2011).  Alabama's new alien registration provision is an

18

impermissible intrusion into the exclusively federal field of alien registration and is therefore preempted.

Alabama cannot save Section 10 from preemption by claiming that Section 10 simply piggybacks on the requirements of federal law rather than creating its own substantive standards. To begin with, the Supreme Court anticipated and rejected this argument by holding that even state "complements" to the federal registration system are preempted. *Hines*, 312 U.S. at 66-67. More generally, where Congress has comprehensively regulated and occupied a field (as it has here), a state cannot enter the field by levying its own system of sanctions, even if those sanctions purport to pursue the same goal animating the federal scheme. As the Supreme Court recognized in *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379-80 (2000), "a common end hardly neutralizes" the interference posed by "conflicting means." Otherwise, states would be free to design their own penalty schemes, which would inevitably "undermine[] the congressional calibration of force" embodied in the penalty scheme established by federal law. *Id.* at 380. What Alabama has done is no different from what the Supreme Court prohibited in *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282 (1986), where the Court struck down a Wisconsin law that prohibited certain violators of the National Labor Relations Act from doing business with the State. *Id.* at 283-84. The Court held that where states had no *independent* authority to "regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits," so, too, are states prohibited from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Id.* at 286 ("The rule is designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy, and *administration*,' . . . and this Court has recognized that '[c]onflict in technique can be fully as disruptive to the system Congress erected

as conflict in overt policy.'") (emphasis added).

By removing federal control of prosecution for registration violations through creation of state-specific crimes based on federal alien registration requirements, Alabama seeks to impose its own corresponding set of state penalties for federal registration violations regardless of whether the alien has already been punished by the federal government under the federal alien registration scheme, or whether the federal government has chosen or would choose a different measure to address the alien's situation.  Alabama therefore allows for increased and varied punishment for registration violations that happen to occur in Alabama.  Ala. H.B. 56 § 10(f).  But *Hines* makes clear that states are precluded from supplementing the federal alien registration scheme, even if such regulations might appear to complement that scheme.  *See, e.g., Hines*, 312 U.S. at 66-67; *Garamendi*, 539 U.S. at 420 n.11; *Buckman*, 531 U.S. at 347 ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").  Accordingly, Alabama's auxiliary penalties for violations of the federal alien registration laws are preempted.  *See also Arizona*, 641 F.3d at 354-57 (holding that a virtually identical state provision criminalizing the failure to comply with federal alien registration provisions was likely preempted).[3]

### 3. Section 10 is Preempted Because it Essentially Seeks to Criminalize Unlawful Presence and Will Result in the Harassment of Aliens

Section 10 of H.B. 56 is preempted for the additional reason that it is a thinly veiled and impermissible attempt to criminalize unlawful presence.  Although Section 10 ostensibly relates

---

[3]  Section 10 also conflicts with the federal goal, recognized in *Hines*, of uniformity and singularity in registration — a field that closely touches on the "uniquely federal area" of foreign relations.  *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1983 (2011).  Specifically, Section 10 would result in the inconsistent treatment of aliens across the United States — a result that would violate the congressional demand for consistency regarding alien registration.  *See Hines*, 312 U.S. at 72; *see also Pennsylvania v. Nelson*, 350 U.S. 497, 515 (1956).

to alien registration, its true purpose is to do what Congress has repeatedly declined to do —
make unlawful presence a criminal offense.  *See* S. 2454, 109th Cong. §§ 206, 275 (2006); H.R.
4437, 109th Cong. § 203 (2005).  By explicitly (i) limiting its reach specifically to unlawfully
present aliens, *see* Ala. H.B. 56 § 10(a); and (ii) providing an exception for any "person who
maintains authorization from the federal government" to remain in the United States, Ala. H.B.
56 § 10(d), Section 10 targets unlawful presence in both design and effect.  And by essentially
criminalizing unlawful presence, this provision can work in conjunction with Section 12 by
affording an independent state-law basis for stopping and inspecting aliens and criminally
prosecuting them.  *See infra,* page 47-49.

　　　Whatever authority states may have to enact laws that incidentally or indirectly touch on
aliens, they have no authority to regulate immigration directly, and consequently may not
establish state sanctions for entering or remaining in the country.  *See De Canas*, 424 U.S. at
356-57.  Unlawful presence is an immigration status the contours and consequences of which are
federally crafted, and are of purely federal concern.

　　　Alabama's attempt to target and criminalize unlawful presence is also preempted because
it creates an obstacle to the accomplishment of the United States' foreign policy goals.  *See*
Burns Decl. ¶ 35 ("U.S. immigration law – and our uniform foreign policy regarding the
treatment of foreign nations – has provided that the unlawful presence of a foreign national, in
itself, ordinarily will not lead to that foreign national's criminal arrest, incarceration, or other
punitive measures . . .  but instead to civil removal proceedings.")**;** *see also Am. Ins. Ass'n v.
Garamendi*, 539 U.S. at 424; *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008)
("[I]mmigration cases often involve complex public and foreign policy concerns with which the
executive branch is better equipped to deal.").  A provision like Section 10, which would operate

to contradict the foreign relations commitments of the United States — threatens not only to disrupt future U.S. foreign relations efforts, but also risks negative reciprocity of the treatment of U.S. citizens abroad, among other deleterious effects.  Burns Decl. ¶¶ 9, 35.  Such interference with the fundamental authority to conduct foreign affairs cannot stand.  *See, e.g.*, *Garamendi*, 539 U.S. at 396 (finding obstacle preemption where a state law impinged on the executive branch's authority to singularly control foreign affairs); *Crosby*, 530 U.S. 363 (similar); *Chy Lung v. Freeman* 92 U.S. 275, 280 (1875) (finding it irreconcilable with the constitutional structure, that "a single State can, at her pleasure, embroil us in disastrous quarrels with other nations.").  For all of the foregoing reasons, the United States is substantially likely to prevail in its preemption challenge to Section 10.

### B.  Section 11(a) of H.B. 56 – Alabama's New Criminal Sanction Against Unauthorized Aliens Who Solicit or Perform Work in a Public or Private Place – is Preempted by the Federal Employer Sanctions Scheme

Although Congress has specifically invited states to enforce alien employment restrictions in limited ways (*e.g.*, through bona fide state licensing schemes, *see* 8 U.S.C. § 1324a(h)(2), Section 11(a) claims the authority to re-write the employment laws altogether by overriding Congress's determination that criminal sanctions should not attach to the seeking or performance of work by unlawfully present aliens.  Section 11(a) thus conflicts with Congress's purposes and objectives embodied in the Immigration Reform and Control Act of 1986 ("IRCA") — Congress's comprehensive scheme for regulating alien employment.

#### 1.  Congress Has Established the Exclusive Sanctions Regime With Respect to Alien Employment

Section 11(a) of the Act provides:

It is unlawful for a person who is an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state.

22

Ala. H.B. 56 § 11(a).   The Act's definition of "unauthorized alien" relies on the federal determination as to who is authorized to work.   Ala. H.B. 56 § 3(16).   A violation of Section 11(a) is a Class C misdemeanor and is punishable by a fine of not more than $500.   Ala. H.B. 56 § 11(h).

As the Ninth Circuit recognized in *Arizona*, IRCA reflects Congress's deliberate choice not to criminally penalize unauthorized aliens for performing work, much less for attempting to perform it.   *See Arizona*, 641 F.3d at 359 ("We . . . conclude that the text of 8 U.S.C. § 1324a, combined with legislative history demonstrating Congress' affirmative choice not to criminalize work as a method of discouraging unauthorized immigrant employment, likely reflects Congress' clear and manifest purpose to supercede [sic] state authority in this context. . . .   Congress' inaction in not criminalizing work, joined with its action of making it illegal to hire unauthorized workers, justifies a preemptive inference that Congress intended to prohibit states from criminalizing work.").   IRCA's "comprehensive scheme" places a primary emphasis on employer sanctions.   *See Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 147-50 (2002); *U.S. v. Zheng*, 306 F.3d 1080, 1087 (11th Cir. 2002) (explaining that the "House Committee was of the opinion that the most reasonable approach to the problem [of illegal immigration] was to make unlawful the "knowing" *employment* of illegal aliens") (emphasis added); *Arizona*, 641 F.3d at 357-60.   IRCA provides robust penalties for employers of unauthorized aliens, and no criminal penalties for the aliens who simply perform or solicit employment.   *See* 8 U.S.C. § 1324a *et seq*; Ragsdale Decl. ¶ 10.   Among its many provisions targeting employers, IRCA punishes the knowing hiring of unauthorized workers, 8 U.S.C. § 1324a(a)(1)(A), the recruitment of such workers, *id.*, the continued employment of such workers, *id.* § 1324a(a)(2), and the use of contracts or subcontracts to hire unauthorized workers, *id.* § 1324a(a)(4).   IRCA

also creates a detailed compliance scheme to enforce an employer's obligations, with escalating monetary penalties, and the prospect of injunctive sanctions.  *See id.* § 1324a(e)(4); 8 C.F.R. § 274a.10.  Criminal penalties against employers are permitted only in the most extreme cases, those involving "a pattern or practice of violations."  8 U.S.C. § 1324(f)(1).

Congress also demonstrated what sanctions it deemed appropriate for unauthorized aliens who perform work, by providing only narrowly tailored sanctions against such aliens, including deportation, and special sanctions for the presentation of fraudulent documents.  *See, e.g.*, 8 U.S.C. § 1227(a)(1)(C)(i) (failure to maintain immigrant status is a deportable offense); 8 C.F.R. § 214.1(e) (prohibiting non-immigrant aliens from unauthorized employment and classifying such conduct as a failure to maintain status under the INA); 8 U.S.C. § 1324c (civil monetary fines for use of fraudulent documents); 18 U.S.C. 1546(b) (criminal sanctions for false attestation or document fraud to obtain employment).  Congress, however, decidedly did not criminalize the mere performance or solicitation of work by an unauthorized alien, believing that criminal sanctions were inappropriate and inhumane.  *See* H.R. Rep. No. 99-682(I) at 46, reprinted in 1986 U.S.C.C.A.N. 5649, 5650 ("Now, as in the past, the Committee remains convinced that legislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens."); *Arizona*, 641 F.3d at 357n.17 ("We find it particularly relevant here that during the hearings which shaped IRCA, the Executive Assistant to the INS Commissioner stated that the INS did 'not expect the individual to starve in the United States while he is exhausting both the administrative and judicial roads that the [INA] gives him.') (internal citation omitted).  Congress's view that incarceration is not an appropriate option for punishing unauthorized aliens is made all the more evident by other provisions of IRCA which establish Congress's  desire "to protect unauthorized immigrant workers from

financial exploitation — a burden less severe than incarceration." *Arizona*, 641 F.3d at 359.  For

example, the INA requires employers to repay all employees — including unauthorized aliens —

for any extracted financial bonds, and it further provides for a system of complaints,

investigation, and adjudication for violations.  *See* 8 U.S.C. §§ 1324a(g), 1324a(e).  Where

Congress did not require undocumented workers to forfeit their bonds, it is highly unlikely that

Congress would favor incarceration of the same workers.  *See Arizona*, 641 F.3d at 359.

### 2.  By Criminalizing Work Performed by Unlawfully Present Aliens, Section 11 Impermissibly Conflicts With IRCA's Objectives

By attempting to override Congress's conscious choice not to criminally punish aliens for

unauthorized work, Alabama has created a clear conflict with federal law and has undermined

the objectives of IRCA.  *See Crosby*, 530 U.S. at 380; *Puerto Rico Dep't. of Consumer Affairs* v.

*Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988).  In fact, by criminalizing "work . . . in a private

place," Section 11(a) is even more restrictive than its Arizona law counterpart which the Ninth

Circuit enjoined.  *See Arizona*, 641 F.3d at 357-60 (holding that "there is likely no set of

circumstances under which [a virtually identical provision of Arizona law which criminalized

unauthorized work] would not be preempted").  Because the Supremacy Clause does not permit

Alabama to second-guess Congress's decision not to impose sanctions on employees for

soliciting or performing work, the United States is substantially likely to prevail in its challenge

to Section 11(a).  *See, e.g., Bonita Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152

(1989); *Felder v. Casey*, 487 U.S. 131, 143 (1988).

### C.  Section 16 & 17 Of H.B. 56 – Alabama's New Penalty System Against Employers Who Hire Unauthorized Aliens – is Preempted by the Federal Employer Sanctions Scheme

IRCA contains the following prohibition on state and local employer sanctions:

The provisions of this section preempt any State or local law imposing civil or criminal

sanctions (*other than through licensing and similar laws*) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens. [4]

8 U.S.C. § 1324a(h)(2) (emphasis added).  In contravention of IRCA's prohibition, Alabama

seeks, through Sections 16 and 17 of the Act, to promulgate its own sanctions scheme for

employers or would-be employers of unauthorized aliens.  Because IRCA expressly forecloses

Alabama from doing so, Sections 16 and 17 are preempted.

### 1.   Section 16 Violates IRCA's Prohibition on Employer Sanctions

Section 16(a) provides:

> No wage, compensation, whether in money or in kind or in services, or remuneration of any kind for the performance of services paid to an unauthorized alien shall be allowed as a deductible business expense for any state income or business tax purposes in this state.  This subsection shall apply whether or not an Internal Revenue Service Form 1099 is issued in conjunction with the wages or remuneration.

Ala. H.B. 56 § 16(a).

"Any business entity or employee who knowingly fails to comply with the requirements of this

section shall be liable for a penalty equal to 10 times the business expense deduction claimed in

violation of subsection (a)."  Ala. H.B. 56 § 16(b).  Section 16 falls outside IRCA's savings

clause authorizing state or local authorities to impose civil or criminal sanctions "through

licensing and similar laws."  "A license is a right or permission granted in accordance with law

. . . to engage in some business or occupation, to do some act, or to engage in some transaction

which but for such license would be unlawful."  *Whiting*, 131 S. Ct. at 1978 (citing *Webster's*

*Third New Dictionary* 1304 (2009)) (internal quotations omitted).  "IRCA does not define

---

[4]   An "unauthorized alien" under IRCA is an alien who is neither "lawfully admitted for permanent residence" nor "authorized to be . . . employed by [the INA] or by the Attorney General."  8 U.S.C. § 1324a(h)(3).  H.B. 56 uses the same definition.  Ala. H.B. 56 § 3(16) (defining "unauthorized alien" as "[a]n alien who is not authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3).")

26

'sanction,' but by its ordinary meaning, a sanction is 'a restrictive measure used to punish a specific action or to prevent some future activity.'" *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) (citing Webster's Third New Int'l Dictionary 2009).  Thus, the "penalty" specified by Section 16(b) is a "sanction" under IRCA; it does not speak to any "right or permission . . . to engage in some business or occupation"; instead, it speaks of an obligation to remit a prescribed monetary amount to the Alabama Department of Revenue triggered by certain actions that contravene Alabama law (*i.e.*, taking tax deductions in connection with wages or remuneration paid to unauthorized aliens).

To be sure, Section 16(b)'s penalty applies only to those employers of unauthorized aliens who claim the prohibited tax deduction.  But this distinction does not take Section 16(b) outside of IRCA's prohibition; the obligation to pay this penalty arises only if the taxpayer is an employer of unauthorized aliens.  *Cf. Edmondson*, 594 F.3d at 766 (holding that a conditional non-licensing sanction, exposing employers to civil liability for hiring unauthorized aliens, was still impermissible under IRCA because "an employer is subject to sanction only if the employer retains an unauthorized alien.").  By making employment of unauthorized aliens a necessary condition for its non-licensing sanctions, Section 16(b) runs afoul of IRCA's express-preemption clause.

Likewise, Section 16(a) is an impermissible sanction because it excludes employers of unauthorized aliens from a generally available tax benefit. The mere fact that Section 16(a) contemplates the denial of a benefit, rather than the imposition of a penalty, is of no moment.  In economic terms, the denial of an otherwise-available tax benefit is indistinguishable from an equivalent tax penalty.  As IRCA's express-preemption clause makes clear, states can alter that economic calculus for employers only through licensing laws.  IRCA's prohibition would be an

27

empty formality if states could evade its prohibition on employer sanctions by framing a sanction as a "denial of a tax benefit."  Because Sections 16(a) and (b) both seek to impose sanctions for hiring unauthorized aliens, and because those section are not saved from preemption by the narrow exception for "licensing [or] similar laws," IRCA preempts them.

### 2. The Employer Tax Deduction Provision is Not Severable From the Penalty Provision

Even if this Court were to determine that Section 16(a) is not a "sanction" and therefore not expressly preempted by 8 U.S.C. 1324a(h)(2), Section 16(a) cannot stand apart from Section 16(b), whose "penalty" provision assuredly does come within the ambit of what IRCA proscribes.  If Section 16(b) falls, Section 16(a) is not severable and falls as well.  Because "[s]everability is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996), Alabama law governs this question.  In this respect, the Alabama Supreme Court has determined that:

> [I]f the [statutory provisions] are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected.  But if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.

*King v. Campbell*, 988 So.2d 969, 982 (Ala. 2007) (citations and quotations omitted).  The presence of a general severability clause addressing H.B. 56 as a whole does not change the fact that invalidating one provision also invalidates provisions that are "dependent, conditional, or connected."  Section 16(b)'s penalty provision is obviously not "wholly independent" from prohibitions set out in Section 16(a).  Nor is there reason to believe that the Alabama Legislature would have passed 16(a) without any enforcement mechanism.  To the contrary, Representative

and bill co-sponsor Mickey Hammon has made clear that Alabama enacted H.B. 56 not because

of any perceived infirmity in federal immigration law itself, but based on Alabama's view that

federal authorities have not enforced federal immigration law adequately.  Representative

Hammon stated that, "When you have thousands of bureaucrats and agencies everywhere that

can simply say, 'I don't like this law, I'm not going to follow it,' then the law is null and void.

This makes sure everyone knows they are required to enforce the law.  We do not intend for our

law to sit idly by and not be enforced." Brian Lawson, *Court Challenges Loom For New, Far-

Reaching Alabama Immigration Law*, Huntsville Times, June 19, 2011.[5]  In view of this

statement by H.B. 56's co-sponsor, Alabama's views could hardly be clearer: Absent

enforcement, legal prohibitions are "null and void."  *Accord Chism v. Jefferson County*, 954

So.2d 1058, 1074 (Ala. 2006) ("It is presumed that the legislature does not enact meaningless,

vain, or futile statutes.") (citations omitted).  Because Section 16(a) is inarguably "connected"

with Section 16(b), and because available evidence indicates that Alabama would not have

passed Section 16(a) without Section 16(b), Section 16(a) is inseverable from Section 16(b).[6]

---

[5] *Available at*:
http://blog.al.com/breaking/2011/06/court_challenges_loom_for_alab.html

[6]  This is not a situation in which Alabama has enacted a statute that is "constitutional on its face" that Alabama had the "undoubted power to enact and which could be reenacted in its exact form" absent Representative Hammon's comments.  *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968).  To the contrary, Section 16 — like much of H.B. 56 — is legally invalid independent of the statements any legislator did or could make.  Nor can Alabama dismiss Representative Hammon's statements as merely views of an "individual legislator."  *Eagerton v. Terra Resources*, Inc., 426 So.2d 807, 809 (Ala. 1982).  The statements of a bill's sponsor are "powerful evidence of legislative intent," *Vensor v. People*, 151 P.3d 1274, 1279 (Colo. 2007), which is consistent with the Eleventh Circuit's approach.  *See United States v. Ambert*, 561 F.3d 1202, 1214 (11th Cir. 2009) (confirming "broad purpose" of SORNA by "review[ing] . . . the legislative history" and citing statements from SORNA co-sponsor Sen. Orrin Hatch); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1227 (11th Cir. 2005) (relying on legislative history to reject argument by Schiavo's parents that congressional legislation passed solely for the purpose of granting them a cause of action was also intended to grant parents temporary injunctive relief).

For all of the foregoing reasons, the United States is substantially likely to prevail in its challenge to Section 16.

### 3.   Section 17 Violates IRCA's Prohibition on Employer Sanctions

Like Section 16, Section 17 is also preempted.  Section 17(a) provides:

> It shall be a discriminatory practice for a business entity or employer to fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) or discharge an employee working in Alabama who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) while retaining or hiring an employee who the business entity or employer knows, or reasonably should have known, is an unauthorized alien.

Ala. H.B. § 17(a).  And Section 17(b) provides:

> A violation of subsection (a) may be the basis of a civil action in the state courts of this state.  Any recovery under this subsection shall be limited to compensatory relief and shall not include any civil or criminal sanctions against the employer.

*Id.*, § 17(b).  In deciding such cases, the court will consider, as proof of immigration status, only federal verifications pursuant to 8 U.S.C. § 1373(c).  *Id.*, § 17(e).

Notwithstanding Section 17(b)'s statement that a private plaintiff under Section 17 does not recover "civil or criminal sanctions against the employer," Section 17 still runs afoul of IRCA's express-preemption provision.  Again, a sanction is "'a restrictive measure used to punish a specific action or to prevent some future activity.'"  *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (2010) (citing Webster's Third New Int'l Dictionary 2009).  Here, "the restrictive measure" — the threat of compensatory relief, H.B. 56 § 17(b), and

---

Other courts have also reached a similar conclusion.  *See, e.g., DiProspero v. Penn*, 183 N.J. 477, 499 (N.J. 2005) (bill sponsor's statements are a "helpful tool in understanding legislative intent"); *Emerald Casino, Inc. v. Illinois Gaming Bd.*, 346 Ill.App.3d 18, 36 (Ill. App. 2 Dist. 2003) ("The statements of a bill's sponsor matter when discerning legislative intent."); *State v. Alfatlawi*, 153 P.3d 804, 818 (Utah App. 2006) (statements of bill sponsor relevant to legislative intent inquiry).

attorney's fees, H.B. 56 § 17(c) — is intended to "punish or prevent" the retention or hiring of unauthorized aliens whose employment comes at the expense of United States citizens or lawfully resident aliens. *See* Ala. H.B. 56 § 17(a).

In *Chamber of Commerce v. Edmondson*, the Tenth Circuit considered a similar provision of an Oklahoma law authorizing compensatory relief. Citing the definition of "sanction" quoted previously, Oklahoma contended that its law was not preempted by IRCA because the relief it authorized was compensatory rather than punitive in nature, and only purely punitive relief constituted a "sanction" for IRCA preemption purposes. The Tenth Circuit rejected this argument, observing that there was no evidence that Congress intended to preempt only purely punitive sanctions. *Edmondson*, 594 F.3d at 765. Alabama has imposed even more "sanctions" than Oklahoma: An employer who violates Section 17(b) is liable not only for compensatory relief, but also attorney's fees. Like the Oklahoma statute invalidated in *Edmonson*, Section 17(b) applies only to employers who "fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States . . . or who discharge an employee working in Alabama who is a United States citizen or an alien who is authorized to work in the United States . . . *while retaining or hiring an employee who the business entity or employer knows, or reasonably should have know, is an unauthorized alien.*" Ala. H.B. 56 § 17(a) (emphasis added). *Accord Edmondson*, 594 F.3d at 766 ("We are not persuaded by Oklahoma's contention that Section 7(C) merely creates a cause of action for the termination of legal residents. While that is a necessary prerequisite, an employer is subject to sanction *only if* the employer retains an unauthorized alien."). Accordingly, the United States is substantially likely to prevail in its preemption challenge to Section 17.

### D. Alabama's Prohibitions on the Harboring and Transporting of Aliens, and on Encouraging Their Travel into the State, are Preempted by Federal Law.

Sections 13(a)(1)-(3) of H.B. 56 make it a state crime to provide transportation to aliens in furtherance of their unlawful presence, and also criminalize the concealing and harboring of aliens, as well the encouraging or inducing of aliens to enter Alabama, in reckless disregard of their unlawful presence.  The federal government is constitutionally vested with the exclusive authority over the process of alien entry, and Congress has regulated this subject matter pursuant to that authority.  These provisions are therefore preempted by this constitutional authority and its exercise through the INA, and they also impermissibly regulate interstate movement in violation of the Commerce Clause.

*First*, through various provisions of the INA, Congress has exercised its constitutional authority to regulate the terms and conditions of an alien's entry, admission, and residence in the United States.  *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) ("The conditions of entry for every alien . . . the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress."); *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895).  In Part VIII of Chapter 12 of the INA, Congress has provided a detailed set of sanctions for those who unlawfully enter, 8 U.S.C. § 1325, and for the third parties who aid in their entry and stay, *see* 8 U.S.C. § 1323 (penalizing persons for unlawfully bringing aliens into the United States); 8 U.S.C. § 1324 (penalizing persons for bringing in or harboring certain aliens); 8 U.S.C. § 1327 (penalizing persons who assist certain inadmissible aliens to enter the country); 8 U.S.C. § 1328 (penalizing the importation of aliens for immoral purposes).  These statutory provisions reflect the fulfillment by Congress of the exclusive authority vested in it by the Constitution to substantively regulate the terms and conditions of an alien's entry and subsequent movement,

32

including by criminally sanctioning third parties who assist or aid that entry.  Indeed, in the context of discussing the unique and comprehensive nature of the federal legislation governing the terms of entry, the Supreme Court in *De Canas* specifically contrasted Section 1324's concerns regarding alien transportation (which *De Canas* considered related to the INA's core concern of alien entry) with Section 1324's concern with alien employment (which, prior to IRCA, represented a relatively minor concern of the immigration laws).

The preemptive force of this constitutional and congressional authority, including Section 1324, has been recognized by several courts.  *See, e.g., Lozano v. City of Hazleton*, 620 F.3d 170, 220-21 (3d Cir. 2010) (finding that the City's prohibition on rental housing was preempted, *inter alia*, because the INA "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status," and explaining that even though the City's "housing provisions neither control actual physical entry into the City, nor physically expel persons from it . . . '[i]n essence,' that is precisely what they attempt to do") (*vacated by Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011))[7]; *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1056 (S.D. Cal. 2006) (finding "serious concerns" of preemption by § 1324); *See Georgia Latino Alliance For Human Rights v. Deal*, — F.Supp.2d —, 2011 WL 2520752, *11-15 (N.D. Ga. 2011) (finding similar state concealment and transportation laws preempted, because "[u]nlike *De Canas*, Congress has expressed much more than 'peripheral concern' with the transportation, harboring, and inducement of illegal aliens. . . . That concern is expressed in the text of § 1324.  [Georgia's prohibition on concealment and

---

[7] *Lozano*, which also addressed the issue of whether a municipal licensing ordinance was preempted by IRCA, was vacated and remanded in light of the Supreme Court's recent decision in *Whiting*.  Because *Whiting* did not address the preemptive effect of federal law on state or local ordinances addressing transportation, harboring, concealment, or housing, we do not believe the result should be any different on remand with respect to the housing ordinance.

transportation of aliens] seeks not only to replace and complement the text of § 1324 with its own criminal provisions, but to replace the discretionary and interpretive mechanisms of the federal government as well"); *cf. United States v. Sanchez-Vargas*, 878 F.2d 1163, 1169 (9th Cir. 1989) ("§ 1324(a)(1) . . . presents a single comprehensive 'definition' of the federal crime of alien smuggling – one which tracks smuggling and related activities from their earliest manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens).").

Sections 13(a)(1)-(3) are preempted because, by criminalizing the transportation, harboring, and concealment of unlawfully present aliens, the State is improperly imposing its own substantive regulation over facets of alien entry into the United States.  While Alabama might claim that these provisions simply mirror federal law, even complementary or auxiliary state regulations would be impermissible in such an area.  *See Gould, Inc.*, 475 U.S. at 286 (finding that where states have no independent authority to regulate an activity, they are also prohibited from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by [federal law]").   In this case, these new state crimes for transportation, harboring, and concealment carry with them an independent state penalty and prosecution enforcement mechanism that operates wholly outside of federal control.  This is particularly troubling here, because Congress has already made quite clear the precise role that states should have with respect to enforcing federal transportation, harboring, and concealment laws: Congress has provided that states can make *arrests* for violations of these federal prohibitions. *See* 8 U.S.C. § 1324(c).  The ability to make arrests for such violations in aid of federal enforcement, means that the ultimate prospect of prosecution and sanctions, rests with the federal government.  Sections 13(a)(1)-(3), however, remove any federal discretion and impermissibly

34

places the entire operation — from arrest to incarceration — squarely in the State's purview.

*Second*, Sections 13(a)(1)-(3) also violate the dormant Commerce Clause, which forbids state attempts to discourage or otherwise restrict the movement of people between states.  Article I, Section 8 of the Constitution grants Congress the right to regulate commerce among the states — a positive grant of power that has been interpreted as limiting the states' power to interfere with interstate commerce.  The Supreme Court has specifically held that the "Dormant Commerce Clause" forbids certain state attempts to restrict the movement of people between states.  *See Edwards v. California*, 314 U.S. 160, 172-73 (1941).  *Edwards* involved a challenge to a depression-era California statute prohibiting "the 'bringing' or transportation of indigent persons into California." *Id.* at 173.  The Supreme Court invalidated the statute under the Dormant Commerce Clause, which "prohibit[s] attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders." *Id.*  It is not constitutionally significant that Sections 13(a)(1)-(3) attack those who would facilitate such movement, rather than the aliens themselves.  The statute in *Edwards* did not target the indigent person, but instead criminalized the conduct of those who assisted with the interstate movement, just as Sections 13(a)(1)-(3) target those who, among other things, "encourage[e] or induc[e] an alien "to come to or reside in" Alabama.  *See also Georgia Latino Alliance For Human Rights*, 2011 WL 2520752, at *12 (explaining that "[d]espite superficial similarities" with federal law, Georgia's prohibition on transporting and harboring aliens goes too far in that it "prohibits knowingly inducing, enticing or assisting illegal aliens to enter Georgia," but that "[o]nce in the United States, it is not a federal crime to induce an illegal alien to enter Georgia from another state").  Accordingly, Sections 13(a)(1)-(3) also run afoul of the Commerce Clause.

### E.  Alabama's Housing Restriction – Section 13(a)(4) of H.B. 56 – is Preempted by Federal Law

Section 13(a)(4) of the Act criminalizes housing "rental agreement[s]" between landlords and unlawful alien renters, if the landlord "knows or recklessly disregards the fact that the alien is unlawfully present in the United States."  Ala. H.B. 56 § 13(a)(4).  "Local regulation that conditions the ability to enter private contract[s] for shelter on federal immigration status is of a fundamentally different nature than the sorts of restrictions on employment or public benefits that have been found not to be preempted regulations of immigration." *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 855 (N.D. Tex. 2010).  Because "[d]eciding which aliens may live in the United States has always been the prerogative of the federal government," *Lozano v. City of Hazleton*, 620 F.3d 170, 220 (3d Cir. 2010), courts have repeatedly determined that anti-housing rental ordinances like Section 13(a)(4) are preempted by 8 U.S.C. § 1324.  *See Lozano*, 620 F.3d at 224 (finding housing ordinance preempted); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1056 (S.D. Cal. 2006) (finding "serious concerns" of preemption based on § 1324 and issuing preliminary injunction); *Villas at Parkside Partners*, 701 F. Supp. 2d. at 859 (issuing permanent injunction).  Indeed, a court has recently issued a preliminary injunction against a similar anti-harboring provision of Georgia law, holding that plaintiffs were likely to prevail in their claim that Section 1324 preempted the Georgia ordinance.  *See Georgia Latino Alliance For Human Rights v. Deal*, — F.Supp.2d —, 2011 WL 2520752, *13 (N.D. Ga. 2011).

As the Supreme Court has recognized, states may "neither add to nor take from the conditions imposed by Congress upon admission, naturalization and *residence* of aliens in the United States or the several states." *De Canas*, 424 U.S. at 358 (adding emphasis and omitting citation).  Relatedly, states also may not impose "an auxiliary burden upon the entrance or

residence of aliens that was never contemplated by Congress." *Toll v. Moreno*, *458 U.S.* 1l, 12 (1982) (citations omitted). Like the ordinance struck down in *Lozano*, Section 13(a)(4) does not expressly expel unlawful aliens from the state or prevent them from entering. But "it is difficult to conceive of a more effective method" of doing just that than establishing criminal liability for anyone who might provide them shelter. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 164 (1989).

This is not "a situation where [Alabama] is aiding in the enforcement of federal immigration law based on federal standards through the means set forth by federal law; rather, [Alabama] is attempting to enforce its own scheme that incorporates federal standards for purposes not contemplated by Congress." *Villas at Parkside Partners*, 701 F. Supp. 2d at 859. That this is Alabama's "own scheme" and not the federal government's is confirmed by the fact that Alabama's housing rental prohibition, if enforced to its maximal extent, which it must be, *see* H.B. 56 § 6, would prevent the state's unlawful alien population from obtaining practically any kind of housing or shelter.[8] The federal government "has never evidenced an intent for [unlawful aliens] to go homeless." *Lozano*, 620 F.3d at 224; *see also* Burns Decl. ¶ 35 ("U.S. immigration law . . . has provided that the unlawful presence of a foreign national, in itself,

---

[8] In this regard, it is worth noting the apparent breadth of Section 13(a)(4). This provision of the Act incorporates the definition of "rental agreement" as defined at 35-9A-141 of the Alabama Code which defines "rental agreement" as "all agreements, written or oral, and valid rules and regulations adopted under Section 35-9A-302 embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Ala. Code 35-9A-141(13). A "dwelling unit" "means a structure or the part of a structure, including a manufactured home, that is rented as a home, residence, or sleeping place by one or more persons." *Id.* at 35-9A-141(4). Although Section 13(a)(4) would clearly apply to longer-term housing agreements such as apartment leases, there is nothing in 35-9A-141 that suggests that a short-term motel or hotel room rental could not or should not constitute a "dwelling unit" under Alabama law. Although a contract for lodging for a single night would fall outside Section 27's non-enforceability provision, *see* Ala. H.B. § 27(b), whether a contract is enforceable does not necessarily answer the question of whether a motel or hotel owner could be held criminally liable pursuant to Section 13(a)(4) for entering into such a contract.

ordinarily will not lead to . . . punitive measures [such as] legislated homelessness[].").  And indeed, the statutory provision for removal of even unlawfully present aliens from the United States plainly contemplates that an alien who challenged his removal may remain in the United States pending entry of a final removal order.  *See also* 8 U.S.C. § 1229(a)(1)(F)(i) (an alien noticed to appear for a removal proceeding must immediately provide the Attorney General "with a written record of an address . . . at which the alien may be contacted respecting [the] proceedings.").  By Section 13(a)(4), Alabama effectively seeks to decide who may reside within its borders.  Because deciding which aliens may live within the United States has always been a power committed exclusively to the federal government, Section 13(a)(4) of the Act impermissibly encroaches on that area of "significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000), and is therefore preempted.

### F.  Alabama's Restrictions on Private Contracts and Transactions with the Government – Sections 27 and 30 of H.B. 56 – Are Preempted by Federal Law

With limited exceptions, Section 27 of H.B. 56 prevents Alabama state courts from enforcing the terms or conditions of any contract to which an unlawfully present alien was a party if the other party had direct or constructive knowledge that the alien was unlawfully present at the time the parties entered into the contract.  In addition, Section 30 makes it a felony for any unlawfully present alien to enter into or attempt to enter into a "business transaction" with a state or local government within Alabama.  As set forth below, the United States is substantially likely to prevail on its claim that federal law preempts these provisions.

#### 1. Section 30 Conflicts with Federal Policies Regarding the Treatment of Aliens

Section 30(b) provides:

An alien not lawfully present in the United States shall not enter into or attempt to enter into a business transaction with the state or a political subdivision of the state and no

person shall enter into a business transaction or attempt to enter into a business transaction on behalf of an alien not lawfully present in the United States.

Ala. H.B. 56 § 30(b).

Section 30(a) broadly defines the term "business transaction" to include:

> any transaction between a person and the state or a political subdivision of the state, including, but not limited to, a person applying for or renewing a motor vehicle license plate, applying for or renewing a driver's license or nondriver identification card, or applying for or renewing a business license. "Business transaction" does not include applying for a marriage license.

*Id.*, § 30(a).  Any person who wants to enter into such a "business transaction" must provide proof of lawful residence.  *Id.*, § 30(c).  Violation of Section 30 is a Class C felony.  *Id.*, § 30(d).

Although a "business transaction" is defined as "any transaction between a person and the state or a political subdivision of the state," the Act does not define "transaction" itself.  In any case, a "business transaction" for Section 30 purposes would necessarily include interactions with the state or political subdivision involving an exchange of money, other than an application for a marriage license.  Ala. H.B. 56 § 30(a).  This would mean that an unlawfully present alien would commit a felony by, for example, paying his bills for utilities provided by local governments, such as water or sewer service, paying municipal property tax assessments, or paying the filing fee required to initiate a court case.  Section 30 thus transforms otherwise lawful conduct into unlawful conduct by virtue of who is performing it.  That is, Section 30 conduct becomes criminalized only because it is engaged in by an unlawfully present alien.  If Section 30 were to remain, Alabama could easily negate policies enacted by Congress by declaring otherwise innocent conduct to be illegal only when committed by an unlawfully present alien.

This is particularly problematic where, as here, the conduct criminalized extends to transactions that, for the overwhelming majority of all Alabama residents, are both universal and

unavoidable.  For example, Alabama has essentially given unlawful aliens the choice between

not paying for — and thus not having — service for basic necessities such as water, paying for

those essentials and thereby committing a felony, or leaving Alabama.  Manifestly, it is not for

Alabama or any other state to impose this sort of "distinct, unusual and extraordinary burdens

and obligations upon aliens."  *Hines*, 312 U.S. 52, 65-66 (1941); *see also* Burns Decl. ¶ 37

("Section 30 . . . mark[s] a dramatic departure from the norms of mutuality, hospitality, and

respect that have informed U.S. law and policy in this area.").

    Alabama's treatment of unlawfully present aliens in Section 30 also conflicts with

Congress's longstanding policy determination not to criminalize unlawful presence.  *See also*

*supra*, pages 20-22 (Section 10) & pages 36-38 (Section 13(a)(4)) (both effectively criminalizing

unlawful presence).  Accordingly, the United States is substantially likely to prevail in its

challenge to Section 30.

### 2. Section 27 Conflicts with Federal Policies Regarding the Treatment of Aliens

    As with Section 30, in Section 27 Alabama has impermissibly altered "the conditions

imposed by Congress upon admission, naturalization and *residence* of aliens in the United States

or the several states."  *De Canas*, 424 U.S. at 358 n.6 (adding emphasis and omitting citation).

Subject to limited exceptions, Section 27 mandates that:

> No court of this state shall enforce the terms of, or otherwise regard as valid, any
> contract between a party and an alien unlawfully present in the United States, if
> the party had direct or constructive knowledge that the alien was unlawfully
> present in the United States at the time the contract was entered into, and the
> performance of the contract required the alien to remain unlawfully present in the
> United States for more than 24 hours after the time the contract was entered into
> or performance could not reasonably be expected to occur without such
> remaining.

Ala. H.B. 56 § 27(a).

Like Section 30, Section 27 poses the same specter of burden and harassment of aliens, lawful and unlawful alike.  *See* Burns Decl. ¶ 37.  Section 27 would sharply limit both aliens' willingness and ability to enter into contracts, as well as the willingness and ability of potential counterparties.  Aliens would be loath to enter into a contract if they knew that the other party could breach the contract without legal consequence.  Even if the alien believed he could ultimately vindicate his contractual rights, the prospect of being swindled would still be a deterrent to entering into any contract in the first place.  Prospective counterparties also would have reason to be wary.  An unlawfully present alien could just as easily breach a contract in the belief (accurate or not) that it would be unenforceable under Section 27.  Recognizing this possibility, counterparties would also be reluctant to enter into contracts with those whom they knew or suspected to be unlawfully present aliens.  But whenever such beliefs were mistaken, Section 27 would impair the ability of lawfully present aliens or U.S. citizens to make contracts.  In any case, there is no evidence that Congress intended, as a categorical matter, unlawfully present aliens' contracts to be unenforceable.  *See Mureau v. Oppenheim*, 663 F.2d 1300, 1308 (5th Cir. 1981) ("We seriously doubt whether illegal entry, standing alone, makes outlaws of individuals, permitting their contracts to be breached without legal accountability.").  By abrogating an unlawfully present aliens' ability to enter into and enforce contracts, Alabama has imposed different and starkly more burdensome conditions on aliens in violation of *De Canas* and *Toll*.  For all of these reasons, the United States is substantially likely to prevail in its preemption challenge to Sections 27 and 30.

### G.  Section 28 of H.B. 56 – Alabama's Education Registration Scheme – is Preempted by Federal Law

#### 1.  Alabama's Educational Registration Scheme Conflicts with Federal Policy, and Will Impermissibly Burden Lawfully Present Aliens

Just as Alabama may not punish unlawful presence by barring aliens from obtaining housing or making contracts if they are unlawfully present, *see supra*, pages 36-41, Alabama may not impose a comparable burden on unlawfully present aliens who are school-age children, or parents of school-age children.  Section 28 imposes just such an impermissible burden: contrary to strong federal policy supporting education for children, involvement in that education by schoolchildren's parents, and humane treatment of foreign nationals, Section 28 discourages parents from enrolling their children in school by demanding that students prove lawful presence. That requirement serves no lawful purpose, as the Constitution guarantees all children an equal right to attend public school irrespective of their immigration status (let alone their parents'). *See Plyler v. Doe*, 457 U.S. 202 (1982).  Federal law preempts any attempt to impose such an irrational new sanction for unlawful presence.

There is no question that, if allowed to go into effect, Section 28 would have a chilling effect on school attendance by children who are aliens or whose parents are aliens.  That effect would extend not only to parents who know their children are unlawfully present — some of whom would likely keep their children home rather than have their status reported to authorities — but to parents of lawfully present children as well.  Some parents or guardians of lawfully present alien children may not be able to provide the documentation Section 28 requires and thus fear the consequences of the school's statutorily-required presumption of unlawful presence.  *See* Declaration of Tony Miller, Deputy Secretary and Chief Operating Officer, U.S. Department of Education (Attached as Exhibit 3), at ¶¶ 11, 47.  For example, some parents may not have any

official documentation of their child's lawful presence.  And given the myriad designations and

rules governing federal immigration status, some of those parents may not be in a position to

declare, under penalty of perjury, their children's immigration status.  Thus, such parents or

guardians may choose to withdraw their children from school to avoid having to choose to

possibly perjure themselves, with all the consequences that might entail (or that the parent fears

such perjury might entail for themselves or their children, or both).  *Id.* ¶¶ 19-21, 46.  Section

28's reliance on parental reporting means that many lawfully present children would be reported

as unlawfully present.

Other aliens whose children were born in this country — and thus are United States

citizens — may keep their children home because of concerns about their own immigration

status.  Because Section 28's notification requirement applies if "upon review of the student's

birth certificate, it is determined that the student . . . is the child of an alien not lawfully present

in the United States," many aliens may not send their children to school because of concerns

about their own status.  Ala. H.B. 56 § 28(a)(3).  Nor could aliens have any assurance that any

information that they provide, or any determination schools make, would remain with state and

local officials.  Section 28 expressly permits state and local authorities to communicate with the

federal government regarding information obtained in connection with Section 28.  *See id.*,

§ 28(e) ("Public disclosure by any person of information obtained pursuant to this section which

personally identifies any student shall be unlawful, *except for purposes permitted pursuant to 8*

*U.S.C. Sections 1373 and 1644*") (emphasis added).

Although states retain in certain instances the "authority to act with respect to illegal

aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal,"

*Plyler*, 457 U.S. at 225, Section 28 does neither.  Under *Plyler*, even children unlawfully present

in the United States have a constitutional right to attend public elementary or secondary school.

As a result, federal law recognizes no legitimate interest in deterring alien children from

attending public school.  Alabama has no valid interest in creating an atmosphere so inhospitable

to unlawful aliens that it constructively evicts aliens (whether lawfully or unlawfully present)

from Alabama, or prevents them from entering.  *See supra*, page 36-38; *cf. Saenz v. Roe*, 526

U.S. 489, 511 (1999) (States "do not have any right to select their citizens").  Discouraging alien

children from obtaining an education is just such a measure.  *See Plyler*, 457 U.S. at 220 ("[I]t is

. . . difficult to conceive of a rational justification for penalizing [alien] children for their

presence within the United States.").

 Our nation has long viewed "education and the acquisition of knowledge as matters of

supreme importance."  *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).  Public schools stand as "a

most vital civic institution for the preservation of a democratic system of government, and as the

primary vehicle for transmitting the values on which our society rests."  *Plyler*, 457 U.S. at 221

(internal citations and quotations omitted).  [E]ducation furthermore "provides the basic tools by

which individuals might lead economically productive lives to the benefit of us all."  *Id.*

Consistent with the view that "education has a fundamental role in maintaining the fabric of our

society," *id.*, a foundational tenet of federal educational policy is and remains that all children,

regardless of immigration status, should have full access to public primary and secondary

schools, Miller Decl. ¶¶ 8, 48, and consequently school districts "may not request information

with the purpose or result of denying access to public schools on the basis of race, color, or

national origin."  *Id.* ¶ 10 (internal citations omitted).  Those policies underlie numerous federal

statutes, including those under which Alabama has voluntarily elected to accept hundreds of

millions of dollars per year in federal funding — funding the United States intends Alabama to

44

use to educate children regardless of immigration status.  *Id.* ¶¶ 5, 7, 14, 19, 22-23, 26, 38-40, 42, 47-48.  Unlike United States citizens, who ordinarily will be able to produce United States birth certificates, resident aliens will often be unable to do so.  This means that essentially all aliens attending public schools will be subject to the notification procedures of Section 28(a)(4), which requires in every instance a statement under penalty of perjury that the alien is lawfully present.  The parents or guardians of unlawfully present aliens therefore will face a Hobson's choice: Either fail to comply with the notification procedures, which will necessarily result in their child being "presumed" to be unlawfully present, with whatever consequences that might have (or that the alien might fear would occur), or perjure themselves by making a false statement about their child's status, with whatever consequences that might have.  To require an alien seeking access to education first to endure this sort of inquiry about whether one or one's children are lawfully present is the sort of "inquisitorial practices and police surveillance" that so troubled the *Hines* Court.  *Hines*, 312 U.S. at 74.

Furthermore, by hindering aliens' access to public schools, Alabama has unilaterally and dramatically departed "from the norms of mutuality, hospitality, and respect that have informed U.S. law and foreign policy."  Burns Decl., ¶ 37.  Alabama thus "risks the adoption of harmful reciprocal measures toward U.S. nationals by foreign governments," among other possible deleterious foreign policy consequences.  *Id.*, ¶ 38.  Because Section 28 "provoke[s] questions in the field of international affairs," Alabama's actions "bear an inseparable relationship to the welfare and tranquility of all the states, and not merely to the welfare and tranquility of one."  *Hines*, 312 U.S. at 66.  It is not Alabama's prerogative to "foster[] . . . a damaging perception that the United States is becoming more hostile to foreign nationals."  Burns Decl., ¶ 38.  Accordingly, Section 28 conflicts with federal policies in the areas of education and foreign

relations.

That Section 28 serves no legitimate state interest is confirmed by the law's overbreadth. The notification requirements apply if "upon review of the student's birth certificate, it is determined that the student was born outside the jurisdiction of the United States *or is the child of an alien not lawfully present in the United States.*"  Ala. H.B. 56 § 28(a)(3) (emphasis added). If an unlawfully present alien gives birth to a child in the United States, the child would be a United States citizen by virtue of the child's birth in the United States.[9]  Because the alien status of the parent would be irrelevant to the child's status in these circumstances, Alabama can have no legitimate reason for seeking this information in this circumstance.  The same is true even for children of aliens "born outside the jurisdiction of the United States."  It is not obvious how a child's birth certificate would allow school officials to determine the immigration status of the child's parents; even if a birth certificate contained immigration-status information about a parent at the time of birth, that information would be outdated by the time the child attended school.  Because Alabama has no legitimate educational purpose in inquiring about *parental* alien status, it stands to reason that Alabama's purpose in drafting Section 28 as it did was to discourage unlawful aliens from enrolling their children in school.

### 2.  Alabama's Mandatory Alien Registration Scheme for School Children is Preempted

As shown above, Alabama's mandatory data collection, classification, and reporting requirements serve no valid education-related purpose.  Instead, Alabama has impermissibly established a registration scheme for children (and derivatively their parents) akin to the one the

---

[9]  Moreover, simply because a child is born outside of the United States does not preclude the possibility that the child is a United States citizen—for example, by having a parent or parents who are United States citizens, the naturalization of a parent, and adoption by a United States citizen. *See, e.g.,* 8 U.S.C. §§ 1401(c)-(g) (birth abroad to United States citizen parent(s)), 1431(a)-(b) (citizenship through naturalization of a parent or through adoption).

Supreme Court invalidated in *Hines*, and the scheme is preempted for that further reason as well. The Pennsylvania alien registration law at issue in *Hines* required "every alien 18 years or over, with certain exceptions, to register once each year; provide such information as is required by the statute, plus any 'other information and details that the Department of Labor and Industry may direct; pay $1 as an annual registration fee; receive an alien identification card and carry it at all times; show the card whenever it may be demanded by any police officer or any agent of the Department of Labor and Industry; and exhibit the card as a condition precedent to registering a motor vehicle in his name or obtaining a license to operate one." *Hines*, 312 U.S. at 56 (internal quotations omitted). The Supreme Court ruled that Pennsylvania's mandatory registration scheme was preempted by federal law. *Id.* at 74.

No different result should obtain here with respect to Section 28. As the Supreme Court has observed, "[t]he States enjoy no power with respect to the classification of aliens," *Plyler*, 457 U.S. at 225 (citing *Hines*, 312 U.S. 52 (1941)), which is precisely what Section 28 purports to do. Through its immigration status inquiry and verification procedures, Section 28 contemplates dividing up public school children into two categories: those "presumed" to be unlawfully present, Ala. H.B. 56 §§ 28(a)(5), and those not "presumed" to be unlawfully present. Because the federal government has enacted a "complete scheme of regulation" for alien registration and classification, *see supra*, pages 17-22, Alabama may not "conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66-67. For all of the foregoing reasons, the United States is substantially likely to prevail in its challenge to Section 28.

### H. Sections 12 and 18 of H.B. 56 – Alabama's Mandatory Immigration Status Verification Scheme – are Preempted by Federal Law

Unlike many of the aforementioned provisions, sections 12 and 18 do not create new

state crimes or penalties associated with alienage.  These provisions, however, represent a

systematic effort by Alabama to inject itself into the enforcement of the federal government's

own immigration laws in a manner that is non-cooperative with the Secretary, and therefore is

impermissible.

Sections 12 and 18 operate in tandem to mandate immigration status verifications upon

an enormous number of routine encounters with law enforcement personnel.

Section 12(a) establishes the following scheme for verifying immigration status:

> Upon any lawful stop, detention, or arrest made by a state, county, or municipal
> law enforcement officer of this state in the enforcement of any state law or
> ordinance of any political subdivision thereof, where reasonable suspicion exists
> that the person is an alien who is unlawfully present in the United States, a
> reasonable attempt shall be made, when practicable, to determine the citizenship
> and immigration status of the person, except if the determination may hinder or
> obstruct an investigation.

Ala. H.B. 56 § 12(a).  In turn, Section 18 provides an overlapping verification mandate

for all persons arrested for driving without a license.  Upon such an arrest, Alabama

officials must make "[a] reasonable effort . . . to determine the citizenship of the person

and if an alien, whether the alien is lawfully present in the United States by verification

with the federal government pursuant to 8 U.S.C. § 1373(c)."  Ala. H.B. 56 § 18(c).  A

determination must be made within 48 hours, and if the person is unlawfully present, then

he "shall be considered a flight risk and shall be detained until prosecution or until

handed over to federal immigration authorities."  *Id.*, § 18(d).

These mandatory verification provisions are reinforced through the creation of a private

right of action, which subjects authorities to civil penalties of up $5,000 per day if a court

concludes that "any official or agency . . . [has] adopt[ed] or implent[ed] a policy" that "limits or

restricts the enforcement" of these provisions "to less than the full extent permitted by federal

law." Ala. H.B. 56 § 6(d).

Sections 12 and 18 of H.B. 56 convert the Alabama police force into a roving immigration patrol and conflict with the INA by prescribing an alien verification scheme that is inherently not one that is cooperative with the Secretary — despite the INA's explicit requirement that states and local officers cooperate with federal officers if they choose to assist in the identification of unlawfully present aliens for immigration enforcement purposes. The INA precludes such state-directed immigration enforcement efforts — and for good reason. Alabama's mandatory verification scheme promises to disrupt (i) federal control and discretion over immigration enforcement, (ii) the operation of DHS enforcement priorities generally, and (iii) the conditions of residence of lawfully present aliens. Any one of these effects is sufficient to preempt the statute. Accordingly, the United States is likely to succeed in its challenge to Sections 12 and 18.

### 1. Alabama's Mandatory Verification Scheme Represents a Non-Cooperative Method of Participating in Federal Immigration Enforcement

In areas of exclusive federal concern – such as setting immigration policy and enacting regulatory schemes for the enforcement of that policy – Congress has the authority to offer States a choice between "conform[ing] to federal policy choices" and "regulating [ ] activity according to federal standards," or "having state law pre-empted by federal regulation." *See New York*, 505 U.S. at 167-68. In this context, Congress has explicitly recognized various opportunities for state assistance to federal officials in the latter's enforcement of the federal immigration laws. For example, Congress has authorized states to broadly participate in enforcement actions in specified circumstances. *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent

49

mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony); 8 U.S.C. § 1324(c) (granting certain state and local law enforcement officers the authority to make arrests for violations of federal smuggling and harboring laws).  Outside of such specific authorizations, Congress has also recognized two avenues for the involvement by state and local law enforcement officers.  8 U.S.C. § 1357(g).  *First*, a state or locality may "enter into a written agreement with" the Secretary "pursuant to which an officer or employee of the State or subdivision, who is determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."  8 U.S.C. § 1357(g)(1).  The conditions for any such agreement are detailed by the INA (*see* 8 U.S.C. § 1357(g)(1)-(9)), and make clear that any performance of immigration functions by the states "under this subsection," "shall be subject to the direction and supervision of the [Secretary]."  *Id.* § 1357(g)(3).  *Second*, in the absence of a written agreement, state and local law enforcement may also act by "cooperat[ing] with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  8 U.S.C. § 1357(g)(10)(B).  The plain terms of the INA thus require cooperation with the Secretary where states seek to participate in a systematic way in the "identification, apprehension, detention, or removal of aliens not lawfully present."  And, in requiring that the state's performance of immigration functions "under this subsection" must not interfere with the Secretary's ultimate supervisory authority and discretion, *see* 8 U.S.C. § 1357(g)(3), the statute makes clear that the guarantee of federal primacy applies

50

equally even in the absence of a written agreement, and that a state law that provides for a mandatory systematic or programmatic enforcement approach to the state's own immigration policy or otherwise interferes with the Secretary's authority or discretion is preempted.[10]

### a. A State's Systematic and Mandatory Verification of Immigration Status Must be Conducted in "Cooperation With" the Secretary

The INA requires that states or local officers "cooperate with" the Secretary if they choose to assist federal officers in immigration enforcement, and states may not enact their own mandatory schemes for verifying immigration status or otherwise identifying unlawfully present aliens. In the absence of an agreement with the federal government on immigration enforcement (or another express authorization), the INA allows states to assist "in the *identification*, apprehension, detention, or removal of aliens not lawfully present in the United States" only if they do so in "cooperat[ion] with the [Secretary]" in pursuing such enforcement. 8 U.S.C. § 1357(g)(10)(B) (emphasis added). Although the term "cooperate with [the Secretary]" is not expressly defined in section 1357, the meaning of the term follows from federal primacy in the

---

[10] Any effort to read Section 1357(g)(10) as authorizing unlimited state-directed enforcement would violate clear congressional intent. First, the INA's limited authorization of state involvement at the initial (arrest) stage of immigration enforcement in delineated circumstances (*e.g.*, 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c)) would be nullified were Section 1357(g)(10) construed as authorizing unlimited state-directed enforcement. Any such construction would further undermine Congress's intent by eliminating the close supervision contemplated by portions of Section 1357(g) which related to written agreements. It makes little sense to read the statute as requiring close supervision in cases where a state acts through a written agreement (where some level of supervision can be assured through the terms of the written agreement) but as being entirely indifferent to the federal role in situations where there is already reduced federal control over a state scheme due to the absence of a written agreement. Similarly, Section 1357(g)(10)(A) – which permits state and local officers to communicate with the Secretary regarding an individual's immigration status – must be read in light of Section 1357(g)(10)(B), which immediately follows and provides for states to "*otherwise* cooperate" with the secretary, which implies that the communication occurring under Section 1357(g)(10)(A) for immigration enforcement purposes is also "cooperative." *Id.* (emphasis added).

administration and enforcement of the immigration laws.  The text and underlying purpose of the

immigration laws reveals complex and multi-faceted objectives.[11]   Accordingly, the *extent* and

*method* of federal enforcement of the INA must be informed not only by a singular interest of

preventing unlawful entry and residence, but also by, *inter alia*, the humanitarian and foreign

policy interests in ensuring the fair and equitable treatment of lawfully present foreign nationals

wherever they may visit and reside, and the need to exercise forbearance when dealing with

aliens (lawfully present or not) who may be eligible for humanitarian relief.  *See, e.g., Reno v.*

*American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 489 (1999) (observing that

enforcement discretion has long been "a special province of the Executive," and that such

prerogatives "are greatly magnified in the deportation context"); *see also* Ragsdale Decl., ¶¶ 7, 9-

10, 18.  In addition, Congress has further tasked DHS with establishing enforcement priorities to

ensure that finite resources for identifying, apprehending, and removing aliens are used in the

most effective manner.  *See* DHS Appropriations Act, 2010, Pub. L. No. 111-83, Title II, 123

Stat. 2142, 2149 (2009); Pub. L. No. 110-329, Title II, 122 Stat. 3574, 3659 (2008); *see also*

H.R. Rep. 111-157, at 8 (2009) ("[R]ather than simply rounding up as many illegal

immigrants as possible, which is sometimes achieved by targeting the easiest and least

---

[11] For example, DHS or DOJ may generally order the removal of an unlawfully present alien or
an alien who has engaged in certain unlawful conduct, *see* 8 U.S.C. §§ 1182, 1225, 1227,
1228(b), 1229, 1229a, 1231, and in certain instances, may employ civil and criminal sanctions
for immigration violations, such as unlawful entry, failing to appropriately register with the
federal government, and document fraud, *see, e.g.,* 8 U.S.C. §§ 1325, 1306, 1324c.  But the
administering agencies are not required to pursue removal or other sanctions in every case, as
other congressional purposes may counsel in favor of forbearance or even an affirmative grant of
relief.  *See, e.g.,* 8 U.S.C. § 1158 (asylum); § 1254a (temporary protected status);
§ 1227(a)(1)(E)(iii) (humanitarian waiver of deportability to assure family unity); § 1229b
(cancellation of removal); § 1182 (d)(5) (parole); § 1182(a)(6)(A)(ii) (exclusions from
inadmissibility); 8 C.F.R. § 274a.12(c)(14) (limited employment authorizations); Ragsdale Decl.
¶¶ 7, 9, 10, 18, 41 ("[T]he federal government often has affirmative reasons for not bringing
immigration charges against an alien.").  The ability to forego sanctions represents a type of
enforcement option that the INA directly and explicitly establishes.

threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer."); *id.* ("When individuals are identified as illegally present in the United States, ICE can take appropriate steps to ensure the most dangerous of these criminals are deported upon completion of their jail sentences, while those convicted of lesser crimes are *identified and deported as resources allow*.") (emphasis added); *see also* Ragsdale Decl., ¶ 10 (Resource constraints "necessitate[] prioritization to ensure that ICE expends resources most efficiently to advance the goals of protecting national security and public safety and securing the border").   Congress's desire that the federal government balance competing immigration objectives while effectively prioritizing its enforcement resources is reflected in the federal administration and enforcement of the immigration laws, and necessarily requires federal officers to exercise discretion when setting a direction for immigration enforcement.  *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (describing immigration control as "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program") (internal citations omitted)

Because DHS is charged with administering the immigration laws, and therefore with setting a direction for enforcement, the INA's "cooperation" requirement means that a state may not adopt its own mandatory set of directives to implement the state's own enforcement policies because such a mandate would serve as an obstacle in every instance to the ability of individual state and local officers to cooperate with federal officers administering federal policies and discretion as the circumstances in the particular case require.  Thus, for example, a state may systematically involve itself (as H.B. 56 does) in immigration enforcement only if state and local officers remain in a position to respond to the judgment and discretion of appropriate federal

officers, and only if the state acts consistently with the policies and any applicable direction set by federal officials.  Accordingly, a state is not acting "cooperatively" if it disregards express federal direction; attempts to force the federal government to routinely deploy scarce enforcement resources in accordance with an immigration enforcement regime of a state's choosing; or if it attempts to deny its officers (who are assisting federal officers in enforcing the INA) the opportunity to exercise their discretion on a case-by-case basis so that they can be responsive to the direction and priorities of the federal officials charged with implementing and enforcing the immigration laws.[12]  As the Ninth Circuit has explained, a state may not "assume[] a role in directing its officers how to enforce the INA," because no "INA provision demonstrat[es] that Congress intended to permit states to usurp the [Secretary's] role in directing state enforcement of federal immigration laws."  *United States v. Arizona*, 641 F.3d at 350. Thus, cooperation with federal enforcement requires preservation of the federal government's statutorily assured enforcement discretion, which must allow the appropriate balance of the various concerns underlying the INA.[13]

---

[12]  The United States is not challenging Alabama's power to *authorize* its officers to *assist* federal officers in their enforcement of the immigration laws.  However, the prospect of such authorization does not allow a state to systematically mandate enforcement of federal immigration law in particular circumstances.  Any such state -directed mandate would function as a parallel or contradictory direction, in competition with the Secretary's direction, as to how to enforce immigration law, thereby eroding the federal government's exclusive authority over immigration enforcement.  It would also force the federal government to divert resources away from the enforcement priorities it has set.

[13]  The "cooperation" requirement does not necessarily require *ex ante* permission from the federal government for state and local law enforcement personnel to assist in immigration enforcement; Section 1357(g)(10) recognizes that formal authorization is not required before every instance of such cooperation.  And the INA's requirement that the assistance rendered by states and local officers be cooperative or responsive to federal priorities and exercise of discretion likewise does not require affirmative authorization before every single act of assistance.  However, the need to preserve federal primacy and ultimate federal enforcement discretion *does* preclude systematic efforts to reject federal control or direction, or to

Per the plain terms of the INA, then, states may participate in the "identification . . . of aliens not lawfully present" — in other words assist in immigration status verification — only if they do so in cooperation with the Secretary.

> b. *Alabama's Mandatory Verification Scheme Inherently Interferes with Federal Discretion and is Not Cooperative*

In categorically mandating immigration status verification for the entire alien population,[14] Alabama has violated the INA's requirement that alien verification proceed in cooperation with the Secretary.  8 U.S.C. § 1357(g)(10)(B).  Although the federal government is exclusively entrusted with setting national immigration policy and enacting frameworks for administering and enforcing such policies — including the processes and techniques used for systemically identifying unlawfully present aliens for law enforcement purposes — Alabama has, through Sections 12 and 18, dictated the circumstances under which verification is required and thereby "usurp[ed] the [Secretary's] role in directing state enforcement."  *Arizona*, 641 F.3d at 350.  H.B. 56 thus embodies an unmistakably non-cooperative scheme.  Sections 12 and 18 mandate that Alabama law enforcement personnel participate in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States," *see* 8

---

categorically demand enforcement in such a way as to deprive the federal government – and state and local officers – of the flexibility and discretion that animates the federal government's ability to globally supervise immigration enforcement and to exercise judgment and discretion in particular cases where the responsible federal officers elect to do so.

   [14]  Although verification under Section 12 arises only after a lawful stop, the combination of Sections 12, 10, and 6 expand the dragnet much further.  As described previously, anyone who is unlawfully present has committed a crime under Alabama law.  *See supra*, page 17-22.  Ala. H.B. 56 § 10.  The Act's maximal enforcement directive, on pain of the sanctions Sections 5 and 6 threaten, requires Alabama police to vigorously pursue investigations of the remainder of H.B. 56, including Section 10.  Thus, Alabama police have been commanded to seek out the unlawfully present so as to pursue enforcement of Section 10.  Once an alien is lawfully stopped as part of an investigation of a violation of Section 10 (stops that are generally commanded by Section 6), the remainder of the verification scheme kicks in.

U.S.C. § 1357(g)(10)(B),[15] but preclude the availability of discretion of the sort that federal officers may exercise, as well as the prospect of responsiveness to federal enforcement priorities. *See* Ragsdale Decl., ¶¶ 18, 22, 40-41 ("Section 12 is not in alignment with federal guidance on use of discretionary authority and finite enforcement resources, because an alien in Alabama may be unlawfully present in the United States but may be an individual for whom ICE would decide or already has decided, subject to its internal policies, to afford some case-specific exercise of prosecutorial discretion."). In its place, H.B. 56 imposes direction *from Alabama* to verify upon any lawful stop that gives rise to a suspicion of unlawful presence or any occasion in which an alien is found driving without a license. This substitution of a state mandate outside of federal control, exceeds the INA's scope of permissible state enforcement activity. *See* 8 U.S.C. § 1357(g)(10)(B).

Tellingly, Section 12 relieves state and local law enforcement of the burdens of verification "if the determination may hinder or obstruct an investigation." Ala. H.B. 56 § 12(a). Alabama thus recognizes that an inflexible verification mandate may interfere with the broader concerns of its own law enforcement[16] (and accordingly provides an exception), but at the same time evinces no concern for whether implementation of the verification mandate in a particular

---

[15] The federal government's ultimate exclusive control over removal does not somehow minimize the importance of federal direction over the verification process. Congress explicitly included the "identification . . . of aliens not lawfully present," 8 U.S.C. § 1357(g)(10)(B), as a process that requires cooperation with the Secretary, and thus prohibits states from requiring a verification process that by its very structure, cannot be responsive to the direction and discretion of the federal government. *See* Ragsdale Decl., ¶ 18 ("ICE exercises prosecutorial discretion throughout all the stages of the removal process [including] investigations.").

[16] Various Alabama law enforcement officers have confirmed that H.B. 56 will result in such interference with police activity. *See* Declaration of Mike Hale, Sheriff of Jefferson County (Attached as Exhibit 4), ¶ 7 ("[H.B. 56] will cause direct interference with my office's general work, and its ability to respond to an emergency (such as we did, and are still doing, after the recent tornado."); Declaration of A.C. Roper, Chief of Birmingham Police Department (Attached as Exhibit 5), ¶¶ 5-8; Declaration of Roy Latham, Sheriff of Clay County (Attached as Exhibit 6), at 3.

instance would interfere with the *federal* government's broader immigration enforcement objectives, policies, and discretion, or resource constraints.  In other words, Alabama does not countenance competing federal needs when it wishes to initiate a Section 12 verification inquiry, but when Alabama's interests are at stake, its maximal enforcement mandate yields.

The mandate embodied in Sections 12 and 18 is especially egregious because it not only casts off the *prospect* of federal priorities and direction, but affirmatively disregards the federal direction that has already been issued.  As part of the authority assigned by the INA to balance the competing concerns of the INA, and in order to manage resource constraints, DHS has made, as its top priority, enforcement efforts against "[a]liens who pose a danger to national security or a risk to public safety."  *See* John Morton, Assistant Secretary of DHS, ICE, "Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens" (June 2010).  Consistent with this enforcement priority, the federal government principally targets aliens engaged in or suspected of terrorism or espionage; aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; certain gang members; aliens subject to outstanding criminal warrants; and repeat border crossers and fugitive aliens, especially those with criminal records.  Ragsdale Decl., ¶¶ 8-9.  These priorities animate DHS's internal enforcement decisions, and over time, through the traditional and ongoing process of cooperative communication with state and local law enforcement officers, these priorities communicate to states how the federal government is attempting to balance resource constraints and competing immigration objectives.  Ragsdale Decl., ¶¶ 5-20; *id.*, ¶ 13 ("ICE routinely communicates with local law enforcement officers on an informal basis, and through this ongoing cooperative process, over time, ICE is generally able to relay its enforcement priorities to individual local law enforcement officers.").

But H.B. 56 imposes an inflexible mandate that necessarily prevents state and local law enforcement officers from even attempting to tailor their assistance over time to this federal priority, and instead requires the entire state and local police forces to target individuals such as jaywalkers and aliens who forgot their driver's licenses.  This affirmative conflict with the chosen federal approach and priorities renders Sections 12 and 18 non-cooperative and therefore preempted by the INA.

### 2. Alabama's Verification Scheme Will Impermissibly Burden Federal Resources

Putting aside that H.B. 56's verification mandate constitutes *per se* non-cooperation – and therefore conflicts with and is preempted by the INA – Sections 12 and 18 would result in real, impermissible burdens on the federal government.  Sections 12 and 18 require local law enforcement officers to obtain immigration status information from the federal government by making a request to the Law Enforcement Support Center ("LESC") under 8 U.S.C. § 1373(c).  Because Alabama has imposed an across-the-board requirement that its law enforcement officers verify the immigration status of every person stopped who is reasonably suspected to be unlawfully present and every alien stopped without a driver's license, the number of new verification requests made to DHS will undoubtedly be significant.  *See* Hale Decl., ¶ 9.  The state mandate would thus interfere with LESC's immigration investigation functions.  "[T]he LESC prioritizes its efforts in order to focus on criminal aliens and those most likely to pose a potential threat to their communities."  Declaration of William M. Griffen, Acting Unit Chief for LESC (Attached as Exhibit 7), ¶ 15.  DHS has advised that "H.B. 56 will inevitably result in a significant increase in the number of" immigration verification queries, and that such an increase would "reduc[e] [LESC's] ability to provide timely responses to law enforcement on serious criminal aliens."  Griffen Decl. ¶¶ 22-24.  This increase in requests therefore would create a

significant risk that the federal government would be forced to shift resources away from its chosen priorities.  *See id*. ¶¶ 23, 26-29; Ragsdale Decl., ¶ 44.

Such interference with DHS operations would result both from the sheer number of the Alabama inquiries, and the resulting difficulty in differentiating between high and low priority verification requests.   The LESC system does not automatically route inquiries based on seriousness of the offense that gives rise to the verification request.  Griffen Decl., ¶¶ 16, 25. Accordingly, DHS needs to individually prioritize each incoming request for information.  *Id.*, ¶ 16.  Alabama's contemplated submission of verification requests for minor offenses and those who drive while talking on their cell-phones (*see* Montgomery Ordinance No. 34-2010) would make it exponentially more difficult for DHS to pay timely attention to inquiries related to high priority or time-sensitive enforcement targets.  Griffen Decl., ¶¶ 26-28.  This is all the more true where the state promises to detain such individuals until the federal government provides a verification response.

This substantial uptick in verification requests would interfere with federal operations. LESC resources are available not only for immigration verification but also are dedicated in part to critical national security and law enforcement functions.  Griffen Decl., ¶ 9.  LESC processes FBI requests for immigration-related background information on individuals seeking to purchase firearms, U.S. Secret Service requests for individuals seeking access to a protected area (*e.g.*, the White House Complex), and requests related to employment issues at sensitive locations that could be vulnerable to sabotage, attack, or exploitation.  *Id.*  By commandeering greater proportion of LESC resource capacity, Sections 12 and 18 would leave LESC with far fewer resources to devote to these other, crucial law enforcement functions.  Accordingly, implementation of H.B. 56's mandatory verification scheme would "reduc[e DHS's] ability to

provide timely responses to law enforcement on serious criminal aliens," thereby potentially allowing "very serious violators [to] escape scrutiny and be released before the LESC can respond to police" and inform them of the serious nature of the unlawfully present alien they have encountered. *Id.*, ¶ 28.

The Supremacy Clause prohibits such interference with federal priorities, especially where the interference is driven by state-imposed burdens on federal resources that result from a state's categorical refusal to conform – and categorical refusal to allow its officers to conform – to federal discretion, prioritization and oversight on immigration enforcement. *See United States v. Arizona*, 703 F. Supp. 2d 980, 995 (D. Ariz. 2010) ("The United States argues that the influx of requests for immigration status determination directed to the federal government or federally-qualified officials would impermissibly shift the allocation of federal resources away from federal priorities. State laws have been found to be preempted where they imposed a burden on a federal agency's resources that impeded the agency's function.") (*affirmed* on other grounds by *United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011). Even outside of the immigration framework, a state law is preempted where it imposes a burden on a federal agency's resources that impedes the agency's functions. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-51 (2001) (preempting state law cause of action in part because it would encourage third parties to submit a deluge of unnecessary information to the FDA, thereby burdening the agency's ability to evaluate drug applications in a timely fashion); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006) (acknowledging serious concerns regarding the city's use of federal authorities in determining immigration status).

In assessing the scope of H.B. 56's interference with federal operations, moreover, the Court must consider the cumulative impact that would result if Alabama's scheme were

replicated in other states. *See, e.g., North Dakota v. United States*, 495 U.S. 423, 458 (1990)

(Brennan, J., concurring in the judgment in part and dissenting in part) (considering that the

difficulties presented by state requirement would "increase exponentially if additional States

adopt[ed] equivalent rules," and noting that such a nation-wide consideration was "dispositive"

in *Public Utility Commission of the State of California v. United States*, 355 U.S. 534, 546

(1958)); *see generally Arizona*, 641 F.3d 339. Indeed, the prospect of such additional legislation

is not speculative:  Not only Arizona, but also Georgia, Indiana, South Carolina, and Utah have

already adopted their own immigration enforcement measures. Enactments by additional states

of H.B. 56-like mandates will only further burden DHS's operations. Griffen Decl., ¶ 28;

Ragsdale Decl. ¶ 38; *Chae v. SLM Corp*., 593 F.3d 936, 948-49 (9th Cir. 2010) (similar).

### 3. Alabama's Verification Scheme Will Impermissibly Result in the Harassment and Interrogation of Lawfully Present Aliens

By adopting its own mandatory verification scheme in Sections 12 and 18, the State of

Alabama would also necessarily impose substantial burdens on lawful immigrants in a way that

conflicts with the INA's provision of nationally uniform rules governing the treatment and

registration of aliens throughout the country — rules designed to ensure "our traditional policy of

not treating aliens as a thing apart." *Hines*, 312 U.S. at 73-74. As the Court held in *Hines*,

Congress has "plainly manifested a purpose to . . . protect the personal liberties of law-abiding

aliens . . . and to leave them free from the possibility of inquisitorial practices and police

surveillance that might not only affect our international relations but might also generate the very

disloyalty which the law has intended guarding against." *Id*. at 74. Specifically, *Hines* made

clear that the INA's uniform method of registering or tracking aliens is undermined by state laws

that "impos[e] distinct, unusual and extraordinary burdens and obligations upon aliens — such as

subjecting them alone, though perfectly law-abiding, to indiscriminate and repeated interception

and interrogation by public officials." *Id.* at 65-67.  It is for the federal government, not the individual states, to establish a system for tracking aliens because such laws, which govern the conditions of residence of foreign nationals, "bear[] an inseparable relationship to the welfare and tranquility of all the states, and not merely to the welfare and tranquillity of one." *Id.* at 66. In exercising its constitutionally assigned authority in this field, the federal government has long rejected a system by which aliens' papers are routinely demanded and checked, especially where such a system operates outside the control of *federal* officials who protect the interests of the nation as a whole.  Sections 12 and 18 are at odds with this longstanding federal policy and practice.  The Supreme Court has consistently recognized that where, as here, the Constitution commits a particular topic exclusively to the federal government's authority, "Congress can more appropriately and with more acceptance exercise it than any other body known to our law, state or national."  *Henderson v. Mayor of the City of New York*, 92 U.S. 259, 274 (1876); *Graham v. Richardson*, 403 U.S. 365, 378 (1971) (states cannot pass laws that conflict with "overriding national policies in an area constitutionally entrusted to the Federal Government").

Although Alabama's verification scheme may intend to ultimately target unlawfully present aliens, the system would inevitably subject lawfully present aliens to the type of "indiscriminate and repeated interception and interrogation by public officials" that *Hines* described as preempted by the INA.  312 U.S. at 66.  After all, the very nature of an immigration status verification scheme, *i.e.*, a scheme to determine whether an alien is lawfully or unlawfully present, is only necessary to resolve ambiguity as to the immigration status of a stopped individual.

There are numerous categories of individuals who will be lawfully present but who will not have readily available documentation to demonstrate that fact.  For example, some lawful

62

foreign travelers visiting from countries participating in the Visa Waiver Program will not have a form of identification sufficient to demonstrate lawful presence under Section 12.  Declaration of David V. Aguilar, Deputy Commissioner, CBP (Attached as Exhibit 8), ¶¶ 10-11.  Several categories of individuals who have applied for asylum, temporary protected status, U or T non-immigrant visas for victims of crimes who are providing assistance to law enforcement, or abused women petitioning for immigration relief under the Violence Against Women Act, also may not have a form of identification sufficient to demonstrate lawful presence.  Scialabba Decl., ¶¶ 3, 11, 21, 26, 31, 37, 29.  Moreover, United States citizens are of course not required to carry proof of citizenship and some will not have easy access to documents that readily satisfy H.B. 56.  Many U.S. citizens do not have or carry a government-issued photo identification, such as minor children and others who do not have a driver's license.[17]  And if Alabama officers contact DHS about a U.S. citizen's immigration status, DHS may not be able to confirm the person's citizenship, as many citizens have no entries in DHS databases.  *See* Griffen Decl. ¶¶ 17, 29.

Section 12's reliance on a "reasonable suspicion" of unlawful presence does little to mitigate the risk of an application to lawfully present aliens.  "[T]he requirement of reasonable suspicion is not a requirement of absolute certainty."  *N.J. v. T.L.O*., 469 U.S. 325, 346 (1985); *see also Safford Unified School Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2647 (2009) ("[R]easonable suspicion does not deal with hard certainties, but with probabilities. To satisfy this standard, more than a mere hunch of wrongdoing is required, but considerably less suspicion is needed than would be required to satisf[y] a preponderance of the evidence standard.")

---

[17]  In the context of a vehicle stop, it is not clear that Section 12 applies only to the driver of the vehicle.  If, for example, an officer develops "reasonable suspicion" during a stop that passengers in the vehicle are unlawful aliens, the Act's maximal enforcement provisions suggest that the officer would have an affirmative obligation to initiate a verification inquiry for each individual the officer suspected as unlawfully present.

(internal citations omitted).  Many factors used to support a "reasonable suspicion" that an alien is unlawfully present could also apply to lawfully present aliens.  *See* Hale Decl., ¶ 11 ("I do not believe it is possible to instruct my deputies on how to enforce H.B. 56 without taking into consideration factors such as the person's appearance and manner of speaking."); Roper Decl., ¶ 11.  So, at the outset, Section 12 would necessarily result in the interception and interrogation of lawfully present aliens, and therefore conflicts with the INA.[18]

H.B. 56's application to lawfully present aliens is explicit in Section 18, which demands verification for *all* aliens, regardless of whether there is any suspicion whatsoever of unlawful presence.  The prospect of harassment of lawfully present aliens is compounded further by the risk that aliens also will be subject to prolonged detention as Alabama law enforcement officials await the result of a verification inquiry.  Section 18 explicitly allows for detention for 48 hours before a verification inquiry is even submitted.  *See* H.B. 56 § 18(c).  And unlike Section 12(a), Section 18 provides no limitation on the length of detention that can result from an immigration status verification.  Indeed, the only assurance the Act provides is that a private citizen of Alabama can sue a local law enforcement agency for money damages if that agency fails to enforce the immigration laws to the fullest extent possible.  H.B. 56 § 6(d).  Thus, if forced to decide between holding and releasing a lawfully present alien during the pendency of a status verification, the statute is clearly designed to encourage Alabama police authorities to opt for continued detention.  *See, e.g.*, Hale Decl. ¶ 4 ("[M]y deputies will be required to detain the

---

[18]   The likely magnitude of the interception and interrogation scheme — and thus, the degree of conflict with the INA — becomes more pronounced because of the total absence of police training on immigration matters.  As one Alabama sheriff has explained, "my deputies . . . are not familiar with reasonable suspicion as to immigration status" and "have not received training on federal immigration law."  Hale Decl. ¶ 10; *see also* Declaration of Bobby Timmons, Executive Director of Alabama Sheriffs' Association (Attached as Exhibit 10), ¶ 5 (noting absence of training related to H.B. 56).  This absence of training renders the "reasonable suspicion" standard a useless safeguard against application to lawfully present aliens.

target of the stop pending confirmation of the individual's immigration status.").  There is also

no assurance that a lawfully present alien who is subjected to an immigration status verification

under Section 12 would not be subjected to the same inquiry the very next time he is stopped by

the police for any reason — raising the specter of the prospect for exactly the type of "repeated

interception and interrogation" that *Hines* held to be preempted by the INA.

Through the INA's exclusive control over the conditions of residence for lawfully present

aliens, the federal government has developed a complex system for tracking aliens throughout

the United States.  Scialabba Decl. ¶¶ 2, 41–43.  The calibration of this system is a federal

concern, and — as *Hines* held — the preservation of federal exclusivity in the area of alien

registration is necessary to promote the INA's goal of ensuring the consistent treatment of aliens.

In adopting Sections 12 and 18, Alabama has subjected lawfully present aliens to a redundant

tracking system of the type that was held to be unlawful in *Hines*.  Sections 12 and 18 would

necessarily increase police intrusion into the lives of lawfully present aliens and compel them to

prove their lawful status to the satisfaction of state or local authorities, which is exactly the type

of redundant local inquisition and special burden cautioned against by *Hines*; *see also De Canas*,

424 U.S. at 358 n.6 ("Of course, state regulation not congressionally sanctioned that

discriminates against aliens lawfully admitted to the country is impermissible if it imposes

additional burdens not contemplated by Congress").  The United States is accordingly

substantially likely to prevail in its preemption challenge to Sections 12 and 18.

## II.    THE UNITED STATES WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Upon demonstrating a likelihood of success on the merits, a plaintiff must also establish

that, absent the preliminary injunction, there is a likelihood that the defendant's conduct will

cause irreparable harm.  *See Osmose, Inc.,* 612 F.3d at 1320.  Preliminary injunctive relief is

necessary here because H.B. 56 is causing irreparable harm to the United States, and this harm will only be magnified if the law goes into effect.  If not enjoined, H.B. 56 will continue to cause irreparable harm to the United States in at least four significant ways.  *First*, H.B. 56 irreparably undermines the federal government's control over the regulation of immigration and immigration policy.  If H.B. 56 is permitted to become effective on September 1, 2011, the federal government's administration of the immigration laws will be altered and, at least during the pendency of this action, the federal government's ability to achieve its chosen balance of the multiple and competing goals underlying the federal immigration system will be seriously damaged.  Among other things, as discussed above, H.B. 56 would override and impair the ability of DHS to execute the federal government's enforcement priorities in locating, detaining, prosecuting, and removing criminal aliens who pose risks to the safety and security of our Nation's citizens.  *See* Ragsdale Decl., ¶ 38, Griffen Decl., ¶¶ 26-28.  This assault on federal priorities is not speculative, as the purpose of H.B. 56 is to interfere with and disrupt the daily lives of unlawfully present aliens in every conceivable way, so that ultimately the federal government will be compelled to initiate enforcement proceedings against these individuals.  In the words of H.B. 56 co-sponsor Mickey Hammon, "We really want to prevent illegal immigrants from coming to Alabama and to prevent those who are here from putting down roots."  Julia Preston, *In Alabama, a Harsh Bill for Residents Here Illegally*, New York Times, June 3, 2011.[19]  By violating the Constitution's structural reservation of authority to the federal government to set immigration policy, H.B. 56 effects ongoing irreparable harm to the constitutional order.  *See Arizona*, 641 F.3d at 366 (finding irreparable harm where state enacted an immigration statute that was likely preempted, stating that "an alleged constitutional

---

[19]  *Available at*: http://www.nytimes.com/2011/06/04/us/04immig.html

infringement will often alone constitute irreparable harm."); *see also Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992) (noting that irreparable injury requirement does not prevent courts from enjoining enforcement of unconstitutional laws); *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (suggesting that "irreparable injury may possibly be established . . . by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause"). Although the Eleventh Circuit has noted that not every allegation that a defendant has violated a plaintiff's constitutional rights will constitute irreparable harm, *see Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), where a constitutional injury is "intangible in nature" and "cannot be undone through monetary remedies," irreparable harm is evident. *See id.; e.g., Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) (holding that loss of First Amendment rights constitutes irreparable injury); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (holding that loss of constitutional privacy rights constitutes irreparable injury). As noted above, a violation of the fundamental division of constitutional authority between the federal and state government is an injury that cannot be undone, and is of sufficient magnitude to itself constitute irreparable harm.

*Second*, as discussed above, H.B. 56 will immediately alter the conditions of residence for lawfully present aliens, thereby resulting in the harassment of lawfully present aliens. Such harassment and alteration of aliens' conditions of residence frustrates the United States' relationship with immigrant communities and damages the United States' reputation both with other countries and with lawfully admitted aliens. *See* Ragsdale Decl., ¶¶ 49-50; Burns Decl., ¶¶ 9, 19 ("[D]omestic processes for arrest, detention, and removal of aliens and other aspects of their treatment in the United States are of great interest to foreign governments because of the

impact these processes have on foreign nationals and their families"; *see also Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (injury is irreparable if it "cannot be undone through monetary remedies"); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").  DHS, which maintains the primary interest in the humane treatment of aliens and the fair administration of federal immigration laws, has advised that such "humanitarian interests would be undermined" if certain aliens or categories of aliens are "detained or arrested by Alabama authorities for being illegally present in the United States," including aliens eligible for or seeking asylum, aliens seeking protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and aliens in various other circumstances which require individualized discretion.  Ragsdale Decl. ¶¶ 41-42.  However, because it is impossible for the state to know when ICE would apply such discretion, and because H.B. 56's blanket and mandatory enforcement policy makes any such knowledge irrelevant, it is all but guaranteed that H.B. 56 will work a very real and irreparable interference with Congress's humanitarian objectives and enforcement priorities, which are now carried out by ICE's measured exercise of discretion.  *See* Ragsdale Decl. ¶¶ 9, 10, 18, 22, 40-41 (explaining uses of discretion for humanitarian interests).  A court cannot undo the effect of a victimized alien's inability to find housing, or improper detention, anymore than it can undo the impact that repeated police interrogations would have on a marginalized foreign population, or the chilling effect of a school alien verification program.  Nor could a court order undo the message that such conduct would convey abroad.  *See Georgia Latino Alliance for Human Rights v. Deal*, Case No. 11-1804, Doc. 93, June 27, 2011 (N.D. Ga.) (order granting preliminary injunction and finding likelihood of

irreparable injury because aliens "will be subject to criminal penalties under laws that are allegedly preempted by federal law and the Supremacy Clause of the United States Constitution").

*Third*, irreparable harm will result because the enforcement of H.B. 56 will, as discussed above, place a significant burden on DHS resources and force DHS to react to Alabama's enforcement of H.B. 56 at the expense of its own policy priorities – namely, aliens presenting threats to national security and public safety. *See* Griffen Decl. ¶¶ 23, 26-29; Ragsdale Decl., ¶¶ 36-39; Declaration of Dominic Gentile, Chief of Records Division, USCIS (Attached as Exhibit 11), ¶¶ 10-11. Sections 12 and 18 of H.B. 56 will result in a dramatic increase in verification requests to DHS. Such an increase is not speculative; it is the exact point of the law. *See* Griffen Decl., ¶¶ 22-24, 26-29 ("Alabama H.B. 56 will inevitably result in a significant increase in the number of [queries] received by the LESC . . . . This will reduce our ability to provide timely responses to law enforcement on serious criminal aliens as resources will need to be devoted to handling these non-priority queries."); Ragsdale Decl. ¶¶ 36-39 ("Responding to the number of referrals likely to be generated by enforcement of H.B. 56 and similar state laws could require ICE to divert existing resources from other duties, resulting in fewer resources being available to cases and aliens within ICE's priorities."). And, as explained above, the greater share of DHS's attention that Alabama receives as a result will reduce the federal ability to pursue dangerous aliens. If H.B. 56 is not enjoined, every day the federal government is forced to focus on managing the output of H.B. 56 rather than on these dangerous aliens will constitute an irreparably lost opportunity to focus on higher priority targets. Moreover, H.B. 56 will force the federal government to dedicate resources to Alabama's inquiries that might otherwise be allocated to non-immigration national security matters, and will increase the

69

difficulty of distinguishing between high priority and time-sensitive enforcement matters and the low-level violations that may give rise to verification inquiries under H.B. 56.  This, in turn, poses significant and irreparable risks to the safety and security of our nation's citizens.  Enforcement of H.B. 56's mandatory attrition provisions will similarly interfere with ICE's outreach program, which ensures the assistance of unlawfully present aliens in the prosecution of higher priority threats and will also endanger federal immigration authorities' capacity to apprehend highly dangerous targets.  Ragsdale Decl., ¶¶ 46-48.  Once this type of damage is done to ICE's enforcement priorities during the period in which Alabama's maximal enforcement scheme  supplants the federal government's balanced set of values, no final judgment can undo it.

*Finally*, the enforcement of H.B. 56 will inflict irreparable injury on the United States' ability to manage foreign policy.  As a specific matter, the effect of Alabama's scheme is to criminalize unlawful status to such an extreme degree so as to conflict not only with the United States' humanitarian interests, but also its stated foreign policy.  Under H.B. 56, aliens in Alabama who may have committed no crime under federal or international law but who have remained in the United States without permission, will either be subjected to detention and incarceration in Alabama, or will be evicted from their homes and denied access to virtually all state and local services designed to benefit those in need.  But as a matter of articulated foreign policy, the United States has committed itself not to treat another foreign state's citizens in such a manner where those foreign nationals are merely unlawfully present. *See* Burns Decl. ¶¶ 34-37.  The consequence of individual states like Alabama acting contrary to the stated foreign policy of the United States — which foreign governments rely upon — are obvious and dire.  Burns Decl., ¶¶ 34-38, 50-53.

As a general matter, the mere existence of Alabama's comprehensive, punitive immigration policy — with its concomitant promise of the sweeping criminalization of immigrant populations — has already had negative effects on U.S. foreign policy interests, and these consequences will intensify if H.B. 56 is permitted to operate.  The reaction of foreign governments to H.B. 56 — from around the Western Hemisphere and elsewhere, including the government of Mexico — has undermined the United States' ability to pursue various diplomatic objectives and broadly damaged American interests.  Burns Decl., ¶¶ 39-45.  Such reactions are the predictable result of a state immigration policy whose exclusive aim is attrition of foreign nationals in Alabama through a policy of maximum "enforcement" of particular criminal sanctions – a policy given teeth by a discretion-less verification scheme that enforces a series of interlocking and virtually automatic criminal penalties. Burns Decl., ¶ 21 ("The exercise of immigration functions can quickly provoke a significant bilateral or multilateral problem that harms U.S. interests if handled without appropriate consideration of relevant foreign policy implications."); *id.*, ¶ 19 ("[D]omestic processes for arrest, detention, and removal . . . are of great interest to foreign governments."); *id.*, ¶ 31 "[As] a matter of international law and practice, the federal government is held accountable . . . for the actions of state and local authorities regarding our treatment of foreign nationals.").  The State Department carefully cultivates relationships with foreign governments so as to enable maximum cooperation on issues of concern to the United States and its citizens — such as immigration, national security, and economic policy.  Indeed, with the deepest understanding of these complex foreign relationships, the State Department advises that H.B. 56 "is likely to hinder our ability to secure the cooperation of foreign governments in efforts to promote U.S. interests internationally across a range of trade, security, and other interests," is "likely [to] undermine the United States' ability

to engage effectively with the international community to promote the advancement and protection of human rights," and "risk[s] provoking retaliatory treatment against U.S. nationals by other states."  Burns Decl., ¶ 54.  Damage that is done to these relationships is irreparable, as it cannot be undone by court order.  This ongoing and expected irreparable harm to weighty foreign policy interests alone warrants preliminary injunctive relief.  *See Garamendi*, 539 U.S. 396 (upholding district court's injunction due to interference with foreign policy).

## III.   A BALANCING OF THE HARDSHIPS FAVORS THE UNITED STATES AND DEMONSTRATES THAT THE PUBLIC INTEREST WOULD NOT BE DISSERVED BY GRANTING INJUNCTIVE RELIEF

In this action, which seeks to protect the interests of the United States as a whole, the burdens that will result absent injunctive relief are directly tied to the public benefits that will be protected if this Court issues the requested injunction.  *See Scott*, 612 F.3d at 1290 (noting that where the government is a party, the third and fourth preliminary injunction considerations are largely the same); *Nken v. Holder*, 129 S. Ct. 1749, 1762 (2009) (stating, in the related context of criteria governing stay of removal, that the criteria of "harm to the opposing party" and "the public interest" "merge when the Government is the opposing party" because harm to the Government is harm to the public interest).  As discussed throughout this memorandum, a variety of national, public interests are endangered by the operation of H.B. 56, and will be promoted by the issuance of the requested injunction.  Preliminary injunctive relief will permit federal immigration authorities to continue to focus on high priority issues of national security and public safety; will curb the damage to foreign policy and preserve the federal government's ability to productively cooperate with other countries on issues of public importance, such as national security, trade, tourism, and the environment; and will prevent unnecessary and impermissible burdens on lawfully present aliens.

By contrast, a preliminary injunction will not meaningfully burden Alabama.  H.B. 56 has not yet gone into effect, so an injunction in this context would merely preserve the status quo.  *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1261, 1262 (11th Cir. 2005) (noting that textbook application of an injunction is where it would "preserve the status quo and prevent allegedly irreparable injury until the court had the opportunity to decide whether to issue a permanent injunction").  Were this Court ultimately to conclude that H.B. 56 does not offend the Supremacy Clause, Alabama would then be able to implement and enforce H.B. 56 without having suffered any substantial burden.  Alabama can hardly argue otherwise, in light of its representation to the Court that the Alabama Constitution might prevent any number of the Act's provisions from taking effect until at least October 2011.  *See Hispanic Interest Coalition of Alabama, et al. v. Robert Bentley, et al.*, 5:11cv02484 (SLB) (Dkt. # 36, at 2, n.2).  In any case, "the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law."  *Scott*, 612 F.3d at 1297; *see also Edmonson*, 594 F.3d at 771 ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.").

73

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court issue a

preliminary injunction with respect to Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30.


DATED:  August 1, 2011

> TONY WEST
> Assistant Attorney General
> JOYCE WHITE VANCE
> United States Attorney
> ARTHUR R. GOLDBERG
> Assistant Director, Federal Programs Branch
>
> */s/ C. Lee Reeves, II*
> C. LEE REEVES, II
> VARU CHILAKAMARRI
> JOSHUA WILKENFELD
> Trial Attorneys
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Avenue, N.W.
> Washington, D.C. 20530
> Telephone: (202) 514-4805
> Fax: (202) 616-8470
> Email: lee.reeves@usdoj.gov