FILED
2011 Aug-01  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT  1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>THE STATE OF ALABAMA, et al.,<br><br>        Defendants. | Civil Action No. |

## DECLARATION OF WILLIAM J. BURNS

Pursuant to 28 U.S.C. § 1746, I, William J. Burns, declare and state as follows:

*1.* I am Deputy Secretary of State. I make this declaration based on my personal knowledge and on information I have received in my official capacity.

*2.* I was sworn in as Deputy Secretary of State on July 28, 2011. For the preceding three years, I was the State Department's Under Secretary for Political Affairs. From 2005 to 2008, I served as United States Ambassador to Russia, and from 1998 to 2001 as United States Ambassador to Jordan. From 2001 to 2005, I served as Assistant Secretary of State for Near Eastern Affairs. Since entering the Foreign Service in 1982, I have held a variety of other posts, including Executive Secretary of the State Department and Special Assistant to Secretaries Warren

1

Christopher and Madeleine Albright; Acting Director and Principal Deputy Director of the State Department's Policy Planning Staff; and Special Assistant to the President and Senior Director for Near East and South Asian Affairs at the National Security Council staff. I hold the highest rank in the Foreign Service, Career Ambassador.

3. In my capacity as Deputy Secretary of State, I assist the Secretary of State in the formulation and conduct of U.S. foreign policy and in giving general supervision and direction to all elements of the Department. I have delegated authority to act on behalf of the Secretary of State, and assist the Secretary in representing the United States at international meetings and in performing other representational assignments with senior foreign governmental officials. As Under Secretary for Political Affairs from May 2008 to July 2011, I was the Department's third-ranking official and its senior career diplomat. In that capacity, I likewise had broad policymaking, supervisory, and representational responsibilities. I was the day-to-day manager of overall regional and bilateral policy issues, and oversaw the bureaus for Africa, East Asia and the Pacific, Europe and Eurasia, the Near East, South and Central Asia, the Western Hemisphere, International Organizations, and International Narcotics and Law Enforcement.

4. I have read and am familiar with the Beason-Hammon Alabama Taxpayer and Citizen Protection Act ("H.B. 56"). I am also familiar with the

2

reactions of foreign governments to this law and to other recently enacted state immigration laws.

5. As I explain further below, U.S. federal immigration law incorporates foreign relations concerns by providing a comprehensive range of tools for regulating entry and enforcement. These may be employed with sensitivity to the spectrum of foreign relations interests and priorities of the national government. By contrast, Alabama law H.B. 56 establishes an inflexible, state-specific immigration enforcement policy based narrowly on criminal sanctions that is not responsive to these concerns, and that unnecessarily antagonizes foreign governments. If allowed to enter into force, H.B. 56 would result in lasting harm to U.S. foreign relations and foreign policy interests.

6. Through the Immigration and Nationality Act ("INA") and other federal laws, the national government has developed a comprehensive regime of immigration regulation, administration, and enforcement, in which the Department of State participates. This regime is designed to accommodate complex and important U.S. foreign affairs priorities—including economic competitiveness and trade, humanitarian and refugee protection, access for diplomats and official foreign visitors, national security and counterterrorism, criminal law enforcement, and the promotion of U.S. human rights policies abroad. To allow the national government flexibility in addressing these concerns, the INA provides the

3

Executive Branch with a range of options governing the entry, treatment, and departure of aliens. Moreover, foreign governments' reactions to immigration policies and the treatment of their nationals in the United States impacts not only immigration matters but also any other issue on which we seek cooperation with foreign states, ranging from investment protection to tourism to defense. These foreign relations priorities and policy impacts are ones to which the national government is sensitive in ways that individual states are not.

7. By rigidly imposing a singular form of immigration enforcement through mandatory verification of immigration status and criminal enforcement of alien registration, H.B. 56 interferes with the national government's carefully calibrated policy of immigration regulation. The Alabama law also uniquely burdens foreign nationals by regulating, and in many cases criminalizing, work, travel, housing, contracting, and educational enrollment well beyond any restrictions imposed by U.S. law. These multiple, interlinking procedural and criminal provisions, adopted to supplant the federal regime and deter unlawfully present aliens from entering or residing in the State of Alabama, all manifest Alabama's intention to regulate virtually every aspect of those aliens' lives and to influence immigration enforcement nationwide. H.B. 56 thereby undermines the diverse immigration administration and enforcement tools made available to federal authorities, and establishes a distinct state-specific immigration policy, driven by an individual

4

state's own policy choices, which risks significant harassment of foreign nationals, is insensitive to U.S. foreign affairs priorities, and has the potential to harm a wide range of delicate U.S. foreign relations interests.

8. Alabama's H.B. 56 also must be viewed in the context of the recent proliferation of stringent state laws addressed to the issue of immigration enforcement. Arizona enacted such a law, after which H.B. 56 was modeled in part, in April 2010; Utah enacted such a law in March 2011; Georgia and Indiana enacted such laws in May 2011; and South Carolina enacted such a law in June 2011. The first law in this series, Arizona's S.B. 1070, created significant difficulties for U.S. bilateral relationships with many countries, particularly in the Western Hemisphere, and provoked vociferous and sustained criticism in a variety of regional and multilateral bodies. Foreign governments and international organizations expressed serious concerns regarding the potential for discriminatory treatment of foreign nationals posed by S.B. 1070, among other issues. These same criticisms and concerns have been reasserted—and expanded upon—in response to the recent wave of state laws, including H.B. 56.

9. By deviating from federal immigration enforcement policies as well as federal rules governing work, travel, housing, contracting, and educational enrollment by foreign nationals, and by seeking to regulate virtually every aspect

of certain aliens' lives, H.B. 56 threatens at least three different serious harms to U.S. foreign relations.

- *First*, H.B. 56 risks reciprocal and retaliatory treatment of U.S. citizens abroad, whom foreign governments may subject to equivalently rigid or otherwise hostile immigration regulations, with significant potential harm to the ability of U.S. citizens to travel, conduct business, and live abroad. Reciprocal treatment is an important concern in immigration policy, and U.S. immigration laws must always be adopted and administered with sensitivity to the potential for reciprocal or retaliatory treatment of U.S. nationals by foreign governments.

- *Second*, H.B. 56 antagonizes foreign governments and their populations, both at home and in the United States, likely making them less willing to negotiate, cooperate with, or support the United States across a broad range of foreign policy issues. U.S. immigration policy and treatment of foreign nationals can directly affect the United States' ability to negotiate and implement favorable trade and investment agreements, to secure cooperation on counterterrorism and counternarcotics trafficking operations, and to obtain desired outcomes in international bodies on priorities such as nuclear nonproliferation, among other important U.S. interests. Together with the other recently enacted state immigration laws, H.B. 56 is already complicating our efforts to pursue such interests. H.B. 56's impact is liable to be especially acute, moreover, not only

6

among our critical partners in the region but also among our many important democratic allies worldwide, as those governments are the most likely to be responsive to the concerns of their constituents and the treatment of their own nationals abroad.

- *Third*, H.B. 56 threatens to undermine our standing in regional and multilateral bodies that address migration and human rights matters, and to hamper our ability to advocate effectively for the advancement of human rights and other U.S. values. Multilateral, regional, and bilateral engagement on human rights issues and international promotion of the rule of law are high priorities for the United States. Consistency in U.S. practices at home is critical for us to be able to argue for international law consistency abroad. By deviating from national policy in this area, H.B. 56 may place the United States in tension with our international obligations and commitments, and compromise our position in bilateral, regional, and multilateral conversations regarding human rights.

    *10.* Furthermore, when H.B. 56 is considered in the context of the unprecedented surge in state legislative efforts to create state-specific immigration enforcement policies, each of these threats is significantly magnified, and several additional concerns arise.

- *First*, by creating a patchwork of immigration regimes, states such as Alabama make it substantially more difficult for foreign nationals to understand their

7

rights and obligations, rendering them more vulnerable to discrimination and harassment.

- *Second*, this patchwork creates cacophony as well as confusion regarding U.S. immigration policy, and thereby undermines the United States' ability to speak with one voice in the immigration area, with all its sensitive foreign policy implications.

- *Third*, this patchwork fosters a perception abroad that the United States is becoming more hostile to foreign nationals, corroding a reputation for tolerance, openness, and fair treatment that is critical to our standing in international and multinational fora, our ability to attract visitors, students, and investment from overseas, our influence in a wide range of transnational contexts, and the advancement of our economic and other interests.

*11.* In light of these broad, overlapping, and potentially unintended ways in which immigration activities can adversely impact our foreign affairs, it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the national government. In all matters that are closely linked to U.S foreign relations, including immigration, the United States is constantly engaged in weighing multiple competing considerations and choosing among priorities in order to develop an overall foreign policy strategy that will

most effectively advance U.S. interests and values. The United States likewise is constantly seeking the support of foreign governments, through a delicately navigated process, across the entire range of U.S. policy goals. Only the federal government has the international relationships and information, and the national mandate and perspective, to be able to appropriately evaluate these choices on a continuing basis in response to fluctuating events on the world stage. The proliferation of state laws advancing state-specific approaches to immigration enforcement represents a serious threat to the national control over immigration policy that effective foreign policy demands.

12. While particular state enactments that incidentally touch on immigration may not implicate foreign affairs concerns or may implicate them only slightly, Alabama's law H.B. 56, even when considered in isolation, more directly and severely impacts U.S. foreign affairs interests by establishing an alternative immigration policy of multiple, interlinking procedural and criminal provisions, all of which manifest Alabama's intention to create a separate regulatory regime and to influence immigration enforcement nationwide. Alabama's effort to set its own immigration policy is markedly different from instances in which states and localities assist and cooperate with the federal government in the enforcement of federal immigration laws. Such a cooperative approach greatly diminishes the likelihood of conflicts with U.S. foreign policy interests. When states and

9

localities work in concert with the federal government, and take measures that are coordinated with federal agencies and in line with federal priorities, the United States retains its ability to speak with one voice on matters of immigration policy, which in turn enables it to keep control of the message it sends to international audiences and to calibrate responses as it deems appropriate, in light of the ever-changing dynamics of foreign relations.

*13.* In contrast, H.B. 56 pursues a singular policy of criminal enforcement at all costs through, among other things, an extraordinary mandatory verification regime coupled with the effective state criminalization of unlawful presence and numerous other mutually reinforcing sanctions. By so doing, the law has the capacity to cause harassment of foreign nationals; to provoke retaliatory treatment of U.S. nationals overseas; to weaken public support among key constituencies abroad for cooperating with the United States; to endanger our ability to negotiate international arrangements and to seek bilateral, regional, or multilateral support across a range of economic, human rights, security, and other non-immigration concerns; and to be a source of ongoing criticism in international fora. Alabama's effort to set its own immigration policy conflicts with numerous U.S. foreign policy interests and with the United States' ability to speak with one voice in this sensitive area.

10

# I.   U.S. Immigration Law Incorporates Foreign Relations Concerns

*14.* The Secretary of State is charged with the day-to-day conduct of U.S. foreign affairs, as directed by the President, and exercises authority derived from the President's powers to represent the United States under Article II of the Constitution and from statutory sources. As part of its responsibilities, the State Department plays a substantial role in administering U.S. immigration law and policy, as well as in managing and negotiating their foreign relations aspects and impact. Within the Department, the Bureau of Consular Affairs has responsibility for the adjudication and issuance of passports, visas, and related services; protection and welfare of U.S. citizens and interests abroad; third-country representation of interests of foreign governments; and the determination of nationality of persons not in the United States. *See* 1 Foreign Affairs Manual 250.[1] The Bureau of Population, Refugees, and Migration has responsibility for coordinating and managing the U.S. Refugee Admissions Program; administering and monitoring U.S. contributions to migration-focused multilateral organizations such as the Office of the UN High Commissioner for Refugees and the International Organization for Migration; and advancing effective and humane migration policies globally and regionally. Several other bureaus within the

---

[1] The Secretary of State's authorities under the INA are found in various provisions, including §§ 104, 105, 349(a)(5), 358, and 359 (8 U.S.C. §§ 1104, 1105, 1481(a)(5), 1501, and 1502) (visa and other immigration-related laws). The Department also exercises passport-related authorities, including those found at 22 U.S.C. §§ 211a et seq.

11

Department of State, including the Bureau of Human Rights, Democracy, and

Labor, the Bureau of International Organization Affairs, and all regional bureaus

are routinely engaged in negotiations and multilateral diplomatic and policy work

in global, regional, and bilateral fora on migration issues. Collectively, the

Department of State promotes U.S. policies internationally in this area and bears

the burden of managing foreign governments' objections to the treatment of their

nationals in the United States.

*15.* Federal statutes, and particularly Section 104 of the INA as amended by

the Homeland Security Act, invest the Secretary of State with specific powers and

duties relating to immigration and nationality laws. A 2003 Memorandum of

Understanding Between the Secretaries of State and Homeland Security

Concerning Implementation of Section 428 of the Homeland Security Act of 2002

("MOU"), 1(b), provided that the Secretary of Homeland Security would establish

visa policy, review implementation of that policy, and provide additional direction

as described in the MOU, while respecting the prerogatives of the Secretary of

State to lead and manage the consular corps and its functions, to manage the visa

process, and to execute the foreign policy of the United States.

*16.* Our federal immigration laws, including those administered by the State

Department, are crafted to incorporate and accommodate a wide range of sensitive

U.S. foreign relations concerns. Our visa regime, for example, both embodies and

12

permits consideration of U.S. diplomatic, human rights, and other foreign relations interests.  To give just a few examples, the INA authorizes the Secretary of State to help determine which diplomats are entitled to official visas to represent their countries in the United States.  INA § 101(a)(15)(A).  INA § 243(d) authorizes the Secretary of State to determine the scope of visa sanctions that will be imposed on countries, upon notification from DHS that such countries have denied or unreasonably delayed accepting their nationals back from the United States.  The INA also authorizes the Secretary of State to deny visas to aliens whose entry or proposed activity in the United States "would have potentially serious adverse foreign policy consequences."  INA § 212(a)(3)(C).  During the Honduran constitutional crisis in 2009, the State Department imposed visa restrictions and revoked several visas under this authority to encourage the de facto government to enter into good-faith negotiations with deposed President Zelaya.  Likewise, under the auspices of INA § 212(f) and Presidential Proclamation 7750, the State Department recently revoked several visas for officials who engaged in or benefited from corruption, in an effort to bring pressure to bear on other countries to investigate and eliminate corruption by their government officials.

*17.* Further, our laws provide for the denial of U.S. visas on security and related grounds to aliens who are anticipated to violate U.S. law following entry into the United States and to aliens with a broad range of ties to terrorism,

13

including those who have engaged in terrorist activity as defined in the INA, §
212(a)(3)(B), as well as those who a consular officer reasonably believes are
engaging or will engage in terrorist activity.  Our visa laws also render
inadmissible and make subject to removal aliens who participated in human rights
violations such as genocide or torture.[2]  And even the general authority to issue
visas requires Department officials to monitor the political, legal, economic, and
cultural developments in foreign countries for matters directly relevant to the full
range of visa ineligibilities, including economic, demographic, political, ethnicity,
criminal, and security issues.

*18.*  Under section 244 of the INA, 8 U.S.C. § 1254a, federal law also
provides for temporary protected status ("TPS"), which permits eligible foreign
nationals who are already present in the United States to remain in the country and
obtain employment authorization.  TPS is available to eligible foreign nationals
who, due to armed conflict, an environmental disaster, or extraordinary and
temporary conditions in their state of nationality, may face risk to personal safety if
returned to that state while such conditions persist.  Recent examples include the
designation last year of Haiti for TPS following the devastating earthquake in that
country, and the extension of Sudan's designation as a result of ongoing armed
conflict.  DHS administers this program and, pursuant to the statute, routinely

---

[2] 8 U.S.C. §§ 1182(a)(2)(G), 1182(a)(3)(E)(iii), and 1182(a)(3)(G) (inadmissible); 8 U.S.C. §§
1227(a)(4)(D)-(4)(F) (removable).

consults with the State Department for its views on issues relevant to

determinations whether to designate or continue to designate a foreign state or part

thereof for TPS, including whether the statutory criteria are satisfied in each case.

TPS furthers certain U.S. foreign policy interests by facilitating provision of

humanitarian protection to eligible persons who might otherwise be subject to

removal to their home countries in times of armed conflict, environmental

disasters, or other extraordinary and temporary conditions. The impact of the

program can be significant: As of July 14, 2011, U.S. Citizenship and Immigration

Services, a component of DHS, had approved more than 48,000 applications for

TPS under the original designation of Haiti made by the Secretary of Homeland

Security on January 15, 2010.

## II.    U.S. Immigration Practices Significantly Impact Our Foreign Relations

*19.* In addition to incorporating foreign affairs concerns, the United States'

choices with respect to immigration policies and practices also have a significant

impact on our foreign relations. Again using State Department visa processes as

an example, the process for visa issuance and denial is of great interest to foreign

governments, owing to the direct impact the visa process has on the affairs of their

own nationals. Similarly, domestic processes for arrest, detention, and removal of

aliens and other aspects of their treatment in the United States are of great interest

to foreign governments because of the impact these processes have on foreign

15

nationals and their families.  Aspects of U.S. immigration laws, such as the

prohibitions on removal of individuals to countries where it is more likely than not

that they would be tortured, and on removal of refugees to countries where their

life or freedom would be threatened on account of their race, religion, nationality,

membership in a particular social group, or political opinion, implement U.S. treaty

obligations under the Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment and the 1967 Protocol relating to the Status of

Refugees.

20.  Given the diplomatic, legal, and policy sensitivities surrounding

immigration issues, even small changes in U.S. immigration laws, policies, and

practices can provoke a substantial international reaction—both in the immigration

context and across American diplomatic concerns.  It is for reasons such as these

that, while federal law recognizes that states and localities may play beneficial

roles in assisting in the enforcement of federal immigration law, *see, e.g.*, 8 U.S.C.

§ 1357(g), it is critical from a foreign affairs standpoint that the authority to

directly regulate immigration be assigned exclusively to the federal government.

21.  Indeed, countries routinely raise concerns about immigration-related

changes in bilateral, regional, and multilateral arenas.  The exercise of immigration

functions can quickly provoke a significant bilateral or multilateral problem that

harms U.S. interests if handled without appropriate consideration of relevant

16

foreign policy implications.  The State Department is often in the position of interacting directly with foreign governments in managing the impact of these bilateral problems.  For example, decisions regarding the issuance of individual visas to controversial figures, such as leaders of foreign governments with which the United States experiences significant diplomatic tensions, prominent individuals with checkered pasts, and delegates to international bodies, require a full review of U.S. government equities, including foreign policy interests and consideration of international treaties to which the United States is a party.

   A.  *Reciprocal Impact on U.S. Citizens Abroad*

   *22.*  U.S. immigration policies and practices can also have immediate and substantial impacts on the treatment of U.S. nationals abroad.  INA § 221(c), for example, requires the length of validity for visas to be reciprocal as far as practicable.  Even relatively non-controversial issues such as the period of validity of a visa and the fees charged are the subject of discussion, negotiation, and agreement among countries and have a direct impact on how other governments treat U.S. citizens who wish to travel abroad.  For example, in the recent past, some countries have responded to changes in U.S. visa charges by significantly raising the entry fees that they impose on U.S. nationals.  The Enhanced Border Security and Visa Entry Reform Act of 2002, which requires the fingerprinting of foreign nationals for the visa application process and for entry into the United

17

States, was the subject of much criticism by other governments and caused some governments to consider taking reciprocal retaliatory action against U.S. nationals. For instance, Brazil instituted a new tourist visa requirement in response, and reserves the right to require a thumbprint of Americans upon entry into its territory.

23.  In the area of consular services, how we treat foreign nationals who are present in the United States likewise can affect how a foreign government treats U.S. citizens present in its country.  For example, the Department of State proactively takes a number of steps to ensure U.S. compliance with our obligations under Article 36 of the Vienna Convention on Consular Relations ("VCCR"), which requires that all foreign nationals arrested or in custody in the United States be informed of their option to request to meet with a consular official.  The Department does so in important part to increase the likelihood that such notification and consular access will be provided to U.S. citizens who are arrested or detained abroad.

24.  Accordingly, the State Department considers carefully not only the foreign policy goals and consequences of its immigration-related decisions, but also the potential impact of those decisions on the reciprocal treatment of U.S. citizens by the relevant foreign governments.

B. *Impact in Regional and Multilateral Fora*

25. The situation of foreign nationals within a country, particularly with regard to the protection of the human rights of migrants, irrespective of their immigration status, is a matter of international concern and is addressed by international treaties. The United Nations and regional bodies such as the Organization of American States ("OAS"), an intergovernmental organization composed of all thirty-five States of the Americas, have established institutions and mechanisms for the discussion, examination, and oversight of international migration policy. As a matter of longstanding human rights and humanitarian policy, the U.S. government strongly supports international efforts to protect migrants, who are typically especially vulnerable to mistreatment and abuse. Accordingly, the United States as a matter of its foreign policy engages actively in regional and multilateral human rights fora, through which the United States promotes respect for human rights (including the human rights of migrants), the rule of law, and other U.S. values.

26. As part of the international migration framework, the United States has ratified several global human rights treaties which impose obligations on States Parties regarding the rights of persons, including migrants, within their territories, often without regard to the legal status of a non-national within a State's territory. Such treaties include the International Covenant on Civil and Political Rights, the

19

International Convention on the Elimination of All Forms of Racial

Discrimination, and the Convention Against Torture.  The United States is also

party to law enforcement conventions that address multilateral cooperation on

immigration issues and the rights of certain migrants, including the United Nations

Convention Against Transnational Organized Crime and two of its supplemental

Protocols:  the Protocol Against the Smuggling of Migrants by Land, Sea, and Air

and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons,

Especially Women and Children.  These protocols require States Parties to protect

the rights of smuggled aliens.  Other relevant conventions include the 1967

Protocol relating to the Status of Refugees, the VCCR, and various bilateral

Friendship, Commerce, and Navigation treaties creating reciprocal treatment

obligations toward foreign nationals.

27.  Many United Nations human rights conventions, including those

referenced above, establish expert treaty bodies which are responsible for

monitoring compliance by reviewing and commenting upon reports from States

Parties regarding implementation of their treaty obligations.  These expert bodies

routinely address immigration and migration-related issues, and criticize states,

including the United States, for laws and policies which, in their view, raise

questions about unfair, arbitrary, or racially discriminatory treatment of migrants,

or other human rights concerns.  Such criticisms are public, are often the subject of

20

further discussion in UN bodies, and may be raised directly with the United States in bilateral exchanges with foreign countries.

28. Additionally, the United Nations General Assembly and other UN organs routinely adopt resolutions regarding the human rights and protection of migrants. The United Nations has also established "special mechanisms," including independent experts and special rapporteurs, that investigate, issue reports, and make recommendations regarding the human rights of migrants.

29. At the regional level, the OAS has several organs in which issues related to migration policy and the treatment of migrants are raised. Like the UN General Assembly, the OAS General Assembly adopts resolutions on a range of topics including the human rights of migrants. Additionally, within the OAS system, the Inter-American Commission on Human Rights ("IACHR"), which is based in Washington, D.C., promotes respect for human rights, including by issuing statements and reports and holding hearings and adopting findings in response to individual petitions regarding a breach of a Member State's human rights commitments. The IACHR often expresses concern about the treatment of migrants by OAS Member States, including the United States. For example, in addition to holding hearings that considered the enforcement of U.S. immigration laws and policies, the IACHR recently published a thematic report addressing the United States' use of immigration-related detention and associated issues.

21

*30.* Other intergovernmental organizations and international bodies, not specifically focused on issues related to the human rights of migrants, also provide venues in which States address issues related to migration generally, and which often include issues related to the treatment of migrants within a State's domestic legal and policy framework. These include the International Organization for Migration, the Regional Conference on Migration (Western Hemisphere), the UN High Level Dialogue on International Migration and Development, the Global Forum on Migration and Development, the International Labor Organization, the UN Office for Drug Control and Crime Prevention, and others.

*31.* As a matter of both international law and practice, the federal government is held accountable internationally for the actions of state and local authorities regarding our treatment of foreign nationals. International bodies and foreign governments do not typically distinguish between the conduct of the national government and the conduct of individual states within a federal system. This is starkly evidenced by the United States' experience in cases in which U.S. state and local government authorities have failed to comply with U.S. obligations under the VCCR to provide consular notification to all foreign nationals in U.S. custody. Failure to provide such notice by state officials has led to three suits by Paraguay, Germany, and Mexico against the United States in the International Court of Justice, an advisory opinion sought by Mexico in the Inter-American

22

Court of Human Rights, petitions against the United States in the IACHR, and
bilateral complaints by numerous foreign governments. The fallout from these
state activities remains a serious, ongoing foreign policy problem for the United
States.

32. The United States takes seriously allegations that it has failed to adhere
to its international law obligations and foreign policy commitments, and engages in
a variety of venues to address such claims. Although the State Department is fully
prepared to defend U.S. practices against unjustified claims of human rights
shortcomings, criticism from an international body over immigration issues can
directly undercut the credibility of U.S. efforts to advance human rights and can
lead to significant diplomatic obstacles—both on immigration issues of bilateral
concern and on other matters that might be the subject of diplomatic negotiations.

33. As discussed below, in this context, H.B. 56's criminal-enforcement-at-
all-costs approach and its sweep into matters left properly to federal direction and
control open the United States up to such criticism, while simultaneously denying
the United States the tools to decide for itself whether and how to adjust its
activities in response. These problems are magnified by H.B. 56's concurrent
enactment with other state laws that establish a cacophony of state-specific
immigrant enforcement regimes uncoordinated with the federal government's
policies and priorities. The State Department should be conducting international

diplomacy and defending U.S. interests only with regard to, and in light of, immigration policies that have been adopted through a considered process that reflects the interests of all the American people, not just the views of a particular state legislature or set of state legislatures.

### III.   Alabama Law H.B. 56's Harm to U.S. Foreign Relations

*34.* H.B. 56 broadly threatens the national government's primacy in setting immigration policy and ensuring that, when the federal government has spoken, its word has weight and can be trusted by the international community.  The Alabama law conflicts with or undermines a number of specific foreign policy positions of the United States, including:  (1) that we do not ordinarily impose criminal sanctions or other punitive measures on foreign nationals solely for unlawful presence; (2) that we abide by norms of mutuality, hospitality, and respect, as well as the principle of uniformity, in crafting and enforcing our immigration rules; and (3) that we honor our international legal, political, and moral commitments to protect the human rights of migrants.  Foreign governments rely on these policies, and trust that we will treat their nationals accordingly; the United States, in turn, has the credibility and leverage to demand the same.  It is because the international community perceives laws like H.B. 56 as reneging on these stated policy positions, which guarantee aliens are not, for example, subjected to legislated homelessness or put in prison solely for seeking work, that so many foreign

24

governments have expressed their displeasure at such laws, and may retaliate in kind. This kind of grievance tarnishes the United States' image and reduces our ability to engage in foreign policy on numerous fronts.

35. Given the diplomatic and foreign relations sensitivities surrounding U.S. immigration policy generally and the significant foreign relations consequences that can result from even small changes in this area, and given that H.B. 56 represents an effort to regulate virtually every aspect of certain aliens' lives, it is not surprising that H.B. 56 has already provoked international controversy. The Alabama law unilaterally alters clear and longstanding policy choices by the federal government regarding enforcement against individuals who are unlawfully present in the United States. U.S. immigration law—and our uniform foreign policy regarding the treatment of foreign nationals—has provided that the unlawful presence of a foreign national, in itself, ordinarily will not lead to that foreign national's criminal arrest, incarceration, or other punitive measures (e.g., legislated homelessness) but instead to civil removal proceedings. Unlawful presence is a basis for removal, not retribution. This is a policy that is understood internationally, that is consonant with multilateral resolutions expressing the view that an individual's migration status should not in itself be a crime, and that is both important to and supported by foreign governments. This policy has been the subject of repeated international discussions, and is firmly grounded in the United

25

States' human rights commitments as well as our interest in having our own citizens treated humanely when abroad.  H.B. 56 undermines this aspect of U.S. immigration law and foreign policy by effectively allowing for criminal sanctions and other punitive measures based on unlawful presence alone.

36.  H.B. 56 further deviates from federal law and priorities by imposing mandatory verification of immigration status and criminal enforcement of alien registration, and by regulating, and in many cases criminalizing, work, travel, housing, contracting, and educational enrollment by foreign nationals in a manner not contemplated by U.S. law.  H.B. 56's registration scheme imposes on aliens severe administrative and interrogation burdens beyond those imposed by federal law.  Aliens in the United States expect to be verified and tracked by the federal government, just as U.S. citizens traveling in other countries are prepared to accommodate the legitimate demands of the national host government.  But it is counter to our longstanding foreign policy and our national interest for individual states unilaterally to impose such severe, distinct burdens, and thereby to invite both retaliatory measures against American nationals abroad and excessive encroachments on the liberty of foreign nationals in the United States.

37.  Through a variety of overlapping criminal and procedural mechanisms, H.B. 56 invites harassment and mistreatment of foreign nationals locally, and jeopardizes the United States' relationships and reputation abroad.  Provisions in

H.B. 56 such as Section 27, which prohibits Alabama state courts from enforcing contracts between an "alien unlawfully present in the United States" and any other party; Section 28, which requires every public elementary and secondary school to determine and report whether enrolling students were born "outside the jurisdiction of the United States" or to an unlawfully present alien, and which will chill both citizen and noncitizen minors from seeking an education; and Section 30, which makes it a felony for unlawfully present aliens to enter into or attempt to enter into any transaction with the state or its political subdivisions, all mark a dramatic departure from the norms of mutuality, hospitality, and respect that have informed U.S. law and foreign policy in this area.  While the negative effects of these provisions will not be limited to unlawfully present aliens, the clear intention is to remove such individuals from Alabama public life, and from the State of Alabama itself.

38.  Both standing alone and in conjunction with other recently enacted state immigration enforcement laws, H.B. 56 thus threatens significant harm to U.S. bilateral relationships and to our standing and efficacy in regional and multilateral fora.  The criticism provoked by the Alabama law threatens multiple concrete harms to U.S. foreign relations.  As noted above, Alabama's effort to revise immigration policy invariably risks the adoption of harmful reciprocal measures toward U.S. nationals by foreign governments.  It can also undermine the

27

willingness of foreign states to engage bilaterally and multilaterally with the United States to advance U.S. foreign policy goals, and erode the credibility of U.S. efforts in regional and multilateral intergovernmental bodies to advance human rights.  In addition, by contributing to the growing patchwork of state-specific immigration regimes, Alabama has fostered both cacophony and confusion regarding U.S. immigration policy, undermining the United States' ability to speak with one voice in this area and fueling a damaging perception that the United States is becoming more hostile to foreign nationals.

A. *Immediate Reaction to H.B. 56*

*39.* The consequences of H.B. 56 on U.S. bilateral, regional, and multinational relationships have inevitably been less visible than the consequences of Arizona's S.B. 1070, enacted in April 2010, given that H.B. 56 was signed into law only a few weeks ago; it followed on the heels of other state laws that had already spotlighted the issue of state-specific immigration enforcement policies; and Alabama is not a border state.  Nevertheless, H.B. 56 has already generated negative reaction that has damaged the public image of the United States, thereby undermining our ability to pursue diplomatic objectives, and has provoked public criticisms by governments with which the United States maintains important and sensitive relations.  Moreover, as noted above, the foreign affairs significance of H.B. 56 cannot be assessed in isolation from the legislative efforts by other states

such as Arizona.  The collective impact of these efforts threatens significant harm

to U.S. foreign relations and foreign policy interests.

40. Mexico's reaction to H.B. 56 was swift and strongly negative.  The

Mexican Foreign Ministry issued a statement on the day H.B. 56 was signed into

law, expressing the Government of Mexico's "concerns and objections," and

noting that the Government had already registered its opposition "through several

channels and to different actors."  The statement further remarked that H.B. 56

"criminalizes immigration and may lead to the incorrect enforcement of the law by

local authorities;" "potentially affects human and civil rights of Mexicans who live

in or visit Alabama;" and "goes against the principles of shared responsibility,

trust, and mutual respect under which the federal governments of Mexico and the

United States have determined to work to address shared challenges in North

America."  Shortly after the issuance of this statement, the Government of El

Salvador publicly expressed its support for Mexico's protest against H.B. 56.

41. On the day after H.B. 56 was signed into law, the Mexican Ambassador

to the United States, Arturo Sarukhan, sent a letter to U.S. Attorney General Eric

Holder expressing the Government of Mexico's "deepest concern regarding the

recent enactment of HB 56."  Ambassador Sarukhan devoted special criticism to

Section 28, stating that it "creat[es] a subclass of students singled out on the sole

basis of national origin and/or ethnicity," and warned that "Alabama's actions are

detrimental to the robust relationship that [Mexico and the United States] have built as partners and neighbors in such important issues as enhancing economic competitiveness and trade, cooperating against transnational organized crime, promoting clean energy, and combating climate change." Ambassador Sarukhan further criticized the growing state "patchwork of individual immigration regimes," which "make[s] it impossible for Mexican nationals to understand their rights and obligations[,] thereby rendering them vulnerable to potential discrimination and abuse," and which "will weaken public support in Mexico for working together" with the United States.

42. On July 8, 2011, the Embassy of Mexico issued a statement reiterating Mexico's "deep concern" about H.B. 56 and "express[ing] dismay about its content." The statement remarked that Section 28 of the Alabama law "could likely lead to potential discrimination of Mexican students, including those who are actually U.S. citizens of Mexican descent," and that "[t]he Government of Mexico has repeatedly underscored that certain provisions of this law could adversely affect the fundamental civil rights of Mexican nationals living or visiting Alabama, further criminalize immigrants, and potentially lead to the selective application of the law." H.B. 56 has deepened the perception that significant parts of the United States are hostile toward Mexico, which in turn negatively affects

both Mexican popular views of the United States and numerous diplomatic processes between U.S. and Mexican officials.

*43.* H.B. 56 has already received criticism from a key regional human rights body as well. The IACHR, an autonomous organ of the OAS, announced on June 24 that it "is troubled by Alabama's HB56 and Arizona's SB1070 laws, as well as by other similar laws that have been enacted in the states of Utah, Indiana, and Georgia," as these laws are in its view in tension with international human rights standards. The IACHR warned that H.B. 56 "could lead to the use of racial profiling by law enforcement officers," and that "implementing Alabama's HB56 carries a high risk of discrimination." The IACHR further expressed concern with "the criminalization of the presence of irregular or undocumented immigrants," and with the possibility that H.B. 56's provisions criminalizing third-party activities "could improperly hinder the work of assistance and protection of the defenders of migrants' human rights." The IACHR "strongly urge[d]" the United States to take corrective action in response to H.B. 56 and related state laws.

*44.* This kind of negative reaction by key regional allies and human rights experts cannot readily be dismissed. Such criticisms—particularly when provoked by an immigration enforcement policy that is being pursued unilaterally by a U.S. state and that the national government does not control or endorse—affect the United States' standing in bilateral, regional, and international relationships, and

31

ultimately the leadership role of the United States as we seek to advance a wide range of policy goals within the international community. They risk retaliatory harms to the legal rights of U.S. nationals abroad. And they compromise our ability to engage effectively in bilateral, regional, and multilateral conversations regarding human rights.

45. In my professional judgment, these immediate reactions provide only a sample of the serious concerns that foreign governments and international bodies will likely have with H.B. 56, and of the criticisms that H.B. 56 can be expected to generate in the future. The international community has already demonstrated that it perceives the Alabama law as a pernicious continuation and extension of Arizona's S.B. 1070. The negative foreign relations effects of H.B. 56 will only intensify if the legislation goes into effect.

B. *Impact Since July 2010 of Related State Laws*

46. As noted above, foreign governments and international legal and policy bodies, as well as overseas opinion-makers, hold the United States responsible for the immigration activities of its states, and have already lumped together Alabama's H.B. 56 with recently enacted immigration enforcement laws in Arizona, Utah, Georgia, Indiana, and South Carolina. These laws differ in certain meaningful respects, but share a common purpose of establishing state-specific immigration enforcement regimes. Because these laws adversely affect U.S.

32

foreign relations in similar and mutually reinforcing ways, and because the growing patchwork of state immigration policies generates additional foreign relations concerns, it is necessary to view the reaction to H.B. 56 in the context of the fallout caused by Arizona's S.B. 1070 and follow-on state laws.

47. In a declaration dated July 2, 2010 which was filed in court, then-Deputy Secretary of State James Steinberg provided a detailed explanation of how "the passage of Arizona S.B. 1070 ha[d] provoked broad-based criticism and concern among U.S. allies in the Western Hemisphere, by human rights experts, and in numerous intergovernmental fora." Declaration of James B. Steinberg at 20-25, United States v. Arizona, 641 F.3d 339 (9th Cir. 2011) (No. 10-16645). Without repeating that explanation here, I can confirm that S.B. 1070 has had a continued detrimental effect on U.S. foreign relations and foreign policy objectives, and that the more recently enacted state immigration enforcement laws have, individually and collectively, exacerbated those negative effects.

48. S.B. 1070 has been repeatedly criticized by foreign leaders in public venues and raised by foreign officials in nonpublic settings, and has generated a range of foreign affairs difficulties. For instance, Mexican concerns about S.B. 1070 led to the cancellation of the September 2010 U.S.-Mexico Border Governors' Conference, an important initiative for improving binational coordination on border issues, and to its subsequent relocation to New Mexico. At

33

the November 2010 Universal Periodic Review of the United States before the UN

Human Rights Council, part of a new process established by the UN General

Assembly to review quadrennially the human rights record of every UN Member

State, numerous countries pressed the high-level U.S. delegation on S.B. 1070.

Bolivia characterized S.B. 1070 as facilitating racial profiling in an advance

question. Ecuador characterized the law as discriminatory and racist, and

Guatemala implicitly characterized it as repressive and a violation of human rights,

in written recommendations. El Salvador similarly condemned S.B. 1070 at the

second Ibero-American Forum on Migration and Development, held in San

Salvador in late July 2010. Media in many Western Hemisphere countries, as well

as others, continue to cover S.B. 1070 extensively and in highly negative terms,

associating the law with American racism, xenophobia, and intolerance.

Consistent with the polling data cited by Deputy Secretary Steinberg, *id.* at 21,

diplomats who work in the region report that S.B. 1070 has contributed to a

perception among many Mexicans that ethnically based prejudice is free to find

legislative expression in the United States, and that S.B. 1070—together with the

more recently enacted state immigration enforcement laws—complicates numerous

aspects of their work.

49. Recently enacted immigration laws in Utah, Georgia, Indiana, and South

Carolina, along with Alabama's H.B. 56, have aggravated the negative foreign

relations and foreign policy impacts caused by S.B. 1070. The Government of

Mexico has issued statements criticizing each of these laws, and it vociferously

protested them both publicly and privately. Mexico has specifically criticized

provisions in the Georgia and Indiana laws that would bar the use of consular

identification cards for a wide range of purposes and therefore potentially

undermine U.S. compliance with our consular access obligations under the VCCR.

As noted above, the Mexican Ambassador has expressed particular concern about

the "patchwork of immigration regimes" developing within the United States.

Other Western Hemisphere countries, including Guatemala, Ecuador, and El

Salvador, have issued critical statements and/or sent critical diplomatic notes to the

State Department. Media coverage in Mexico has been particularly negative. On

account of Georgia's new law, Mexico has already elected to move a significant

binational health conference that it had planned to hold in Atlanta. Foreign

governments have additionally expressed their opposition to these new state laws

through litigation. Mexico has filed *amicus* briefs in support of private challenges

to the Utah, Indiana, and Georgia laws, and numerous Western Hemisphere

countries have joined those briefs. Indeed, more countries have joined Mexico's

*amicus* brief in Utah (Argentina, Brazil, Chile, Colombia, Costa Rica, Ecuador, El

Salvador, Guatemala, Honduras, Nicaragua, Paraguay, Peru, and Uruguay) than

35

joined its corresponding brief in Arizona—reflective of the growing regional concern about these laws.

C. *Future Ramifications*

50. If H.B. 56 were to enter into effect, criticism will unquestionably increase, and the risk of such harms will escalate. If enforced, the Alabama law would have an increasingly caustic impact on the United States' relations with important regional allies, undermine additional diplomatic arrangements and opportunities for international cooperation, constitute an ongoing irritant in U.S. bilateral, regional, and multilateral relationships, and subject the United States to ongoing criticism in international fora.

51. A few such circumstances are readily foreseeable. For example, the United States would almost certainly be criticized for H.B. 56 and related state laws by UN human rights treaty monitoring bodies in the context of U.S. human rights treaty reporting requirements. Within the next several months, the United States is expected to report to both the UN Human Rights Committee and the Committee on the Elimination of Racial Discrimination, and thereafter will be expected to appear before each body to defend the United States' record of human rights compliance. H.B. 56, if still in effect, would very likely be the subject of criticism before both bodies.

52. If Alabama's attempt through H.B. 56 to set its own uncoordinated immigration policy that regulates virtually every aspect of certain aliens' lives were to go into effect, it would directly call into question the ability of the United States to speak with one voice at the international level on issues related to immigration and migration policy. As explained above, only the national government is in a position to assess the full impact of a policy such as H.B. 56 on our overall foreign relations agenda, and to balance the competing foreign affairs considerations involved in the adoption and enforcement of such a law. Normally, when the United States incurs criticism of immigration law and policies adopted at the federal level, the United States is in a position to review the criticism and determine whether to defend the practices against attack or else to take appropriate action to modify its practices. The United States is also able to develop and implement immigration policy in anticipation of these and other foreign affairs concerns. But in this case, the policy being pursued has not been developed, nor would it be implemented, with sensitivity to the full range of foreign policy information and considerations available to the national government, and the United States is unable to calibrate its immigration and foreign policies to respond effectively to these claims.

53. The proliferation of state laws that seek to advance state-specific immigration enforcement policies magnifies these concerns significantly. This

37

development threatens to subject the United States to a cacophony of competing immigration enforcement priorities and agendas, with little regard for the sensitive diplomatic and foreign relations considerations that immigration policy addresses, and with an extreme adverse impact on the United States' international reputation and its ability to speak with one voice in this sensitive area. Although the harm is inflicted by the individual states, the costs invariably will fall on the United States as a whole. Both the current and expected foreign affairs impacts of H.B. 56 must be assessed with reference to such related state initiatives and potential future initiatives, as the United States is held responsible internationally for all such efforts.

54. In sum, H.B. 56—in particular, the mandatory verification and criminal registration regime and the interlinking provisions restricting work, travel, housing, contracting, and educational enrollment—poses a significant risk of provoking retaliatory treatment against U.S. nationals by other states, and of generating ongoing adverse consequences for important and sensitive bilateral relationships with U.S. allies such as Mexico and others in the Western Hemisphere, and for our global standing in regional and multilateral institutions. Along with other recently enacted state immigration enforcement laws, it will likely hinder our ability to secure the cooperation of foreign governments in efforts to promote U.S. interests internationally across a range of trade, security, and other interests unrelated to

immigration. Finally, it will likely undermine the United States' ability to engage effectively with the international community to promote the advancement and protection of human rights. Such serious harm to international relations and U.S. stature in bilateral, regional, and multilateral relationships is often extremely difficult to repair after the fact.

*55.* Thus, having analyzed Alabama law H.B. 56, considered how it would interact with existing federal immigration policy and practice, and assessed the international reaction, I have concluded that the law runs significantly counter to American foreign policy interests, and that its enforcement would further undermine American foreign policy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief. Executed the 29th day of July 2011 in Washington, D.C.

William J. Burns

39