

FILED

2011 Aug-22  PM 06:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 5:11-cv-02746 (SLB)** |
| | ) | |
| STATE OF ALABAMA & | ) | |
| GOVERNOR ROBERT J. BENTLEY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

TONY WEST
Assistant Attorney General
JOYCE WHITE VANCE
United States Attorney
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch
C. LEE REEVES, II
VARU CHILAKAMARRI
JOSHUA WILKENFELD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4805
Fax: (202) 616-8470
Email: lee.reeves@usdoj.gov

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................1

ARGUMENT ....................................................................................................................2

    A.    Section 10 is Preempted Because it Both Regulates in an Area Exclusively Occupied by the Federal Government and Conflicts with the INA ........................7

        1.    The Supreme Court has barred states from enacting laws touching on alien registration ...................................................................................................7

        2.    Section 10 impermissibly interferes with foreign affairs ...........................9

    B.    Section 13's Prohibitions on the Harboring, Housing, and Transporting of Aliens, and on Encouraging Their Travel into the State, are Preempted ...........................10

        1.    Even if Section 13 mirrored federal law, it could not stand .....................10

        2.    Sections 13(a)(3) & 13(a)(4) do not even mirror federal law, and conflict with the purposes and objectives of Congress ............................14

    C.    The Mandatory Verification Scheme Created by Sections 12 and 18 is Preempted18

        1.    Alabama acknowledges that Sections 12 and 18 preclude cooperation with the federal government and thus necessarily conflict with federal law .....18

            a.    Alabama attempts to evade the INA's demand for cooperation ....19

            b.    Neither Section 1357(g)(10)(A) nor Section 1373 provides an alternative basis for defending this type of mandatory scheme .....22

            c.    Alabama's attack on discretionary verification does not speak to the conflicts between H.B. 56 and the INA ...................................24

            d.    Alabama cannot escape from the cooperation requirement by portraying H.B. 56 as an effort to control police procedures.........26

        2.    By abandoning cooperation, Sections 12 and 18 will impermissibly burden DHS enforcement resources ...................................................................27

        3.    Sections 12 and 18 will result in the harassment of lawfully present aliens29

D.    Section 11's Criminalization of Aliens Seeking or Performing Unauthorized Work Conflicts with IRCA and Improperly Regulates in an Area Comprehensively Attended to by Congress............................................................31

E.    Sections 16 & 17 of H.B. 56 – Alabama's New Penalty Scheme Against Employers Who Hire Unlawfully Present Aliens – are Expressly Preempted by IRCA  34

    1.    Section 16 violates IRCA's prohibition on employer sanctions................34

    2.    Section 17 violates IRCA's prohibition on employer sanctions................36

F.    Alabama's Restrictions on Transactions with State and Local Government and on Private Contracts Are Preempted by Federal Law...................................................38

    1.    Section 30 effectively criminalizes unlawful presence, and seeks to remove unlawfully present aliens from the State........................................38

    2.    The procedural posture of this challenge does not diminish the United States' likelihood of success on the merits .................................................40

    3.    Section 27 would impermissibly effect removal ........................................42

G.    Section 28 of H.B. 56 – Alabama's Education Registration Scheme – is Preempted by Federal Law ...................................................................................44

CONCLUSION.............................................................................................................................48

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008).................................................................................................. 23

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003)............................................................................ 10, 12, 32, 41

*Anderson v. Edwards*,
   514 U.S. 143 (1995).................................................................................................. 41

*Ariz. Contractors Ass'n., Inc. v. Napolitano*,
   2007 WL 4570303 (D. Ariz. Dec. 21, 2007) ........................................................ 5

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
   476 U.S. 573 (1986)............................................................................................ 12, 13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001)........................................................................................ 3, 26, 28

*Chamber of Commerce v. Whiting*,
   131 S. Ct. 1968 (2011)...................................................................................... *passim*

*Chamber of Commerce v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ........................................................................ *passim*

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875)............................................................................................ *passim*

*City of New York v. United States*,
   179 F.3d 29 (2d Cir. 1999)....................................................................................... 22

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978).................................................................................................. 13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)........................................................................................ 3, 10, 42

*De Canas v. Bica*,
   424 U.S. 351 (1976).......................................................................................... *passim*

*Department of Revenue v. ACF Indus., Inc.*,
   510 U.S. 332 (1994).................................................................................................. 23

iii

*Diamond Waste, Inc. v. Monroe County, Ga.*,
   939 F.2d 941 (11th Cir. 1991) ........................................................ 12

*Edwards v. California*,
   314 U.S. 160 (1941) ........................................................................ 13

*English v. General Elec. Co.*,
   496 U.S. 72 (1990) ............................................................................ 8

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ........................................................................ 11

*Florida Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) .......................................................................... 5

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ........................................................................ 33

*Garrett v. City of Escondido*,
   465 F. Supp. 2d 1043 (S.D. Cal. 2006) ............................................ 12

*Georgia Latino Alliance for Human Rights v. Deal*,
   2011 WL 2520752 (N.D.Ga.2011) ............................................... 3, 12

*Gonzales v. Peoria*,
   722 F.2d 468 (9th Cir. 1983) ............................................................ 5

*Gray v. City of Valley Park*,
   2008 WL 294294 (E.D. Mo. Jan. 31, 2008) ...................................... 5

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*,
   493 U.S. 365 (1990) ........................................................................ 24

*Henderson v. Mayor of N.Y.*,
   92 U.S. 259 (1876) ................................................................... 11, 13

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) .................................................................. *passim*

*Hoffman Plastic Compounds, Inc. v. NLRB*,
   535 U.S. 137 (2002) .............................................................. 29, 31, 33

*Howard v. Uniroyal, Inc.*,
   719 F.2d 1552 (11th Cir. 1983) ...................................................... 33

*League of United Latin American Citizens v. Wilson,*
  997 F.Supp. 1244 (C.D. Cal. 1997) ..................................................... 44

*Lem Moon Sing v. United States,*
  158 U.S. 538 (1895) ........................................................................... 11

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ........................................................................... 42

*NCAA v. Miller,*
  10 F.3d 633 (9th Cir. 1993) ............................................................... 12

*Nat'l Ass'n of State Utility Consumer Advocates v. FCC,*
  457 F.3d 1238 (11th Cir. 2006) ........................................................... 8

*Oyama v. California,*
  332 U.S. 633 (1948) ........................................................................... 47

*Pliva v. Mensing,*
  564 U.S. 1 (2011) ............................................................................... 42

*Plyler v. Doe,*
  457 U.S. 202 (1982) ..................................................................... 44, 46

*Pub. Util. Comm'n v. United States,*
  355 U.S. 534 (1958) ........................................................................... 11

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,*
  485 U.S. 495 (1988) ............................................................................. 5

*Reno v. American-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ............................................................................. 3

*Takahashi v. Fish & Game Comm'n,*
  334 U.S. 410 (1948) ........................................................................... 11

*This That & Other Gift & Tobacco, Inc. v. Cobb County, Ga.,*
  285 F.3d 1319 (11th Cir. 2002) ......................................................... 42

*Thomas v. Crosby,*
  371 F.3d 782 (11th Cir. 2004) ..................................................... 19, 24

*Toll v. Moreno,*
  458 U.S. 1 (1982) ......................................................................... 6, 43

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950)............................................................................ 3

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ................................................... *passim*

*United States v. Arizona*,
   No. 10-1413 slip op. (D. Ariz Dec. 12, 2010) ....................................... 14

*United States v. Cantu*,
   557 F.2d 1173 (5th Cir. 1977) ............................................................ 16

*United States v. Fleet*,
   498 F.3d 1225 (11th Cir. 2007) .......................................................... 33

*United States v. Hernandez-Rodriguez*,
   975 F.2d 622 (9th Cir. 1992) ....................................................... 13, 14

*United States v. Herrera*,
   584 F.2d 1137 (2d Cir. 1978) ............................................................. 17

*United States v. Locke*,
   529 U.S. 89 (2000)............................................................................. 5

*United States v. Lopez*,
   521 F.2d 437 (2d Cir. 1975)............................................................... 16

*United States v. Martinez-Medina*,
   2009 WL 117611 (5th Cir. 2009) ......................................................... 17

*United States v. Rubio-Gonzales*,
   674 F.2d 1067 (5th Cir. 1982) ............................................................ 16

*United States v. Salerno*,
   481 U.S. 739 (1987)............................................................. 40, 41, 42, 43

*United States v. Sanchez*,
   963 F.2d 152 (8th Cir. 1992) .............................................................. 16

*United States v. Shum*,
   496 F.3d 390 (5th Cir. 2007) .............................................................. 16

*United States v. Tipton*,
   518 F.3d 591 (8th Cir. 2008) .............................................................. 16

*United States v. Varkyoni*,
   645 F.2d 453 (5th Cir. 1981) ......................................................................... 15

*United States Philips Corps. v. KBC Bank*,
   590 F.3d 1091 (9th Cir. 2010) ...................................................................... 48

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
   701 F. Supp. 2d 835 (N.D. Tex. 2010) ........................................................ 12

*Wisconsin Dep't of Industry v. Gould, Inc.*,
   475 U.S. 282 (1986) ............................................................................ 9, 11, 12

*Wood v. A. Wilbert's Sons Shingle & Lumber Co.*,
   226 U.S. 384 (1912) ..................................................................................... 23

## STATE CASES

*Bessemer Water Service v. Lake Cyrus Development Co., Inc.*,
   959 So. 2d 643 (Ala. 2006) .......................................................................... 40

*Ex Parte Bank of America, N.A.*,
   39 So. 3d 113 (Ala. 2009) ............................................................................ 40

*Faria v. San Jacinto Unified School District*,
   59 Cal. Rptr. 2d 72 (Ct. App. 1996) ............................................................ 36

*Hilgers v. Jefferson County*,
   2010 WL 4034875 (Ala. Civ. App. 2010) .................................................... 40

*Jackson v. Hubbard*,
   53 So. 2d 723 (Ala. 1951) ............................................................................ 39

*Jie v. Liang Tai Knitwear Co.*,
   107 Cal. Rptr. 2d 682 (Ct. App. 2001) ........................................................ 36

*King v. Campbell*,
   988 So. 2d 969 (Ala. 2007) ..................................................................... 35, 36

*State v. Barragan-Sierra*,
   196 P.3d 879 (Ariz. Ct. App. 2008) ............................................................. 14

*Water Works and Sewer Bd. of City of Talladega v. Consolidated Pub., Inc.*,
   892 So.2d 859 (Ala. 2004) ........................................................................... 39

## CONSTITUTION & FEDERAL STATUTES

U.S. Const., art. VI, cl. 2 ................................................................ 42

8 U.S.C. § 1229(a)(1)(F)(i) ...........................................................15

8 U.S.C. § 1323 ..............................................................................11

8 U.S.C. § 1324 ....................................................................... *passim*

8 U.S.C. § 1324(a)(1)(A) ............................................................... 14

8 U.S.C. § 1324a(e)(4)(A) .............................................................. 37

8 U.S.C. §1324a(f) ..........................................................................37

8 U.S.C. § 1324a(h)(2) ....................................................... 33, 34, 37

8 U.S.C. § 1327 .............................................................................. 11

8 U.S.C. § 1328 .............................................................................. 11

8 U.S.C. § 1357(g)(1)-(9) .............................................................. 20

8 U.S.C. § 1357(g)(10) ............................................................. 20, 21

8 U.S.C. § 1357(g)(10)(A) ...................................................21, 22, 23

8 U.S.C. § 1357(g)(10)(B) ......................................................*passim*

8 U.S.C. § 1373 ......................................................................*passim*

8 U.S.C. § 1643(a)(2) ..................................................................... 44

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ................................. 23

## LEGISLATIVE MATERIALS

H.R. Res. 4437, 109th Cong. (2005) ............................................... 9

S. Res. 2454, 109th Cong. (2006) ................................................... 9

## STATE REGULATIONS & LEGISLATION

Ala. Code. § 13A-10-102 ................................................................................ 46

Ala. Code. § 32-6-9(c) .................................................................................. 30

H.B. 56 ...................................................................................................... *passim*

## MISCELLANEOUS

Black's Law Dictionary (9th ed. 2009) ......................................................... 38-39

Webster's Third New Int'l Dictionary (2009) ................................................... 37

## INTRODUCTION

Exercising its constitutional authority to "establish an uniform Rule of Naturalization" and to "regulate Commerce with foreign Nations," Congress has enacted a complex federal immigration scheme which covers a broad range of issues, including alien entry, movement, employment, and removal, as well as immigration benefits.  Under this system, the federal government expends significant resources to prevent illegal immigration and to remove unlawfully present aliens.  Since 2004, the Department of Homeland Security (DHS) has doubled the size of the Border Patrol, Aguilar Decl. ¶ 7, U.S. Br., Ex. 8, and over the last fiscal year, it has processed over 260,000 individuals at ports of entry in Alabama alone, *id.* ¶ 4a, preventing thousands of inadmissible aliens from entering the country though the state, *id.* ¶ 5.  On an average day this year, DHS arrested 775 aliens nationwide and removed 1,049 aliens, including 537 criminal aliens.  Ragsdale Decl. ¶ 5, U.S. Motion for a Preliminary Injunction [hereinafter, "U.S. Br."], Ex. 2.  While removal and criminal sanctions form a critical part of the federal immigration scheme, these are not Congress's sole concerns.  Congress also sought to protect aliens against exploitation, despite their unlawful status, and affirmatively created an enforcement system that is built around the appropriate exercise of discretion, which can account for humanitarian and foreign relations concerns, as well as resource constraints. *See* U.S. Br. at 5-7, 52 & n.11.

Alabama ignores the multi-faceted objectives that *Congress* has evidenced through the enactment of various immigration laws, complaining that the federal government has not employed criminal sanctions and removal to the exclusion of all other goals.  Attempting to take matters into its own hands, Alabama has enacted its own comprehensive immigration scheme, touching virtually every aspect of unlawfully present (and sometimes lawfully present) aliens'

lives in Alabama – covering their registration, entry and movement in the state, housing, employment, education, and ability to contract – all with the singular goal of criminally sanctioning the aliens or essentially effectuating their removal from the state.

As demonstrated in our opening brief, it is impermissible for a state to enact such provisions, as their enforcement would present an obstacle to the fulfillment of the purposes and objectives Congress embodied in its complex system of immigration laws and would intrude upon certain areas reserved to the federal government.  In response, Alabama advocates what amounts to a two-fold approach that would essentially eliminate the doctrine of implied preemption and permit states to run roughshod over the objectives of Congress:  wherever Congress *has* enacted a specific immigration provision, the states are free to enact their own laws – laws such as Sections 10, 13, 12, and 18 – which supposedly parallel or are intended to help enforce the federal laws.  On the other hand, where Congress *has not* enacted a law proscribing specific immigration related conduct, Alabama contends that the states are also free to fully regulate in those areas – as with Sections 11, 16, 17, 27, 28, and 30 – because there can be no "preemption by omission."  Alabama's approach has no basis in preemption law.  This reply will first address the general flaws in Alabama's approach, and will then turn to each specific provision at issue.

## <u>ARGUMENT</u>

Alabama claims that H.B. 56 does not conflict with federal law because Alabama is simply trying to achieve federal objectives.  But Alabama's approach misreads the complex immigration scheme as having a singular and exclusive focus on criminal prosecution or sanction. The Supreme Court has recognized that, in carrying out the sometimes competing congressional objectives underlying the immigration laws, "flexibility and the adaptation of the

congressional policy to infinitely variable conditions constitute the essence of the program."
*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Congress has therefore
designated DHS and the Department of Justice to enforce the Immigration and Nationality Act
(INA), and with that comes the authority to implement this statutory scheme with the necessary
flexibility and discretion.  *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S.
471, 483-85 (1999).  This authority is not limited to the simple decision of whether or not to
remove an alien from the United States, but necessarily infuses the manner in which immigration
sanctions are applied, as well as the methods of enforcement.[1]  Thus, contrary to Alabama's
claim that the United States is advocating a theory of preemption by executive policy or inaction,
*see* Defendants' Opp'n to Plaintiff's Motion for a Preliminary Injunction [hereinafter, "Alabama
U.S. Opp."] at 8-10, the issue here is that "flexibility" in the executive's enforcement forms a
"'critical component of the statutory and regulatory framework' under which the federal
government pursues the difficult (and often competing) objectives" set forth by Congress in the
INA.  *Ga. Latino Alliance for Human Rights v. Deal*, 2011 WL 2520752, at *14 (N.D. Ga.
2011); *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-350 (2001) (holding that
additional state-law punishment for unlawful fraud on the Food and Drug Administration is
preempted because it would interfere with FDA's "flexibility" to "pursue[] difficult (and often
competing) objectives"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

    Accordingly, in an arena where flexibility and adaptation to multiple objectives are
critical, and where Congress has vested discretion to balance those objectives in the Executive,

---

[1]  *See, e.g., Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (noting that the federal government's
control over immigration includes control over the "manner of the[ immigration laws']
execution"); Ragsdale Decl. ¶¶ 9, 42, U.S. Br., Ex. 2 (noting, *inter alia*, that criminal sanctions
for unlawful entry would not be appropriate for an alien who may have been victimized and
eligible for relief such as asylum).

Alabama's general claim that it may "concurrently enforce" any singular congressional objective does not pass muster – even where the state's professed intention is to help the federal government achieve that particular objective.[2]  Alabama's supposed support for its "concurrent enforcement" principle is a case dealing with the unique area of employer regulation, *see* Alabama U.S. Opp. at 3, 17, 27; *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968 (2011).  Regulation of employers is a unique area because Congress has expressly authorized the states to regulate concurrently – but only through a single means, "licensing and similar laws."  8 U.S.C. 1324a(h)(2).  *Whiting* thus deals with a "particular category of sanctions" over which "Congress specifically preserved [state] authority"; a plurality of the Court concluded that given the express authorization to regulate in that area, "it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority."  131 S. Ct. at 1981, 1984.  Alabama cannot bootstrap concurrent regulation of employers through licensing, which has a statutory basis, into concurrent regulation of immigration *writ large*, which does not.

Rather, the question of whether a state can enact its own laws and enforcement systems which parallel federal laws depends on the subject matter of, and congressional intent surrounding, the specific federal provision at issue.  For example, where Congress has legislated in an area within its superior constitutional authority, even a state law that "mirrors" federal law may be preempted.  As the Supreme Court has explained:

> The State contends that its requirement is not pre-empted because it is similar to federal requirements.  This is an incorrect statement of the law.  It is not always a sufficient answer to a claim of pre-emption to say that state rules supplement, *or*

---

[2]  Alabama portrays H.B. 56 as merely an effort to "fully cooperate with federal immigration authorities," Alabama U.S. Opp. at 1, citing Section 2 of H.B. 56.  The United States is not seeking to invalidate this hortatory Section, and invites the genuine cooperation of the states.  But many of the other sections of H.B. 56 go well beyond offering assistance to the United States, and attempt to seize control of numerous facets of immigration law from the United States.

> *even mirror*, federal requirements. . . . The appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation.

*United States v. Locke*, 529 U.S. 89, 115 (2000) (emphasis added); *accord Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963) ("The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.").   Even where Congress has regulated an issue, the separate state regulation of that same issue would undoubtedly result in some degree of difference in enforcement and interpretation of the federal statutes, which could impair Congress's ability to effectively control a particular area.[3]  Thus, Alabama's premise that it is free to enact and enforce any law that parallels or is designed to enhance existing federal provisions is untenable.

The second prong of Alabama's approach similarly overreaches and ignores real limitations on the states.[4]  Alabama claims that it does not seek to "replace the immigration laws passed by the federal government," Alabama U.S. Opp. at 2-3, yet it presses a theory where states are virtually free to enact any immigration law unless affirmatively prohibited by Congress.  First, Alabama attempts to read *De Canas v. Bica*, 424 U.S. 351 (1976), as giving free

---

[3]  Alabama cites *Gonzales v. Peoria,* 722 F.2d 468, 474 (9th Cir. 1983), as supporting concurrent enforcement by the states, but that case addressed certain enforcement of *federal* law, not enactment of independent state law.  Other cases cited by defendants, (Alabama U.S. Opp. at 27), are similar to *Whiting*, in that they deal with a state's narrow ability to revoke employer licenses based on express savings clause in federal law. *See Gray v. City of Valley Park*, 2008 WL 294294, at *9-11 (E.D. Mo. Jan. 31, 2008); *Ariz. Contractors Ass'n v. Napolitano*, 2007 WL 4570303, at *9 (D. Ariz. Dec. 21, 2007).

[4]  For example, the Supreme Court has often noted that, "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls . . . the pre-emptive inference can be drawn."  *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988).

rein to state enactments that are unrelated to local concerns and traditional police powers. *See* Alabama U.S. Opp. at 5-8. But the *type* and *scope* of state power being exercised were central to the Court's analysis in *De Canas*. Rather than simply "descri[bing] the *impetus* behind the California law at issue," *see id.* at 7, the Court went to some length to describe the sorts of "police powers" that states ordinarily possess, including laws affecting "child labor," and "occupational health and safety," and concluded that (prior to the passage of IRCA) the regulation of employment fell within these local concerns. 424 U.S. at 356. The Court also explained that "even state regulation designed to protect vital state interests" could be preempted by paramount federal legislation, *id.* at 357, indicating that state regulation should, at a minimum, focus on local interests. The primary import of *De Canas* here is that states cannot create their own independent immigration policies and schemes for enforcing such policies, such as Sections 12 and 18 of H.B. 56. U.S. Br. at 15. And, as relevant to many other sections of H.B. 56, Alabama cannot ignore *De Canas*'s admonition that "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress," because such regulations "conflict with [the United States'] constitutionally derived federal power to regulate immigration." *De Canas*, 424 U.S. at 358 n.6; *Toll v. Moreno*, 458 U.S. 1, 12-13 & n.8 (1982).

Alabama further misinterprets the significance of foreign policy as it applies to areas left "unregulated" by Congress. While the disruption to U.S. foreign relations does not form the sole basis of the challenge to any of H.B. 56's sections, there are numerous instances in which sections of H.B. 56 conflict with the longstanding stated foreign policy of the United States. This argument is not one of preemption by "heckler's veto," as Alabama suggests, Alabama U.S. Opp. at 13. Rather, as Deputy Secretary of State Burns advises, "our uniform foreign policy . . .

6

has provided that the unlawful presence of a foreign national, in itself, ordinarily will not lead to that foreign national's criminal arrest, incarceration, or other punitive measures (e.g. legislated homelessness) but instead to civil removal proceedings.  Unlawful presence is a basis for removal, not retribution," and this policy is "longstanding," "understood internationally," "consonant with multilateral resolutions," and consistent with U.S. human rights commitments and interests in reciprocal treatment for U.S. citizens abroad.  Burns Decl. ¶ 35, U.S. Br., Ex. 1.  Thus, the foreign policy conflict does not arise from the mere displeasure of foreign nations – although such concerns certainly highlight the deleterious effects of the conflict.  Instead, the conflict arises because many sections of the Alabama law effectively criminalize or penalize unlawful presence in a manner that "alters" or could be seen as "reneging" on the very real stated U.S. foreign policy positions on which the international community has relied.  *Id.* ¶ 34.

Alabama's approach to preemption would allow a state to enact almost any type of immigration regulation.  Such a position is unsupportable.  Instead, each of the challenged provisions of H.B. 56 must be viewed against the federal law and congressional intent that is unique to each area of regulation. Under that standard, each of these provisions must be enjoined.

**A.      Section 10 is Preempted Because it Both Regulates in an Area Exclusively Occupied by the Federal Government and Conflicts with the INA.**

**1.   The Supreme Court has barred states from enacting laws touching on alien registration.**

The federal government has comprehensively regulated alien registration, leaving no room for supplemental state regulation.  *See Hines v. Davidowitz*, 312 U.S. 52, 74 (1941); *see* U.S. Br. at 18-20.  For this reason, the Ninth Circuit unanimously held that an almost identical Arizona provision was preempted.  *United States v. Arizona*, 641 F.3d 339, 355 (9th Cir. 2011).

Alabama quibbles over whether *Hines* involved field preemption or conflict preemption.  Alabama U.S. Opp. at 18-20.  This argument is misplaced, as Alabama acknowledges that

7

Congress established "an integrated national registration system maintained by the federal government."  Alabama Opposition to HICA Motion for a Preliminary Injunction [Hereinafter, "Alabama HICA Opp."] at 65.  Defendants forget that the categories of implied preemption are not "rigidly distinct"; instead, "field pre-emption may be understood as a species of conflict pre-emption."  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990); *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1252 (11th Cir. 2006).  The precise classification of *Hines* is therefore irrelevant here because under either analysis, Section 10 is preempted.  The Supreme Court described federal regulation of the "registration of aliens" as sufficiently "comprehensive" to foreclose any state supplementation, and held that the states are precluded from "complement[ing]" the registration scheme or from "enforc[ing] additional or auxiliary regulations."  *Hines*, 312 U.S. at 61, 66-67, 70.  Section 10 falls on this basis alone.  *See Arizona*, 641 F.3d at 383 (Bea, C.J., concurring and dissenting) (referring to "the federal government's uniform, integrated, and comprehensive system of [alien] registration which leaves no room for its enforcement by the state").[5]

Eventually, Alabama acknowledges "the 'comprehensive' nature of the federal alien-registration laws" and defends Section 10 as an effort to "concurrentl[ly] enforce[]" the federal registration laws.  Alabama U.S. Opp. at 20.  *Hines* forecloses this effort.  Alabama may not

---

[5] Alabama misreads *Hines* as leaving open whether the field of alien registration is preempted, *see* Alabama U.S. Opp. at 18.  The language cited by Alabama does not speak to preemption via congressional occupation of the field, but to whether alien registration is a field that the states are constitutionally precluded from entering, even in the absence of any congressional enactments.  *See Hines*, 312 U.S. at 61-62 (leaving unaddressed whether the state exceeded its "constitutional power" to register aliens, and whether "federal power in this field, whether exercised or *unexercised*, is exclusive") (emphasis).  Given that Congress had enacted a comprehensive scheme for alien registration, *Hines* did not need to decide whether the federal power over alien registration – even if *unexercised* – was exclusive; the actual scheme enacted by Congress was, and continues to be, sufficiently preemptive.

independently criminalize immigration conduct.  *See De Canas*, 424 U.S. at 363 ("[I]n neither *Hines* nor *Nelson* was there affirmative evidence . . . that Congress sanctioned concurrent state legislation[.]"); *see also supra* at 7.  And the criminal provisions of Section 10 are especially inappropriate in light of the Supreme Court's confirmation that the states are not permitted to have their own alien registration requirements, and therefore cannot "provide their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [federal statute]."  *Wisconsin Dep't of Industry v. Gould, Inc.*, 475 U.S. 282, at 283 (1986).

Section 10 also contradicts federal law by effectively criminalizing the mere unlawful presence of aliens, which Congress has chosen not to do.[6]  Alabama does not dispute that it lacks the authority to sanction unlawful presence.  Instead, Alabama argues that Section 10 is no more of a sanction on unlawful status than what is already available under federal law.  Alabama U.S. Opp. at 21-22.  Although Section 10 is superficially based on the federal registration laws, it is tailored to apply exclusively to unlawfully present aliens.  Unlawful presence is an element of the crime created by Section 10, beyond mere failure to comply with the federal registration laws.  To reiterate its focus on unlawfully present aliens, Section 10 additionally immunizes anyone who "maintains authorization from the federal government to be present in the United States."  H.B. 56 § 10(d).  Thus, Section 10 is not simply an effort to copy the federal registration provisions – which itself would be impermissible – it is an effort to start with the federal registration crime and end in a crime focused exclusively on unlawful presence.

### 2.   Section 10 impermissibly interferes with foreign affairs.

Lastly, Alabama contends that the United States cannot rely on the Executive's control over foreign affairs to argue for preemption of Section 10.  But Alabama cannot deny that the

---

[6]  Congress has repeatedly considered and rejected attempts to criminalize unlawful presence. *See* S. Res. 2454, 109th Cong. §§ 206, 275 (2006); H.R. Res. 4437, 109th Cong. § 203 (2005); *see also* Burns Decl., ¶ 35.

Supreme Court invalidated the registration scheme at issue in *Hines* partly because of the risk that that state alien registration requirements would interfere with foreign relations. *Hines*, 312 U.S. at 66. Alabama's argument that the Executive's control over foreign affairs is relevant to the preemption analysis only where a state statute might contradict a specific, established federal policy "enshrined in [a] federal statute or treaties," Alabama U.S. Opp. at 14, is demonstrably incorrect. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 n.14 (2003) (finding preemption even though "the President in this case is acting without express congressional authority," because "the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, and conflict with that authority is a comparably good reason to find preemption of state law" (citation omitted)); see also *id.* at 416-17. And as the Deputy Secretary of State has made clear, state registration laws *do* conflict with actual arrangements with other countries (*see* Burns Decl. ¶ 35) – at least to the same extent as the registration provision that was invalidated in *Hines*. Defendants' narrow understanding of the federal foreign affairs power would "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381.

**B.    Section 13's Prohibitions on the Harboring, Housing, and Transporting of Aliens, and on Encouraging Their Travel into the State, are Preempted.**

   **1.    Even if Section 13 mirrored federal law, it could not stand.**

Alabama contends that Section 13 simply mirrors federal law, and therefore cannot be preempted under its theory that "concurrent enforcement" by states is always permissible. This argument is flawed for several reasons. *First*, the underlying premise that a state law cannot be preempted if it seeks to concurrently regulate and enforce conduct already regulated by the federal government is simply incorrect. *See supra* at 4-6. The preemption analysis here thus

requires an inquiry into the specific federal statutes and authorities at issue – an inquiry in which Alabama has wholly failed to engage.

   As explained in the United States' motion, Congress has unique constitutional authority to regulate the terms and conditions of an alien's entry in the United States, and it has exercised this authority by providing a detailed set of sanctions for those who unlawfully enter, and for the third parties who aid in their entry or concealment, or who harbor them.  *See* U.S. Br. at 32-34 (citing 8 U.S.C. §§ 1323, 1324, 1327, 1328).  The preemptive force of these provisions is derived from the subject matter of these laws, which relate to the entry and movement of aliens and thus strike at the heart of immigration itself.  *See, e.g.*, *De Canas*, 424 U.S. at 360-61; *Fiallo v. Bell*, 430 U.S. 787, 796 (1977); *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875) (Constitution prohibits sanction on third parties who assist in alien entry).  Alabama makes no effort to contradict this point, and the reason is clear:  If a single state were permitted to regulate alien entry and movement into and through the state, one must imagine the effect if all *50 states* were permitted to do the same.[7] The consequence of each state eliminating any real possibility of passage or residence for certain aliens, would be that the *United States* has effectively closed its external and interstate borders in a manner dictated by the states rather than the national government.  Alabama's claim that it only targets the activities of the unlawfully present is beside the point, because the Constitution precludes states from engaging in *any* regulation of entry and residence in the United States.  *De Canas*, 424 U.S. at 355; *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948).  The federal government's exclusive authority here includes the concomitant authority over the

_____

[7]  *See, e.g., Gould*, 475 U.S. at 288; *Pub. Util. Comm'n v. United States*, 355 U.S. 534, 546 (1958); *Arizona*, 641 F.3d at 354 (noting that the effect and magnitude of all states enacting similar laws must be considered in a preemption analysis).

manner of enforcement and when to sanction individual offenders.  *See Chy Lung*, 92 U.S. at 280 (explaining that the federal government exercises exclusive control over "the character of [immigration] regulations" and "the manner of their execution"); *see also Gould*, 475 U.S. at 286 (holding that where states have no authority to regulate an activity, they are also prohibited from "providing their own regulatory or judicial remedies for conduct prohibited . . . by [federal law]").  For any state to take that authority unto itself would necessarily intrude upon the federal government's exclusive ability to administer uniform immigration rules relating to entry and residence.[8]

*Relatedly*, Section 13 also violates the dormant Commerce Clause, as it attempts to discourage or otherwise restrict the movement of people between states.  The Supreme Court has adopted a two-tiered approach to analyzing potential Commerce Clause violations:

> [1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. . . . [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  Under this test, a state regulation is *per se* invalid where it "directly regulates *or* discriminates against interstate commerce." *Id.* (emphasis added); *see also Diamond Waste, Inc. v. Monroe County, Ga.*, 939 F.2d 941, 944 (11th Cir. 1991) ("[W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.  The clearest example of

---

[8] Several other courts have similarly held that state regulation in this area is impermissible. *See, e.g.*, *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 855 (N.D. Tex. 2010); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1056 (S.D. Cal. 2006); *Deal*, — F. Supp. 2d —, 2011 WL 2520752, at *13 (N.D. Ga. 2011).

such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders."); *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (similar).

Alabama responds that Section 13 is not invalid because it does not "discriminate" against interstate commerce or substantially "burden" interstate commerce, Alabama U.S. Opp. at 30-31, ignoring the first part of the *Brown-Forman* test for *per se* unconstitutionality. Alabama's prohibition on encouraging an alien to come to the state, or transporting an alien into the state *directly regulates* commerce by "restraining the transportation of persons . . . across its borders," just like the statute that was struck down in *Edwards v. California*, which made it a criminal offense to "bring[ ]or assist[ ] in bringing into the State any indigent person who is not a resident of the State." 314 U.S. 160, 171-73 (1941).  Alabama also attempts to evade constitutional scrutiny by arguing that it targets the movement of "illegal aliens," Alabama U.S. Opp. at 32, but this distinction is irrelevant.  The Supreme Court has long made clear that the Commerce Clause is implicated by restrictions on the movement of aliens.  *Henderson*, 92 U.S. at 270.  The exclusive federal control over the interstate movement of aliens is not diminished because of an alien's unlawful presence.  *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 622 (1978) ("All objects of interstate trade merit Commerce Clause protection" and "none is excluded by definition at the outset.").  In fact, the Court in *Bowman* ruled in a similar fashion, when it held that a state may not bar the importation of a product even if it would be illegal to possess or sell in the state.  *See Bowman v. Chicago & N.W. Ry. Co.*, 125 U.S. 465, 493 (1888) (invalidating state's bar on the importation of alcohol, which was illegal in the state).  Thus, just as the lawful status of an article of commerce has no bearing on a state's inability to control its importation, by analogy, an alien's unlawful presence does not permit Alabama to regulate his or her interstate movement.

**2. Sections 13(a)(3) & 13(a)(4) do not even mirror federal law, and conflict with the purposes and objectives of Congress.**

Although Alabama would be precluded from enacting state provisions which "mirror" federal law in this area, even the suggestion that the state is mirroring federal law does not withstand scrutiny. Parts of Section 13 differ from federal law in ways that undermine the purposes and objectives of Congress.

*First*, although Alabama attempts to defend Section 13(a)(3) by relying on Arizona state court precedent on a similar provision, *see* Alabama U.S. Opp. at 28-29, the analogy to Arizona's so-called self-smuggling provision reveals that Section 13 is *not* a mirror image of federal law. Instead, Section 13 – like Arizona's law – permits the state to criminally punish the "smugglee" himself for furthering his own unlawful presence. *Compare* H.B. 56 § 13(a)(3) ("Conspiracy to be so transported shall be a violation"), *with State v. Barragan-Sierra*, 196 P.3d 879, 885 (Ariz. Ct. App. 2008) (finding that Arizona's law permits the person smuggled to be convicted). By contrast, federal law does not extend to the smuggled alien, *United States v. Hernandez-Rodriguez*, 975 F.2d 622, 626 (9th Cir. 1992) (observing that unlawfully present aliens who are transported "are not criminally responsible for smuggling under 8 U.S.C. § 1324"), and therefore, Alabama has attempted to broaden the crime to penalize mere unlawful presence. Not only has Congress declined to criminalize unlawful presence, but such criminalization conflicts with the objectives of Congress and the foreign policy of the United States. *See supra* at 9 n.6. For this reason, the district court in *United States v. Arizona* found there to be potential preemptive conflict between Arizona's self-smuggling provision and federal law. *See United States v. Arizona*, Case No. 10-1413, slip op. at 15 (D. Ariz. Dec. 12, 2010).

*Second*, Section 13(a)(4) – Alabama's anti-housing rental prohibition – similarly differs from federal law in a significant way, and is preempted 8 U.S.C. § 1324. Alabama asserts that

Section 13(a)(4) "prohibits a type of 'harboring' that is equally prohibited by federal law,"

Alabama U.S. Opp. at 33, claiming that because "the language in Section 13 is taken directly

from 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv)," it represents "perfect concurrent enforcement against the

same criminal activity that is already prohibited by federal law."  Alabama HICA Opp. at 75.

Alabama is wrong.[9]  Alabama simply ignores the judicial authority striking down similar housing

restriction provisions on preemption grounds.  *See* U.S. Br. at 36 (citing cases).  Nor does

Alabama address federal immigration regulations that contemplate the provision of housing to

unlawfully present aliens.  *See id*. at 38 (citing 8 U.S.C. § 1229(a)(1)(F)(i)).  Unable to contend

with the case law finding similar state enactments to be preempted, Alabama attempts to seek

refuge in the case law applying 8 U.S.C. § 1324.  Alabama cites a litany of cases, all ostensibly

for the proposition that the act of providing housing to unlawfully present aliens has constituted

harboring under federal law.  *Id.* at 80-82; Alabama U.S. Opp. at 33-34.  These cases cannot bear

the weight that Alabama places on them:  Not one of the cases Alabama cites holds that the

provision of housing to unlawful aliens, *without more*, constitutes harboring within the meaning

of 8 U.S.C. § 1324.  Although Alabama emphasizes the housing aspect of the harboring

decisions it cites, the cases uniformly involve conduct that transcends the provision of housing.

Alabama represents, for example, that "[t]he Former Fifth Circuit has specifically held

that providing illegal aliens with 'lodging' constitutes harboring."  Alabama HICA Opp. at 81

(citing *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981)).  The facts of *Varkonyi*, as

determined by the Court, are as follows:

---

[9]  Indeed, if the federal anti-harboring provisions "already prohibited" all renting to unlawfully
present aliens, Section 13(a)(4) would not prohibit anything beyond what Sections 13(a)(1)-(3)
already prohibit, and would have been unnecessary to enact.

> Border Patrol Agents Barragan and Gomez were proceeding to make a routine
> check of the El Paso railroad yards . . . . As the [INS] van drew near, one of the
> men in the scrap metal yard yelled, "Immigration is coming", and the men . . .
> attempted to hide behind a table in the back of that yard.  The agents stopped the
> van and called to the men, who were visible through the fence, to come out and
> talk with them.  Receiving no answer, Agent Barragan attempted to enter the yard
> to ascertain the immigration status of the workers; however, his entry was blocked
> at the open gate by Varkonyi, who shoved him out of the yard and threatened to
> call the police.  Seeing the above confrontation, the workers left their hiding place
> and decided to voluntarily surrender.

*Id.* at 454-55.  Based on these events, the former Fifth Circuit affirmed Varkonyi's conviction for

harboring, concluding that "[t]he evidence adduced at trial revealed that Varkonyi knew of the

aliens undocumented status; that he had instructed the aliens on avoiding detection on a prior

occasion; that he was providing the aliens with employment and lodging while they were

unlawfully in the United States; that he had forcibly interfered with INS agents to protect the

aliens from apprehension; and, that he was partly responsible for the subsequent escape of one

alien in INS custody."  *Id.* at 459. Alabama's characterization of other harboring decisions is

equally incomplete.[10]  In sum, Alabama identifies no case in which any court has interpreted 8

---

[10]  In *United States v. Tipton*, 518 F.3d 591 (8th Cir. 2008), a restaurant owner was convicted of
harboring six unlawful aliens.  The evidence in *Tipton* was not, as Alabama represents, that the
defendants simply "provid[ed] an apartment for the undocumented aliens," Alabama HICA Opp.
at 82, but rather that the defendants "harbored these aliens by granting them employment, by
providing the aliens a place to live, daily transportation, and money to purchase necessities, and
by maintaining counterfeit immigration papers for each alien." *Tipton*, 518 F.3d at 595.
Similarly, in *United States v. Sanchez*, 963 F.2d 152 (8th Cir. 1992), the evidence of harboring
was that the defendant "met with illegal aliens; that the aliens told Sanchez that they were illegal;
that Mr. Sanchez told illegal aliens that he could provide immigration papers for them; that
Sanchez paid to rent an apartment for the illegal aliens"; and that "in exchange for anywhere
from $300 to $800, Sanchez would provide aliens with falsified [immigration documents]." *Id.*
at 154-55.  And in *United States v. Lopez*, 521 F.2d 437 (2d Cir. 1975), the defendant, in addition
to sheltering a "substantial number of illegal aliens," also assisted these aliens "in obtaining
employment for them and transporting them to and from their jobs,[] arrange[d] sham marriage
ceremonies to United States citizens for the purpose of enabling the aliens to claim citizenship,
and [] assist[ed] in preparation of their applications for citizenship." *Id.* at 441.  This evidence,
"taken together," was sufficient to sustain Lopez's conviction for illegal harboring.  *Id.*

U.S.C. § 1324 to reach the mere provision of housing, as Section 13(a)(4) would.[11]  The absence

of any such case, even though Section 1324's harboring prohibition has been on the books in

substantially the same form for decades, fully refutes Alabama's unfounded suggestion that the

divergence between its prohibition and the federal one results from some recent prosecutorial

reinterpretation of the federal statute.  *See* Alabama U.S. Opp. at 34.  Accordingly, Alabama's

assertion that Section 13(a)(4) "parallels federal law" (Alabama U.S. Opp. at 35) finds no

support in either the text of 8 U.S.C. § 1324 or pertinent case law.

Because Section 13(a)(4) purports to reach every housing rental agreement involving

unlawfully present aliens, Alabama impermissibly seeks to decide who may reside within its

borders, a power that is committed exclusively to the federal government.  *See* U.S. Br. at 38.

Alabama responds that "a finding that someone has violated [Section 13(a)(4)] does not result in

a decision as to which aliens may live in the United States," but "simply results in a conviction

of the landlord for housing."  Alabama U.S. Opp. at 35.  That is not even superficially responsive

to the preemption point.  Residence requires a place to reside.  The purpose of Alabama's anti-

housing rental provision, like all of H.B. 56, is to "decrease illegal immigration."  *Id.* at 6.  Just

_____

[11]  Alabama's other harboring citations are equally inapt.  *See, e.g.*, *United States v. Cantu*, 557 F.2d 1173, 1175-75 (5th Cir. 1977) (evidence of harboring including refusing entry to INS agents and seeking to arrange transportation for illegal alien to avoid detection by INS agents); *United States v. Rubio-Gonzales*, 674 F.2d 1067, 1070 (5th Cir. 1982) (informing illegal aliens that "immigration is here"); *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007) (defendant confessed to making false identification cards for illegal aliens, and concealed aliens' identity from authorities by failing to file social security paperwork); *United States v. Herrera*, 584 F.2d 1137, 1145 (2d Cir. 1978) (defendants "installed and utilized closed circuit television cameras and an alarm system to warn illegal aliens that INS officials were on the premises"; upon INS' arrival, defendants also "yelled 'Immigration' several times in Spanish to warn the illegal aliens of the INS presence"); *United States v. Martinez-Medina*, 2009 WL 117611, at *1 (5th Cir. 2009) (defendant "provided the aliens with jobs, transportation, housing, and utilities, [and] "also paid his workers in cash, did not pay taxes on the workers' wages, and did not complete the required I-9 forms, thereby enabling them to avoid scrutiny by federal authorities," and "advised his workers not to run when Border Patrol vehicles drove past in order to avoid arousing suspicion, advice intended to enable them to avoid detection").

as an employer-sanctions law seeks to reduce unauthorized aliens' supply of work by penalizing employers who offer it, *cf. Whiting*, 131 S. Ct. at 1984-1985, Alabama seeks to reduce the supply of housing by penalizing landlords. As shown in the opening brief, that goal is not a permissible one. Accordingly, Section 13(a)(4) is preempted.

## C. The Mandatory Verification Scheme Created by Sections 12 and 18 is Preempted.

In its opening brief, the United States argued that Sections 12 and 18 of H.B. 56 are preempted because they (i) conflict with the INA , (ii) will impermissibly burden DHS resources, and (iii) will result in the harassment of lawfully present aliens. Alabama has failed to genuinely dispute any of these arguments. Accordingly, this Court should preliminarily enjoin operation of Sections 12 and 18, just as the Ninth Circuit – in a decision whose relevance to Sections 12 and 18 Alabama largely ignores – held that federal law preempted nearly identical Arizona provisions. *See Arizona*, 641 F.3d at 349-50.

### 1. Alabama acknowledges that Sections 12 and 18 preclude cooperation with the federal government and thus necessarily conflict with federal law.

Alabama's opposition brief explicitly acknowledges that Sections 12 and 18 are designed to forbid Alabama police who might engage in alien verification from considering any factor other than the direction received through H.B. 56. Alabama U.S. Opp. at 48-49. The plain point of this regime is to displace federal authority with Alabama's dictates, and to preclude responsiveness to federal enforcement priorities. *See Arizona*, 641 F.3d at 349-50 (holding that Arizona's mandatory verification scheme precluded cooperation and thus conflicted with the INA). This avowed refusal to cooperate with the Secretary of DHS – who Congress entrusted to administer the INA – necessarily conflicts with federal law and renders Sections 12 and 18 preempted.

Instead of attempting to portray Sections 12 and 18 as cooperative, Alabama asks this Court to construe the INA as indifferent to whether states cooperate with the federal government when they enforce the federal immigration laws.  But Alabama's revisionism is unavailing.

a.     **Alabama attempts to evade the INA's demand for cooperation.**

In opposing the instant motion, Alabama suggests that the INA's reference to "cooperat[ion] with" the Secretary is not meant actually to require cooperation.  Alabama U.S. Opp. at 57.  Alabama construes the word "cooperate" as having no substantive importance, and more generally, construes 8 U.S.C. § 1357(g)(10)(B) as authorizing unlimited state efforts to participate in the "identification, apprehension, detention, [and] removal of aliens not lawfully present in the United States" – regardless of whether those efforts cooperate with or undermine federal enforcement efforts.  *Id.* at 56-57 (arguing that Section 1357(g)(10)(B) is meant to "free the states of any obligation").  This approach violates basic maxims of statutory interpretation, the structure of the INA, and core notions of federal primacy in immigration enforcement.

First, Alabama's construction is untenable because it reads the word "cooperate" out of Section 1357(g)(10)(B).  As the Eleventh Circuit has explained, "an interpretation of statutory language that causes other language within the statute to be meaningless contravenes the elementary canon of . . . construction that a statute should be interpreted so as not to render one part inoperative."  *Thomas v. Crosby*, 371 F.3d 782, 786 (11th Cir. 2004) (internal citations omitted).  Thus, Alabama's failure to give the word "cooperate" any effect is unpersuasive.

More generally, Alabama's approach would impermissibly render whole provisions of the INA superfluous.  As discussed in the United States' opening brief, Congress specifically authorized states to participate in immigration enforcement in very limited circumstances.  *See* U.S. Br. at 49-50.  Outside of these specific authorizations, Congress created a structure through

which state and local officers could engage in generalized immigration enforcement activities where (i) the law enforcement agency agrees, in writing, to certain terms with the federal government, (ii) the state officers who would engage in immigration enforcement are appropriately trained, and (iii) the state conduct is subject to the supervision of the Secretary. 8 U.S.C. § 1357(g)(1)-(9).  Such a written agreement is not an absolute prerequisite for certain cooperative state immigration enforcement efforts, as Section 1357(g)(10) makes clear. Alabama, however, goes farther, and would construe Section 1357(g)(10)(B) as meaning that states are free of "any obligation," Alabama U.S. Opp. at 57, thereby rendering the remainder of Section 1357(g) totally meaningless.  Basic rules of statutory construction forbid such an approach. *See Arizona*, 641 F.3d at 350.

The implausibility of Alabama's approach is also confirmed by paragraph 1357(g)(10)'s reference to "cooperat[ion]" in the "removal" of aliens not lawfully present.  State and local officers have no independent authority to remove an alien from the United States.[12]  But Alabama's construction of Section 1357(g)(10)(B) – which suggests that Congress intended to allow the states to independently direct all the activities listed in Section 1357(g)(10)(B) – would, read to its logical conclusion, mean that states could independently remove aliens from the United States.  This is clearly not the case, as Section 1357(g)(10) makes clear by allowing for state efforts in connection with removal only in "cooperat[ion] with" the Secretary.  And, per the explicit terms of the INA, the same type of cooperation required for state involvement in removal proceedings is likewise required throughout the four-step enforcement process described in Section 1357(g)(10) – including in state efforts to "identif[y] . . . aliens not lawfully present."

---

[12]  *See Chy Lung*, 92 U.S. at 281 (invalidating deportation order issued by California, because "[t]he passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States"); *Arizona*, 641 F.3d at 349.

Alabama protests that Section 1357(g)(10) does not, as a linguistic matter, directly order states to cooperate. *See* Alabama U.S. Opp. at 57 ("Section 1357(g)(10) does not say that '*if* a state wishes to make an immigration inquiry, *then* it must cooperate.'").  But Alabama does not dispute that the "cooperation" reference in Section 1357(g)(10) reflects (i) the federal government's primacy in immigration enforcement under the U.S. Constitution and (ii) the various ways in which the INA reaffirms that federal primacy. *See* U.S. Br. at 51-54.  As the Supreme Court has explained, the federal government exercises exclusive control over "the character of [immigration] regulations" and "the manner of their execution."  *Chy Lung*, 92 U.S. at 280.  Whatever inherent authority a state may have to assist DHS with immigration enforcement, that authority must be exercised cooperatively so as to avoid interference with "the manner of . . . execution" adopted by the federal government.  Section 1357(g)(10) confirms this federal primacy, and the concomitant imperative that states seeking to enforce immigration laws cooperate with federal enforcement efforts.

Even Alabama does not genuinely or consistently dispute the necessity of cooperation.  In discussing Section 1357(g)(10)(A), Alabama suggests that "(g)(10)(B) come[s] into play" after "ICE confirms that the individual in question is an illegal alien" and before a state officer decides to "'det[ain]' the alien and transfer him to ICE custody to assist in ICE's 'removal' of the alien from the United States."  Alabama U.S. Opp. at 59.  Alabama thus eventually acknowledges that cooperation is required under Section 1357(g)(10)(B), but simply disputes whether cooperation is required at the alien verification stage, or only thereafter.  The INA unequivocally resolves this

dispute by requiring cooperation for state efforts to "identif[y] . . . aliens not lawfully present" as forcefully as it requires cooperation in detention or removal efforts.[13]

### b. Neither Section 1357(g)(10)(A) nor Section 1373 provides an alternative basis for defending this type of mandatory scheme.

Alternatively, Alabama suggests that no cooperation is necessary for Sections 12 and 18 because such systematic, mandatory verification schemes – *i.e.*, schemes that foreclose and reject responsiveness to DHS's direction and priorities – are otherwise authorized by 8 U.S.C. § 1357(g)(10)(A) and 8 U.S.C. § 1373.  Alabama U.S. Opp. at 50-54, 58-59.  But neither of these provisions overrides the cooperation requirement of Section 1357(g)(10)(B).

First, Alabama suggests that Section 1357(g)(10)(A) – which specifies that no 287(g) Agreement is necessary for a state to "communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States" – allows a state to pursue a systematic mandatory verification scheme "without ever running into the word 'cooperate.'"  Alabama U.S. Opp. at 58. This is wrong, and ignores basic rules of statutory construction.  Section 1357(g)(10)(A) must be read in light of subparagraph 1357(g)(10)(B), which immediately follows and provides for state and local officers to "*otherwise* . . . cooperate" with the Secretary, without a written agreement.

---

[13]  As an alternative to ignoring the word "cooperate" outright, Alabama tries to redirect the focus of the "cooperation" required by the INA and suggests that the INA merely requires Alabama and the federal government "to associate with [each] other[] for mutual benefit."  Alabama U.S. Opp. at 57 (internal citation omitted).  This approach is triply flawed.  First, it ignores that the INA requires cooperation "*with the* [Secretary]" rather than cooperation in the abstract.  Second, it ignores the federal government's general supremacy in federal/state relations.  *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Third, this approach ignores the federal government's particular primacy in immigration enforcement – a primacy that, as discussed above, makes clear why state enforcement efforts must assist the federal government's efforts rather than pursuing state-specific ends.

*Id.* (emphasis).  The phrase "otherwise cooperate" in Section 1357(g)(10)(B) makes clear that the immediately prior subsection, Section 1357(g)(10)(A), also requires cooperation.[14]

Similarly, Section 1373 – which recognizes some state authority to request immigration status information from the federal government – does not eliminate the cooperation requirement established by Section 1357 and therefore does not support Alabama's claim that "[t]he provisions of 8 U.S.C. § 1373 belie the United States' argument that Sections 12 and 18 are preempted."  Alabama U.S. Opp. 50-54.  Under Section 1357(g)(10)(A) and (B), communication regarding individuals' immigration status must be "cooperat[ive]"; Section 1373 does not lift that requirement, expressly or implicitly.

Congress enacted Section 1373 at the same time as Section 1357(g)(10).  *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104- 208, §§ 133, 642 (1996); *Arizona*, 641 F.3d at 350-51.   The two provisions therefore must be read consistently with each other.  *See Wood v. A. Wilbert's Sons Shingle & Lumber Co.*, 226 U.S. 384, 389 (1912) (separate parts of the same enactment should be read as to not conflict and should be construed such that "each [part has] its proper application, distinct from and harmonious with that of the other"); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) ("[C]onstruction of [a statute] must, to the extent possible, ensure that the statutory scheme is coherent and consistent.").  This need for consistency prohibits Alabama's effort to construe Section 1373 as overriding the cooperation requirement of Section 1357(g)(10)(B).  "It would be illogical to assume that Congress . . . would turn around and nullify its own choice" elsewhere in the same legislation by lifting the

---

[14]  As discussed above, Alabama suggests that Section 1357(g)(10)(A) controls the verification process, and that Section 1357(g)(10)(B) only picks up after a verification inquiry is complete. Alabama U.S. Opp. at 59.  But, as noted above, this approach willfully ignores the demand in Section 1357(g)(10)(B) for cooperation in state efforts to "identif[y]" unlawfully present aliens.

cooperation requirement it had just imposed.  *Department of Revenue* v. *ACF Indus., Inc.*, 510 U.S.. 332, 343 (1994).

Instead, the general provisions of Section 1373 apply outside of the specific situations in which Section 1357(g)(10)(B) mandates cooperation.  Thus, a state or local government may use the procedures described by subsection 1373(c) to promote bona fide state interests – for example, investigating identity fraud, ensuring eligibility for certain state benefits, or corroborating information obtained in investigating a state crime.  But when a state or local government utilizes Section 1373 to systematically assist in the "identification . . . of aliens not lawfully present in the United States," the "more specific statute [*i.e.*, Section 1357(g)(10)(B)] takes precedence over the more general statute [*i.e.*, Section 1373]."  *Thomas*, 371 F.3d at 786; *see also Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) ("It is an elementary tenet of statutory construction that . . . a specific statute will not be controlled or nullified by a general one." (internal citations omitted)).  To hold otherwise would be to allow Alabama to exploit Section 1373 to establish its own immigration priorities, thereby negating not only the specific cooperation requirement of Section 1357(g)(10)(B), but also skewing Congress's carefully delineated scheme of state participation in federal enforcement, and the federal government's general primacy in immigration enforcement as derived from the INA.

### c.   Alabama's attack on discretionary verification does not speak to the conflicts between H.B. 56 and the INA.

Rather than even attempting to defend H.B. 56 as cooperative, Alabama tries to suggest that other schemes might also be non-cooperative, and specifically argues that "the United States fails to explain how an *ad hoc* policy in which state officers exercise their own discretion . . . is more 'cooperative' than a uniform policy."  Alabama U.S. Opp. at 57-58.

To begin with, this argument is plainly irrelevant.  Whether or not a *different* policy might be cooperative certainly does not help defend Alabama's avowedly non-cooperative policy.  But, more substantively, Alabama fails to recognize the critical flaw in its mandatory system:  That by inflexibly mandating deference to Alabama's verification conditions, Sections 12 and 18 forbid state and local officers from responding to direction from DHS or from considering whether federal priorities might counsel against verification in a particular instance.  *See* U.S. Br. at 55-56.  Although a similar lack of receptiveness to federal priorities might pervade even a system that gives officers discretion, such a discretionary system generally allows individual state and local officers to consider federal priorities when deciding whether to "identif[y] . . . aliens unlawfully present," and thereby preserves the prospect of cooperation.

Alabama's mandatory verification scheme does not preserve any such prospect of cooperation.  In fact, the very purpose of the law, as Alabama acknowledges, is to have the state (not the federal government) dictate the conditions of alien verification.  *See* Alabama U.S. Opp. at 48-49.  Alabama is intentionally shutting out direction from the federal government, because it concluded that a discretionary scheme would give officers too much latitude to consider factors outside of Alabama's control.  The mandate of H.B. 56 eschews individual officers' discretion and therefore ends the prospect of cooperation, in direct conflict with the INA.[15]  Beyond the inherent conflict with the INA that arises from foreclosing cooperation, Alabama's particular

---

[15]  Similarly unavailing is Alabama's suggestion that the federal government has no interest in prioritizing or directing alien verification efforts.  Alabama U.S. Opp. at 59-60.  First, this argument is undermined by the INA, which commands cooperation for the alien "identification" stage.  If, as Alabama suggests, Congress wanted to encourage unlimited verification, it would have had no need to require the same type of cooperation for alien verification as it did for alien removal.  *See supra* at 20-21.  Moreover, this argument is undermined by H.B. 56 itself, which (as discussed in the United States' opening brief) allows Alabama law enforcement officers to refrain from a mandated verification inquiry where alien verification would interfere with other *Alabama* law enforcement priorities, and thereby acknowledges that an inflexible verification mandate can interfere with such priorities.  *See* U.S. Br. at 56-57.

refusal to cooperate has consequences:  Moving from a discretionary to a mandatory scheme will necessarily increase the burdens on DHS and thereby further undermine DHS operations.  *See* U.S. Br. at 58-61

> **d.      Alabama cannot escape from the cooperation requirement by portraying H.B. 56 as an effort to control police procedures.**

As part of its repeated efforts to establish a presumption against preemption and to escape the cooperation requirement, Alabama offers the questionable claim that Sections 12 and 18 of H.B. 56 are designed as mere "stop-and-arrest protocols."  Alabama U.S. Opp Br. at 50, 57, 60-63.  This argument lacks all credibility as the plain and explicit purpose of Sections 12 and 18 is to affect immigration enforcement.  *See* Alabama U.S. Opp. at 48-49.

Sections 12 and 18 do not, as Alabama claims, "only come into play *after* law-enforcement officers encounter . . . persons because of their violations of other laws."  Alabama U.S. Opp. at 50; *see also id.* at 61 ("Sections 12 and 18 . . . . come into play *after* an individual has been stopped, detained, or arrested for breaking a law unrelated to his or her immigration status.").   Section 12 intersects with the other immigration crimes established throughout H.B. 56.  By enacting its own set of immigration crimes – *e.g.*, for failure to maintain or carry registration documents (H.B. 56 § 10) or for attempting to engage in a transaction with a public entity (H.B. 56 § 30) – Alabama ensured that Sections 12 and 18 *would* apply to stops for violations "[]related to [an alien's] immigration status."  *Cf.* Alabama U.S. Opp. at 61.

Most critical, though, is the focus of Sections 12 and 18, which dictates the state's involvement in the indisputably federal scheme of immigration enforcement.  *See* Alabama U.S. Opp. at 2-3 ("[H.B. 56] seek[s] . . . to help ensure that the federal immigration law that Congress put on the books is respected.").  Sections 12 and 18 do not simply relate to internal Alabama procedures – the very purpose of these provisions is to engage the federal government's

enforcement resources.  Alabama cannot now portray Sections 12 and 18 as regulating purely local activities.

2. **By abandoning cooperation, Sections 12 and 18 will impermissibly burden DHS enforcement resources.**

Aside from conflicting with the INA's command of cooperation, Sections 12 & 18 will also impose an impermissible burden on a federal agency's resources that impedes the agency's functions (U.S. Br. at 60-61).  Alabama has not disputed the jurisprudence holding that state laws that impose such burdens can be preempted.  Instead, Alabama (i) attempts to portray Sections 12 and 18 as resulting in minimal burdens and (ii) suggests that Section 1373 authorizes Alabama such burdens on DHS enforcement resources.  Both of these arguments are meritless.

First, Alabama suggests that the United States' burden argument relies on speculation. *See* Alabama U.S. Opp. at 54-55.  Notably, Alabama has not disputed that H.B. 56 will likely result in a dramatic increase in verification requests; the state simply suggests that the United States cannot definitively predict the precise size of the increase.

The United States has articulated a sufficient basis for preemption here.  Alabama's own police chiefs – the officers charged with implementing this mandate – have predicted that a large percentage of lawful stops will result in alien verification requests.  *See* Hale Decl. ¶ 9, U.S. Br., Ex. 4.  Alabama has not disputed that it arrested and booked over 178,000 people in 2010, and that it stopped and detained many, many more.  *See* Griffen Decl. ¶ 22, U.S. Br., Ex. 7. Additionally, Alabama has not disputed that, as discussed in the United States' opening brief, Alabama police have no training in assessing reasonable suspicion of unlawful presence.  *See* U.S. Br. at 64 n.18.  Accordingly, speculation is not required to predict that, in the absence of a good grounding in what constitutes reasonable suspicion of unlawful presence, a large

percentage of stops will result in verification inquiries.[16]  DHS is in the best position to know

what impedes its enforcement efforts.  Alabama does not and cannot genuinely dispute DHS's

judgment regarding the effect on its operations if even a *small* percentage of stops produce

verification inquiries.[17] *See* Griffen Decl. ¶ 22, U.S. Br., Ex. 7.  The United States has therefore

presented sufficient evidence that Sections 12 and 18 will impermissibly burden DHS

resources.[18]  Moreover, as discussed in the United States' opening brief, the burden inquiry

should envision the increased workload that would result if Alabama's mandatory scheme were

enacted around the country – thereby multiplying the already significant burdens resulting from

Sections 12 and 18.  *See* U.S. Br. at 60-61.

---

[16]  Alabama incorrectly argues that the United States has adduced a merely "hypothetical
scenario" by "suggesting [that] an individual [will have] his immigration status checked multiple
times."  Alabama U.S. Opp. at 55.  Multiple checks are not hypothetical; they are explicitly
required by the statute.  If an officer develops a "reasonable suspicion" of unlawful presence, an
alien arrested for failure to carry a driver's license *must* be verified once under Section 12 and
then again under Section 18.  If the alien is confined, further verification will be mandated by
Section 19, and may be mandated again by Section 19 based on the charge.  These redundant
inquiries are therefore explicitly required by the statute's text.

[17]  Alabama cites ICE's website to try to suggest that LESC can absorb this burden without
difficulty.  *See* Alabama U.S. Opp. at 54.  But the cited website language only suggests that
LESC resources have proven sufficient for the inquiries that have resulted in the absence of
mandates like this one.  The clear – and stated – motivation for Sections 12 and 18 is to
dramatically *increase* the number of verification requests.  *See* Alabama U.S. Opp. at 48-49.
Further, for preemption purposes, this Court should assess the cumulative impact that would
result if Alabama's scheme were replicated in other states – at which point the burden would far
outstrip LESC's capacity.  *See* U.S. Br. at 60-61 (citing sources).  And finally, Sections 12 and
18 will impose an impermissible burden not only because of the sheer number of requests, but
also because many such requests will necessarily result from low-priority offenses and violations
of civil ordinances.  *See* U.S. Br. at 59.  Thus, LESC's current, aggregate performance has no
bearing on the burden that will be generated from H.B. 56's new scheme.

[18] The same conclusion is commanded by *Buckman Co.*, where the Supreme Court held that a
state law was preempted in part because it would burden the agency's ability to evaluate drug
applications in a timely fashion – a conclusion the Supreme Court reached even in the absence of
any specific data on the burden that would result from the law.  *See* 531 U.S. at 349-51.

Other than this feint effort to disclaim the burdensomeness of Sections 12 and 18, Alabama argues that 8 U.S.C. § 1373 entitles it to impose these types of burdens on the United States.  Alabama U.S. Opp. at 54-55.  But, as discussed above, Section 1373 does not relieve Alabama of the obligation to cooperate with the Secretary.  *See supra* at 23-24.  The statute thus does not provide an invitation to burden federal resources and interfere with federal operations.  Instead, the burdens that result from H.B. 56's mandate highlight why cooperation with the Secretary is so crucial, and why this Court should enjoin Sections 12 and 18.

### 3.  Sections 12 and 18 will result in the harassment of lawfully present aliens.

In its opening brief, the United States argued that that Sections 12 and 18 are also preempted because they will necessarily result in the harassment of lawfully present aliens and thereby also interfere with foreign policy (*see* U.S. Br. at 61-65); Alabama has not denied this likely effect of the statute.  As discussed above, Alabama has not disputed that its officers receive *no* immigration training, and that Alabama officers are therefore ill-equipped to distinguish between lawfully and unlawfully present aliens (and even between aliens and U.S. citizens).  *See supra* at 27-28.  Nor could Alabama offer any contrary suggestion:  This lack of training has been confirmed by several of Alabama's own police chiefs, as well by the Alabama Sheriffs' Association.  *See* U.S. Br. at 64 n.18 (citing declarations).  Alabama has thus provided no protection against the type of systematic, repeated interceptions of lawfully present aliens that resulted in preemption in *Hines*.

To discount the significance of this harassment, Alabama claims that Sections 12 and 18 "come into play *after* an individual has been stopped, detained, or arrested for breaking a law unrelated to his or her immigration status."  Alabama U.S. Opp. at 61.  This is incorrect, as discussed above.  *See supra* at 26-27.  Section 12 mandates verification for aliens suspected of violating Alabama's various immigration crimes – crimes that clearly are not "unrelated" to

immigration status.  Section 12 also mandates verification for individuals who have not "broken"

any law, but have merely been stopped, as well as for individuals who may have "broken" an

ordinance regulating bicycle or cell-phone use.  Alabama thus fails to justify the harassment that

results from Sections 12 and 18.[19]

Similarly, Alabama argues that the prospects of harassment are diminished by Section

12's recognition of certain forms of identification as evidence of lawful presence.  *See* Alabama

U.S. Opp. at 61-62.  But the ability to establish a presumption of lawful presence provides little

relief from the sting of Sections 12 and 18.  The presumption of lawful presence will be totally

unhelpful to an alien or a U.S. citizen who happens not to be carrying any identification.  The

presumption will be similarly unavailable to aliens visiting from any jurisdiction that does not, to

Alabama's satisfaction, sufficiently establish lawful presence as a condition of granting a

driver's license.  *See* H.B. 56 § 12(d)(4).

Finally, Alabama suggests that Sections 12 and 18 are justified by general police

authority "to inquire into [a] person's immigration status without any prior reasonable suspicion

that the person is unlawfully present."  Alabama U.S. Opp. at 62-63.  But the authority to

*potentially* and *occasionally* investigate immigration status is not at issue here.  Instead, by

mandating sweeping alien verification based on stops for trivial offenses, Sections 12 and 18

---

[19]  Alabama also argues that Section 18 – which authorizes Alabama law enforcement to detain
an alien for 48 hours pending verification – will not prolong the detention of aliens who are
arrested for driving without a license.  Alabama U.S. Opp. at 62.  But Alabama cannot seriously
suggest that Alabama police would, prior to the enactment of Section 18, generally detain aliens
for *two days* for driving without a license.  Besides, even if Alabama police did adhere to such a
practice – for which Alabama offers no proof whatsoever – that would still not justify the
detention contemplated by Section 18, which proceeds because of ambiguity over immigration
status rather than as a sanction for driving without a license.  Notably, the statute does not
authorize 48 hour detention for U.S. citizens caught driving without a license (*see* Alabama Code
§ 32-6-9(c)), and thus clearly allows for extended detention only for aliens – many of whom will
prove to be lawfully present.

squarely risk the type of widespread police interceptions that formed the basis of the preemption ruling in *Hines*.  The risk of harassment of lawfully present aliens from an occasional immigration inquiry has no bearing on the risk of harassment – and the related interference with foreign policy – that results from the type of systematic, mandatory verification scheme that is advanced by Sections 12 and 18.

**D.      Section 11's Criminalization of Aliens Seeking or Performing Unauthorized Work Conflicts With IRCA and Improperly Regulates in an Area Comprehensively Attended to by Congress.**

Alabama's attempt to defend Section 11 by glossing over contrary congressional purposes and objectives in the area of alien employment is untenable.  *First*, Alabama mistakenly describes Congress as having been silent on the question of whether unauthorized aliens should be criminally sanctioned and fined for seeking work, and contends that in this alleged vacuum, the state has merely created a "more effective" way of preventing employers from unlawful hiring by "cut[ting] off the supply of those employees as well."  Alabama U.S. Opp. at 25. Alabama is wrong in its portrayal of federal law, and it has ventured into an area of regulation that is foreclosed to the states.

Indeed, as Alabama again ignores, the *unanimous* panel in *Arizona* upheld a preliminary injunction of a state law that was virtually identical to Section 11, finding that state-imposed criminal sanctions and fines on unauthorized aliens seeking or performing work runs contrary to the clear purposes and objectives of Congress.  *Arizona*, 641 F.3d at 357-61, 383.  Federal law "establishes a complex scheme to discourage the employment of unauthorized immigrants – primarily by penalizing employers who knowingly or negligently hire them."  *Id.* at 358; *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (noting that Congress created a "comprehensive scheme prohibiting the employment of illegal aliens").  In enacting

this comprehensive scheme of civil and criminal penalties on employers, *see* U.S. Br. at 23 (citing provisions), Congress did not simply fail or forget to enact criminal penalties against unauthorized aliens.  Instead, Congress provided targeted sanctions against such aliens, including deportability and sanctions for document fraud, and, just as critically, Congress simultaneously sought to protect unauthorized aliens from financial exploitation by requiring employers to repay their financial bonds, *see id.* at 24-25 (citing provisions).  Congress constructed this scheme deliberately and drew its boundaries consciously.  This is not, as Alabama contends, a case of "preemption by omission."  To the contrary, there is striking evidence that in comprehensively regulating this area, Congress purposefully withheld criminal sanctions and fines against unauthorized aliens, believing removal and other remedies to be more appropriate in this context than criminal liability and financial hardship.  *See Arizona*, 641 F.3d at 359-60 ("Congress has deliberately crafted a very particular calibration of force which does not include the criminalization of work."); U.S. Br. at 24-25 (detailing how the structure of IRCA and legislative history indicate that Congress crafted a system it thought was most effective and humane).[20]

Alabama may not agree with Congress's approach, and indeed, may believe that it has created a "more effective" method for controlling illegal immigration. *See* Alabama U.S. Opp. at 25.  But that policy perspective does not permit Alabama to contravene Congress's considered judgment in this area. *Am. Ins. Assn. v. Garamendi*, 539 U.S. 396, 427 (2003) (state statute

---

[20]  In dismissing the context in which IRCA was passed, and a statement that the INS did not expect aliens to starve while exhausting administrative remedies, Alabama states that it would only criminalize and fine aliens who do not yet have formal work authorization, *see* Alabama U.S. Opp. at 25.  Alabama appears to assume, without reason, that at any point in the adjustment of status process (including the early stages of submitting an application) an alien would have already been granted work authorization by DHS. In any event, the weight of other authority – including the specific structure of IRCA and the committee statements indicating that employer-based sanctions were seen by Congress as the most credible, effective, and humane means of regulating this area – makes clear that Congress did not want criminal sanctions and fines to be imposed on unauthorized workers. *See* U.S. Br. at 24; *Arizona*, 641 F.3d at 357-61.

preempted that "seeks to use an iron fist where [Congress] has consistently chosen kid gloves"). Nor can Alabama ignore the doctrine of implied preemption, which by its nature rests not only on the federal statute's plain text, but also the statutory objectives, structure, and legislative history.  *See, e.g.*, *De Canas*, 424 U.S. at 357-60 & n.8; *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1556-57 (11th Cir. 1983).

*Second*, Alabama claims that Congress's decision to *expressly* preempt states from imposing civil or criminal sanctions on employers who hire unauthorized aliens, *see* 8 U.S.C. § 1324a(h)(2), indicates that Congress did not intend to preempt states from imposing criminal sanctions on alien employees.  Alabama U.S. Opp. at 23.  It is well established, however, that the "existence of an express preemption clause does not preclude a holding that there is implied preemption beyond the scope of the express provision." *United States v. Fleet*  498 F.3d 1225, 1229 (11th Cir. 2007) (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).  Here, because Section 1324a constitutes a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds*, 535 U.S. at 147, replacing a previous regime that the Supreme Court in *De Canas* had found was not preemptive, it made sense for Congress to include an express preemption provision regarding *employers*.  That Congress wanted to permit states to continue regulating one, and only one, aspect of that area, *i.e.*, licensing, was further reason to include such a provision.  Likewise, because Congress has *not* enacted a statute imposing criminal sanctions on unauthorized workers, and Congress was not legislating against a background of state sanctions on alien employees at the time of IRCA's passage, there has been no similar occasion for Congress to enact an express preemption provision here.  Thus, the absence of such a provision is inconsequential.  Alabama's attempt to equate Section 11 with the state *employer*-based license revocation law that was upheld in

*Whiting* is also unavailing.  The law in *Whiting* was expressly saved from preemption, which was a factor in the Court's implied-preemption analysis as well. *See* 131 S. Ct. at 1981. Here, by contrast, the "scope of 'licensing' law[s] in the savings clause of the express preemption provision in IRCA has no bearing on whether IRCA impliedly preempts [Alabama] from enacting sanctions against undocumented workers." *Arizona*, 641 F.3d at 358 & n.18. Accordingly, there is no basis for permitting Section 11 to go into effect.

**E.      Sections 16 & 17 of H.B. 56 — Alabama's New Penalty Scheme Against Employers Who Hire Unlawfully Present Aliens — are Expressly Preempted by IRCA.**

IRCA expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2).  In response to the United States' argument that this provision expressly preempts Sections 16 and 17, Alabama does not argue that either section falls within the IRCA's licensing savings clause, but instead disputes whether IRCA's preemption provision applies in the first instance.

**1.   Section 16 violates IRCA's prohibition on employer sanctions.**

Alabama argues that neither Section 16(b)'s penalty provision nor Section 16(a)'s tax deduction denial provision comes within the ambit of IRCA's employer sanctions prohibition, because IRCA "can only be read as preempting sanctions that States impose on employers for the actual acts of employing or recruiting unauthorized aliens, or referring them for employment."  Alabama U.S. Opp. at 68.  Alabama maintains that Section 16(b) "only comes into play if that employer files his state income taxes and then fraudulently claims those employees' wages as deductible business expenses." *Id.* at 69.

To begin with, Section 16 does not merely reform the state tax code.  Alabama did not enact Section 16 as some generally applicable, stand-alone provision of tax law; Alabama

enacted Section 16 as part of its overall effort to regulate immigration.  Alabama U.S. Opp. at 1.

Section 16, like Sections 11(a) and 17, targets a particular subset of employers, *i.e.*, employers of

unlawfully present aliens.  An employer is entitled to deduct employees' wages; *only* an

employer that employs unauthorized aliens is punished financially through higher taxes and

associated penalties.  In any case, Alabama's restrictive interpretation of IRCA's prohibitory

ambit would substantially undermine its vitality.  A state could easily evade IRCA's sanctions

preemption provision by levying a sanction on entities who "employ, recruit, or refer" illegal

aliens, but by making the trigger for such sanctions be some activity besides "employment,

recruitment, or referral."  For example, under Alabama's interpretation, IRCA would not prohibit

the state from imposing a utilities surcharge of 500% on employers of unlawful aliens.  The

employer would in theory be free to employ unlawful aliens, and would only face a sanction if it

wished to use electricity.  Alabama's tenfold tax penalty is not materially different.  *Cf.*

*Edmondson*, 594 F.3d at 766 (holding that a conditional non-licensing sanction, exposing

employers to civil liability for hiring unauthorized aliens, was still impermissible under IRCA

because "an employer is subject to sanction *only* if the employer retains an unauthorized alien.").

For these reasons, Alabama's argument that Section 16(b) is not a "sanction" that IRCA

prohibits lacks merit.

In its opening brief, the United States argued that Section 16(a) was not severable from

Section 16(b), because the two provisions are "dependent, conditional, or connected."  U.S. Br.

at 28 (citing *King v. Campbell*, 988 So. 2d 969, 982 (Ala. 2007)).  Alabama correctly does not

dispute that Sections 16(a) and (b) are "dependent, conditional, or connected," but responds

instead that "the Act's severability clause should end the analysis."  Alabama U.S. Opp. at 70.

That is obviously wrong.  If the existence of a severability clause were dispositive of

severability, it would not matter whether a statute's provisions were "dependent, conditional, or connected." Alabama cites no case in which the mere existence of a severability provision obviated the need for further analysis, and the cases it does cite contradict its argument. *See* Alabama U.S. Opp. at 69 (citing *King v. Campbell*). For these reasons, IRCA preempts Section 16, both in whole and in part.

### 2. Section 17 violates IRCA's prohibition on employer sanctions.

Section 17 authorizes a private right of action for an individual who is either not hired or not retained by an employer while the employer "retain[s] or hir[es] an employee whom the . . . employer knows, or reasonably should have known, is an unauthorized alien." Ala. H.B. 56 § 17(a). Alabama asserts that because "Section 17 expressly disclaims any intent to punish or deter conduct," and "expressly seeks only to compensate victims of a newly defined discriminatory practice for their losses," Alabama U.S. Opp. at 71, Section 17 falls outside IRCA's sanctions preemption provision. At bottom, Alabama's argument is that compensatory damages cannot constitute a "sanction" within the meaning of IRCA. Alabama's sole citation, *Jie v. Liang Tai Knitwear Co.*, 107 Cal. Rptr. 2d 682, 690 n.7 (Ct. App. 2001), stated in dicta that "sanctions are not the same as damages; a statutory reference to sanctions does not equal a reference to damages." For this proposition, *Jie* relied on *Faria v. San Jacinto Unified School District*, 59 Cal. Rptr. 2d 72 (Cal. App. 4th 1996), which states that "[e]ven when the statute expressly provides for *criminal* sanctions, damages may be available." *Id.* at 77-78 (emphasis added). Alabama thus seeks to bootstrap a case unremarkably holding that criminal sanctions do not preclude civil damages into the far broader, and less tenable proposition that civil damages can never constitute civil sanctions.

As Alabama concedes, the only court to have squarely addressed this issue has rejected the state's cramped interpretation of "sanction."  *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010).  As the *Edmondson* Court recognized, Congress used the word "sanction" rather than "penalty" in § 1324a(h)(2), although it used the word "penalty" elsewhere in § 1324a.  *Id.*; *also compare* 8 U.S.C. § 1324a(h)(2) *with* 8 U.S.C. § 1324a(e)(4)(A) & § 1324a(f).  Alabama makes no attempt to address the penalty/sanction distinction the *Edmondson* Court noted, maintaining instead that the *Edmondson* Court "misinterpreted § 1324a(h)(2) and misapplied the presumption against preemption."  Alabama U.S. Opp. at 71.  According to Alabama, because Congress did not clearly evince its desire to preempt compensatory damages and attorney's fees, IRCA's preemption provision is ambiguous, and such ambiguity must be read in Alabama's favor, "against displacement of state law."  *Id.*  But it is hard to see how Congress could have been any clearer in § 1324a(h)(2).

Alabama next argues that the compensatory damages and attorney's fees Section 17 authorizes do not constitute a sanction "because merely establishing a private right of action does not *guarantee* success at litigation" or even "guarantee that any action will be taken against the employer at all."  Alabama U.S. Opp. at 72 (emphasis in original).  Alabama's suggestion that a sanction is not a "sanction" for IRCA preemption purposes absent a guarantee that the sanction will be applied to each and every violation finds no support in law or logic.  A "sanction" is a "restrictive measure used to punish a specific action *or to prevent some future activity*."  *Edmondson*, 594 F.3d at 765 (citing Webster's Third New Int'l Dictionary 2009) (emphasis added).  As any driver can attest, police need not pull over every speeder to deter others from breaking the speed limit.  So too, here.  Alabama correctly does not dispute that the prospect of litigation — with the attendant possibility of compensatory damages and attorney's fees — will

37

deter employers from hiring or retaining unlawfully present aliens.  This deterrent is not somehow less because the sanction will be imposed through private litigation rather than by Alabama directly.  To an employer, how it is being sanctioned for employing unlawfully present aliens is economically unimportant; whether it is being sanctioned is what matters.  Accordingly, Section 17 is preempted by IRCA.

**F.     Alabama's Restrictions on Transactions with State and Local Government and on Private Contracts Are Preempted by Federal Law.**

**1.     Section 30 effectively criminalizes unlawful presence, and seeks to remove unlawfully present aliens from the State.**

With limited exceptions, Section 30 makes it a felony for any unlawfully present alien to attempt to enter into or attempt to enter into a "business transaction" with state or local governments.  H.B. 56 § 30.  The United States argued that by closing the doors of state and local governments to unlawfully present aliens, Alabama has impermissibly imposed "distinct, unusual, and extraordinary burdens" on aliens in violation of *Hines v. Davidowitz*, 312 U.S. 52, 65-66 (1941), particularly given that many of the transactions Section 30 prohibits "are both universal and unavoidable."  U.S. Br. at 39-40.  Alabama's response that "there is no congressional policy that aliens unlawfully present must always be treated exactly the same" as others is beside the point.  Alabama U.S. Opp. at 40.  The salient question is whether Alabama may forbid unlawfully present aliens, under pain of criminal liability, from engaging in such a broad array of conduct that Section 30 effectively criminalizes unlawful presence or would otherwise effect removal.  *Hines* makes clear that the answer to this question is no.

Here Alabama backpedals, accusing the United States of "misinterpreting" and "exaggerating" the scope of conduct that Section 30 would reach.  Alabama argues that there is "no logical reason why covered 'business transactions' would include the payment of property

taxes or the payment of court fees."  Alabama U.S. Opp. at 37.  But the very term "business transaction" plainly encompasses such interactions.  Black's Law Dictionary defines "business transaction" as "[a]n action that affects the actor's financial or economic interests, including the making of a contract."  Black's Law Dictionary 9th Ed. (2009).  Alabama cannot dispute that payment of property taxes or the payment of court fees does "affect[a person's] financial or economic interests."  A second "logical reason" is that Section 30 is a broadly worded provision in a comprehensive statute the acknowledged purpose, according to the bill's sponsor, is to "attack[] every aspect of an illegal immigrant's life . . . so they will deport themselves."  April 5 Debate at 9:3-8 (emphasis added).

Alabama nonetheless assures that Section 30 would only apply to "transactions involv[ing] the exchange of money for goods or services."  Alabama U.S. Opp. at 37.  Even accepting Alabama's self-serving construction of the statute to encompass only *quid pro quo* financial transactions, Alabama still has not removed the specter of criminal liability even from certain fundamentally important transactions, such as the ability to access courts.  Without paying a filing fee, one generally cannot gain access to courts.  Alabama argues that "the payment of court fees" does not involve the "exchange of money for goods or services," but it never explains why.  *Id.*  In defense of Section 30, Alabama argues that this provision would not prohibit unlawfully present aliens from obtaining water or sewer services in Limestone County because the Limestone County Water and Sewer Authority is a "public corporation" and therefore is a distinct legal entity from the state or its subdivisions, Even if Alabama were correct in this regard,[21] its example misses the point:  Alabama cannot defeat a facial challenge by

---

[21] It is not clear that Alabama is correct in its interpretation of Section 30's scope.  The Alabama Supreme Court has held that "[b]ecause public corporations perform municipal functions, they have long been held to be agencies of the municipality they serve, regardless of their

pointing to a circumstance under which the statute would *not* apply.  More fundamentally, what about those unlawfully present aliens who reside elsewhere, in one of Alabama's other 66 counties?  Alabama notably does not suggest that aliens who live in major population areas within the state, such as the greater Birmingham area, would fall outside the ambit of Section 30 because "public corporations" provide their essential utilities.  Alabama's silence is unsurprising, because municipal governments provide utility services to consumers in parts of Jefferson County.  *See, e.g.*, *Bessemer Water Service v. Lake Cyrus Development Co.*, 959 So.2d 643, 645 (Ala. 2006) (Bessemer Water Service is "a department of the city of Bessemer"); *Ex parte Bank of America, N.A.*, 39 So.3d 113 (Ala. 2009); *Hilgers v. Jefferson County*, — So.3d —, 2010 WL 4034875, (Ala. Civ. App. 2010) (Jefferson County directly provides customers sewage service).  Alabama's suggestion that "all applications of Section 30 are valid" is therefore demonstrably false.  Alabama U.S. Opp. at 38.

### 2.  The procedural posture of this challenge does not diminish the United States' likelihood of success on the merits.

Alabama devotes most of its Section 30 discussion to rebutting at length an argument that the United States has not advanced; namely, that unlawful aliens must be allowed to apply for drivers' licenses.  Alabama presumably does so in an effort to show that not every conceivable application of Section 30 would be preempted.  From this Alabama argues that the United States' facial challenge to Section 30 is doomed under *United States v. Salerno*, 481 U.S. 739 (1987).  Alabama U.S. Opp. at 38, 42 ("To defeat a facial challenge . . . , the State Defendants need only offer one application of [a challenged provision] that is clearly constitutional.").  Because it can

---

organizational structure."  *Water Works and Sewer Bd. of City of Talladega v. Consolidated Publ'g, Inc.*, 892 So.2d 859, 863 (Ala. 2004); *Jackson v. Hubbard*, 53 So.2d 723, 728 (Ala. 1951) (("[T]he supplying of water to a city and its inhabitants is a municipal function and that the Water Works Board of the City of Auburn is in that sense an agency of the city.").

deny unlawfully present aliens drivers' licenses without running afoul of the Supremacy Clause, Alabama argues that Section 30 is impervious to any facial challenge under *Salerno*.  This elides a critical point: It is one thing for Alabama to deny an unlawfully present alien or any other ineligible person a driver's license; it is quite another for Alabama to threaten to incarcerate a subset of ineligible people (*i.e.*, unlawfully present aliens) simply for making the request. Moreover, Alabama's theory, if accepted, would perversely encourage a state to adopt a broader law so as to sweep in some unstated permissible application to accompany all of the unconstitutional applications, and thereby inoculate the law against a facial challenge.

In any event, Alabama's search for a single, saving, permissible application of an otherwise unconstitutional statute begins from a flawed premise.  "[C]ongressional intent," not speculation, "is the 'ultimate touchstone' in a preemption case," and "this intent governs [a court's] determination of whether federal law preempts state law." *This That & Other Gift & Tobacco, Inc. v. Cobb County, Ga.*, 285 F.3d 1319, 1322 (11th Cir. 2002) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  For preemption purposes, the only question this Court needs to ask is whether this provision enters a field that "Congress intend[ed] federal law to occupy" fully or whether it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373.  Indeed, the Supreme Court has expressly disavowed in Supremacy Clause challenges the sort of approach that Alabama contemplates.  "If [such] conjectures suffice[d] to prevent federal and state law from conflicting for Supremacy Clause purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have any force. . . .  The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress." *Pliva v. Mensing*, 131 S. Ct. 2567, 2579 (2011) (citing U. S. Const., art. VI, cl. 2.")); *accord Crosby*, at

379-800 ("The conflicts are not rendered irrelevant by the State's argument that there is no real conflict between the statutes . . . .  [T]he fact that some companies may be able to comply with both sets of sanctions does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ.").

Moreover, as the Ninth Circuit has observed, "it is not entirely clear from relevant Supreme Court cases the extent to which the *Salerno* doctrine applies to a facial preemption challenge."  *See United States v. Arizona*, 641 F.3d 339, 345 n.3.  In the almost twenty five years since the Supreme Court decided *Salerno*, the Court has never applied *Salerno*'s "no set of circumstances" standard in a preemption case.[22]  *Id*.  *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), were both facial preemption challenges decided after *Salerno*, yet the Supreme Court did not apply *Salerno*'s "no set of circumstances" formulation in either case.  *See also Whiting*, 131 S. Ct. 1968 (not referencing *Salerno* in a facial pre-enforcement challenge to a state law immigration provision).  Accordingly, Alabama's reliance on *Salerno* to save Section 30 is misplaced.

### 3.  Section 27 would impermissibly effect removal.

Like Section 30, Section 27 is a broadly worded provision intended to alter the conditions of residence for unlawfully present aliens in Alabama and does so in a manner not contemplated by federal immigration law. *Cf. De Canas*, 424 U.S. at 358 (states may "neither add to nor take

---

[22]  In *Anderson v. Edwards*, 514 U.S. 143 (1995), the Supreme Court did cite *Salerno*.  Although aspects of *Edwards* do deal with preemption, *Edwards* does not cite *Salerno* in the preemption section of the opinion. "Rather, the [Supreme] Court references *Salerno* in the section of the *Edwards* opinion holding that the California rule at issue there did not violate any of the three federal regulations on which the Court of Appeals relied."  *Arizona*, 641 F.3d at 345 n.3 (citing *Edwards*, 514 U.S. at 155).  "*Edwards* continues on, in another section, to hold that the California regulation at issue is also not preempted by federal law; this analysis includes no mention of the *Salerno* standard."  *Id*.

from the conditions imposed by Congress upon admission, naturalization and residence of aliens in the United States or several states") (citations omitted).    In particular, Section 27 is intended to effect removal: It precludes state courts from enforcing any contract to which an unlawfully present alien is a party when the counterparty knows or should know the alien is unlawfully present, and when performance is premised on the alien being in Alabama for more than 24 hours. It expressly excepts contracts that are incidental to an alien's leaving Alabama.  *See* Ala. H.B. 56 § 27(b) (exempting, for example, "a contract for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin").  The United States previously demonstrated that Section 27 "would sharply limit both aliens' willingness and ability to enter into contracts, as well as the willingness and ability of potential counterparties."  U.S. Br. at 41.  At no point does Alabama deny that by abrogating unlawfully present aliens' ability to enter into and enforce contracts, it has "imposed different and starkly more burdensome conditions on aliens in violation of *De Canas* and *Toll*."  *Id.*  Rather, Alabama relies predominantly on its mistaken understanding of *Salerno*.  *See* Alabama U.S. Opp. at 41-42.  It dismisses as "pure speculation" the United States' concern about Section 27's impact on lawfully present aliens and United States citizens, even though pre-enforcement challenges necessarily involve some predictive element.  Alabama reasons that because federal law prohibits certain contracts involving illegal aliens, *see id.* at 42, Alabama has free reign to invalidate or otherwise not to enforce *every* contract to which an unlawfully present alien is a party, with the exception of those contracts Section 27 expressly exempts.  As explained *supra* at 41-42, the Supremacy Clause does not countenance such a result.  Section 27 is preempted.

**G.      Section 28 of H.B. 56 — Alabama's Education Registration Scheme — is Preempted by Federal Law.**

In its opening brief, the United States argued that Alabama's education registration and verification scheme was preempted by federal law because it constituted an impermissible registration scheme under *Hines*, and because it would impermissibly burden lawfully present aliens.  Although Alabama accuses the United States of transposing equal protection jurisprudence with preemption jurisprudence, Alabama U.S. Opp. at 44, these two bodies of law are not rigidly distinct in the immigration context.  *Plyler* cited *Hines* extensively.  Recognizing that Congress has expressly endorsed *Plyler*, *see* 8 U.S.C. § 1643(a)(2), at least one court has determined that federal law regarding "regulation of government benefits to aliens" "demarcate[s] a field of comprehensive federal regulation within which states may not legislate, and define federal objectives with which states may not interfere."  *League of United Latin American Citizens v. Wilson*, 997 F.Supp. 1244, 1253-54 (C.D. Cal. 1997).

Because Section 28's notification requirements would apply to essentially all aliens attending public schools, the United States argued that Alabama will force the parents or guardians of unlawfully present alien children to "[e]ither fail to comply with the notification procedures, which will necessarily result in their child being 'presumed' to be unlawfully present, with whatever consequences that might have (or the alien might fear would occur), or perjure themselves by making a false statement about their child's status, with whatever consequences that might have."  U.S. Br. at 45.  Alabama responds that Section 28's "reporting requirement applies only at 'enrollment,' which occurs only once — when the child enters school — not on an ongoing or yearly basis."  Alabama U.S. Opp. at 44.  But imposing "distinct,

unusual, and extraordinary burdens" on aliens only once does not somehow make it lawful.

*Hines v. Davidowitz*, 312 U.S. 52, 65-66 (1941).[23]

More important, Section 28's demand for information about parental immigration status demonstrates that this provision does not genuinely advance even an arguable educational purpose. *See* U.S. Br. at 42-46. Although Alabama denies that Section 28 "is merely a subterfuge for discouraging unlawful aliens from enrolling their children in school," Alabama U.S. Opp. at 45, Alabama does not even attempt to assert an educational interest in information concerning parental immigration status. *Id.* at 45-47. Indeed, Alabama's own filings affirmatively belie its assurances on this point. Joseph B. Morton, Alabama's State Superintendent of Education, has provided a flow chart entitled "Enrollment of Students in Alabama Public School," Alabama HICA Opp, Ex. 3, p.4, presumably to explain how Section 28 would operate. At no point does Superintendent Morton's flow chart explain what a school official should do if "upon review of the student's birth certificate, it is determined that the student . . . is the child of an alien not lawfully present in the United States." H.B. 56 § 28(a)(3). Superintendent Morton simply omits this portion of the statute from his analysis. Evidently, not even Alabama's highest education officer can conceive of a legitimate state interest that is served by having schools probe the immigration status of a student's parents.

Alabama is similarly mistaken in its registration analysis. Alabama argues that "Section 28 bears no resemblance" to the registration scheme the Supreme Court invalidated in *Hines*,

---

[23]  Alabama furthermore does not deny that, under 8 U.S.C. § 1373, the federal government is entitled to access the immigration-status information schools collect. Given Alabama's representation that immigration status *information,* "*once entered into the statewide student management system, remains saved,*" Alabama HICA Opp. at 121 (emphasis in original), the prospect of information sharing means that for some students and parents, Section 28's deterrent effect may not be limited to the provision of immigration status-related information upon enrollment.

relying heavily on the assertion that the Pennsylvania scheme authorized criminal penalties for violations, while Alabama's does not. Alabama U.S. Opp. at 47. This is misleading. Alabama ignores Section 28's requirement that a student without a United States birth certificate, or whose birth certificate indicates that he "is the child of an alien not lawfully present," must produce a parental declaration under penalty of perjury to avoid being "presumed" to be unlawfully present. Ala. H.B. 56 § 28(a)(3), (4)(b). Under Alabama law, lying under oath to a public servant (*i.e.*, a school official) constitutes second degree perjury, *see* Ala. Code. § 13A-10-102, a Class A misdemeanor punishable by up to a year in jail — a penalty that far exceeds the 60 day maximum sentence Pennsylvania authorized for violations of its registration scheme. *See Hines*, 312 U.S. 59-60.

Not only does Section 28 create the prospect of substantially more severe criminal liability than the provision invalidated by *Hines*, the fundamental fact remains that Section 28 purports to classify its students on the basis of perceived immigration status, which the Supreme Court has forbidden. *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) (citing *Hines*, 312 U.S. 52 (1941)). Alabama cannot deny that Section 28 requires school officials to divide school children into two categories: those "presumed" to be unlawfully present, and those not "presumed" to be unlawfully present. H.B. 56 § 28(a)(5). Alabama notes that because "[p]arents are already routinely required to submit documents to schools upon enrollment, including immunization certificates, medical or religious exemptions, social security numbers or temporary numbers, and proof of age, [r]equesting another document — either a birth certificate or declaration — does not establish an entirely new 'registration scheme.'" Alabama U.S. Opp. 47-48. But none of these documents forms the basis for statutory classifications on the basis of "presumed" immigration status, nor do parents attest to the veracity of these documents under penalty of

perjury.[24]  Alabama's attempts to distinguish Section 28 from the registration scheme in *Hines*

are therefore unavailing.[25]  For all of these reasons, Section 28 is preempted.

*   *   *

The United States incorporates by reference the arguments made in its opening brief

regarding irreparable harm and the balance of the hardships and public interest. U.S. Br. at 65-

73.  Alabama affords little attention to these equitable considerations, and does not dispute that a

violation of the Supremacy Clause alone would constitute irreparable harm to the United States.

Instead, Alabama simply reiterates its claims on the merits, contending that H.B. 56 represents a

cooperative and concurrent effort to enforce federal law.  *See* Alabama U.S. Opp. at 74-75.

Alabama also responds that "the United States cannot show that it will suffer irreparable harm,"

id. at 73, plainly ignoring that the legal standard is a showing of a "likelihood" of irreparable

harm.  There is no authority suggesting that a plaintiff must wait until it has been actually

---

[24] Furthermore, regardless of the holding in *Plyler*, Section 28's effect on *lawfully present* children is significant in a preemption analysis.  Section 28 requires school officials to "determine whether the student enrolling . . . is the child of an alien not lawfully present," H.B. 56 § 28(a)(1).  This requirement – particularly when read in the context of a state immigration scheme that is designed to effectuate the removal of unlawfully present aliens from the State – violates *De Canas*'s clear prohibition against "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country," where such regulations "impose[] additional burdens not contemplated by Congress." *De Canas*, 424 U.S. at 358 n. 6. The Supreme Court has previously rejected state efforts that "point[] in one direction for minor citizens . . . whose parents cannot be naturalized, and in another for all other children-for minor citizens whose parents are either citizens or eligible aliens." *Oyama v. California*, 332 U.S. 633, 641 (1948). Section 28 represents such a measure. Section 28 – through intent and effect – treats lawfully present alien children whose parents are unlawfully present differently from those whose parents are lawfully present, because the registration-under-perjury automatically sweeps the parent – *through her child* – into the state's law enforcement purview.

[25] Also unavailing is Alabama's effort to claim that "the State Defendants and the United States are in agreement" on the application of the Equal Protection Clause to Section 28.  *See* Alabama Supp. Br. on Equal Protection at 3.  As Alabama acknowledges, the United States did not challenge Section 28 on Equal Protection grounds.  *Id.* at 3 n.1.  The absence of such a challenge from the United States, however, should not be construed as a comment one way or another on Alabama's position on the Equal Protection claims raised by private plaintiffs.

47

harmed before seeking an injunction.  In fact, the opposite is true, as various courts have recognized that "the very purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause" –  to prevent the infliction of harm in the first place.  *See, e.g., U.S. Philips Corps. v. KBC Bank*, 590 F.3d 1091, 1094 (9th Cir. 2010).   And here, where the United States has advanced clear legal justifications coupled with significant authority indicating that its equities will – and have already begun to be – eroded as it pertains to its ability to administer the immigration laws and effectively manage U.S. foreign policy, the United States has satisfied its burden.  *See United States v. Arizona*, 641 F.3d at 366 (finding that the equitable factors favor a preliminary injunction in similar circumstances).

## **CONCLUSION**

For the foregoing reasons, the United States' preliminary injunction motion should be granted in its entirety.

DATED:  August 22, 2011

TONY WEST
Assistant Attorney General
JOYCE WHITE VANCE
United States Attorney
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch

*/s/ C. Lee Reeves, II*
C. LEE REEVES, II
VARU CHILAKAMARRI
JOSHUA WILKENFELD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4805
Fax: (202) 616-8470
 Email: lee.reeves@usdoj.gov