## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | )   **Case Number:  2:11-CV-2746-SLB** |
| **STATE OF ALABAMA; GOVERNOR** | ) |
| **ROBERT J. BENTLEY,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

## I.  SUMMARY

On June 2, 2011, the Alabama Legislature approved House Bill 56 (H.B. 56), the

"Beason-Hammon Alabama Taxpayer and Citizen Protection Act," Ala. Laws Act 2011-535,

hereinafter H.B. 56.  On June 9, 2011, Governor Robert Bentley signed the Act into law, with

the majority of its provisions to become effective on September 1, 2011.  On August 29,

2011, this court temporarily enjoined the Act until September 29, 2011.

On August 1, 2011, the United States filed a Complaint against the State of Alabama

and Governor Robert J. Bentley seeking declaratory and injunctive relief contending that

various provisions of H.B. 56 are preempted by federal law, and, therefore, violate the

Supremacy Clause of the United States Constitution.  (Doc. 1.)[1]  On the same date, the

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.  References to page numbers in this

United States filed a Motion for Preliminary Injunction, (doc. 2), seeking to preliminarily enjoin the following sections of H.B. 56:  10, 11(a), 12(a), 13, 16, 17, 18, 27, 28, and 30. The Act declares it "a compelling public interest to discourage illegal immigration by requiring all agencies within [Alabama] to fully cooperate with federal immigration authorities in the enforcement of federal immigration laws."  H.B. 56 § 2.  The term "alien" is defined in the Act as "[a]ny person who is not a citizen or national of the United States, as described in 8 U.S.C. § 1101, *et seq.*, and amendments thereto."  H.B. 56 § 3.

H.B. 56 includes a severability provision, stating that "If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains."  H.B. 56 § 33.  Therefore, the court will address the challenges to H.B. 56 on a section-by-section basis.  The following sections are challenged by the United States:

> H.B. 56 § 10, which creates a criminal misdemeanor violation under Alabama law for willful failure to complete or carry an alien registration document if the person is in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a) and is unlawfully present in the United States.
>
> H.B. 56 § 11(a), which makes it a misdemeanor crime for an unauthorized alien to apply for, solicit, or perform work.
>
> H.B. 56 § 12(a), which requires a law enforcement officer to make a reasonable attempt, when practicable, to determine the citizenship and immigration status of a person stopped, detained or arrested when reasonable suspicion exists that the person is an alien who is unlawfully present in the United States.

---

Memorandum Opinion refer to the page numbers assigned to the document by the court's electronic filing system, not the page number at the bottom of each page.

H.B. 56 § 13, which makes it unlawful for a person to 1) conceal, harbor or shield an alien unlawfully present in the United States, or attempt or conspire to do so; 2) encourage an unlawful alien to come to the State of Alabama; or 3) to transport (or attempt or conspire to transport) an unlawful alien.

H.B. 56  § 16, which forbids employers from claiming as business tax deductions any wages paid to an unauthorized alien.

H.B. 56 § 17, which establishes a civil cause of action against an employer who fails to hire or discharges a U.S. citizen or an alien who is authorized to work while hiring, or retaining, an unauthorized alien.

H.B. 56 § 18, which amends Ala. Code 32-6-9 to include a provision that if a person is arrested for driving without a license, and the officer is unable to determine that the person has a valid driver's license, the person  must be transported to the nearest magistrate; a reasonable effort shall be made to determine the citizenship of the driver, and if found to be unlawfully present in the United States the driver shall be detained until prosecution or until handed over to federal immigration authorities.

H.B. 56 § 27, which bars Alabama courts from enforcing a contract to which a person who is unlawfully present in the United States is a party.  This section does not apply to contracts for lodging for one night, contracts for the purchase of food, contracts for medical services, or contracts for transportation for an alien to return to his or her country of origin.

H.B. 56 § 28, which requires every public elementary and secondary school in Alabama to determine if an enrolling student was born outside the jurisdiction of the United States or is the child of an unlawfully present alien and qualifies for assignment to an English as second language class or other remedial program.

H.B. 56 § 30, which makes it a felony for an alien not lawfully present in the United States to enter into a "business transaction" with the State of Alabama or any political subdivision thereof.

As discussed more fully below, "[a] preliminary injunction is an extraordinary and drastic remedy." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of*

*Jacksonville, Florida,* 896 F.2d 1283, 1285 (11th Cir. 1990) (citations omitted).  Moreover, as the Eleventh Circuit has noted

> When a federal court before trial enjoins the enforcement of a municipal ordinance adopted by a duly elected city council, the court overrules the decision of the elected representatives of the people and, thus, in a sense interferes with the processes of democratic government. Such a step can occasionally be justified by the Constitution (itself the highest product of democratic processes). Still, ***preliminary injunctions of legislative enactments – because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits – must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts***.

*Id.* (emphasis added).

Upon consideration of the Motion for Preliminary Injunction, the memoranda submitted in support of and in opposition to the Motion, the arguments of counsel, the Amici briefs accepted by the court, and the relevant law, the court is of the opinion, as more fully discussed below, that the United States has not met the requirements for a preliminary injunction on its claim that Sections 10, 12(a), 18, 27, 28, and 30 of H.B. 56 are preempted by federal law.  Therefore, the motion for preliminary injunction as to these sections will be denied.  However, the court is of the opinion, as more fully discussed below, that there is a substantial likelihood that the United States will succeed on the merits of its claim that Sections 11(a), 13, 16, and 17 of H.B. 56 are  preempted by federal law.  The court further finds that the United States will suffer irreparable harm if these sections of H.B. 56 are not enjoined, the balance of equities favors the entry of an injunction, and its entry would not be

4

adverse to the public interest.  Therefore, the Motion for Preliminary Injunction will be granted as to these sections.

## II. PRELIMINARY INJUNCTION STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[2]  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotations and citations omitted).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)(internal quotations and citations omitted).  In this Circuit –

> In order to prevail on an application for a preliminary injunction, the plaintiff must clearly establish all of the following requirements:
>
> (1) . . . a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

---

[2]"It is always true, by definition, that the status quo is less restrictive than a new regulatory law.  It is always less restrictive to do ***nothing*** than to do ***something***."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 684 (2004)(Breyer, J., dissenting)(emphasis in original).

*Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011)(quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade County Sch. Bd.*,  557 F.3d 1177, 1198 (11th Cir. 2009)).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

### III.  <u>FEDERAL IMMIGRATION LAW</u>

The Third Circuit in *Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010), clearly set forth the current federal law regarding immigration and immigrants:

### 1. The Immigration and Nationality Act

The primary body of federal immigration law is contained in the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–537, enacted in 1952, and amended many times thereafter.  The INA sets forth the criteria by which "aliens," defined as "any person not a citizen or a national of the United States," 8 U.S.C. § 1101(a)(3), may enter, visit, and reside in this country.

Under the INA, there are three primary categories of aliens who may lawfully enter and/or spend time within the United States:  (1) "nonimmigrants," who are persons admitted for a limited purpose and for a limited amount of time, such as visitors for pleasure, students, diplomats, and temporary workers, see 8 U.S.C. § 1101(a)(15); (2) "immigrants," who are persons admitted as (or after admission, become) lawful permanent residents of the United States based on, *inter alia*, family, employment, or diversity characteristics, *see* 8 U.S.C. § 1151; and (3) "refugees" and "asylees," who are persons admitted to and permitted to stay for some time in the United States because of humanitarian concerns, *see* 8 U.S.C. §§ 1157–58.  Aliens wishing to be legally admitted into the United States must satisfy specific eligibility criteria in one of these categories, and also not be barred by other provisions of federal law that determine inadmissibility.  Congress has determined that non-citizens who, *inter alia*, have certain health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States, are inadmissible, *see* 8 U.S.C. § 1182, and if

6

detained when attempting to enter or reenter the country, may be subject to expedited removal, *see* 8 U.S.C. § 1225.

Despite the carefully designed system for lawful entry described above, persons lacking lawful immigration status are obviously still present in the United States.  As the Supreme Court explained almost thirty years ago: "[s]heer incapability or lax enforcement of the laws barring entry into this country . . . has resulted in the creation of a substantial 'shadow population' . . . within our borders."  *Plyler* [*v. Doe*], 457 U.S. [202,] 218 [(1982)].  Such persons may lack lawful status because they entered the United States illegally, either by failing to register with immigration authorities or by failing to disclose information that would have rendered them inadmissible when they entered.  *See* 8 U.S.C. § 1227.  In addition, aliens who entered legally may thereafter lose lawful status, either by failing to adhere to a condition of admission, or by committing prohibited acts (such as certain criminal offenses) after being admitted.  *See id*.

Persons here unlawfully are subject to removal from the country. Removal proceedings are initiated at the discretion of the Department of Homeland Security ("DHS").  [footnote]  *See Juarez v. Holder*, 599 F.3d 560, 566 (7th Cir. 2010)("[T]he decision when to initiate removal proceedings is committed to the discretion of immigration authorities." (citing *Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 489 (1999))).  Although certain aliens are subject to more expedited removal proceedings, for all others, section 240 of the INA sets forth the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  8 U.S.C. § 1229a(a)(3).

[Footnote:]  Prior to 2003, the Immigration and Naturalization Service ("INS"), which operated under the Department of Justice, administrated both immigration services and immigration enforcement.  On March 1, 2003, Congress abolished the INS.  Pursuant to the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135, that agency's functions were transferred to three separate agencies within the newly created Department of Homeland Security:  U.S. Citizenship and Immigration Services ("USCIS"), which performs immigration and naturalization services, U.S. Immigration and Customs Enforcement ("ICE"), which enforces federal immigration and customs laws, and U.S. Customs and Border Protection ("CBP"), which monitors and

secures the country's borders.  Older documents may continue to refer to the pre–2003 administrative structure, and citations to them should be understood in that context.

Under section 240, an alien facing removal is entitled to a hearing before an immigration judge and is provided numerous procedural protections during that hearing, including notice, the opportunity to present and examine evidence, and the opportunity to be represented by counsel (at the alien's expense).  *See* 8 U.S.C. § 1229a.  At the conclusion of a removal hearing, the presiding immigration judge must decide, based on the evidence produced during the hearing, whether the alien is removable, *see* 8 U.S.C. § 1229a(c)(1)(A), and if so, whether s/he should be ordered removed, or should be afforded relief from removal.  Such relief can include postponement of removal, cancellation of removal, or even adjustment of status to that of lawful permanent resident.  *See* 8 U.S.C. §§ 1229a(c)(4), 1229b.

In sum, while any alien who is in the United States unlawfully faces the prospect of removal proceedings being initiated against her/him, whether s/he will actually be ordered removed is never a certainty until all legal proceedings have concluded.  Moreover, even after an order of removal issues, the possibility remains that no country will accept the alien.  Under such circumstances, the Constitution limits the government's authority to detain someone in anticipation of removal if there is no significant likelihood of removal in the reasonably foreseeable future.  *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

The INA, as amended, also prohibits the "harboring" of aliens lacking lawful immigration status.  It provides that any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection . . . such alien in any place, including any building or any means or transportation" shall be subject to criminal penalties.   8 U.S.C. § 1324(a)(1)(A)(iii).

For decades, the INA contained no specific prohibition against the employment of aliens lacking legal status.  Rather, regulation of the employment of aliens not lawfully present was at most a "peripheral concern." *DeCanas v. Bica*, 424 U.S. 351, 360 (1976).  This changed in 1986, when Congress amended the INA through enactment of the Immigration Reform and Control Act ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359 (codified at 8

U.S.C. §§ 1324a–1324b).  IRCA "forcefully made combating the employment of illegal aliens central to the policy of immigration law."  *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 147(2002) (internal quotation marks and alterations omitted).

### 2.  The Immigration Reform and Control Act

IRCA regulates the employment of "unauthorized aliens," a term of art defined by the statute as those aliens neither "lawfully admitted for permanent residence" nor "authorized to be . . . employed by this chapter or by the Attorney General."  8 U.S.C. § 1324a(h)(3).  IRCA makes it unlawful to knowingly hire or continue to employ an unauthorized alien, or to hire anyone for employment without complying with the work authorization verification system created by the statute.  8 U.S.C. § 1324a(a)(1)-(2).  This verification system, often referred to as the "I–9 process," requires that an employer examine certain documents that establish both identity and employment authorization for new employees.  *See* 8 U.S.C. § 1324a(b).  The employer must then fill out an I–9 form attesting that s/he reviewed these documents, that they reasonably appear to be genuine, and that to the best of the employer's knowledge, the employee is authorized to work in the United States.  *See id*.  Although employers are required to verify the work authorization of all ***employees***, Congress did not extend this requirement to independent contractors.  *See* 8 U.S.C. § 1324a(a)(1)(making unlawful the knowing "employment" of an unauthorized alien, and the hiring of an employee for "employment" without verifying the employee's work authorization); 8 C.F.R. § 274a.1(f)(specifically excluding "independent contractors" from the definition of "employee"); 8 C.F.R. § 274a.1(g) (specifically excluding a "person or entity using . . . contract labor" from the definition of "employer").

The I–9 "verification system is critical to the IRCA regime."  *Hoffman Plastic Compounds*, 535 U.S. at 147–48.  Not only is failure to use the system illegal, but use of the system provides an affirmative defense to a charge of knowingly employing an unauthorized alien.  *See* 8 U.S.C. § 1324a(a)(3). Thus, employers who use the I–9 process in good faith to verify the work authorization of employees are presumed not to have knowingly employed someone unauthorized to work in this country.  In enacting IRCA, Congress required the President to monitor the security and efficacy of this verification

9

system.  *See* 8 U.S.C. § 1324a(d).  Congress also imposed limits on the President's ability to change it.  *Id*.

In addition to relying on the I–9 verification system, IRCA uses public monitoring, prosecution, and sanctions to deter employment of unauthorized aliens.  IRCA provides for the creation of procedures through which members of the public may file complaints about potential violations; it authorizes immigration officers to investigate these complaints; and it creates a comprehensive hearing and appeals process through which complaints are evaluated and adjudicated by administrative law judges.  *See* 8 U.S.C. § 1324a(e)(1)-(3).

Under IRCA, an employer who knowingly hires an unauthorized alien shall be ordered to cease and desist the violation, and to pay between $250 and $2000 per unauthorized alien for a first offense, between $2000 and $5000 per unauthorized alien for a second offense, and between $3000 and $10,000 per unauthorized alien for a third or greater offense.  8 U.S.C. § 1324a(e)(4).  An employer who fails to verify the work authorization of its employees can be ordered to pay between $100 and $1000 for each person whose authorization it failed to authenticate.  8 U.S.C. § 1324a(e)(5).  Employers who engage in a "pattern or practice" of hiring unauthorized aliens shall be fined up to $3000 per unauthorized alien, imprisoned for not more than six months, or both.  8 U.S.C. § 1324a(f)(1).

IRCA expressly pre-empts states and localities from imposing additional "civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).

Because of its concern that prohibiting the employment of unauthorized aliens might result in employment discrimination against authorized workers who appear to be foreign, Congress included significant anti-discrimination protections in IRCA.  *See* 8 U.S.C. § 1324b.  [Footnote] The statute provides that, with certain limited exceptions, it is an "unfair immigration-related employment practice" to discriminate in hiring on the basis of national origin or citizenship status.  8 U.S.C. § 1324b(a)(1).  Congress put teeth into this provision by creating the office of a "Special Counsel" to investigate and prosecute such offenses, and it required that the President fill that position "with the advice and consent of the Senate."  8 U.S.C. § 1324b(c).  Congress also authorized immigration judges to punish those who violate IRCA's

10

anti-discrimination mandate by imposing civil fines equivalent in amount to those imposed for knowingly hiring unauthorized aliens.  *Compare* 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii) *with* 8 U.S.C. § 1324b(g)(2)(B)(iv)(I)-(III).

> [Footnote:]  8 U.S.C. § 1324b provides in relevant part that:
>
>> [with certain limited exceptions, it] is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment – (A) because of such individual's national origin, or (B) in the case of a protected individual . . . because of such individual's citizenship status.
>
> 8 U.S.C. § 1324b(a).  Any person adversely-affected by an unfair immigration-related employment practice "may file a charge respecting such practice or violation."  8 U.S.C. § 1324b(b)(1).

### 3.  The Illegal Immigration Reform and Immigrant Responsibility Act

In 1996, Congress again amended the INA by enacting the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in various sections of 8 U.S.C.).  In IIRIRA, Congress directed the Attorney General, and later the Secretary of Homeland Security, to conduct three "pilot programs of employment eligibility confirmation" in an attempt to improve upon the I-9 process.  IIRIRA § 401(a), 110 Stat. 3009-655.  Congress mandated that these programs be conducted on a trial basis, for a limited time period, and in a limited number of states.  *See* IIRIRA § 401(b)-(c), 110 Stat. 3009-655-66. Two of these trial systems were discontinued in 2003.  However, the third – originally known as the "Basic Pilot Program" but since renamed "E-Verify" – was reauthorized and expanded to all fifty states in 2003.  *See* Basic Pilot Program Extension and Expansion Act of 2003, Pub.L. No. 108-156, §§ 2, 3, 117 Stat. 1944.  It has been reauthorized several times since, and its current authorization will expire, absent congressional action, on September 30, 2012.

*See* Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 547, 123 Stat. 2177; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Div. A, § 143, 122 Stat. 3580.

E-Verify allows an employer to actually authenticate applicable documents rather than merely visually scan them for genuineness. When using E-Verify, an employer enters information from an employee's documents into an internet-based computer program, and that information is then transmitted to the Social Security Administration and/or DHS for authentication. *See* IIRIRA, as amended, § 403(a)(3). These agencies confirm or tentatively nonconfirm whether the employee's documents are authentic, and whether the employee is authorized to work in the United States. *See* IIRIRA, as amended, § 403(a)(4). If a tentative nonconfirmation is issued, the employer must notify the employee, who may contest the result. *See id*. If an employee does not contest the tentative result within the statutorily prescribed period, the tentative nonconfirmation becomes a final nonconfirmation. *See id*. If the employee does contest it, the appropriate agencies undertake additional review and ultimately issue a final decision. *See id*. An employer may not take any adverse action against an employee until it receives a final nonconfirmation. *See id*. However, once a final nonconfirmation is received, an employer is expected to terminate the employee, or face sanctions.

With only a few exceptions, federal law makes the decision of whether to use E-Verify rather than the default I-9 process entirely voluntary. *See* IIRIRA, as amended, § 402(a). Federal government employers and certain employers previously found guilty of violating IRCA are currently required to use E-Verify; all other employers remain free to use the system of their choice. *See* IIRIRA, as amended, § 402(e). Significantly, in enacting IIRIRA, Congress specifically prohibited the Secretary of Homeland Security from requiring "any person or other entity to participate in [E-Verify]." *See* IIRIRA, as amended, § 402(a). Congress also directed the Secretary to publicize the "voluntary nature" of the program and to ensure that government representatives are available to "inform persons and other entities that seek information about [E-Verify] of [its] voluntary nature." IIRIRA, as amended, § 402(d).

Those employers who elect to use E-Verify and actually do use the system to confirm an employee's authorization to work are entitled to a rebuttable presumption that they did not hire that employee knowing that s/he

> lacks authorization to work in this country.  *See* IIRIRA, as amended, §
> 402(b)(1).  Employers who elect to use E-Verify, but in practice continue to
> use the I-9 process, are not entitled to the E-Verify rebuttable presumption, but
> can still claim the I-9 affirmative defense.  *See* IIRIRA, as amended, §
> 402(b)(2).

*Lozano v. City of Hazleton*, 620 F.3d 170, 196-201 and nn.21, 24 (3d Cir. 2010)(emphasis

in original; footnotes omitted except where otherwise indicated, parallel Supreme Court

citations omitted), *cert. granted and judgment vacated*, 131 S. Ct. 2958 (2011) (Mem).

## IV.  DISCUSSION

### A.    PREEMPTION AND THE SUPREMACY CLAUSE

The United States argues that Sections 10, 11(a), 12(a), 13, 16, 17, 18, 27, 28 and 30

of H.B. 56 are preempted under the Supremacy Clause of the United States Constitution and

federal immigration law.  (Doc. 1 ¶¶ 69-70, 72.)  The Supremacy Clause of the U.S.

Constitution provides that the Constitution, federal laws, and treaties are "the Supreme Law

of the Land."  U.S. CONST., art. VI, cl. 2.  In certain instances, the Constitution – in its own

right – can preempt state action in a field exclusively reserved for the federal government.

*DeCanas v. Bica*, 424 U.S. 351, 354-56 (1976) ("[The constitutional] [p]ower to regulate

immigration[3] is unquestionably exclusively a federal power."), *superceded by statute as

stated in Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1975 (2011).[4]  The Supremacy

---

[3]According to the Supreme Court, a regulation of immigration "is essentially a
determination of who should or should not be admitted to the country, and the conditions
under which a legal entrant may remain.  *DeCanas*, 424 U.S. at 355.

[4]In *DeCanas*, the Supreme Court held that a California law prohibiting an employer
from knowingly employing an alien unlawfully present in the United States, if such

13

Clause also "vests Congress with the power to preempt state law." *Stephen v. Am. Brands, Inc.*, 825 F.2d 312, 313 (11th Cir. 1987); *see also Gibbons v. Ogden*, 22 U.S. 1, 211 (1824).[5]

Therefore, this court's analysis of preemption claims

> must be guided by two cornerstones of [the Supreme Court's] pre-emption jurisprudence. First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, [i]n all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . [courts] start with the assumption that the historic

_____

employment would have an adverse effect on lawful resident workers, was not unconstitutional as a regulation of immigration or as being preempted under the Supremacy Clause by the Immigration and Nationality Act . *DeCanas*, 424 U.S. at 356, 363.  In *Whiting*, the Court noted:

> IRCA also restricts the ability of States to combat employment of unauthorized workers; the Act expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." [8 U.S.C.] § 1324a(h)(2).  Under that provision, state laws imposing civil fines for the employment of unauthorized workers like the one we upheld in *DeCanas* are expressly preempted.

*Whiting*, 131 S. Ct. at 1975.

[5]In *Gibbons*, Chief Justice Marshal wrote:

> The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution, or some treaty made under the authority of the United States.  In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.

*Gibbons*, 22 U.S. at 211.

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 1194-95 (2009)(quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996))(internal quotations and citations omitted).

Preemption may be express or implied, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (O'Connor, J., plurality opinion), and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Express preemption occurs when the text of a federal law is explicit about its preemptive effects. *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)("Express preemption occurs when Congress manifests its intent to displace a state law using the text of a federal statute.").

Implied preemption falls into two categories: field preemption and conflict preemption. *Gade*, 505 U.S. at 98; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)("Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances."); *see Browning*, 522 F.3d at 1167 ("Field and conflict preemption in turn have been considered under the umbrella term 'implied preemption.'"). Field preemption exists when:

Congress' intent to supercede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same

> subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Commn*, 461 U.S. 190, 203-04 (1983)(internal quotations omitted). "Conflict preemption" occurs when "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132,142-43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). These "categories of preemption are not 'rigidly distinct,'" however, as "field pre-emption may be understood as a species of conflict pre-emption." *Crosby*, 530 U.S. at 373 n.6 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79-80 n.5 (1990)).

In their Motion for Preliminary Injunction, the United States argues that some sections of H.B. 56 are due to be enjoined on the basis of express preemption by federal statutes and that other sections are due to be enjoined because the United States contends they are impliedly preempted by federal law.

## B.    SECTION 10

Section 10(a) of H.B. 56 states:

> (a)  In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a), and the person is an alien unlawfully present in the United States.

H.B. 56 § 10(a). An "alien unlawfully present in the United States" who violates Section 10 is "guilty of a Class C misdemeanor and subject to a fine of not more than one hundred dollars ($100) and not more than 30 days in jail." *Id.* § 10(f). For the purposes of enforcing Section 10, "an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)." H.B. 56 § 10(b). Section 10 "does not apply to a person who maintains authorization from the federal government to be present in the United States." *Id.* § 10(d).

To understand H.B. 56 § 10, it is necessary to consult certain provisions of the INA, namely 8 U.S.C. §§ 1302, 1304(e), and 1306(a). As with any question of statutory interpretation, the court "begin[s] by examining the text of the statute to determine whether its meaning is clear." *United States v. Zheng*, 306 F.3d 1080, 1085 (11th Cir. 2011) (quoting *Lewis v. Barnhart*, 285 F.3d 1329, 1331 (11th Cir. 2002)). Section 1302 provides that "every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted . . . , and (3) remains in the United States for thirty days or longer" must "apply for registration and to be fingerprinted before the expiration of such thirty days." 8 U.S.C. § 1302(a). Section 1302 also provides that "every parent or legal guardian of any alien now or hereafter in the United States, who (1) is less than fourteen years of age, (2) has not been registered . . . , and (3) remains in the United States for thirty days or longer" must "apply for the registration of such alien before the expiration of such thirty days." *Id.* (b). An alien described in Section 1302(b) who "attains his fourteenth

birthday in the United States" must, "within thirty days thereafter, apply in person for registration and to be fingerprinted." *Id.*

Section 1304 provides that "[e]very alien in the United States who has been registered and fingerprinted . . . shall be issued a certificate of alien registration or an alien registration card . . . ." 8 U.S.C. § 1304(d).  Section 1304 also provides that "[e]very alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him . . . ." *Id.* § 1304(e).  An alien who violates Section 1304(e) is "guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both." *Id.*  Section 1304(e) presupposes that the alien has registered pursuant to § 1302 and been provided documentation pursuant to Section 1304(d).  An alien who has never registered or applied for a certificate of alien registration cannot, by the plain language of 8 U.S.C. § 1304(a), be charged with a crime for failure to have in his or her personal possession any registration documents issued to him or her.

Section 1306 provides:

Any alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted,  and any parent or legal guardian required to apply for the registration of any alien who willfully fails or refuses to file application for the registration of such alien" is "guilty of  a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both.

8 U.S.C. § 1306(a).

Essentially, H.B. 56 § 10 creates two Alabama state crimes related to the INA's alien registration scheme. The first state crime has two elements and arises when an alien is "unlawfully present in the United States" *and* "in violation of 8 U.S.C. § 1304(e)." H.B. 56 § 10(a). The second state crime has two elements and arises when an alien is "unlawfully present in the United States" *and* "in violation of . . . 8 U.S.C. § 1306(a)." *Id.* Although it is a federal crime to violate 8 U.S.C. § 1304(e) and 8 U.S.C. § 1306(a), the state crimes for violating H.B. 56 § 10 arise in a narrower set of circumstances than the federal crimes for violating either 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a). In other words, there may be circumstances when an alien would be in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a) but would not, under the same circumstances, be in violation of H.B. 56 § 10(a).

Section 1304(e) applies to "[e]very alien," whether lawfully present or not, who has registered under Section 1302 and been issued documentation under Section 1304(d) but who fails to carry the documentation as required by Section 1304(e). *See, e.g.*, *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 546 (6th Cir. 2002)(citing 8 U.S.C. § 1304(e))("Failure to carry one's green card on his or her person can subject a legal resident alien to criminal sanctions.")*; Etuk v. Slattery*, 936 F.2d 1433, 1444 (2d. Cir. 1991) ("The INA mandates that the Attorney General provide [lawful permanent residents] who register with proof of their legal status." (citing 8 U.S.C. § 1304(d))). Section 10(a) of H.B. 56, on the other hand, applies only to aliens who are "unlawfully present in the United States" and who fail to carry documentation as required by 8 U.S.C. § 1304(e). Unlike 8 U.S.C. §

19

1304(e), H.B. 56 § 10(a), by its plain language, does not apply to aliens lawfully present in the United States, such as legal permanent residents, who fail to carry their registration documents.

The same reasoning applies to the second state crime created by H.B. 56 § 10(a). Section 1306(a) applies to "any alien," whether lawfully present or not, who has failed to register or be fingerprinted as required by 8 U.S.C. § 1302.  Section 10(a) of H.B. 56, on the other hand, applies only to an alien who is "unlawfully present in the United States" and has failed to register and be fingerprinted in violation of 8 U.S.C. § 1306(a).  Unlike Section 1306(a), H.B. 56 § 10(a), by its plain language, does not apply to aliens lawfully present in the United States who fail to register or be fingerprinted in violation 8 U.S.C. § 1306(a).

The United States argues that H.B. 56 § 10 is conflict preempted because it interferes with the federal alien registration scheme.  (Doc. 2 at 28-31.)   As noted, every preemption analysis "must be guided by two cornerstones." *Wyeth*, 129 S. Ct. at 1194.  The first is that "'the purpose of Congress is the ultimate touchstone.'" *Id.* (quoting *Lohr*, 518 U.S. at 485.)  The second is that a presumption against preemption applies when "Congress has legislated . . . in a field which the States have traditionally occupied." *Id.*  Because the states have not traditionally occupied the field of alien registration, the court applies no presumption against preemption for H.B. 56 § 10.

The current federal registration system set forth in 8 U.S.C. §§ 1302, 1304, and 1306, creates a comprehensive scheme for alien registration.  *See Hines*, 312 U.S. at 74.  The

federal system requires aliens to register, 8 U.S.C. § 1302, and requires registered aliens to obtain a certificate of alien registration or an alien registration card,  8 U.S. C. § 1304(d). The INA provides criminal penalties for aliens who fail to carry a registration card or certificate, 8 U.S.C. § 1304(e), and who willfully fail to register, notify the federal government of a change of address, make fraudulent statements, and produce counterfeit documents.  8 U.S.C. § 1306 (a)-(d).

The United States relies primarily on *Hines* to support its assertion that H.B. 56 § 10 is preempted.  (*See* doc. 2 at 28-30.)  In *Hines*, the Supreme Court considered whether the federal Alien Registration Act, the precursor to the INA, preempted the Alien Registration Act adopted in Pennsylvania.  *Hines*, 312 U.S. at 56.  The subject of both the federal Act and the Pennsylvania Act was the registration of aliens.  *Id.* at 61. The Court stated:

> [W]here the federal government, in the exercise of its superior authority in  [the] field [of immigration], has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, ***inconsistently with the purpose of Congress***, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

*Id.* at 66-67 (emphasis added).  On that basis, the Court found that its "primary function" was "to determine whether . . . Pennsylvania's law [stood] as an obstacle to the accomplishment . . . of the full purposes and objectives of Congress" in enacting the federal Act.  *Id.* at 67. Although  compliance  with  both  the  Pennsylvania  Act  and  the  federal  Act  was  not

impossible,[6] the Court nonetheless found that the Pennsylvania Act could not be enforced because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 67, 71-74.

First, the Pennsylvania Act established a separate, state-specific alien registration scheme that was independent from the federal Act. *Id.* at 59-61. Pennsylvania's state-specific registration scheme stood in clear conflict with Congress's objective of having a "uniform national registration system," and "a standard for alien registration in a single integrated and all-embracing system" through the federal Act. *Id.* at 74. Second, the Pennsylvania Act created registration requirements that were different from those provided by Congress in the federal Alien Registration Act. *Id.* at 59-61. For example, the Pennsylvania Act required aliens to carry their registration cards with them at all times. *Id.* at 60-61. Congress had considered and rejected such a provision in the federal Act. *Id.* at 72-73.[7]

---

[6]*See Hines*, 312 U.S. at 78 (in his dissent, Justice Stone noted, "It is conceded that the federal act in operation does not at any point conflict with the state statute, and it does not by its terms purport to control or restrict state authority in any particular.")(Stone, J., dissenting); *see also Wyeth*, 129 at 1211-12 ("The Court [in *Hines*] did not find that the two statutes, by their terms, directly conflicted.")(Thomas, J., concurring)(citations and footnote omitted).

[7] The Court in *Hines* explained:

The requirement that cards be carried and exhibited has always been regarded as one of the most objectionable features of proposed registration systems, for it is thought to be a feature that best lends itself to tyranny and intimidation. Congressman Celler, speaking in 1928 of the repeated defeat of registration bills and of an attempt by the Secretary of Labor to require

22

This case is distinguishable from *Hines*.  As the State Defendants note "there was a clear conflict between Pennsylvania law and the federal scheme" in *Hines* and "[i]n contrast, no such conflict exists between Section 10 of [H.B. 56] and 8 U.S.C. §§ 1304(e) and 1306(a)."  (Doc. 38 at 65-66.)  First, unlike the Pennsylvania Act in *Hines*, H.B. 56 § 10 does not create an independent, state-specific registration scheme, attempt to register anyone, or create registration requirements in addition to the rights established by Congress in the INA.  The standard for registration provided by Congress remains uniform.  H.B. 56 § 10, consistent with the Court's recent decision in *Chamber of Commerce v. Whiting*, expressly defers to the federal alien registration scheme and federal immigration status determinations.  *See Whiting*, 131 S. Ct. at 1981.  It does so by: (1) requiring that "an alien's immigration status . . . be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)," H.B. 56 § 10(b); (2) exempting "a person who maintains authorization from the federal government to be present in the United States," *id.* (d); and (3) providing penalties that closely track those provided by federal law, *compare* 8 U.S.C. § 1306(a) (providing that a person who willfully fails to register is "guilty of a

---

registration of incoming aliens by executive order, said: ["]But here is the real vice of the situation and the core of the difficulty:  'The admitted alien,' as the order states, 'should be cautioned to present (his card) for inspection if and when subsequently requested so to do by an officer of the Immigration Service.[']"  70 Cong. Rec. 190.

*Hines*, 312 U.S. at 71 n.32.  In 1952, after the *Hines* decision, 8 U.S.C. §§ 1304 and 1306 were adopted to add the requirement that aliens carry their registration documents.  *See* H.R. Rep. 82-1365, 2d Session, 1952, 1952 U.S.C.C.A.N. 1653, 1723.

misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000 or be imprisoned not more than six months, or both") *and* 8 U.S.C. § 1304(e) (providing that a person who fails to carry his registration documents is "guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both") *with* H.B. 56 § 10(f) (providing that an alien unlawfully present in the United States and who is in violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a) is "guilty of a Class C misdemeanor and subject to a fine of not more than one hundred dollars ($100) and not more than 30 days in jail").  Second, the current federal alien registration scheme requires that aliens carry their registration documents.  *See* 8 U.S.C. § 1304(e).  In 1952, Congress amended the alien registration laws to require aliens to carry their registration documents.  *See* 8 U.S.C. § 1304(e).  When Congress passed the 1952 law making an alien's failure to carry his registration documents a crime, it stated, "the provisions have been modified . . . to require . . . the registration . . . and fingerprinting of all aliens in the country and to assist in the enforcement of those provisions."   *See* H.R. Rep. 82-1365, 2d Session, 1952, 1952 U.S.C.C.A.N. 1723.  Congress explicitly recognized that the 1952 amendments to the scheme made it a crime for aliens not to carry their registration documents. *See* 98 Cong. Rec. 4432-33 (1952)("Alien registration cards are not new in the law, yet this is the first time where it becomes a necessity for an alien to carry the card with him and, if he does not, it becomes a crime." (statement of Rep. Chudoff)).  As a result, H.B. 56 § 10 does not suffer the same obstacle preemption problem as the Pennsylvania Act.

Although the penalties provided by H.B. 56 § 10 "complement" the INA's registration provisions by making it a state crime for "alien[s] unlawfully present" to violate 8 U.S.C. §§ 1304(e) or 1306(a), this "complement[ing]" is not "inconsistent[] with the purpose of Congress." *See Hines*, 312 U.S. at 66-67. The penalties provided by H.B. 56 § 10 apply in narrow circumstances that are completely encompassed by the federal scheme.  It is already a crime under the federal alien registration scheme for an unlawfully present alien to violate 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a).  Unless Congress has occupied the field through the INA – a conclusion the Supreme Court appears to have rejected, *seeDeCanas*, 424 U.S. at 358; *United States v. Arizona*, 703 F. Supp. 2d 980, 999 (D. Ariz. 2010) ("[In *DeCanas*] the Supreme Court rejected the possibility that the INA is so comprehensive that it leaves no room for state action that impacts aliens.") – it is not "inconsistent[] with the purpose of Congress" to do that which Congress has already done.  *See Hines*, 312 U.S. at 66.  The Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal Government. *Heath v. Alabama*, 474 U.S. 82, 89 (1985). The fact that states can enact laws which impose state penalties for conduct that federal law also sanctions, without being preempted, is "too plain to need more than statement." *Westfall v. United States*, 274 U.S. 256, 258 (1927).

The United States argues, "The federal alien registration scheme has been held by the Supreme Court to represent the quintessential example of a pervasive and comprehensive

scheme of federal regulation that leaves no room for state legislation in this area," and, "*Hines* squarely held that Congress intended the federal government to exercise exclusive control over all issues related to alien registration." (Doc. 2 at 29.)   However, it does not address whether the provisions of H.B. 56 § 10 are "inconsistent[] with the purpose of Congress." *See Hines*, 312 U.S. at 66.   The court does not read *Hines* as holding that Congress has "occupied the field" of alien registration. *Id.* at 67 ("Our primary function is to determine whether, ***under the circumstances of this particular case***, Pennsylvania's law ***stands as an obstacle*** to the accomplishment and execution of the full purposes and objectives of Congress.") (emphasis added); *see also Wyeth*, 129 S. Ct. at 1213 (Thomas, J., concurring).[8]   The United States has not directed this court to any authority for the proposition that Congress intended ***exclusivity***, rather than ***uniformity***.   "[S]ilence on the part of Congress ***alone*** is not only insufficient to demonstrate field preemption, it actually weighs in favor of holding that it was the intent of Congress ***not*** to occupy the field." *Frank Bros.,*

---

[8] The court notes that in *Wyeth*, Justice Thomas stated:

> According to Justice Stone, the *Hines* majority's analysis resembled an inquiry into whether the federal act "'***occupied the field***,'" rather than an application of simple conflict pre-emption principles. *Id.*, at 78 (dissenting opinion).   Regardless of whether *Hines* involved field or conflict pre-emption, the dissent accurately observed that in assessing the boundaries of the federal law – *i.e.,* the scope of its pre-emptive effect – the Court should look to the federal statute itself, rather than speculate about Congress' unstated intentions. *Id.* at 78-79.

*Wyeth*, 129 S. Ct. at 1213 n.4 (Thomas, J., concurring) (parallel citations omitted).

*Inc. v. Wisconsin Dept. of Transp.*, 409 F.3d 880, 891 (7th Cir. 2005)(emphasis added).

Although the *Hines* Court "relied on the comprehensiveness of the federal regulatory

scheme[] in finding" intent to preempt a state-specific alien registration scheme, *see*

*DeCanas*, 424 U.S. at 362-63, this court does not interpret the comprehensiveness of the

federal alien registration scheme as evidence of Congress's intent to preempt state laws that

do not affect the uniformity of the national standard for alien registration.  Consequently, the

court sees no reason why Alabama, pursuant to its dual sovereignty, cannot, consistent with

the purpose of Congress, make violations of 8 U.S.C. §§ 1304(e) and 1306(a) by unlawfully

present aliens, state crimes in Alabama.[9]

----

[9] The court's conclusion is consistent with the decision in *League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755 (C.D. Cal. 1995). There, the district court considered various constitutional challenges to California's Proposition 187. *Id.* at 763.  As relevant here, plaintiffs had challenged Sections 2 and 3 of Proposition 187, which made "it a crime to manufacture, distribute, sell or use false documents to conceal true citizenship or immigration status."  *Id.* at 786. Violations of Sections 2 and 3 were "punishable by imprisonment for up to five years or, in the case of manufacturing, distributing or selling false documents, a fine of up to $75,000 and for use of such documents, a fine of up to $25,000." *Id.*  The court stated:

> Plaintiffs argue that by imposing different penalties than those already imposed under federal laws regulating the production or use of false citizenship, naturalization and alien registration papers and the misuse or forgery of passports and visas, sections 2 and 3 conflict with federal law.  ***There has been no showing that the criminal penalties contemplated by sections 2 and 3 conflict with or impede the objectives of federal law. Sections 2 and 3 are not preempted under the third De Canas test.***

*Id.* (emphasis added; footnote omitted).

27

The United States contends, though not in certain terms, that the court should follow the recent decision in *United States v. Arizona*. (Doc. 2 at 29, 31 [citing *United States v. Arizona*, 641 F.3d 339, 354-57 (9th Cir. 2011)].)  In that case, the United States had challenged the constitutionality of Arizona's Support Our Law Enforcement and Safe Neighborhoods Act in the United States District Court for the District of Arizona and moved to enjoin the Act.  *See Arizona*, 703 F. Supp. 2d 980.  Section 3 of the Arizona Act, A.R.S. § 13-1509(A), which is substantially similar to H.B. 56 § 10(a), was among the challenged provisions.  *Id*. at 998-99.  Section 3 of the Arizona Act provides: "In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code section 1304(e) or 1306(a)." *Id*. at 998.  This section of the Arizona Act did not, as H.B. 56 § 10 does, apply only to those "unlawfully present."   The district court preliminarily enjoined Section 3, reasoning that:

> Section 3 attempts to supplement or complement the uniform, national registration scheme by making it a state crime to violate the federal alien registration requirements, which a state may not do "inconsistently with the purpose of Congress." *Hines,* 312 U.S. at 66-67; *see also* A.R.S. § 13-1509(A). While Section 3 does not create additional registration requirements, the statute does aim to create state penalties and lead to state prosecutions for violation of the federal law.  Although the alien registration requirements remain uniform, Section 3 alters the penalties established by Congress under the federal registration scheme.  Section 3 stands as an obstacle to the uniform, federal registration scheme and is therefore an impermissible attempt by Arizona to regulate alien registration.  *See Hines,* 312 U.S. at 67.

28

*Arizona*, 703 F. Supp. 2d at 999 (parallel citations omitted).  Arizona appealed.  *See Arizona*,

641 F.3d at 354-57.

On appeal, the Ninth Circuit affirmed the district court's decision to enjoin Section

3.  *Id.* at 357.  The Ninth Circuit reasoned:

> S.B. 1070 Section 3 plainly stands in opposition to the Supreme Court's
> direction:  "where the federal government, in the exercise of its superior
> authority in this field, has enacted a complete scheme of regulation and has
> therein provided a standard for the registration of aliens, states cannot,
> inconsistently with the purpose of Congress, conflict or interfere with, curtail
> or complement, the federal law, or enforce additional or auxiliary regulations."
> *Hines,* 312 U.S. at 66-67.  In *Hines,* the Court considered the preemptive effect
> of a precursor to the INA, but the Court's language speaks in general terms
> about "a complete scheme of regulation," – as to registration, documentation,
> and possession of proof thereof – which the INA certainly contains.  Section
> 3's state punishment for federal registration violations fits within the Supreme
> Court's very broad description of proscribed state action in this area – which
> includes  "complement[ing]"  and  "enforc[ing]  additional  or  auxiliary
> regulations."  *Id.*

*Arizona*, 641 F.3d at 355-56 (alteration in original; footnote and parallel citations omitted).

This court is not persuaded by the decisions in the *Arizona* cases regarding Section

3 of the Arizona Act. The Arizona district court and the Ninth Circuit both found that

"Section 3's state punishment for federal registration violations fits within the Supreme

Court's very broad description of proscribed state action in this area – which includes

'complement[ing]' and 'enforc[ing] additional or auxiliary regulations.'" *Arizona*, 641 F.3d

at 356 (quoting *Hines*, 312 U.S. at 66-67); *Arizona*, 703 F. Supp. 2d at 999.  Neither court,

however, explained how the "additional or auxiliary regulations" were "inconsistent[] with

the purpose of Congress."  *See Hines*, 312 U.S. at 66-67.  As the Ninth Circuit noted,

"Nothing in the text of the INA's registration provisions indicates that Congress **intended** for states to participate in the enforcement or punishment of federal immigration registration rules." *Arizona*, 641 F.3d at 355 (emphasis added).  However, this lack of affirmative evidence that Congress intended the states to participate is not dispositive of the preemption issue.  *See Saleh v. Titan Corp.*, 580 F.3d 1, 24 (D.C. Cir. 2009)("*Wyeth v. Levine,* the Supreme Court's most recent preemption case, further reflects the Court's unwillingness to read broad preemptive intent from congressional silence.").  Affirmative evidence that Congress intended the states to participate would negate any inference of preemptive intent,[10] but the absence of such affirmative evidence does not, without more, support a finding of any inference of preemptive intent.  The fact that "Congress provided very specific directions for state participation" in matters not relating to alien registration, *Arizona*, 641 F.3d at 355 (referring to 8 U.S.C. § 1357), "demonstrating that it knew how to ask for help where it wanted help," *id.*, says very little about Congress's preemptive intent regarding state penalties for violations of the federal registration scheme.  *See Camps Newfound / Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616 (1997)("[E]ven where Congress **has** legislated in an area subject to its authority, our pre-emption jurisprudence explicitly rejects the notion that

---

[10] For instance, in *DeCanas*, the Court found  "affirmative evidence . . . that Congress sanctioned concurrent state legislation" with respect to the employment of illegal aliens. *DeCanas*, 424 U.S. 361-63.  Similarly, in *Whiting*, the Court found "Congress expressly preserved the ability of the States to impose their own sanctions through licensing" and noted that such preservation "necessarily entails the prospect of some departure from homogeneity." *Whiting*, 131 S. Ct. at 1979-80.

mere congressional silence on a particular issue may be read as preempting state law")
(emphasis in original).   The court declines to construe Congress's silence in this instance as
evidence of its preemptive intent.

H.B. 56 § 10 creates Alabama state crimes for unlawfully present aliens who
engage in conduct that constitutes *existing* federal crimes under the INA.   Section 10 does
*not* criminalize mere unlawful presence because it also requires a violation of 8 U.S.C. §
1304(e) or 8 U.S.C. § 1306(a), both of which carry criminal penalties under federal law.
Although "unlawful presence in the United States is not a federal crime," *see Arizona*, 703
F. Supp. 2d at 988, and criminalizing mere unlawful presence might impair or impede the
United States foreign policy goals, (*see* doc. 2-1 ¶¶ 9, 35), the Supreme Court has recognized
that "*entering or remaining* unlawfully in this country is itself a crime."   *INS v. Lopez-
Mendoza*, 468 U.S. 1032, 1038 (1984)(citing 8 U.S.C. §§ 1302, 1306, and 1325) (emphasis
added; citations omitted).   That "there [is no] federal criminal statute making unlawful
presence in the United States, alone, a federal crime, *Martinez-Medina v. Holder*, 2011 WL
855791, *6 (9th Cir. Mar. 11, 2011), is of little moment here.   As noted above, an alien in
violation of 8 U.S.C. § 1304(e) or 8 U.S.C. § 1306(a) is not necessarily "unlawfully present"
under federal law.   Mere unlawful presence may subject an alien to civil removal, but not
criminal penalties, in a narrow set of circumstances, such as where an "alien has overstayed
a valid visa or otherwise remains in the country after the expiration of a period authorized
by the Department of Homeland Security."   *Martinez-Medina*, 2011 WL 855791 at *6 n.4.

Section 10 does not seek to alter those narrow circumstances.  The court finds H.B. 56 § 10 does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.  For all these reasons, the court finds that the United States is not likely to succeed in showing that H.B. 56 § 10 is impliedly preempted.

The United States also argues that Section 10 is unlawful because it seeks to criminalize unlawful presence[11] and this creates an obstacle to the accomplishment of the foreign policy goals of the United States.  (Doc. 2 at 31-33.)  The court rejects this argument.

The United States argues that H.B. 56 inherently interferes with the Federal Government's foreign policy objectives concerning international diplomatic relations as well as the uniform enforcement of national immigration laws.  (*See* doc. 2 at 12-13, 18, 25, 33-34, 56, 81-83.)  In support of this argument the United States submitted the Declaration of William J. Burns, Deputy Secretary of State, (doc. 2-1), who states that H.B. 56 threatens to disrupt "uniform foreign policy regarding the treatment of foreign nations" and "risks negative reciprocity of the treatment of U.S. citizens abroad, among other deleterious effects." (Doc. 2 at 32-33 [citing doc 2-1 at ¶¶ 9, 35; quoting *id.* ¶ 35].)  Legislation affecting the treatment and movement of another country's citizens living  abroad necessarily touches the foreign relations between the visiting and the host nations; however, something more is required before the court can enjoin an otherwise valid state law on foreign policy grounds.

---

[11]As noted, Section 10 does not criminalize unlawful presence.

The United States has not cited the court to a specific conflict between Section 10, or any other Section of H.B. 56, and some Congressionally-granted Executive Branch authority directly relating to foreign policy.  Nevertheless, it argues that H.B. 56 interferes with the Executive Branch's "fundamental authority to conduct foreign affairs."  (Doc. 2 at 33.) However, Supreme Court cases that have found conflict preemption when a state law obstructs the Executive Branch's authority to conduct foreign affairs are limited to instances where the Executive Branch's action has been specifically authorized by Congress and is intended as a means of achieving key national foreign policy goals. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420-25 (2003); *Crosby*, 530 U.S. at 380-85.

The Supreme Court has taken varying positions regarding the weight to be given statements of Executive Branch officials seeking to preempt a state law on the basis of foreign policy.  *Compare Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 328-31 (1994) (rejecting Executive Branch statements and amicus filings in deciding that state tax law with international implications was not preempted), *with Garamendi*, 539 U.S. at 424-25 (considering letters from the Deputy Secretary of State as well as statements submitted by other foreign governments in the Court's decision to preempt a state law in conflict with executive agreements between the United States and European nations); *and Crosby*, 530 U.S. at 385-88 (distinguishing *Barclays* and finding statements by Executive Branch officials and foreign powers persuasive in deciding that a state law, which limited transactions with a foreign nation, was preempted by a conflicting federal statute).  These decisions

33

demonstrate that, in a conflict preemption analysis, the Supreme Court will rely on statements of Executive Branch officials to invalidate an otherwise valid state law based on preemption only when there is evidence that such statements demonstrate a national foreign relation policy. *See Garamendi*, 539 U.S. at 421 (noting preemption was properly grounded on the "***national position***, expressed unmistakably in the executive agreement" between the President of the United States and the German Chancellor). Statements from Executive Branch officials and other evidence of foreign discontent or threats of reprisal are insufficient to establish the national position. *See Barclays*, 512 U.S. at 327-28. The evidence must show that the foreign policy concerns expressed by the Executive Branch are within "Congress's ***express*** command to the President to take the initiative for the United States among the international community," *Crosby*, 530 U.S. at 380-81 (emphasis added), as demonstrated by statements from Congress, ratified treaties, or international agreements. *See Garamendi*, 539 U.S. at 420 (emphasis added); *see also Arizona*, 641 F.3d at 381 (Bea, J., concurring in part and dissenting in part).

Thus, to base a finding of preemption of Section 10 based on Executive Branch foreign policy, the court must have some evidence of a national foreign policy – either some evidence of Congress's intent or a treaty or international agreement establishing the national position. This is the position raised in Judge Bea's dissent in *Arizona*, in which he noted:

> Neither does the Supreme Court's preemption jurisprudence in the field of foreign relations change the conclusion that Section 2(B) is not preempted. . . . .

. . . . [A]s *Crosby* and *Garamendi* demonstrate, it is not simply any effect on foreign relations generally which leads to preemption, as the majority asserts. *See* Maj. Op. at 352–54. Instead, a state law is preempted because it conflicts with federal law only when the state law's effect on foreign relations conflicts with federally established foreign relations goals. In *Crosby*, the state law conflicted with the degree of trade Congress decided to allow with Burma, and the discretion explicitly given to the Executive to make trade decisions. In *Garamendi*, the state law imposed an investigatory and litigation burden inconsistent with the rules the Executive Agreement had created. **Here, however, there is no established foreign relations policy goal with which Section 2(B) may be claimed to conflict.** The majority contends that Section 2(B) "thwarts the Executive's ability to singularly manage the spillover effects of the nation's immigration laws on foreign affairs." Maj. Op. at 354.

First, the majority fails to identify a federal foreign relation policy which establishes the United States must avoid "spillover effects," if that term is meant to describe displeasure by foreign countries with the United States' immigration policies. The majority would have us believe that Congress has provided the Executive with the power to veto any state law which happens to have some effect on foreign relations, as if Congress had not weighed that possible effect in enacting laws permitting state intervention in the immigration field. To the contrary, here Congress has established – through its enactment of statutes such as 8 U.S.C. §§ 1357(g)(10), 1373(c), and 1644 – a policy which encourages the free flow of immigration status information between federal and local governments. Arizona's law embraces and furthers this federal policy; any negative effect on foreign relations caused by the free flow of immigration status information between Arizona and federal officials is due not to Arizona's law, but to the laws of Congress. Second, the Executive's desire to appease foreign governments' complaints cannot override Congressionally-mandated provisions – as to the free flow of immigration status information between states and federal authorities – on grounds of a claimed effect on foreign relations any more than could such a foreign relations claim override Congressional statutes for (1) who qualifies to acquire residency in the United States, 8 U.S.C. § 1154, or (2) who qualifies to become a United States citizen, 8 U.S.C. § 1421 et seq.

*Arizona*, 641 F.3d at 380-82 (Bea, J., concurring in part and dissenting in part) (emphasis

added).

There is no evidence before the court that Section 10, or any other provision of H.B. 56, conflicts with Congressional intent regarding national foreign policy goals or with an international agreement "identify[ing] a federal foreign relation policy". *See id.* at 381 (Bea, J., concurring in part and dissenting in part).  The statement submitted in this case by the Deputy Secretary of State, alleging that foreign policy is hindered, is insufficient.  Without evidence of Congressional intent, the United States must show specifically a national foreign policy "addressed in Executive Branch diplomacy and formalized in treaties and executive agreements." *Garamendi*, 539 U.S. at 421.  There is no such evidence before the court. Therefore, the court finds that the United States has not shown that it is likely to succeed on its claim that Section 10 is preempted due to interference with the nation's foreign relations policy.

Based on the foregoing, the court finds the United States has not established a likelihood of success on its claim that H.B. 56 § 10 is preempted by federal law.

**C.    SECTION 11(a)**

Section 11(a) of H.B. 56 states:

It is unlawful for a person who is an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor in this state.

H.B. 56 § 11(a).  A person who violates Section 11 is "guilty of a Class C misdemeanor and subject to a fine of not more than five hundred dollars ($500)." *Id.* (h).  For the purposes of enforcing Section 11, "an alien's immigration status shall be determined by verification of

the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)." *Id.* Section 11 "does not apply to a person who maintains authorization from the federal government to be employed in the United States." *Id.* (d). Also, Section 11 "shall be interpreted consistently with 8 U.S.C. § 1324a and any applicable federal rules and regulations." *Id.* (j).

The United States argues that Section 11(a) is conflict preempted because it seeks to override Congress's determination that criminal sanctions should not attach to the solicitation or performance of work by unlawfully present aliens. (Doc. 2 at 33.) As noted above, every preemption analysis "must be guided by two cornerstones." *Wyeth*, 129 S. Ct. at 1194. The first is that "the purpose of Congress is the ultimate touchstone." *Id.* The second is that a presumption against preemption applies when "Congress has legislated . . . in a field which the States have traditionally occupied." *Id.* Because the power to regulate the employment of aliens not authorized to work is "within the mainstream" of the states' historic police power, a presumption against preemption applies. *DeCanas*, 424 U.S. at 356; *Arizona*, 641 F.3d at 357. Therefore, with respect to Section 11(a), the court "start[s] with the assumption that the historic police powers of [Alabama to regulate the employment of unauthorized aliens will not] be superseded . . . unless that [is] the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194-95 (quoting *Lohr*, 518 U.S. at 485)(internal quotations and citations omitted).

In 1986, Congress amended the INA through enactment of the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99–603, 100 Stat. 3359 (codified at 8 U.S.C. §§ 1324a to1324b), which is "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 147 (2002). IRCA "was . . . designed to deter aliens from entering [the United States] illegally." *Zheng*, 306 F.3d at 1087 (internal citations and quotations omitted). IRCA "forcefully made combating the employment of illegal aliens central to the policy of immigration law. *Hoffman Plastic Compounds*, 535 U.S. at 147 (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 194, and n.8 (1991))(internal quotations omitted). The Senate Report explained that "[t]he primary incentive for illegal immigration is the availability of U.S. employment," and that IRCA was "intended to increase control over illegal immigration." S. REP. NO. 99-132, 99th Cong., 1st Sess. 1 (1985).

IRCA makes it "unlawful for a person or other entity . . . to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1)(A); *see also id.* (a)(2) (making it unlawful for an employer to continue "to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment"); *id.* (a)(4) (making it unlawful for an employer to use a "contract, subcontract, or exchange . . . to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien . . . with respect to performing such labor"). An "unauthorized alien" is defined under IRCA as an alien who

38

is not "lawfully admitted for permanent residence" or not otherwise authorized by the Attorney General to be employed in the United States. *Id.* (h)(3). IRCA requires employers to review documents establishing an employee's eligibility for employment. *Id.* (b). An employer can confirm an employee's authorization to work by reviewing, among other things, the employee's United States passport, resident alien card, alien registration card, or other document approved by the Attorney General. *Id.* (b)(1)(B)-(D). The employer must attest under penalty of perjury on Department of Homeland Security ["DHS"] Form I–9 that he "has verified that the individual is not an unauthorized alien" by reviewing these documents. *Id.* (b)(1)(A). The I–9 form itself "and any information contained in or appended to [it] . . . may not be used for purposes other than for enforcement of" IRCA and other specified provisions of federal law. *Id.* (b)(5).

The text of IRCA reflects a clear choice on the part of Congress to deter the employment of unauthorized aliens through a detailed scheme of civil and criminal sanctions against **employers**, not **employees**. *See id.* (e)(4)-(5), (f)(1); 8 C.F.R. § 274a.10. An employer who knowingly hires an unauthorized alien shall be ordered to "cease and desist from such violations," and to pay a civil penalty in an amount "not less than $250 and not more than $2,000 for each unauthorized alien" for a first offense, "not less than $2,000 and not more than $5,000 for each [unauthorized] alien" for a second offense, and "not less than $3,000 and not more than $10,000 for each [unauthorized] alien" for a third or greater offense. 8 U.S.C. § 1324a(e)(4). An employer who fails to verify the work authorization

of its employees "shall [be required] to pay a civil penalty in an amount of not less than $100 and not more than $1,000 for each individual with respect to whom such violation occurred." *Id.* (e)(5).  Employers who engage in a "pattern or practice" of hiring unauthorized aliens "shall be fined not more than $3,000 for each unauthorized alien with respect to whom such a violation occurs, imprisoned for not more than six months for the entire pattern or practice, or both." *Id.* (f)(1).

Congress has demonstrated the sanctions that it deems appropriate for unauthorized aliens who perform work by providing only narrowly-tailored sanctions against such aliens, including deportation, and special sanctions for the presentation of false or fraudulent documents.  *See* 8 U.S.C. § 1227(a)(1)(C)(i) (making failure to maintain immigrant status is a deportable offense); 8 U.S.C. § 1324c (making it a civil violation to make or use a false document or to use a document belonging to another person, in the context of unlawful employment of an unauthorized alien); 8 C.F.R. § 214.1(e) (prohibiting non-immigrant aliens from unauthorized employment and classifying such conduct as a failure to maintain status under the INA).

Other sections in IRCA that provide affirmative protections to unauthorized alien workers counsel against a finding that Congress intended to permit the criminalization of applying for, soliciting, or performing work by unauthorized aliens.  Section 1324a(d)(2)(C) provides that "[a]ny personal information utilized by the [authorization verification] system may not be made available to Government agencies, employers, and other persons except to

the extent necessary to verify that an individual is not an unauthorized alien."  8 U.S.C. §

1324a(d)(2)(C).  This section  would prohibit Alabama from using personal information in

the verification system for the purpose of investigating or prosecuting violations of H.B. 56

§ 11(a).  Also, subsection (g)(1) provides, "It is unlawful for a person or other entity, in the

hiring . . . of any individual, to require the individual to post a bond or security, to pay or

agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against

any potential liability arising under this section relating to such hiring . . . of the individual."

*Id*. (g)(1) Section 1324a(e) provides for a system of complaints, investigation, and

adjudication by administrative judges for employers who violate subsection (g)(1).  *Id.* (e).

The penalty for a violation of (g)(1) is "$1,000 for each violation" and "an administrative

order requiring the return of any amounts received . . . to the employee or, if the employee

cannot be located, to the general fund of the Treasury."  "Congress could have required that

employers repay only ***authorized*** workers from whom they extracted a financial bond.

Instead, Congress required employers to repay ***any*** employee including undocumented

employees." *Arizona*, 641 F.3d at 359 (emphasis added).

The legislative history of IRCA reflects a deliberate decision on the part of Congress

not to criminalize work by unauthorized alien.  In *Nat. Center for Immigrants' Rights, Inc.*

*v. I.N.S.,* 913 F.2d 1350 (9th Cir.1990), *rev'd on other grounds,* 502 U.S. 183 (1991), the

Ninth Circuit thoroughly reviewed IRCA's legislative history.  The Ninth Circuit found that

the determination to reduce or deter employment of unauthorized workers by sanctioning

employers, rather than employees, was "a congressional policy choice clearly elaborated in

IRCA." *Id.* at 1370.

The court stated:

> While Congress initially discussed the merits of fining, detaining or adopting
> criminal sanctions against the ***employee***, it ultimately rejected all such
> proposals. *Immigration Reform and Control Act of 1985: Hearings before the
> Senate Subcommittee on Immigration and Refugee Policy,* 99th Cong., 1st
> Sess. (1985), S. Hrg. 99-273, at 56, 59 (In response to the proposal that aliens
> be fined or detained as a deterrence to illegal immigration, Senator Simpson,
> the Chairman of the Senate Judiciary Committee, stated that this was not a new
> recommendation, but one that had previously been suggested and rejected). *See
> also* 118 *Cong. Rec.* H30155 (daily ed. Sept. 12, 1972) (statement of Rep.
> Rodino) (the House Judiciary Committee decided not to impose any additional
> criminal sanctions or other penalties on employees, believing that such
> penalties "would serve no useful purpose").  Instead, it deliberately adopted
> sanctions with respect to the ***employer*** only.  Congress quite clearly was
> willing to deter illegal immigration by making jobs less available to illegal
> aliens but not by incarcerating or fining aliens who succeeded in obtaining
> work. During the extensive debates and hearings conducted during earlier
> attempts to enact similar legislation, the INS specifically agreed that employee
> sanctions, such as denying aliens employment pending deportation hearings or
> detaining aliens, should be rejected.  James Hennessey, the Executive Assistant
> to the INS Commissioner, testified that the INS would not attempt to control
> employment during deportation proceedings:
>
>> Rep. Rodino:  [During deportation proceedings] the fact that an illegal
>> alien is a holder of a job or some employment, means that there is no
>> such surveillance on the part of the Service or anybody that he won't be
>> holding the job?
>>
>> Mr. Hennessey:  He will undoubtedly continue. In fact, having still the
>> right to go before the Board [of Immigration Appeals], I don't think we
>> could attempt or ask for any legislation that he not hold the job. We will
>> not expect the individual to starve in the United States while he is
>> exhausting both the administrative and judicial roads that the legislation
>> gives him.

Illegal Aliens, Hearings before Subcommittee No. 1 of the Committee on the Judiciary, House of Representatives, 92d Cong., Serial No. 13 pts. 1-5, pt. 1 at 46.  Even an INS District Director for Detroit, Michigan who favored administrative action against illegal aliens who worked, explicitly rejected detention as a means of curtailing immigration:

> Mr. Pederson:  I believe that we ought to impose a penalty against the alien to help stop him [from working].
>
> Rep. Rodino:  What kind of penalty would you impose on the alien?
>
> Mr. Pederson:  Well, I do not feel that a fine or imprisonment is the answer but I do feel that there should be some form of sanction. It could be possible to deny administrative relief of some form.

*Id.*, pt. 3 at 919.  The House Judiciary Committee concluded at the end of this round of hearings that "[t]he illegal entrant should not be subject to additional penalties . . . ."  *Id.,* pt. 1, at 90.

Although some continued to argue for restraints against the employee, the approach of controlling employment through ***employer*** not ***employee*** sanctions was adjudged by Congress to provide the only realistic and appropriate solution. As stated in the final House report, employer sanctions, "coupled with improved border enforcement, is the ***only*** effective way to reduce illegal entry and in the Committee's judgment it is the most practical and cost-effective way to address this complex problem."  H.R. Rep. No. 99-682(I), 99th Cong., 2nd Sess. 49, *reprinted in* 1986 *U.S. Code Cong. & Admin. News.* 5653 (emphasis added).

*Nat'l Center for Immigrants' Rights*, 913 F.2d at 1367-69 (footnote omitted; emphasis in original); *see also* H.R. Rep. No. 99-682(I), *reprinted in* 1986 U.S.C.C.A.N. 5650 ("The Committee remains convinced that legislation containing employer sanctions is the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens.").

In *United States v. Arizona*, the United States challenged Section 5(C) of the Arizona Act, A.R.S. § 13-2928(C), which is similar to H.B. 56 § 11(a). *See Arizona*, 703 F. Supp. 2d at 1001-02. Section 5(C) of the Arizona Act provides that it "is unlawful for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state." A.R.S. § 13-2928(C). The district court, relying on IRCA's text and the Ninth Circuit's interpretation of congressional intent set forth in *National Center for Immigrants' Rights,* found that the United States was likely to succeed on its claim that Arizona's new crime for working without authorization conflicts with a comprehensive federal scheme and is preempted. *Id.* at 1002. Arizona appealed.

On appeal, the Ninth Circuit affirmed the decision of the district court. Finding that it was bound by its holding regarding congressional intent in *National Center for Immigrants' Rights*, the Court of Appeals "conclude[d] that the text of 8 U.S.C. § 1324a, combined with legislative history demonstrating Congress' affirmative choice not to criminalize work as a method of discouraging unauthorized immigrant employment, likely reflects Congress' clear and manifest purpose to supercede state authority in this context." *Arizona*, 641 F.3d at 359.

This court agrees with the Ninth Circuit's holdings in *National Center for Immigrants' Rights* and its decision in *Arizona*. Based on IRCA's text and legislative history, this court concludes that the clear and manifest purpose of Congress was to

44

supercede Alabama's authority to enact H.B. 56 § 11(a) sanctioning work by unauthorized aliens.

The State Defendants argue that IRCA's text and legislative history show "that Congress did ***not*** intend to preempt State laws that criminalized the solicitation and acceptance of work by unauthorized workers." (Doc. 38 at 71.) They maintain that the United States is "attempt[ing] to revive the discredited theory of 'preemption by omission.'" (*Id.*) The court disagrees. The arguments advanced by the United States are not based solely on the inaction or omission of Congress. Rather, the arguments of the United States are based on "inaction joined with action." *See Puerto Rico Dept't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988). In *Isla Petroleum Corp.*, the Supreme Court explained:

> [D]eliberate federal inaction could always imply preemption, which cannot be. There is no federal preemption *in vacuo,* without a constitutional text or a federal statute to assert it. Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, ***then*** the preemptive inference can be drawn — not from federal inaction alone, but from inaction joined with action.

*Id.* at 503.

*Isla Petroleum Corp.* involved an Energy Policy Conservation Act ("EPCA") provision that terminated the President's authority to implement federal price controls on petroleum products that had been granted under the older Emergency Petroleum Allocation Act ("EPAA"). *Id.* at 497-98. After the President's regulatory authority terminated, Puerto Rico implemented price controls on petroleum products. *Id.* at 498-99. Several oil

companies filed suit, arguing that the price controls were preempted; they argued that the EPAA "evinced a federal intent to enter the field of petroleum allocation and price regulation, and that the EPCA never countermanded that intent." *Id.* at 500.  The oil companies argued that the EPCA simply changed the nature of the federal control of petroleum allocation and price regulation from "one of federal hands-on regulation to one of federally mandated free-market control." *Id.*

Justice Scalia, writing for the Court, rejected that argument, stating that, the preemption analysis must begin with the assumption that "the historic police powers of the States" are not to be pre-empted "unless that was the clear and manifest purpose of Congress." *Id.* at 500.  The Court determined that there was no text in "any extant federal regulation that might plausibly be thought to imply exclusivity." *Id.* at 501.  "Without a text that can . . . plausibly be interpreted as ***prescribing*** federal pre-emption it is impossible to find that a free market was mandated by federal law." *Id.*  The Court further determined that, with the EPCA, Congress had "withdrawn from all substantial involvement in petroleum allocation and price regulation.  There being no extant action that can create an inference of pre-emption in an unregulated segment of an otherwise regulated field, preemption, if it is intended, must be explicitly stated." *Id.* at 504.

In *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd. of Mississippi*, 474 U.S. 409 (1986), which was discussed at length in *Isla Petroleum Corp.*, the Court considered whether the states could impose conditions on the first sale of natural gas which,

by direct statutory exemption, was placed beyond regulation by the Federal Energy Regulatory Commission ("FERC").  Prior to 1978 regulation by FERC preempted any state regulation.  *See N. Natural Gas Co. v. State Corporation Comm'n of Kansas,* 372 U.S. 84 (1963).  In the Natural Gas Policy Act of 1978, Pub.L. 95-621, 92 Stat. 3351, Congress substantially restricted FERC's regulatory authority.  The *Transcontinental* Court noted that a "decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate." *Transcontinental*, 474 U.S. at 422 (quoting *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983)).  The Court refused to accept the argument that Congress "in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the States the power it had denied FERC."  *Id.*

Here, unlike in *Isla Petroleum Corp.*, there is "extant action that can create an inference of pre-emption in an unregulated segment of an otherwise regulated field."  *Isla Petroleum Corp.*, 485 U.S. at 504.  "Congress' *inaction* in not criminalizing work, joined with its *action* of making it illegal to hire unauthorized workers, justifies a preemptive inference that Congress intended to prohibit states from criminalizing work."  *Arizona*, 641 F.3d at 359 (emphasis added).  Congress's "decision to forego" criminalizing unauthorized work, as revealed by IRCA's text and legislative history, implies "an authoritative federal determination that the area is best left *un*regulated," and that decision has "as much

47

preemptive force as a decision **to** regulate." *Transcontinental*, 474 U.S. at 422 (citations omitted). "Far from the situation in *Isla,* Congress has not 'withdrawn all substantial involvement' in preventing unauthorized immigrants from working in the United States. It has simply chosen to do so in a way that purposefully leaves part of the field unregulated." *Arizona*, 641 F.3d at 359-60.

Alabama's decision, through Section 11(a) of H.B. 56, to criminalize work – which Congress explicitly chose not to do through IRCA and the INA – "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67. Section 11(a) is not saved from preemption simply because it may further the strong federal policy of prohibiting unauthorized aliens from seeking employment in the United States. As the Supreme Court recognized in *Crosby*, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby*, 530 U.S. at 379; *cf. id.* at 380 ("'[C]onflict is imminent' when 'two separate remedies are brought to bear on the same activity'")(quoting *Wis. Dept. of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)). For these reasons, the court finds that the United States is likely to succeed on its claim that Section 11(a) is preempted.

In addition to demonstrating a likelihood of success on the merits, the United States must also establish that it will suffer an irreparable injury if the injunction does not issue, that the threatened injury to the United States outweighs whatever damage the proposed injunction may cause the state defendants, and that, if issued, the preliminary injunction will not adversely effect the public's interest.

The United States must establish that it will suffer irreparable harm if the preliminary injunction is not granted. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "'Even if the movant establishes a substantial likelihood of success on the merits, his failure to establish irreparable injury 'would, standing alone, make preliminary injunctive relief improper.'" *Windsor v. United States*, 379 Fed. App'x 912, 915-16 (11th Cir. 2010)(quoting *Siegel*, 234 F.3d at 1176); *see also Snook v. Trust Co. of Ga. Bank of Savannah*, 909 F.2d 480, 486-87 (11th Cir. 1990)(although movants proved they would likely succeed on the merits, denying preliminary injunctive relief was proper due to failure to show irreparable injury); *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983)("The Government's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm."). The harm at issue at this stage of the proceeding is the harm that will occur in the time between the filing of the action and a final judgment. *Lambert*, 695 F.2d at 540. The focus of the court's inquiry is directed to whether this harm is irreparable. *N.E. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Whether an injury is irreparable may depend on whether it can "be undone through monetary remedies." *Id.* The availability of remedial measures, including monetary relief, only increases the burden of proving irreparable harm:

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*City of Jacksonville*, 896 F.2d at 1285 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

The court finds that the United States will endure irreparable harm during the pendency of this litigation if Section 11(a) is not preliminarily enjoined.

The United States argues that "H.B. 56 effects ongoing irreparable harm to the constitutional order" by disrupting the "Constitution's structural reservation of authority to the federal government to set immigration policy." (Doc. 2 at 77.)  As a preliminary matter, the court notes that the Eleventh Circuit has clearly stated that not every alleged constitutional infringement *per se* constitutes irreparable harm.  *Siegel*, 234 F.3d at 1177 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however."); *see also City of Jacksonville*, 896 F.2d at 1285 ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation.").  Although in *United States v. Lambert*, the Eleventh Circuit found the United States suffered no irreparable injury stemming from the defendant's likely violation of the Clean Water Act, the decision to uphold denial of preliminary injunctive relief turned, in part, on the availability of environmental restoration and monetary relief following a trial on the merits.  *Lambert*, 695 F.2d at 540.  The *Lambert* court was not satisfied that the harm was truly irreparable because the evidence indicated that any injury suffered in the interim would only "make restoration

more difficult, more expensive, and more uncertain," but not impossible. *Id.* (internal quotations omitted).

By contrast, the injury United States alleges is definite and irreparable – it cannot be remediated or "undone through monetary remedies." *City of Jacksonville*, 896 F.2d at 1285. The court finds that Section 11 is likely preempted by federal law and thus invalid. *See* U.S. CONST. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("state laws that conflict with federal law are 'without effect'" (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981))). To allow Section 11(a) to take effect would be to allow a law of Alabama to be "supreme" over federal law; this is an irreparable constitutional injury.

A preliminary injunction is an extraordinary remedy, but because the court finds Section 11(a) is preempted, preliminary injunctive relief is warranted. The United States will be irreparably harmed if this section is enforced during the pendency of this action and the "public interest will perforce be served by enjoining the enforcement of the invalid provision of state law." *Bank of America v. Sorrell*, 248 F. Supp. 2d 1196, 1200 (N.D. Ga. 2002)(quoting *Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999)); *see also Guttau*, 190 F.3d at 847-48 ("If [plaintiff] proves that the relevant provisions of the [state

law] are preempted by the [federal law] and that it will suffer irreparable harm if the State is not enjoined from enforcing those provisions, then the question of harm to the State and the matter of the public interest drop from the case, for [plaintiff] will be entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.")

Therefore, for these reasons, the court finds the United States has shown its entitlement to an injunction of Section 11(a) of H.B. 56 pending final judgment in this case. The United States's Motion for Preliminary Injunction as to Section 11(a) will be granted.

## D. SECTION 12(a)

Section 12 of H.B. 56 sets forth circumstances under which state, county, and municipal law enforcement officers must attempt to verify the citizenship and immigration status of persons detained or arrested.  Section 12(a) provides:

> Upon any lawful stop, detention, or arrest made by a state, county, or municipal law enforcement officer of this state in the enforcement of any state law or ordinance of any political subdivision thereof, where reasonable suspicion exists that the person is an alien who is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the citizenship and immigration status of the person, except if the determination may hinder or obstruct an investigation.

Section 12(a) requires citizenship and immigration status determinations "be made by contacting the federal government pursuant to 8 U.S.C. § 1373(c) and relying upon any verification provided by the federal government."[12]   A person "is presumed not to be an alien

---

[12]H.B. 56 defines a person as unlawfully present in the United States "only if the

who is unlawfully present in the United States" if the person provides to the law enforcement officer any one of six forms of identification.[13]  *Id.* (d).  In carrying out the requirements of Section 12, law enforcement officers are prohibited from considering "race, color, or national origin . . . except to the extent permitted by the United States Constitution or the Constitution of Alabama of 1901." *Id.* (c).  "A law enforcement officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States."  *Id.* "If an alien is determined by the federal government to be an alien who is unlawfully present in the United States pursuant to 8 U.S.C. § 1373(c), the law enforcement agency shall

---

person's unlawful immigration status has been verified by the federal government pursuant to 8 U.S.C. § 1373(c)." H.B. 56 § 3(10).

[13]  These forms of identification are:

> (1)  A valid, unexpired Alabama driver' license,
> (2)  A valid, unexpired Alabama nondriver identification card.
> (3)  A valid tribal enrollment card or other form of tribal identification bearing a photograph or other biometric identifier.
> (4)  Any valid United States federal or state government issued identification document bearing a photograph or other biometric identifier, if issued by an entity that requires proof of lawful presence in the United States before issuance.
> (5)  A foreign passport with an unexpired United States Visa and a corresponding stamp or notation by the United States Department of Homeland Security indicating the bearer's admission to the United States.
> (6)  A foreign passport issued by a visa waiver country with the corresponding entry stamp and unexpired duration of stay annotation or an I-94W form by the United States Department of Homeland Security indicating the bearer's admission to the United States.

H.B. 56 § 12(d).

cooperate in the transfer of the alien to the custody of the federal government, if the federal government so requests." *Id.* (e).

The United States claims that Section 12(a) is preempted by federal law because it "represent[s] a systematic effort by Alabama to inject itself into the enforcement of the federal government's own immigration laws in a manner that is non-cooperative with the Secretary, and therefore is impermissible." (Doc. 2 at 59.)  Specifically, it contends that "Alabama's mandatory verification scheme promises to disrupt (i) federal control and discretion over immigration enforcement, (ii) the operation of DHS enforcement priorities generally, and (iii) the conditions of residence of lawfully present aliens." (*Id.* at 60.)  As the United States correctly points out, Congress has provided for state assistance in enforcement of federal immigration law in limited circumstances.  In the criminal context, state and local law enforcement are specifically authorized to arrest aliens who are unlawfully present in the United States and who have previously left the country or were deported after being convicted of a felony, 8 U.S.C. § 1252c, and to make arrests for violations of federal smuggling and harboring laws, 8 U.S.C. § 1324(c).  Federal law also authorizes the Attorney General to confer upon state or local law enforcement the powers of a federal immigration officer "[i]n the event the Attorney General determines that an actual or mass influx of aliens" arriving near a water or land border of the United States "presents urgent circumstances requiring an immediate Federal response." 8 U.S.C. § 1103(a)(10).  Aside from those provisions, federal law also provides certain circumstances under which state

officers and employees can perform functions of federal immigration officers.  8 U.S.C. §

1357(g).

Under section 1357(g), the Attorney General "may enter into a written agreement with

a State . . . pursuant to which an officer or employee of the State or subdivision, who is

determined by the Attorney General to be qualified to perform a function of an immigration

officer in relation to the investigation, apprehension, or detention of aliens in the United

States . . . , may carry out such function at the expense of the State or political subdivision

and to the extent consistent with State and local law."  *Id.* (g)(1).  Named after section 287(g)

of the Immigration and Nationality Act, such written agreements are known as "287(g)

agreements".  State officers performing an immigration function pursuant to such a written

agreement with the Attorney General are required to "have knowledge of, and adhere to,

Federal law relating to that function," *id.* (g)(2), and "shall be subject to the direction and

supervision of the Attorney General," *id.* (g)(3).  Further, "the specific powers and duties that

may be, or are required to be, exercised or performed by the individual [who is authorized

to perform a federal immigration function], the duration of the authority of the individual,

and the position of the agency of the Attorney General who is required to supervise and direct

the individual, shall be set forth in a written agreement between the Attorney General and the

State or political subdivision."  *Id.* (g)(5).  Subsection (g)(10) provides that no written

agreement is required under section 1357(g) in order for any state officer or employee –

(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

*Id*. (g)(10).

The aforementioned federal provisions allowing certain state involvement in federal immigration enforcement must be read in conjunction with 8 U.S.C. § 1373(c).  Section 1373(c) states that the INS (now Immigrations and Customs Enforcement or "ICE"),  "***shall respond***" to inquiries from federal, state, or local governments "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."  8 U.S.C. § 1373(c) (emphasis added).

The United States argues that, in the absence of a written agreement under Section 1357(g)(1), states can only assist in the "identification, apprehension, detention, or removal of aliens not lawfully present" ***in cooperation with*** the Attorney General under section 1357(g)(10)(B)." (Doc. 2 at 61.)  According to the United States, the mandatory language regarding verification of immigration status contained in Section 12 of H.B. 56 would serve as an "obstacle . . . to the ability of individual state and local officers to cooperate with federal officers administering federal policies and discretion as the circumstances in the particular case require."  (*Id*. at 64.)  The United States contends that it –

> is not challenging Alabama's power to ***authorize*** its officers to ***assist*** federal officers in their enforcement of the immigration laws.  However, the prospect of such authorization does not allow a state to systematically mandate enforcement of federal immigration law in particular circumstances. Any such state-dictated mandate would function as a parallel or contradictory direction, in competition with the Secretary's direction, as to how to enforce immigration law, thereby eroding the federal government's exclusive authority over immigration enforcement.  It would also force the federal government to divert resources away from the enforcement priorities it has set.

(*Id.* at 65 n.12.)  The United States contends that the mandated submission of verification requests for individuals who violate even minor crimes would result in a "substantial uptick in verification requests [that] would interfere with federal operations," and place "real, impermissible burdens on the federal government."  (*Id.* at 69, 70.)  It further argues that Alabama's mandatory verification scheme impedes the enforcement discretion of the federal government and interferes with the federal government's priorities in enforcing immigration law by pursuing "[a]liens who pose a danger to national security or a risk to public safety."  (*Id.* at 68 [alteration in original; internal quotation and citation omitted].)

The State Defendants respond that 8 U.S.C. § 1357(g)(10) reveals Congress's intent to allow states to assist in immigration enforcement without express authorization from Congress.  They point to 8 U.S.C. § 1373 as evidence of Congressional intent to require ICE to respond to inquiries from the state seeking verification of the citizenship or immigration status of a person.  Also, the State Defendants contend that a presumption against preemption should apply because Section 12 simply sets forth "stop-and-arrest protocols" that are "a fundamental attribute of internal law enforcement operations within a State."  (Doc. 69 at

72.)  They argue that an "arrest [under Sections 12 and 18] is an exercise of state authority

to enforce **state and local laws**," (*id*.); however, Section 12 reaches beyond arrest protocols

into the field of identification of unlawfully present aliens.   Identifying unlawfully present

aliens is not "a field which the States have traditionally occupied." *Wyeth*, 129 S. Ct. at 1194

(internal quotations and citations omitted).   Accordingly, there is no presumption against

preemption of Section 12.

Nothing in the text of the INA expressly preempts states from legislating on the issue

of verification of an individual's citizenship and immigration status.   There is also nothing

in the INA which reflects Congressional intent that the United States occupy the field as it

pertains to the identification of persons unlawfully present in the United States.   Therefore,

the court must consider whether Section 12 is preempted because it "stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress." *See*

*Hines,* 312 U.S. at 67.   As noted above in the discussion of Section 10, in *Arizona*, the United

States challenged the constitutionality of, and moved to preliminarily enjoin, Arizona's

Support Our Law Enforcement and Safe Neighborhoods Act.  *See generally Arizona*, 703 F.

Supp. 2d 980.   Section 2(B) of the Arizona Act, A.R.S. § 11-1051(B), which is nearly

identical to Section 12(a) and (b), was among the challenged provisions.  *Id*. at 993-98.   As

quoted by the Ninth Circuit in *United States v. Arizona*, Section 2(B) of Arizona S.B. 1070

provides:

> For any lawful stop, detention or arrest made by [an Arizona] law enforcement
> official or a law enforcement agency . . . in the enforcement of any other law

or ordinance of a county, city or town [of] this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation.  Any person who is arrested shall have the person's immigration status determined before the person is released.  The persons immigration status shall be verified with the federal government pursuant to 8 United States Code section 1373(c) . . .  A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency any of the following:

1.      A valid Arizona driver license.

2.      A valid Arizona nonoperating identification license.

3.      A valid tribal enrollment card or other form of tribal identification.

4.      If the entity requires proof of legal presence in the United States before issuance, any valid United States federal, state or local government issued identification.

641 F.3d at 346 n.5.

As in the instant case, the United States had argued that this section was "preempted because it [would] result in the harassment of lawfully present aliens and [would] burden federal resources and impede federal enforcement and policy priorities."  *Arizona*, 703 F. Supp. 2d at 993.  The district court preliminarily enjoined Section 2(B), finding the United States had demonstrated a likelihood of success on its claim that the mandatory immigration verification requirements were preempted by federal law.  *Id.* at 993-998.  The court reasoned in part as follows:

Federal resources will be taxed and diverted from the federal enforcement priorities as a result of the increase in requests for immigration status determination that will flow from Arizona if law enforcement officials are

> required to verify immigration status whenever, during the course of a lawful stop, detention or arrest, the law enforcement official has reasonable suspicion of unlawful presence in the United States.  In combination with the impermissible burden this provision will place on lawfully-present aliens, the burden on federal resources and priorities also leads to the inference of preemption.

*Id.* at 998.

On appeal, the Ninth Circuit, in a 2-1 decision on this point, affirmed the district court's decision to enjoin Section 2(B).  However, Judge Bea, the dissenting judge, noted the majority had affirmed the district court, not based on its findings, but on the majority's interpretation of 8 U.S.C. § 1357(g), "which prescribes the process by which Congress intended state officers to play a role in the enforcement of federal immigration laws." *Arizona*, 641 F.3d at 372-73 (Bea, J., concurring in part and dissenting in part).

According to the Ninth Circuit majority, Section 1357(g) demonstrated that "Congress intended for state officers to systematically aid in the immigration enforcement *only* under the close supervision of the Attorney General–to whom Congress granted discretion in determining the precise conditions and direction of each state officer's assistance."  *Id.* at 350.  Arizona had argued that 8 U.S.C. § 1373(c), which requires the Department of Homeland Security "to respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual . . . for any purpose authorized by law," reflects the intent of Congress for states to assist in immigration enforcement.   The majority rejected this argument, however, finding that a reading of all sections of the INA revealed a Congressional intent "that systematic state

60

immigration enforcement will occur under the direction and close supervision of the Attorney General . . . [and that] the mandatory nature of Section 2(B)'s immigration status checks is inconsistent with the discretion Congress vested in the Attorney General to supervise and direct State officers in their immigration work according to federally-determined priorities." *Arizona*, 641 F.3d at 352.

The reasoning of the majority in *Arizona* was followed in *Georgia Latino Alliance for Human Rights v. Deal*, Civil Action File No. 1:11–CV–1804–TWT, 2011 WL 2520752 (N.D. Ga. June 27, 2011), in which the court preliminarily enjoined Section 8 of a Georgia statute, which is similar to Section 12 of H.B. 56 and Section 2(B) of the Arizona Act. Section 8 of the Georgia Act provides in part –

> [W]hen an officer has probable cause to believe that a suspect has committed a criminal violation, the officer shall be authorized to seek to verify such suspect's immigration status when the suspect is unable to provide one of five specified identity documents.

*Id.* at *9 (internal quotations and alterations omitted). The Georgia district court stated: "Section 8 attempts an end-run — not around federal criminal law-but around federal statutes defining the role of state and local officers in immigration enforcement." *Id.* at *11. It found:

> 8 U.S.C. § 1357 and § 1103 clearly express Congressional intent that the Attorney General should designate state and local agents authorized to enforce immigration law. Indeed, Congress has provided that local officers may enforce civil immigration offenses only where the Attorney General has entered into a written agreement with a state, . . . or where the Attorney General has expressly authorized local officers in the event of a mass influx of aliens.

*Id.* at *10 (internal citations omitted).  The court held, "Section 8  circumvents Congress' intention to allow the Attorney General to authorize and designate local law enforcement officers to enforce civil immigration law."  *Id.* at *11.  Because Section 8 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the court held it was preempted by federal law.  *Id.* (internal quotations omitted).

This court is not persuaded by these decisions on this point.  It agrees that Congressional intent should be determined by the intent of Congress as found in 8 U.S.C. §§ 1357 and 1373(c).  However, this court is of the opinion that the dissent in *United States v. Arizona*,  641 F.3d 339, 371-82 (Bea, J., concurring in part and dissenting in part), correctly analyzed the relationship between Federal law and State and local law enforcement.  Judge Bea dissented from the majority's holding in *Arizona* that Section 2(B) of Arizona's S.B. 1070, containing a verification provision very similar to Section 12(a) of H.B. 56, was preempted by federal law.  Focusing on the intent of Congress as expressed in 8 U.S.C. §§ 1357 and 1373, he rejected arguments in favor of preemption similar to those raised in this case and which the majority had accepted.  Judge Bea wrote:

> [T]his court is tasked with determining whether Congress intended to fence off the states from any involvement in the enforcement of federal immigration law.  **It is *Congress's* intent we must value and apply, not the intent of the Executive Department, the Department of Justice, or the United States Immigration and Customs Enforcement**.  Moreover, it is the *enforcement* of immigration laws that this case is about, not whether a state can decree who can come into the country, what an alien may do while here, or how long an alien can stay in this country.

By its very enactment of statutes, Congress has provided important roles for state and local officials to play in the enforcement of federal immigration law. First, the states are free, even without an explicit agreement with the federal government, "to communicate with the Attorney General regarding the immigration status of any individual." 8 U.S.C. § 1357(g)(10)(A). Second, to emphasize the importance of a state's involvement in determining the immigration status of an individual, Congress has commanded that federal authorities "*shall* respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual." *Id.* § 1373(c) . . . Third, putting to one side communications from and responses to a state regarding an individual's immigration status, no agreement with the federal government is necessary for states "otherwise [than through communications regarding an individual's immigration status] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). Finally, Congress has even provided that state officers are authorized to arrest and detain certain illegal aliens. *Id.* § 1252c.

. . . .

I dissent from the majority's determination that Section 2(B) of Arizona S.B. 1070 is preempted by federal law and therefore is unconstitutional on its face. **As I see it, Congress has clearly expressed its intention that state officials *should* assist federal officials in checking the immigration status of aliens,** *see* **8 U.S.C. § 1373(c), and in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10)(B)**. The majority comes to a different conclusion by minimizing the importance of § 1373(c) and by interpreting § 1357(g)(10) precisely to invert its plain meaning "*Nothing* in this subsection shall be construed to require an agreement . . . to communicate with the Attorney General regarding the immigration status of any individual" (emphasis added) to become "*Everything* in this subsection shall be construed to require an agreement."

. . . .

. . . . **Congress has clearly stated its intention to have state and local agents assist in the enforcement of federal immigration law, at least as to the identification of illegal aliens, in two federal code sections.** First is 8

U.S.C. § 1373(c) . . .  The title of § 1373(c) is "Obligation to respond to inquiries." Thus, § 1373(c) *requires* that United States Immigration and Customs Enforcement ("ICE") respond to an inquiry by *any* federal, state, or local agency seeking the immigration status of any person.  The Report of the Senate Judiciary Committee accompanying the Senate Bill explained that the "acquisition, maintenance, and *exchange* of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S.Rep. No. 104–249, at 19–20 (1996) (emphasis added).

. . . .

**Section 1373(c) does not limit the number of inquiries that state officials can make, limit the circumstances under which a state official may inquire, nor allow federal officials to limit their responses to the state officials.**  Indeed, as established by the declaration of the United States' own Unit Chief for the Law Enforcement Support Center ("LESC"), the LESC was established "to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis." Section 1373(c) demonstrates Congress's clear intent for state police officials to communicate with federal immigration officials in the first step of immigration enforcement – identification of illegal aliens.

. . . .

**The second federal code section which states Congress's intention to have state authorities assist in identifying illegal aliens is 8 U.S.C. § 1357(g), entitled "Performance of immigration officer functions by State officers and employees."**  Subsections (g)(1)-(9) provide the precise conditions under which the Attorney General may "deputize" state police officers (creating, in the vernacular of the immigration field, "287(g) officers") for immigration enforcement pursuant to an explicit written agreement. For example, § 1357(g)(1) defines the scope of any such agreement, § 1357(g)(3) provides that the Attorney General shall direct and supervise the deputized officers, § 1357(g)(6) prohibits the Attorney General from deputizing state officers if a federal employee would be displaced, and § 1357(g)(7)-(8) describe the state officers' liability and immunity. Section 1357(g)(9) clarifies that no state or locality shall be required to enter into such an agreement with the Attorney General. Finally, § 1357(g)(10) explains what happens if *no* such

agreement is entered into: it recognizes the validity of certain conduct by state and local officers, and explicitly excepts such conduct from a requirement there be a written agreement between the state and federal authorities . . . . The majority's error is to read § 1357(g)(1)-(9), which provides the precise conditions under which the Attorney General *may* enter into written agreements to "deputize" officers, as the *exclusive* authority which Congress intended state officials to have in the field of immigration enforcement. That reading is made somewhat awkward in view of § 1357(g)(10), which explicitly carves out certain immigration activities by state and local officials as *not* requiring a written agreement.

> . . . .

**To determine Congress's intent, we must attempt to read and interpret Congress's statutes on similar topics together. . . . In light of this, I submit that a more natural reading of § 1357(g)(10), together with § 1373(c), leads to a conclusion that Congress's intent was to provide an important role for state officers in the enforcement of immigration laws, especially as to the *identification* of illegal aliens.**

> . . . .

I agree with the majority that "we must determine how the many provisions of [the] vastly complex [INA] function together." Maj. Op. at 351. However, the majority opinion's interpretation of § 1357(g)(10), which requires the Attorney General to "call upon" state officers in the absence of "necessity" for state officers to have any immigration authority, makes § 1373(c) a dead letter. Congress would have little need to obligate federal authorities to respond to state immigration status requests if it is those very same federal officials who must call upon state officers to identify illegal aliens. Further, there is no authority for the majority's assertion that § 1357(g) establishes the "boundaries" within which state cooperation pursuant to § 1373(c) must occur. Maj. Op. at 351. Indeed, "communicat[ions] with the Attorney General regarding the immigration status of any individual" were explicitly excluded from § 1357(g)'s requirement of an agreement with the Attorney General. 8 U.S.C. § 1357(g)(10)(A). Congress intended the free flow of immigration status information to continue despite the passage of § 1357(g), and so provided in subsection (g)(10). The majority's interpretation turns § 1357(g)(10) and § 1373(c) into: "Don't call us, we'll call you," when what

Congress enacted was "When the state and local officers ask, give them the information."

    . . . .

Further, to "cooperate" means, I submit, "to act or operate jointly, with another or others, to the same end; to work or labor with mutual efforts to promote the same object." *Webster's New Twentieth Century Dictionary of the English Language Unabridged* (Jean L. McKechnie ed., 1979). It does not mean that each person cooperating need be capable of doing all portions of the common task by himself. We often speak of a prosecution's "cooperating witness," but it doesn't occur to anyone that the witness himself cannot be "cooperating" unless he is able to prosecute and convict the defendant himself. Hence, the inability of a state police officer to "remove" an alien from the United States does not imply the officer is unable to cooperate with the federal authorities to achieve the alien's removal.

The provision of authority whereby the Attorney General may "deputize" state police officers allows the Attorney General to define the scope and duration of the state officers' authority, as well as "direct[ ] and supervis[e]" the state officers in performing immigration functions. 8 U.S.C. § 1357(g)(1)-(9). However, this is merely *one of two forms* of state participation in federal immigration enforcement provided for by Congress in § 1357(g). **Congress provided for *another* form of state participation, for which no agreement is required – states are free "to communicate with the Attorney General regarding the immigration status of any individual,"** *id.* **§ 1357(g)(10)(A), and are also free "otherwise [than by communication] to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,"** *id.* **§ 1357(g)(10)(B)**.

This conclusion is confirmed by a close comparison of the language in each part of § 1357(g). **As to the authority of the Attorney General to enter explicit written agreements, these agreements are limited to deputizing state officers to perform immigration-related functions "in relation to the investigation, apprehension, or detention of aliens in the United States."** *Id.* **§ 1357(g)(1). Notably absent from this list of functions is the "identification" of illegal aliens.** However, **Congress recognized state officers' authority even in the absence of a written agreement with federal authorities both "to communicate with the Attorney General regarding**

66

the immigration status of any individual" and "to cooperate with the Attorney General in the *identification . . . of aliens not lawfully present in the United States.*"  *Id.* § 1357(g)(10) (emphasis added).  "We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006).  **The exclusion of illegal alien identification from the restraints of explicit written agreements under § 1357(g)(1)-(9), and the inclusion of this identification function in the state's unrestrained rights under § 1357(g)(10), leads to the conclusion that Congress intended that state officers be free to inquire of the federal officers into the immigration status of any person, without any direction or supervision of such federal officers – and the federal officers "*shall* respond" to any such inquiry.  8 U.S.C. § 1373(c) (emphasis added).**

. . . .

The majority also finds that state officers reporting illegal aliens to federal officers, Arizona would interfere with ICE's "priorities and strategies." . . . **The power to preempt lies with Congress, not with the Executive; as such, an agency such as ICE can preempt state law only when such power has been delegated to it by Congress.** *See North Dakota v. United States*, 495 U.S. 423, 442, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("It is Congress – not the [Department of Defense] – that has the power to pre-empt otherwise valid state laws. . . .").  Otherwise, evolving changes in federal "priorities and strategies" from year to year and from administration to administration would have the power to preempt state law, despite there being no new Congressional action.  Courts would be required to analyze statutes anew to determine whether they conflict with the newest Executive policy.  Although Congress *did* grant some discretion to the Attorney General in entering into agreements pursuant to § 1357(g), Congress explicitly withheld any discretion as to immigration status inquiries by "obligat[ing]" the federal government to respond to state and local inquiries pursuant to § 1373(c) and by excepting communication regarding immigration status from the scope of the explicit written agreements created pursuant to § 1357(g)(10).  Congress's statutes provide for calls and order the calls be returned.

641 F.3d at 369-80 (footnotes omitted; italic emphasis in original; bold emphasis added).

This court agrees with the above-quoted analyses of Congressional intent as expressed in 8 U.S.C. §§ 1357 and 1373(c).  As it did in the *Arizona* case, the United States argues that federal law preempts Section 12 because, while Section 1357(g) authorizes states to assist in enforcement of federal immigration law, Section 1357(g) only provides such authorization when state officials execute immigration duties under the close supervision and direction of the Attorney General.  (Doc. 2 at 60-62.)  The United States argues that the verification scheme in H.B. 56 § 12(a) eliminates the supervision and direction of the Attorney General required for the state's involvement in enforcement of federal immigration law.  However, under Section 1357(g)(10), local law enforcement may cooperate with the Attorney General in identifying immigration status of individuals, and otherwise cooperate in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  The plain language of this subsection reveals that local officials have some inherent authority to assist in the enforcement of federal immigration law, so long as the local official "cooperates" with the federal government.  H.B. 56 § 12 reflects an intent to cooperate with the federal government, in that all final determinations as to immigration status are made by the federal government, § (a), unlawful presence is defined by federal law, *id.* (e), and state law enforcement will only transfer illegal aliens to the federal government's custody at the federal government's request. *Id.*

Under Section 12, Alabama law enforcement officers are instructed under certain circumstances to communicate with the federal government regarding the immigration and

citizenship status of certain individuals who are stopped, detained, or arrested.  The statute does not require the federal government to act upon this information; therefore, the federal government still retains discretion as to whether it wishes to pursue those found to be unlawfully present.

The United States also argues that the mandatory verification scheme of Section 12 imposes "substantial burdens on lawful immigrants in a way that conflicts with the INA's provision of nationally uniform rules governing the treatment and registration of aliens throughout the country" and that has been held preempted by *Hines*.  (Doc. 2 at 72.)  Even if states are not ***required*** to make immigration status requests under §§ 1357 or 1373, they have the option to do so and to require their local officials to do the same.  *See Whiting*, 131 S. Ct. at 1986.  Unlike *Hines*, where the Court found the Pennsylvania Statute to be ***inconsistent*** with the purposes of Congress, this court finds Section 12(a) is consistent with the purposes of Congress, as discussed at length in Judge Bea's concurring and dissenting opinion.  The court is not persuaded that H.B. 56 § 12 must be preempted because it will result in "substantial burdens on lawful immigrants," as discussed in *Hines*.

Finally, the United States argues that Section 12 is preempted by foreign policy goals.  However, for the reasons set forth above, the court finds the United States has not submitted sufficient evidence that Section 12 conflicts with federally-established foreign policy goals.

For the foregoing reasons, the court concludes that the United States is not likely to succeed on its claim that H.B. 56 § 12 conflicts with Congressional intent as expressed in the

69

provisions of the INA.  Therefore, its Motion for Preliminary Injunction as to Section 12 will

be denied.

## E.  SECTION 13

Section 13(a) provides:

> (a) It shall be unlawful for a person to do any of the following:
>
> (1)  Conceal, harbor, or shield or attempt to conceal, harbor, or shield or conspire to conceal, harbor, or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that the alien has come to, has entered, or remains in the United States in violation of federal law.
>
> (2)  Encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such coming to, entering, or residing in the United States is or will be in violation of federal law.
>
> (3)  Transport, or attempt to transport, or conspire to transport in this state an alien in furtherance of the unlawful presence of the alien in the United States, knowingly, or in reckless disregard of the fact, that the alien has come to, entered, or remained in the United States in violation of federal law. Conspiracy to be so transported shall be a violation of this subdivision.
>
> (4)  Harbor an alien unlawfully present in the United States by entering into a rental agreement, as defined by Section 35-9A-141 of the Code of Alabama 1975, with an alien to provide accommodations, if the person knows or recklessly disregards the fact that the alien is unlawfully present in the United States.

H.B. 56 § 13(a). "Any person" who violates Section 13(a) is "guilty of a Class A

misdemeanor for each unlawfully present alien, the illegal presence of which in the United

States and the State of Alabama, he or she is facilitating or attempting to facilitate." *Id.* (b).

"A person" who violates Section 13 is "guilty of a Class C felony when the violation involves

10 or more aliens, the illegal presence of which in the United States and the State of

Alabama, he or she is facilitating or attempting to facilitate." *Id.* (c). "Any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of a violation" of Section 13(a), "and the gross proceeds of such a violation," are "subject to civil forfeiture under the procedures of Section 20-2-93 of the Code of Alabama 1975." *Id.* (f). "Any person acting in his or her official capacity as a first responder or protective services provider" may "harbor, shelter, move, or transport an alien unlawfully present in the United States pursuant to state law." *Id.* (e). For purposes of Section 13, "an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c)." *Id.* (g).

The United States argues that Section 13 is an impermissible regulation of immigration,  and that it "violate[s] the dormant Commerce Clause," (Doc. 2 at 43-45, 46.) It also argues that Section 13 is conflict preempted because it "undermine[s] the purposes and objectives of Congress." (Doc. 81 at 15.) The court will address each argument in turn.

### 1. Preemption

As the Supreme Court has instructed, every preemption analysis "must be guided by two cornerstones." Wyeth, 129 S. Ct. at 1194. The first is that "the purpose of Congress is the ultimate touchstone." *Id.* (citation omitted). The second is that a presumption against preemption applies when "Congress has legislated . . . in a field which the States have traditionally occupied." *Id.* (citation omitted). Because the states have not traditionally

occupied the field in the areas covered by Section 13, no presumption against preemption applies.

### a. Regulation of Immigration

The United States argues that Section 13 is "preempted because, by criminalizing the transportation, harboring, and concealment of unlawfully present aliens, the State is improperly imposing its own substantive regulation over facets of alien entry into the United States." (Doc. 2 at 45.)  As noted above, in *DeCanas* the Court recognized that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *DeCanas*, 424 U.S. at 354.  At the same time, however, the Court noted that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power, whether latent or exercised." *Id.* at 355. According to the Court, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration." *Id.*  It explained that a regulation of immigration "is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id.*; *see also Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (internal quotation marks and citations omitted) ("The conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.").

In *Arizona*, the United States challenged Section 5 of the Arizona Act "which makes it illegal for a person who is in violation of a criminal offense to: (1) transport or move or attempt to transport or move an alien in Arizona in furtherance of the alien's unlawful presence in the United States; (2) conceal, harbor, or shield or attempt to conceal, harbor, or shield an alien from detection in Arizona; and (3) encourage or induce an alien to come to or live in Arizona." *Arizona*, 703 F. Supp. 2d at 1002 (citing A.R.S. § 13-2929(A)(1)-(3)). In order to violate Section 5, "a person must also know or recklessly disregard the fact that the alien is unlawfully present in the United States." *Id.*  The United States, as it does here with regard to Section 13 of H.B. 56, had argued that Section 5 of the Arizona Act was an impermissible regulation of immigration because it "attempt[s] to regulate entry into the nation – a definitively federal area of concern in which state regulations are barred by the U.S. Constitution." *Id.*  The district court rejected the United States's argument, reasoning that Section 5 does not attempt to regulate who should or should not be admitted into the United States, and it does not regulate the conditions under which legal entrants may remain in the United States." *Id.* at 1003 (citing *DeCanas*, 424 U.S. at 355).  On that basis, the court concluded that the United States was not likely to succeed on its claim that Section 5 was an impermissible regulation of immigration.  *Id.*

The court finds the *Arizona* district court's preemption analysis regarding Section 5 to be persuasive.  Section 13 of H.B. 56, like Section 5 of the Arizona Act is not an impermissible regulation of immigration.  Section 13 does not attempt to regulate "who

73

should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355.  Therefore, the United States is not likely to succeed on its claim that H.B. 56 § 13 is preempted because it infringes on Congress's exclusive authority to regulate alien entry.

### b. Conflict Preemption

The United States also argues Section 13 impermissibly conflicts with the operation of federal immigration law.  (Doc. 81 at 13.)  Congress has provided a uniform, comprehensive scheme of sanctions for those who unlawfully enter the United States.  *See*, *e.g.*, 8 U.S.C. § 1325 (penalizing persons for illegal entry into the United States, marriage fraud, and immigration-related entrepreneurship fraud).  Congress has enacted a detailed sanctions scheme for third parties who aid the entry and stay of those who unlawfully enter. 8 U.S.C. § 1323 (penalizing persons for unlawfully bringing aliens into the United States); 8 U.S.C. § 1324 (penalizing persons for bringing in or harboring aliens);  8 U.S.C. § 1327 (penalizing persons who assist certain inadmissible aliens to enter the country); 8 U.S.C. § 1328 (penalizing the importation of aliens for immoral purposes).  The federal scheme also creates a narrow exemption for "a religious denomination having a bona fide nonprofit, religious organization in the United States."  8 U.S.C. § 1324(a)(1)(C).

The State Defendants argue that Section 13 is not preempted because its provisions constitute "perfect concurrent enforcement against the same criminal activity that is already prohibited by federal law."  (Doc. 38 at 75.)  They maintain that the language in Section

74

13(a)(1)-(3) is "taken directly from 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv)," and that it is a "mirror image of the equivalent provisions of 8 U.S.C. § 1324(a)(1)(A)."  (Doc. 38 at 75.)  They cite several cases, including *Whiting*; *Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983), *overruled on other grounds*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Arizona Contractors Ass'n., Inc. v. Napolitano*, Nos. CV07-1355-PHX-NVW, CV07-1684-PHX-NVW, 2007 WL 4570303, *13-14 (D. Ariz. Dec. 21, 2007) (unpublished), and *Gray v. City of Valley Park, Mo.*, No. 4:07CV00881 ERW, 2008 WL 294294 (E.D. Mo. Jan. 31, 2008) (unpublished), for the proposition that "[s]tates are not preempted in the immigration arena when they prohibit the same activity that is already prohibited by federal law." (Doc. 38 at 76-83.)  However, none of these cases  support the State Defendants' authority to enact the specific harboring and transportation scheme of Section 13.  Although Section 13 purports to regulate the same conduct covered by 8 U.S.C. § 1324, its language actually prohibits conduct allowed under federal law and criminalizes conduct that is lawful under federal law.

In *Whiting*, the Court found that "Congress expressly preserved the ability of the States to impose their own sanctions through licensing," and it noted that such preservation "necessarily entail[ed] the prospect of some departure from homogeneity." *Whiting*, 131 S. Ct. at 1979-80; *see also Arizona Contractors Ass'n.*, 2007 WL 4570303 at *13-14.  Likewise, *Gray* concerned the authority of the states to impose additional sanctions on employers through licensing laws, an authority expressly preserved to states by Congress.  2008 WL

294294 at *19.  The court in *Gray*, as the State Defendants do here, cited *Gonzales* for the proposition that "generally, a state has concurrent jurisdiction with the federal government to enforce federal laws." Id. (citing *Gonzales*, 722 F.2d at 474).  In *Gonzales*, the Ninth Circuit, construing Congress's intent with respect to 8 U.S.C. §§ 1324, 1325, and 1326, had held that "federal law does not preclude local enforcement of the criminal provisions of the [INA]." *Gonzales*, 722 F.2d at 475.  The court found the legislative history of 8 U.S.C. § 1324(c), which allows "officers whose duty it is to enforce criminal laws" to make arrests for violations of 8 U.S.C. § 1324, supported a finding "that federal law does not preclude enforcement of the criminal provisions of the [INA]." *Id.*

Unlike *Whiting*, *Arizona Contractors Ass'n., Inc.*, and *Gray*, which all concerned the authority of the states to act in areas where Congress specifically has preserved such authority, Congress has not preserved the authority of any state to regulate alien harboring and transportation in the manner provided in H.B. 56 § 13. The justification for a departure from homogeneity with federal law in the cases cited by the State Defendants – the specific preservation of state authority to act – is absent in this case.  In addition, Section 13  is not a "mirror image" of federal law as the State Defendants claim.   It does not represent "a situation where [Alabama] . . . is aiding in the enforcement of federal immigration law based on federal standards through the means set forth by federal law; rather, [Alabama] . . . is attempting to enforce its own scheme " and impose penalties and burdens on aliens and

citizens that conflict with the purposes and objectives of Congress.  *See Villas at Parkside Partners v. City of Farmers Branch, Tex.*,  701 F. Supp. 2d 835, 859 (N.D. Tex. 2010)**.**

H.B. 56 § 13 seeks to regulate the same subject matter covered by 8 U.S.C. § 1324; however, in doing so, it criminalizes conduct specifically allowed under federal law. Congress, through 8 U.S.C. § 1324(a)(1)(C), provided that "[e]xcept where a person encourages or induces an alien to come to or enter the United States," "a religious denomination having a bona fide nonprofit, religious organization in the United States . . . [may] invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, . . . provided the minister or missionary has been a member of the denomination for at least one year."  8 U.S.C. § 1324(a)(1)(C).  Section 13, in contrast, only creates exemptions for first responders and protective service providers.  H.B. 56 §13(e).   Therefore, H.B. 56 § 13 "impose[s] prohibitions or obligations which are in direct contradiction to Congress' primary objectives, as conveyed with clarity in the federal legislation." Gade, 505 U.S. at 110, 112 (Kennedy, J., concurring).

Furthermore, Section 13, in addition to criminalizing conduct specifically authorized by federal law, creates new regulations for conduct not prohibited by federal law.  These regulations, which have no parallel counterpart in the federal scheme, impose burdens on aliens not contemplated by Congress.  In *Georgia Latino Alliance for Human Rights v. Deal,*

2011 WL 2520752 (N.D. Ga. 2011) (hereinafter "GLAHR"), various nonprofit organizations,

business associations, and individuals challenged several provisions of Georgia's Illegal

Immigration Reform and Enforcement Act of 2011 (the "Georgia Act"). Section 7 of the

Georgia Act was challenged as unconstitutional under the Supremacy Clause. *GLAHR*, 2011

WL 2520752 at *11. Section 7 created three state criminal violations:

> (1) transporting or moving an illegal alien in a motor vehicle, O.C.G.A. 16-11-200(b); (2) concealing, harboring or shielding an illegal alien from detection, O.C.G.A. § 16-11-201(b); and (3) inducing, enticing, or assisting an illegal alien to enter Georgia, O.C.G.A. § 16-11-202(b). All three crimes require knowledge that the person being transported, harbored, or enticed is an illegal alien. Also, all three sections require that the defendant be engaged in another criminal offense.

*GLAHR*, 2011 WL 2520752 at *11. The defendants argued that Section 7 "simply reinforces

§ 1324's parallel provisions." *Id.* at *13. The district court disagreed; it held:

> Despite superficial similarities, however, Section 7 is not identical to § 1324. *See Whiting*, 131 S. Ct. at 1982 (noting that state law traces federal law). For example, O.C.G.A. § 16-11-202 prohibits knowingly inducing, enticing or assisting illegal aliens to enter Georgia. Section 1324's corresponding "inducement" provision prohibits inducing an alien to "come to, enter, or reside in the United States." 8 U.S.C. § 1324. Once in the United States, it is not a federal crime to induce an illegal alien to enter Georgia from another state.
>
> Similarly, O.C.G.A. § 16-11-201 defines "harboring" as "any conduct that tends to substantially help an illegal alien to remain in the United States in violation of federal law," subject to several exceptions. Under § 1324, federal courts have also discussed the bounds of "harboring," developing a significantly different definition. *See Hall v. Thomas*, 753 F. Supp. 2d 1113, 1158 (N.D. Ala. 2010)("The plain language reading of 'harbor' to require provision of shelter or refuge, or the taking of active steps to prevent authorities from discovering that the employee is unauthorized or illegally remaining in the country, should control."); *United States v. Kim*, 193 F.3d

567, 573-74 (2d Cir. 1999)(harboring defined as "conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence."); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298-99 (11th Cir. 2010)(discussing whether hiring illegal alien constituted harboring under § 1324). . . .

Still, the Defendants contend that HB 87 does not create new crimes, but rather "creates a mechanism by which [immigration crimes] could be prosecuted at a local level." (Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Injunction, at 17.) No doubt the Defendants believe such a mechanism is necessary. Indeed, the Defendants assert that "every day that passes with passive enforcement of the federal law is a day that drains the state coffers." (*Id.* at 14.) In response to this concern, Section 7 creates a state system for prosecuting and interpreting immigration law, just as Section 8 creates a state system for policing civil immigration offenses. Under Section 7, state agents will exercise prosecutorial discretion. Decisions about when to charge a person or what penalty to seek for illegal immigration will no longer be under the control of the federal government. Similarly, Georgia judges will interpret Section 7's provisions, unconstrained by the line of federal precedent mentioned above. Thus, although Section 7 appears superficially similar to § 1324, state prosecutorial discretion and judicial interpretation will undermine federal authority "to establish immigration enforcement priorities and strategies." *United States v. Arizona*, 641 F.3d at 352.

. . . .

Further, whereas the Arizona statute in *Whiting* imposed licensing laws specifically authorized by a statutory savings clause, HB 87 imposes additional criminal laws on top of a comprehensive federal scheme that includes no such carve out for state regulation. *See Whiting*, 131 S.Ct. at 1981 (noting that Congress "specifically preserved" states' authority to enact licensing laws). Finally, unlike in *DeCanas* and *Whiting*, HB 87 does not address an area traditionally subject to state regulation. *See Whiting*, 131 S.Ct. at 1971; *DeCanas*, 424 U.S. at 356 ("[T]o prohibit the knowing employment by California employers of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of such police power regulation."). Rather, unlike concurrent state and federal regulations in other areas, the movement of unauthorized aliens is not a traditional area of state regulation. Thus, "[a]ny concurrent state power that may exist is

> restricted to the narrowest of limits; the state's power here is not bottomed on
> the same broad base as is its power to tax." *Id*. at 68.

*GLAHR*, 2011 WL 2520752 at *13-14 (parallel citations omitted).

The court finds the *GLAHR* decision with respect to Section 7 of the Georgia Act persuasive.  First, H.B. 56 § 13(a)(2), in a manner similar to Section 7 of the Georgia Act, prohibits encouraging or inducing aliens to enter Alabama, while 8 U.S.C. 1324(a)(1)(A)(iv)'s corresponding provision only prohibits inducing an alien to "come to, enter, or reside in the United States."  "Once in the United States, it is not a federal crime to induce an illegal alien to enter [Alabama] from another state." *GLAHR*, 2011 WL 2520752 at *13.  Second, Section 13(a)(3) permits Alabama to criminally punish an unlawfully-present alien for furthering his or her own unlawful presence by providing that "[c]onspiracy to be so transported shall be a violation" of Section 13(a)(3).  By contrast, the corresponding federal provision in 8 U.S.C. § 1324(a)(1)(A)(ii) has no such "[c]onspiracy" provision and does not extend to the smuggled or transported alien.  *See United States v. Hernandez-Rodriguez*, 975 F.2d 622, 626 (9th Cir. 1992)(recognizing that unlawfully-present aliens who are transported "are not criminally responsible for smuggling under 8 U.S.C. § 1324").  Third, Section 13(a)(4) reaches beyond the provisions of the Georgia harboring law by criminalizing the "entering into a rental agreement, as defined by Section 35-9A-141 of the Code of Alabama 1975, with an alien to provide accommodations."  H.B. 56 § 13(a)(4).  By

contrast, nothing in 8 U.S.C. § 1324 or any other federal immigration law criminalizes such rental agreements.[14]

The State Defendants contend that Section 13(a)(4) "prohibits a type of 'harboring' that is equally prohibited by federal law." (Doc. 69 at 45 [citing 8 U.S.C. § 1324(a)(1)(A)(iii)].)   Neither Congress nor the Supreme Court  has defined the term "harboring."   However, the Circuit Courts of Appeal have consistently defined "harboring" as facilitating the alien remaining unlawfully in the United States.  *See, e.g.*, *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999)(holding that harboring "encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally *and* to prevent government authorities from detecting his unlawful presence."); *United States v. Cantu*, 557 F.2d 1173 (5th Cir. 1977).[15]   In *Cantu*, the former Fifth Circuit held that Section 1324 prohibits conduct "tending substantially to facilitate an alien's remaining in the United States illegally."  *Cantu*, 557 F.2d at 1180 (citation omitted). It does not appear the Eleventh

---

[14] Indeed, federal law and regulations explicitly or implicitly permit landlords to provide housing and other services to unlawfully present aliens. *See, e.g.*, 42 U.S.C. §§ 10401-10500 (providing federal funding to assist the states in providing domestic violence victims "shelter" without any restrictions on immigration status and defining "shelter" as "the provision of temporary refuge and supportive services in compliance with applicable state law (including regulation) governing the provision, on a regular basis, of shelter, safe homes, meals, and supportive services to victims of family violence, domestic violence, or dating violence, and their dependents"); 24 C.F.R. § 5.508(e) (providing that households in which some, but not all, family members establish eligible immigration status may nonetheless receive federal housing assistance).

[15] In *Bonner v. Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit announced prior to October 1, 1981. *See* 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

Circuit has altered this standard in the years following *Cantu*.  *See, e.g.*, *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299 (11th Cir. 2010); *Zheng*, 306 F.3d at 1086 (referring to harboring in the general sense of facilitating an alien's presence in the United States).  Therefore, the court will follow *Cantu*.

Under the standard articulated in *Cantu*, no Fifth Circuit or Eleventh Circuit case has held that the mere provision of ***rental*** housing to someone he knew or had reason to know was an unlawfully-present alien constitutes "substantial facilitation," of the alien remaining in the United States and this court declines to so hold.  The State Defendants cite a list of cases to show that the act of providing housing to unlawfully present aliens constitutes harboring under federal law.  (*See* doc. 38 at 80-82.)  However, none of these cases supports a finding that providing rental housing to unlawfully present aliens, ***without more***, constitutes harboring within the meaning of 8 U.S.C. § 1324.  For instance, the State Defendants cite, *inter alia*, *United States v. Tipton*, 518 F.3d 591 (8th Cir. 2008), *Zheng*, 306 F.2d 1080, and *United States v. Varkonyi*, 645 F.2d 453 (5th Cir. 1981), to show that H.B. 56 is no more restrictive than federal law.  These cases, however, involved more than the mere provision of rental housing.  *See Tipton,* 518 F.3d at 595 (finding employer violated 8 U.S.C. § 1324(a)(1)(A)(iii) where it ***employed and housed*** six unauthorized alien employees, provided them with transportation and money to purchase necessities, and ***maintained counterfeit immigration papers*** for them)*; Zheng,* 306 F.3d at 1086 (finding defendants "harbored the illegal aliens by providing ***both housing and employment***") (emphasis added); *Varkonyi*, 645

82

F.2d at 459 (finding a violation of Section 1324's harboring provision where the defendant provided **both** employment **and** lodging to illegal aliens **and** forcibly interfered with INS agents to prevent the aliens' apprehension).  While the act of providing housing to unlawfully present aliens may be significant evidence that the provider has "harbored" an illegal alien in violation of §1324(a)(1)(A)(iii), that evidence, without more, is not sufficient to constitute "substantial facilitation," of the alien's unlawful presence to support a conviction.  *cf. Hall v. Thomas*, 753 F. Supp. 2d 1113, 1160 (N.D. Ala. 2010).  As the United States correctly points out, "if the federal anti-harboring provisions 'already prohibited' all renting to unlawfully present aliens, Section 13(a)(4) would not prohibit anything beyond what Sections 13(a)(1)-(3) already prohibit, and would have been unnecessary to enact."[16]  (Doc. 81 at 16 n.9.)

In sum, H.B. 56 § 13 is preempted because it prohibits conduct specifically authorized under the federal harboring and transportation scheme, creates "additional" regulations for conduct not prohibited by the federal harboring and transportation scheme, "inconsistently with the purpose of Congress," *Hines*, 312 U.S. at 66, and allows the Alabama courts to interpret an Alabama-specific transportation and harboring scheme

---

[16] The court does not agree with the United States's assertion that "[b]ecause Section 13(a)(4) purports to reach every housing rental agreement involving unlawfully present aliens, Alabama impermissibly seeks to decide who may reside within its borders."  (Doc. 81 at 18.)  H.B. 56 § 13(a)(4) does not seek to decide which aliens may live in the United States. Instead, it provides criminal penalties for **landlords** who provide rental housing under certain circumstances.  The distinction, though subtle, is an important distinction nonetheless.

"unconstrained by the line of federal precedent" interpreting the federal harboring and transportation scheme. *GLAHR*, 2011 WL 2520752 at *13. H.B. 56 § 13 thus represents a significant departure from homogeneity, which "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67. Section 13 creates an Alabama-specific harboring scheme that "remove[s] any federal discretion and impermissibly places the entire operation – from arrest to incarceration – squarely in the State's purview." (Doc. 2 at 45-46.) Unlike Section 10, which constrains the Alabama courts to the line of federal precedent interpreting 8 U.S.C. §§ 1304 and 1306, Section 13 imposes no obligation on Alabama courts to take guidance from federal courts and agencies in interpreting the word "harboring" as H.B. 56 § 13 is state law. For all these reasons, the court finds the United States is likely to succeed in showing that Section 13 is preempted.

For the reasons set forth above with regard to Section 11(a), the court finds the United States will suffer irreparable harm if Section 13 is not enjoined during the pendency of this action. Also, the court finds the balance of equities and the public's interest support granting the United States's Motion for Preliminary Injunction.

Based on the foregoing, the United States's Motion for Preliminary Injunction will be granted as to Section 13.

## 2. Dormant Commerce Clause

The United States also argues that Subsections 13(a)(1)-(3) of H.B. 56 "violate the dormant Commerce Clause." (Doc. 2 at 46.)  The Commerce Clause vests Congress with the power to "regulate Commerce . . . among the several States."  U.S. CONST. art I, § 8, cl. 3.  The Supreme Court has interpreted the Commerce Clause "to have a 'negative' aspect," *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994), which is often referred to as the "dormant Commerce Clause." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  The dormant Commerce Clause "prohibits states from enacting statutes that impose 'substantial burdens' on interstate commerce." *Locke v. Shore*, 634 F.3d 1185, 1192 (11th Cir. 2011)(citing *Dennis v. Higgins*, 498 U.S. 439, 447 (1991)).  A review of a state statute under the dormant Commerce Clause:

> involves two levels of analysis. *Bainbridge v. Turner*, 311 F.3d 1104, 1108-09 (11th Cir. 2002).  We first must determine whether the state law discriminates against out-of-state residents on its face. *Id.*  Laws that facially discriminate against out-of-state residents are analyzed under heightened scrutiny and are rarely upheld. *Id.* (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986)).  Second, state laws that do not facially discriminate against out-of-state residents are struck down only if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Bainbridge*, 311 F.3d at 1109.

*Locke*, 634 F.3d at 1192 (parallel citations omitted).

The United States argues that Section 13 violates the dormant commerce clause by "restrict[ing] the movement of people between states."  (Doc. 2 at 46.)  The United States has not established that Section 13 discriminates against out-of-state residents on its face.

Nor has it established that any burden imposed on interstate commerce "is clearly excessive in relation to the putative local benefits," argued by the State Defendants.  (*See* doc. 89 at 44.)   Therefore, the United States is not likely to succeed on its claim that Section 13 violates the dormant Commerce Clause.   However, as noted, Section 13 is due to be enjoined because it is preempted under federal law.

## F.  SECTION 16

Section 16 provides:

(a)  No wage, compensation, whether in money or in kind or in services, or remuneration of any kind for the performance of services paid to an unauthorized alien shall be allowed as a deductible business expense for any state income or business tax purposes in this state.  This subsection shall apply whether or not an Internal Revenue Service Form 1099 is issued in conjunction with the wages or remuneration.

(b)  Any business entity or employer who knowingly fails to comply with the requirements of this section shall be liable for a penalty equal to 10 times the business expense deduction claimed in violation of subsection (a).  The penalty provided in this subsection shall be payable to the Alabama Department of Revenue.

H.B. 56, § 16.

The United States contends Section 16 is expressly preempted by 8 U.S.C. § 1324a(h)(2), which states, "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." (Doc. 2 at 36-38 [citing 8 U.S.C. § 1324a(h)(2)].)  The Supreme Court has held, "IRCA expressly preempts States from imposing 'civil or criminal sanctions' on those who employ

unauthorized aliens, 'other than through licensing and similar laws.'" *Whiting*, 131 S. Ct. at 1977 (quoting 8 U.S.C. § 1324a(h)(2)).

> In *Whiting*, the Supreme Court noted:

> > IRCA . . . restricts the ability of States to combat employment of unauthorized workers.  The Act expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  § 1324a(h)(2).  Under that provision, state laws imposing civil fines for the employment of unauthorized workers like the one we upheld in *De Canas* are now expressly preempted.

*Id.* at 1975.  Section 16 is not a licensing law; therefore, if Section 16 **sanctions** "those who employ, or recruit or refer for a fee for employment, unauthorized aliens," it is expressly preempted by § 1324a(h)(2).

The State Defendants argue that Section 16(a) is not a sanction because it is merely Alabama's "definition of  what expenses may be deducted" under Alabama's tax code. (Doc. 69 at 78.)  To be sure, "[t]he 'creation of a tax deduction is an exercise of legislative grace under which no substantive rights may vest.'"  (*Id.* [quoting *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1085 (11th Cir. 2004)].)  However, such "legislative grace" – in the face of § 1324a(h)(2) – does not allow Alabama to deny an employer a tax deduction to which it otherwise qualifies on the basis of the immigration status of its employee.  The State Defendants argue, by analogy, "If the United States' reasoning [that denial of the deduction is a sanction on employers of unauthorized aliens] [is] correct, then any federal taxpayer who owns a home free and clear, or who lives in an apartment, is being 'sanctioned' by the

Internal Revenue Code because he or she is not eligible for the home-mortgage deduction."
(*Id*. at 78-79.)  However, using the State Defendant's analogy, Section 16 is more akin to
the denial of a home-mortgage deduction to someone who actually pays a home mortgage
than to the denial of the same deduction to someone who does not have the expense of a
home mortgage.

Section 16(a) denies an employer a tax deduction for "wage[s], compensation,
whether in money or in kind or in services, or remuneration of any kind for the performance
of services" based on the immigration status of the employee, a deduction to which the
employer would be eligible but for the immigration status of its employee.  In the opinion
of the court, denying a tax deduction to which the employer is otherwise eligible based on
the immigration status of an employee fits within the meaning of a "sanction" against an
employer of an unauthorized alien found in 8 U.S.C. § 1324a(h)(2).

The Supreme Court has held that "the meaning of 'sanction' is spacious enough to
cover not only what we have called punitive fines, but coercive ones as well." *United States
Dept. of Energy v. Ohio*, 503 U.S. 607, 621-22 (1992).  Indeed, the House Report on Section
1324a(h)(2) stated,

> [t]he penalties contained in this legislation are intended to specifically
> preempt any state or local laws providing civil fines and/or criminal sanctions
> on the hiring, recruitment or referral or undocumented aliens.  They are not
> intended to preempt or prevent lawful state or local processes concerning the
> suspension, revocation or refusal to reissue a ***license*** to any person who has
> been found to have violated the sanctions provisions in this legislation.
> Further, the Committee does not intend to preempt ***licensing*** or "***fitness to do
> business laws***," such as state farm labor contractor laws or forestry laws,

> which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

*Lozano*, 620 F.3d at 208 n.29 (quoting H.R. Rep. No. 99–682(I), at 12, 1986 U.S.C.C.A.N. 5649, 5662)(original emphasis omitted; emphasis added). The Tenth Circuit, interpreting "sanction" as used in Section 1324a(h)(2), stated:

> IRCA does not define "sanction," but by its ordinary meaning, a sanction is "a ***restrictive measure used to punish a specific action or to prevent some future activity*.**" Webster's Third New Int'l Dictionary 2009 (1993). Moreover, the statutory context does not evince an intent to narrowly define "sanction" as requiring a punitive component. Title 8, Section 1324a(e)(4)(A) outlines a series of "penalties" for employers hiring unauthorized aliens, ranging from $250 to $10,000. Penalties are ordinarily understood as serving punitive purposes. Yet, in § 1324a(h)(2) Congress used the term "sanctions" rather than "penalty" as it did in § 1324a(e)(4)(A). ***Had Congress intended to preempt only those state laws that are punitive, we would have expected it to use "penalties"*** in § 1324a(h)(2). Had it used "sanctions" in § 1324a(e)(4), we might reach a similar conclusion. It did neither.

*Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010)(emphasis added). By enacting Section 1324a(h)(2), Congress preempted state and local governments from using any "sanctions" – other than licensing or similar laws – to affect an employer's future behavior with regard to the employment of unauthorized aliens.

By denying a tax deduction to an employer for the wages paid to an unauthorized alien – a tax deduction to which the employer is entitled for wages paid to all other employees – Alabama has ***sanctioned*** that employer for employing the unauthorized alien. This sanction, set forth in Section 16(a) of H.B. 56, is not in the nature of a licensing law; therefore, Section 16(a) is expressly preempted by federal law. *See* 8 U.S.C. § 1324a(h)(2).

Because the court finds Section 16(a) is a "sanction" against employing an unauthorized alien expressly preempted by Section 1324a(h)(2), the court has no need to discuss separately Section 16(b), which imposes a tax penalty "equal to 10 times the business expense deduction claimed in violation of subsection (a)."

The court finds the United States has established a likelihood of success on its claim that Section 16 is expressly preempted by federal law. Also, for the reasons set forth above with regard to Section 11(a), the court finds the United States will suffer irreparable harm if Section 16 is not enjoined during the pendency of this action. The court further finds the balance of equities and the public's interest support granting the United States's Motion for Preliminary Injunction.

Based on the foregoing, the United States's Motion for Preliminary Injunction will be granted as to Section 16.

## G.  SECTION 17

Section 17 of H.B. 56 provides:

(a)  It shall be a discriminatory practice for a business entity or employer to fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) or discharge an employee working in Alabama who is a United States citizen or an alien who is authorized to work in the United States as defined in 8 U.S.C. § 1324a(h)(3) while retaining or hiring an employee who the business entity or employer knows, or reasonably should have known, is an unauthorized alien.

(b)  A violation of subsection (a) may be the basis of a civil action in the state courts of this state.  Any recovery under this subsection shall be

90

limited to compensatory relief and shall not include any civil or criminal sanctions against the employer.

(c)  The losing party in any civil action shall pay the court costs and reasonable attorneys fees for the prevailing party; however, the losing party shall only pay the attorneys fees of the prevailing party up to the amount paid by the losing party for his or her own attorneys fees.

(d)  The amount of the attorneys fees spent by each party shall be reported to the court before the verdict is rendered.[17]

(e)  In proceedings of the court, the determination of whether an employee is an unauthorized alien shall be made by the federal government, pursuant to 8 U.S.C. § 1373(c).  The court shall consider only the federal government's determination when deciding whether an employee is an unauthorized alien.  The court may take judicial notice of any verification of an individual's immigration status previously provided by the federal government and may request the federal government to provide further automated or testimonial verification.

H.B. 56 § 17 (footnote added).

Section 17(b) creates a cause of action in favor of a United States citizen or a lawfully-present alien against a business entity or employer.  This cause of action arises when a business entity/employer fails to hire or terminates the citizen or authorized alien at a time when it has an employee that it knows or should know is unlawfully present according to federal law, irrespective of considerations such as cause for the termination or qualification for the position.  H.B. 56 § 17(a).  Damages for a violation of Section 17(a) are limited to compensatory damages and costs, including attorneys' fees.  *Id.* (b), (c).

---

[17]The court notes that discrimination cases in federal court are often taken by attorneys on a contingency-fee basis.  Assuming the same holds true in cases filed under Section 17, most, if not all, plaintiffs will not have "spent" any money on attorneys' fees before a verdict.

The United States contends that Section 17 is expressly preempted by 8 U.S.C. §
1324a(h)(2).  As set forth above, Section 1324a(h)(2) preempts any state or local law that
"impos[es] civil or criminal sanctions (other than through licensing and similar laws) upon
those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  The
State Defendants argue that Section 17 is not preempted because (1) it is not a "sanction"
as it imposes only compensatory damages to "victims of a newly[-]defined discriminatory
practice" and "expressly disclaims an intent to punish or deter conduct," (doc. 69 at 83), and
(2) it "merely establish[es] a private right of action [and] does not *guarantee* success at
litigation" by the suing employee, (*id*. at 84 [emphasis in original]).

As set forth above, a "sanction" under § 1324a(h)(2) includes all government
penalties and coercive conduct designed to affect an employer's behavior with regard to the
employment of unauthorized aliens.  Therefore, establishing a law that makes an employer
liable to an unsuccessful applicant or terminated citizen/authorized alien based ***only*** on the
employment of an unauthorized alien, despite Section 17's disclaimer of any "intent to
punish or deter conduct," has the effect of creating a sanction based on the employment of
an unauthorized alien.[18]

---

[18]The court notes that it is not required to assume that Section 17 is ***not*** a sanction
merely because it says that any "recovery" does not include a sanction.  *See* H.B. 56 § 17(b).

In *Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 766 (10th Cir. 2010), the Tenth Circuit considered whether an Oklahoma statute, similar to H.B. 56 § 17 was expressly preempted by Section 1324a(h)(2).

> Section 7(C) of the [Oklahoma] Act made it a discriminatory practice for an employer to discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing entity knows, or reasonably should have known, is an unauthorized alien.

*Id*. at 754. The Tenth Circuit found that "cease and desist orders, reinstatement, back pay, costs, and attorneys' fees" were "'restrictive measures' that fall within the meaning of 'sanctions' as used in § 1324a(h)(2)." *Id*. at 765.  Moreover, the court held:

> Additionally, we conclude that Section 7(C) sanctions are imposed "upon those who employ . . . unauthorized aliens," 8 U.S.C. § 1324a(h)(2). An employer is subject to sanction under Section 7(C) if it terminates a legal worker while retaining a worker the employer knows, or should reasonably know, is an unauthorized alien.  Okla. Stat. tit. 25, § 1313(C)(1).  Sanctions are therefore contingent on the employment of an unauthorized alien.  *See id*. We are not persuaded by Oklahoma's contention that Section 7(C) merely creates a cause of action for the termination of legal residents.  While that is a necessary prerequisite, an employer is subject to sanction *only* if the employer retains an unauthorized alien.  *Id*.  The [Plaintiffs] are thus likely to succeed on the merits of this portion of their express preemption claim.

*Id*. at 766.  In a separate opinion concurring in the majority's decision that Section 7(C) was expressly preempted, Judge Hartz stated that he considered reinstatement, back pay, costs, and attorney fees not to be civil sanctions within the meaning of Section 1324a(h)(2).  *Id*. at 777 (Hartz, J., concurring in part and dissenting in part).  However, he considered Section 7(C) to be preempted by Section 1324a(h)(2) because other provisions of the Oklahoma law

provided for "civil penalties" for "discriminatory practices." *Id*.  The court agrees with the reasoning of the majority of the Tenth Circuit, which held that neither the contingent nature of litigation nor the form of damages saved the Oklahoma statute from the express preemption of Section 1324a(h)(2).

Although this court believes that back pay and attorneys fees should be classified as "sanctions" despite their compensatory nature, this court finds Section 1324a(h)(2) is not limited to money "sanctions".  By creating a cause of action in favor of citizens and authorized aliens based ***solely*** on the hiring or retention of an unauthorized alien, Alabama has sanctioned the employment of an unauthorized alien beyond its licensing laws.

According to federal law, employment discrimination is typically divided into two categories:  "Disparate-treatment," which "occur[s] where an employer has treated a particular person less favorably than others because of a protected trait," and "disparate impact," which occurs where "an employer uses a particular employment practice that causes a disparate impact on the basis of [a protected trait]." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009) (internal quotations omitted).  The Alabama Supreme Court has similarly described "discrimination." *Alabama Power Co. v. Aldridge*, 854 So. 2d 554, 569 (Ala. 2002)("The necessary element of discriminatory treatment in the context of claims alleging excessive monitoring is ***disparate treatment of wrongdoers***, not merely getting caught doing wrong.")(emphasis added); *Ex parte Branch*, 526 So. 2d 609, 623 (Ala. 1987)(Among the factors relevant to consideration of a *Batson* challenge include:

94

"***Disparate treatment*** of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner;" and "***Disparate examination*** of members of the venire")(emphasis added); *Ex parte Wooden*, 670 So. 2d 892, 894 (Ala. 1995)(In certain contexts, at least, evidence of such a ***disparate impact*** on an ethnic group permits a strong inference of invidious discrimination.")(emphasis added).   In other words, to constitute "discrimination," the decision being challenged must be based on a protected class or status as opposed to a decision on the merits.[19]

To create a cause of action in state courts for discrimination based, not on an employer's purposeful disparate treatment based on a protected class, but on mere presence of a single unauthorized alien employee is to sanction employment of that unauthorized alien.  However, what Alabama has called "discrimination" does not describe a decision by the employer ***based on*** immigration status – the targeted classification.   Indeed, liability

_____

[19]Black's Law Dictionary defines "discrimination" as:

1.  The effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of race, age, sex, nationality, religion, or disability.  • Federal law, including Title VII of the Civil Rights Act, prohibits employment discrimination based on any one of those characteristics.  Other federal statutes, supplemented by court decisions, prohibit discrimination in voting rights, housing, credit extension, public education, and access to public facilities. State laws provide further protections against discrimination.  2.  Differential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.

BLACK'S LAW DICTIONARY 534 (9th ed. 2009).

may be established pursuant to Section 17 if the plaintiff, the United States citizen or authorized alien, shows only (1) he or she was not hired or was fired for any reason, irrespective of qualifications, and (2) an unauthorized-alien employee was hired or retained.

For example, Alabama has determined that "[a]n individual shall be *disqualified* for total or partial unemployment . . . [i]f he was discharged or removed from his work for a dishonest or criminal act committed in connection with his work or for sabotage or an act endangering the safety of others or for the use of illegal drugs after previous warning or for the refusal to submit to or cooperate with a blood or urine test after previous warning." ALA. CODE § 25-4-78(3)(a)(1975)(emphasis added).  Under Section 17(a), an employer could be found liable for terminating a citizen or authorized alien for any of these reasons – if the employer has  retained or hired an unauthorized alien.  Also, an employer is liable for not hiring a citizen or authorized alien that lacks the required education, experience, or license for the position – if it has hired or retained an unauthorized alien.  Therefore, the *only* basis for the employer's liability in such situations is the employment of an unauthorized alien. Clearly such "liability" is a sanction for the employment of an unauthorized alien, rather than liability for a business decision based on consideration of a protected classification.

The court is not called upon to decide today whether Section 17 could evade preemption if it had created a cause of action designed to compensate qualified employees and applicants for discrimination based on their citizenship and/or authorized alien status. Federal employment discrimination laws allow an employer to choose any candidate or to

prefer one employee over another as long as its decision is not based on "unlawful criteria," such as a protected characteristic. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981). And, the Supreme Court has found that "undocumented status" is not protected under the Equal Protection Clause. *See Plyler*, 457 U.S. at 220 ("Of course, undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful, action.") It may be that such a statute would not be considered a "sanction" for the employment of an unauthorized alien. Nevertheless, the plain language of Section 17 creates employer liability based ***solely*** on hiring or retaining an unauthorized alien. This is a sanction expressly preempted by Section 1324a(h)(2).

Based on the foregoing the court finds the United States has established a likelihood of success on the merits of its challenge to Section 17 of H.B. 56. Also, for the reasons set forth above with regard to Section 11(a), the court finds the United States will suffer irreparable harm if Section 17 is not enjoined during the pendency of this action. The court further finds the balance of equities and the public's interest support granting the United States's Motion for Preliminary Injunction.

Based on the foregoing, the United States's Motion for Preliminary Injunction will be granted as to Section 17.

## H.  SECTION 18

Section 18 amends Section 32-6-9, Code of Alabama 1975, which requires drivers of motor vehicles to have their drivers' licenses in their possession at all times.  Section 32-6-9 currently states:

> Every licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a judge of any court, a peace officer, or a state trooper. However, no person charged with violating this section shall be convicted if he or she produces in court or the office of the arresting officer a driver's license theretofore issued to him or her and valid at the time of his or her arrest.

Ala. Code § 32-6-9.  Section 18 of H.B. 56 adds the following subsections to Section 32-6-9 of the Code of Alabama:

> (b) Notwithstanding the provisions of Section 32-1-4,[20] if a law officer arrests a person for a violation of this section and the officer is unable to determine by any other means that the person has a valid driver's license, the officer shall transport the person to the nearest or most accessible magistrate.

> (c) A reasonable effort shall be made to determine the citizenship of the person and if an alien, whether the alien is lawfully present in the United States by verification with the federal government pursuant to 8 U.S.C. § 1373(c). An officer shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

> (d) A verification inquiry, pursuant to 8 U.S.C. § 1373(c), shall be made within 48 hours to the Law Enforcement Support Center of the United States Department of Homeland Security or other office or agency designated for that purpose by the federal government. If the

---

[20]  Ala. Code § 32-1-4 governs the right to hearings and court appearances for those arrested for a misdemeanor related to motor vehicles and traffic violations.

person is determined to be an alien unlawfully present in the United States, the person shall be considered a flight risk and shall be detained until prosecution or until handed over to federal immigration authorities.

H.B. 56 § 18 [footnote added].

The United States argues that Section 18 is preempted by federal law and represents "a systematic effort by Alabama to inject itself into the enforcement of the federal government's own immigration laws in a manner that is **non-cooperative** with the Secretary," and therefore is preempted.  (Doc. 2 at 59 [emphasis added].)  Relying on 8 U.S.C. § 1357(g)(10)(B), the United States makes the identical argument for preemption with regard to Section 18 that it does with regard to Section 12:  "The INA requires that states or local officers 'cooperate with' the Secretary if they choose to assist federal officers in immigration enforcement, and states may not enact their own mandatory schemes for verifying immigration status or otherwise identifying unlawfully present aliens." (*Id.* at 62.)  Again, the United States relies on the language of 8 U.S.C. § 1357(g)(10)(B) for the proposition that mandatory verification is non-cooperative and thus impermissible under the INA.

Identifying unlawfully present aliens is not "a field which the States have traditionally occupied." *Wyeth*, 129 S. Ct. at 1194 (internal quotations and citations omitted).  Therefore, there is no presumption against preemption of Section 18.    As the court noted in its discussion with regard to Section 12, nothing in the text of the INA expressly preempts states from legislating on the issue of verification of an individual's

citizenship and immigration status.   And, as the State Defendants note, prior to the enactment of H.B. 56, federal law permitted state law enforcement officers to request information concerning "the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law" and the federal government is required to respond "by providing the requested verification or status information."  *See* 8 U.S.C. § 1373(c).

For the reasons discussed more fully with regard to Section 12, this court agrees with the State Defendants that the verification requirements of Ala. Code § 32-6-9(c), as amended by Section 18, do not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."   Therefore, the court finds the United States has not shown a likelihood of success on its claim that Section 18 is impliedly preempted by federal law.

The United States's Motion for Preliminary Injunction as to Section 18 will be denied.

## I.  SECTION 27

Section 27 provides:

(a)  No court of this state shall enforce the terms of, or otherwise regard as valid, any contract between a party and an alien unlawfully present in the United States, if the party had direct or constructive knowledge that the alien was unlawfully present in the United States at the time the contract was entered into, and the performance of the contract required the alien to remain unlawfully present in the United States for more than 24 hours after the time the contract was entered into or performance could not reasonably be expected to occur without such remaining.

100

(b)  This section shall not apply to a contract for lodging for one night, a contract for the purchase of food to be consumed by the alien, a contract for medical services, or a contract for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin.

(c)  This section shall not apply to a contract authorized by federal law.

(d)  In proceedings of the court, the determination of whether an alien is unlawfully present in the United States shall be made by the federal government, pursuant to 8 U.S.C. § 1373(c).  The court shall consider only the federal government's determination when deciding whether an alien is unlawfully present in the United States.  The court may take judicial notice of any verification of an individual's immigration status previously provided by the federal government and may request the federal government to provide further automated or testimonial verification.

H.B. 56 § 27.

In essence, Section 27 strips an unlawfully-present alien of the capacity to contract except in certain circumstances – i.e. the other party to the agreement did not know the alien was unlawfully present and the contract could be performed in less than 24 hours.  H.B. 56 § 27(a).  Section 27(b) excepts from the operation of subsection (a) certain contracts based on the subject matter of the agreement – *i.e.*  "lodging for one night, a contract for the purchase of food to be consumed by the alien, a contract for medical services, or a contract for transportation of the alien that is intended to facilitate the alien's return to his or her country of origin."  Capacity to contract is typically understood as established by state law.  *See United States v. Yazell*, 382 U.S. 341, 343, 352-53 (1966).

The United States argues that Section 27 is preempted by federal immigration laws contending that "Alabama has impermissibly altered the conditions imposed by Congress

101

upon admission, naturalization and *residence* of aliens in the United States or the several states." (Doc. 2 at 51[emphasis in original; internal quotation and citation omitted].)  As set forth above, federal immigration law has not occupied the entire field with regard to all laws touching immigrants.  The United States argues that "there is no evidence that Congress intended as a categorical matter, unlawfully present aliens' contracts to be unenforceable." (Doc. 2 at 52.)  However, this argument is inadequate to find implied preemption because nothing shows Congress intended that such contracts would be enforceable.  Federal immigration law does not prohibit Alabama from passing a law regarding the enforceability of contracts involving aliens unlawfully present in the United States.

Therefore, the court finds that the United States has not established a likelihood of success on its claim that Section 27 is preempted by federal law.  Its Motion for Preliminary Injunction will be denied as to Section 27.

## J.  SECTION 28

Section 28 of H.B. 56 states:

(a)(1)  Every public elementary and secondary school in this state, at the time of enrollment in kindergarten or any grade in such school, shall determine whether the student enrolling in public school was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States and qualifies for assignment to an English as Second Language class or other remedial program.

(2)  The public school, when making the determination required by subdivision (1), shall rely upon presentation of the student's original birth certificate, or a certified copy thereof.

(3)  If, upon review of the student's birth certificate, it is determined that the student was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States, or where such certificate is not available for any reason, the parent, guardian, or legal custodian of the student shall notify the school within 30 days of the date of the student's enrollment of the actual citizenship or immigration status of the student under federal law.

(4)  Notification shall consist of both of the following:

a.  The presentation for inspection, to a school official designated for such purpose by the school district in which the child is enrolled, of official documentation establishing the citizenship and, in the case of an alien, the immigration status of the student, or alternatively by submission of a notarized copy of such documentation to such official.

b.  Attestation by the parent, guardian, or legal custodian, under penalty of perjury, that the document states the true identity of the child.  If the student or his or her  parent, guardian, or legal representative possesses no such documentation but nevertheless maintains that the student is either a United States citizen or an alien lawfully present in the United States, the parent, guardian, or legal representative of the student may sign a declaration so stating, under penalty of perjury.

(5)  If no such documentation or declaration is presented, the school official shall presume for the purposes of reporting under this section that the student is an alien unlawfully present in the United States.

(b)  Each school district in this state shall collect and compile data as required by this section.

(c)  Each school district shall submit to the State Board of Education an annual report listing all data obtained pursuant to this section.

(d)(1)  The State Board of Education shall compile and submit an annual public report to the Legislature.

(2)   The report shall provide data, aggregated by public school, regarding the numbers of United States citizens, of lawfully present aliens by immigration classification, and of aliens believed to be unlawfully present in the United States enrolled at all primary and secondary public schools in this state.  The report shall also provide the number of students in each category participating in English as a Second Language Programs enrolled at such schools.

(3)   The report shall analyze and identify the effects upon the standard or quality of education provided to students who are citizens of the United States residing in Alabama that may have occurred, or are expected to occur in the future, as a consequence of the enrollment of students who are aliens not lawfully present in the United States.

(4)   The report shall analyze and itemize the fiscal costs to the state and political subdivisions thereof of providing educational instruction, computers, textbooks and other supplies, free or discounted school meals, and extracurricular activities to students who are aliens not lawfully present in the United States.

(5)   The State Board of Education shall prepare and issue objective baseline criteria for identifying and assessing the other educational impacts on the quality of education provided to students who are citizens of the United States, due to the enrollment of aliens who are not lawfully present in the United states, [sic] in addition to the statistical data on citizenship and immigration status and English as a Second Language enrollment required by this act.  The State Board of Education may contract with reputable scholars and research institutions to identify and validate such criteria.  The State Board of Education shall assess such educational impacts and include such assessments in its reports to the Legislature.

(e)   Public disclosure by any person of information obtained pursuant to this section which personally identifies any student shall be unlawful, except for purposes permitted pursuant to 8 U.S.C. §§ 1373 and 1644.  Any person intending to make a public disclosure of information that is classified as confidential under this section, on the ground that such disclosure constitutes a use permitted by federal law, shall first apply to the Attorney General and receive a waiver of confidentiality from the requirements of this subsection.

(f)   A student whose personal identity has been negligently or intentionally disclosed in violation of this section shall be deemed to have suffered an invasion of the student's right to privacy.  The student shall have a civil remedy for such violation against the agency or person that has made the unauthorized disclosure.

(g)  The State Board of Education shall construe all provisions of this section in conformity with federal law.

(h)  This section shall be enforced without regard to race, religion, gender, ethnicity, or national origin.

H.B. 56 § 28.

Section 28 requires all children enrolling in a public elementary or secondary school to provide their birth certificate to a school official.  *Id.* (a)(1)-(2).  According to subsection (a)(2) and (3), school officials must rely on the birth certificate to determine "whether the student enrolling in public school was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States."  *Id.* (a)(2)-(3).  Information about the immigration status of a parent is not reflected on Alabama birth certificates. Alabama requires "date, time, and location of birth; name of child; sex; plurality and birth order if not single; mother's information such as name, residence, and date and place of birth; father's information as provided in Code of Ala. 1975, § 22-9A-7(f); attendant's information; and information for legal purposes such as certificate number and date filed."

ALA. ADMIN. CODE r. 420-7-1-.03(2)(a)1 (2007); *see also* ALA. CODE § 22-9A-7(f)(1975)(Information concerning the father in included on the birth certificate based on the mother's marital status and whether paternity has been legally determined.).   Other

information about the parents, "such as race, ethnicity, and education," is collected for "statistical research and public health purposes," but such information is not included on the birth certificate. Ala. Admin. Code r. 420-7-1-.03(2)(a)2. Nothing in the record indicates that immigration status is reflected on the birth certificates from other states or countries. For purposes of determining the reach of H.B. 56 § 28, the court assumes that school officials will not seek to determine the immigration status of parents beyond examination of the child's birth certificate (*see* Section 28(a)(2)), and that such information is not included on the birth certificate. Therefore, Section 28 does not compel school officials to determine the immigration status of a parent of a student.

If the birth certificate shows the child was "born outside the jurisdiction of the United States" or if the birth "certificate is not available for any reason, the parent, guardian, or legal custodian of the student shall notify the school within 30 days of the date of the student's enrollment of the actual citizenship or immigration status of the student under federal law."[21] H.B. 56 § 28(a)(3). This "notification" requires the person responsible for the child to "present[ ] for inspection . . . official documentation establishing the citizenship and, in the case of an alien, the immigration status of the student," and a declaration or affidavit swearing that the official documents "state[ ] the true identity of the child." *Id*. (a)(4). If the parent or other person responsible for the child does not have documentation

---

[21]Although subsection (a)(1) refers to the immigration status of a student's parents, subsection (a)(3) does not require notification or collection of information regarding a parent's immigration status.

establishing citizenship or lawful presence, he or she "may sign a declaration . . . stating" that the child is a citizen or is otherwise lawfully present.  *Id*. (a)(4)(b).  From this information, the school creates a report listing the number of students who are citizens, lawfully-present aliens and presumed unlawfully-present aliens.[22]  *Id*. (a)(5).  The number of unlawfully-present alien children includes any student not submitting the required documentation.  *Id*. (a)(5)(a).  Section 28 states that it "shall be enforced without regard to . . . national origin."  *Id*. (h).  The effect of Section 28 is that all children unable to present a birth certificate showing that he or she was born in the United States are presumed to be unlawfully present for reporting purposes unless and until he or she establishes citizenship or lawful presence.  Therefore, for reporting purposes, it is possible that children will be presumed unlawfully-present aliens who are neither aliens nor unlawfully-present.

The United States argues that Section 28, which creates "mandatory data collection, classification, and reporting requirements,"  is preempted as an "impermissibl[e] . . . registration scheme for children (and derivatively their parents) akin to the one the Supreme Court invalidated in *Hines*."  (Doc. 2 at 57-58.)  The court disagrees.  As the State Defendants argue, "Section 28 bears no resemblance to the Pennsylvania statute examined by the court in *Hines*, which required ***all*** aliens over the age of 18 – whether or not they

---

[22]Also, Sections 28(a)(1) and (d)(2) require schools to determine and report the number of students participating in English as a Second Language [ESL] Programs.  This information is already collected and reported under federal law.  *See* 20 U.S.C. § 6968.  Plaintiffs do not challenge the collection and reporting of the number of ESL students, which, the court notes, is not synonymous with a student's national origin.

were legally in the United States–to, among other things, register annually and carry an alien registration card." (Doc. 69 at 59 [citing *Hines*, 312 U.S. at 59-60].)  They also contend that Section 28 is distinguishable from the state registration scheme in *Hines* because Section 28 does not impose a penalty.  (*Id*.)

As noted above, in *Hines*, the Supreme Court considered whether the federal Alien Registration Act, the precursor to the INA, preempted the Alien Registration Act adopted by the Commonwealth of Pennsylvania.  *Hines*, 312 U.S. at 56.  The subject of both the federal Act and the Pennsylvania Act was the registration of aliens as a distinct group.  *Id.* at 61. The Court stated:

> [W]here the federal government, in the exercise of its superior authority in . . . [the] field [of immigration], has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, ***inconsistently with the purpose of Congress***, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

*Id.* at 66-67 (emphasis added).  On that basis, the Court found that its "primary function" was "to determine whether . . . Pennsylvania's law . . . [stood] as on obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the federal Act.  *Id.* at 66-67.

Unlike the Pennsylvania Act in *Hines*, Section 28 does not create an independent, state-specific registration scheme, attempt to register anyone, or create registration requirements in addition to those established by Congress in the INA.  The standard for registration provided by Congress remains uniform.  Section 28 is not preempted by federal

law.  Therefore, the United States has not shown a likelihood of success on its claim that

Section 28 is preempted by federal law.

Also, the United States argues that Section 28 is preempted by foreign policy goals.

However, for the reasons set forth above with regard to Section 10, the court finds the

United States has not submitted sufficient evidence that Section 28 conflicts with federally-

established foreign policy goals.

Based on the foregoing, the United States's Motion for Preliminary Injunction will

be denied as to Section 28.

## K.  SECTION 30

Section 30 provides:

(a)  For the purposes of this section, "business transaction" includes any transaction between a person and the state or a political subdivision of the state, including, but not limited to, applying for or renewing a motor vehicle license plate, applying for or renewing a driver's license or nondriver identification card, or applying for or renewing a business license.  "Business transaction" does not include applying for a marriage license.

(b)  An alien not lawfully present in the United States shall not enter into or attempt to enter into a business transaction with the state or a political subdivision of the state and no person shall enter into a business transaction or attempt to enter into a business transaction on behalf of an alien not lawfully present in the United States.

(c)  Any person entering into a business transaction or attempting to enter into a business transaction with this state or a political subdivision of this state shall be required to demonstrate his or her United States citizenship, or if he or she is an alien, his or her lawful presence in the United States to the person conducting the business transaction on behalf of this state or a political subdivision of this state.  United States citizenship shall be demonstrated by

presentation of one of the documents listed in Section 29(k).[23]  An alien's

_____

[23]These documents are:

(1)  The applicant's driver's license or nondriver's identification card issued by the division of motor vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship.

(2)  The applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or Secretary of State.

(3)  Pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport.

(4)  The applicant's United States naturalization documents or the number of the certificate of naturalization.  If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States Bureau of Citizenship and Immigration Services by the county election officer or the Secretary of State, pursuant to 8 U.S.C. § 1373(c).

(5)  Other documents or methods of proof of United States citizenship issued by the federal government pursuant to the Immigration and Nationality Act of 1952, and amendments thereto.

(6)  The applicant's Bureau of Indian Affairs card number, tribal treaty card number, or tribal enrollment number.

(7)  The applicant's consular report of birth abroad of a citizen of the United States of America.

(8) The applicant's certificate of citizenship issued by the United States Citizenship and Immigration Services.

110

lawful presence in the United States shall be demonstrated by this state's or a political subdivision of this state's verification of the alien's lawful presence through the Systematic Alien Verification for Entitlements program operated by the Department of Homeland Security, or by other verification with the Department of Homeland Security pursuant to 8 U.S.C. § 1373(c).

(d)  A violation of this section is a Class C felony.

(e)  An agency of this state or a county, city, town, or other political subdivision of this state may not consider race, color, or national origin in the enforcement of this section except to the extent permitted by the United States Constitution or the Constitution of Alabama of 1901.

(f)  In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c).  An official of this state or political subdivision of this state shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States.

H.B. 56 § 30 (footnote added).

––––––––––––––––––––

(9)  The applicant's certification of report of birth issued by the United States Department of State.

(10)  The applicant's American Indian card, with KIC classification, issued by the United States Department of Homeland Security.

(11)  The applicant's final adoption decree showing the applicant's name and United States birthplace.

(12)  The applicant's official United States military record of service showing the applicant's place of birth in the United States.

(13)  An extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.

H.B. 56 § 29(k).

Section 30 prohibits all "business transaction[s]" between an unlawfully-present alien and "the state or a political subdivision of the state."  H.B. 56, § 30(b).  "'It is well established by the decisions of [the Alabama Supreme Court] that a public corporation is a separate entity from the State and from any local political subdivision thereof, including a city or county.'"  *Limestone Cnty. Water and Sewer Auth. v. City of Athens*, 896 So. 2d 531, 534 (Ala. Civ. App. 2004)(quoting *Knight v. W. Ala. Envtl. Improvement Auth.*, 246 So. 2d 903, 905 (Ala. 1971)).  "Business transaction" is not defined in Section 30 except to say that applying or renewing vehicle licenses, driver's licenses, identification cards, and business licenses are "business transactions."  H.B. 56 § 30(a).

To be sure, use of the word "business" to modify "transactions" implies an intent to limit the "transactions" to those involving a commercial aspect.[24]  Indeed, Alabama has defined "business" within the business licensing statute as:

> Any commercial or industrial activity or any enterprise, trade, profession, occupation, or livelihood, including the lease or rental of residential or nonresidential real estate, whether or not carried on for gain or profit, and whether or not engaged in as a principal or as an independent contractor, which is engaged in, or caused to be engaged in, within a municipality.

---

[24]Black's Law Dictionary defines "business" as:

1. A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain.  2. Commercial enterprises.  3. Commercial transactions.

BLACK'S LAW DICTIONARY 226 (9th ed. 2009).  It defines "business transaction" as "An action that affects the actor's financial or economic interests, including the making of a contract."  *Id*. at 227.

112

ALA. CODE § 11-51-90.1(1)(1975).  As commonly understood, Section 30 would prohibit all commercial contracts between unlawfully-present aliens and the state or one of its political subdivisions. However, given that Section 27 declares unlawfully-present aliens do not have the capacity to contract, such interpretation does not reach the scope intended by the Alabama legislature.

Yet, the words of  Section 30 obfuscate its meaning.  It declares a ban on business transactions and then proceeds to define "business transactions" with examples, none of which fit within the commonly understood definition of a business transaction.  The three examples are (1) applying for or renewing a motor vehicle license plate; (2) applying for or renewing a driver's license or a nondriver identification card; and (3) applying for or renewing a business license.  H.B. 56 § 30(a).

Although not a "business transaction," the court finds that Section 30 is intended to prohibit the state from issuing a license to an unlawfully-present alien.[25]  "'The word 'license,' means permission, or authority; and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize.'"  *Fed. Land Bank of Wichita v. Bd. of Cnty. Commrs of Kiowa Cnty.*, 368 U.S. 146, 154 n.23 (1961)

---

[25]The court finds that the term "business transactions" does not reach registration requirements.  Therefore, it finds no need to decide whether prohibiting unlawfully-present aliens from registering births and deaths or complying with state and local government registration laws is prohibited.

113

(quoting *Gibbons v. Ogden*, 22 U.S. 1, 213 (1824)).  Alabama issues licenses to drivers and businesses, but also to professionals, hospitals, day care facilities, and a myriad of other individuals giving them permission to conduct business or "do that thing" the license allows.  The United States has not demonstrated that Congress has – expressly or implicitly – preempted the power of the states to refuse to license an unlawfully-present alien.  *Cf. John Doe No. 1 v. Ga. Dep't of Pub. Safety*, 147 F. Supp. 2d 1369, 1374, 1376 (N.D. Ga. 2001)(holding Georgia can deny an unlawfully-present alien a driver's license).

Based on the foregoing, the court finds that, to the extent Section 30 reaches commercial contracts and licenses, the United States has not shown that it has a likelihood of success on the merits as its claim that Section 30 is preempted by federal law.

Section 30 prohibits unlawfully-present aliens from contracting with state and local governments, applying for or renewing drivers' licenses and identification cards, and applying for and renewing motor vehicle license plates.  This law is not preempted. Therefore, the United States has not shown a likelihood of success of the merits.  The United States's Motion for Preliminary Injunction as to Section 30 will be denied.

## **CONCLUSION**

For the foregoing reasons, the court concludes:

1.  The United States has shown that it is entitled to an injunction preliminarily enjoining Sections 11(a), 13, 16, and 17 of H.B. 56.

2. The United States has not shown that it is entitled to an injunction preliminarily enjoining Sections 10, 12, 18, 27, 28, and 30 of H.B. 56.

An Order granting in part and denying the United States's Motion for Preliminary Injunction, (doc. 2), and enjoining enforcement of Sections 11(a), 13, 16 and 17, will be entered contemporaneously with this Memorandum Opinion.

DONE, this 28th day of September, 2011.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE